JUDGE CARTER

24 CV 09978

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

SONYA SHAYKHOUN, ESQ. ("Plaintiff Sonya Shaykhoun")

|  |  |
|---|---|
| Plaintiff, | : |
|  | : |
| - against -- | : **INDEX NO.** |
|  | : |
| : | : **COMPLAINT** |
| THE DAILY MAIL, DAILYMAIL.COM, | : |
| DAILY MAIL AND GENERAL TRUST | : **JURY TRIAL NOT** |
| PLC ("DGMT"), NOA HALFF, THE DAILY | : **REQUESTED** |
| BEAST COMPANY LLC ("TDB"), AMANDA J. | : |
| MCDOUGALL (A/K/A AJ MCDOUGALL), | : |
| BEN SHERWOOD, JOANNA COLES, | : |
| IAC INC. ("IAC"), TRACY CONNOR, | : |
| BARRY DILLER, BEVAN HURLEY, | : |
| THE INDEPENDENT, GEORGIE GREIG, | : |
| LOUISE THOMAS, RICHARD BEST | : |
|  | : |
| Defendants, | : |

------------------------------------------------------------------------X

## INTRODUCTION

1. Plaintiff Sonya Shaykhoun, Esq., Attorney Pro Se, pursuant to CPLR 3025(a), brings this action against Defendants The Daily Mail, DailyMail.com, Daily Mail and General Trust PLC, Noa Halff, The Daily Beast Company LLC, Amanda J. McDougall (a/k/a AJ McDougall), Ben Sherwood, Joanna Coles, IAC Inc., and Barry Diller, Bevan Hurley, The Independent, Georgie Greig, Louise Thomas, Richard Best, and in support of her Complaint, avers as follows:

## PRELIMINARY STATEMENT

2.     This case exposes the dark underbelly of modern journalism, where truth is sacrificed at the altar of viral content and constitutional rights are trampled in the pursuit of clicks. The Court's decision in this case will set a crucial precedent for the protection of individual rights in the face of coordinated media attacks and digital mob mentality. This case arises from Defendants' publication of false, misleading, and cyberbullying Articles (defined in Paragraph 55) about Plaintiff following a viral social media post. The Articles painted Plaintiff as a racist "Karen" and caused severe damage to her personal and professional reputation. Defendants violated journalistic ethics, breached Plaintiff's privacy rights, infringed her copyright in the Tweets, published articles that can only be characterized as cyberbullying, and injured her reputation. This multifaceted action challenges the unchecked power of media conglomerates to shape public opinion through misleading narratives and bot-driven engagement.

3.     This action is multifaceted and seeks damages for the following causes of action ("Cause/s of Action"):

(i)     Cyberbullying;

(ii)    Injurious Falsehood;

(iii)   Copyright infringement (use of licensed content without permission);

(iv)    Breach of Contract and Quasi-Contract;

(v)    Breach of Privacy (illicit/unauthorized use of a likeness, public disclosure of private facts);

(vi)    Negligence, fraud, prima facie torts (negligent misrepresentations causing harm, fraudulent inducement, fraud and deceit, equitable fraud, equitable estoppel, promissory estoppel, prima facie tort i.e., intentional or malicious harm to plaintiff) (listed individually in the causes of action section below);

(vii)    Vicarious liability;

(viii)    Unjust enrichment; and,

(ix)    Emotional distress.

4.    Plaintiff first filed this case in the New York Supreme Court, Manhattan County on May 16th, 2024 (100558/2024). The judge in that case, Judge James d'Auguste, is a die-hard supporter of New York's ostensibly unconstitutional Anti-SLAPP laws and refused to engage with the causes of action individually. Judge d'Auguste further threatened Plaintiff with the penalty of having to pay Defendants' legal fees if she did not drop the case. In doing so, Judge d'Auguste denied Plaintiff her Constitutional rights, specifically those rights guaranteed under the First, Fourth, Fifth and Fourteenth Amendments. The statute of limitations on the defamation and defamation per se actions have now expired. Consequently, as Plaintiff cannot move the New York Supreme Court case to the United States

District Court Southern District of New York ("SDNY"), Plaintiff has no choice but to file the case in SDNY to seek justice for the harm Defendants caused her.

## THE PARTIES

5.     Plaintiff is a native New Yorker who is a solo practitioner and founder/owner of the Law Offices of Sonya Shaykhoun, Esq., which Plaintiff has run from her home address at 825 West End Avenue, New York, NY 10025, since September 2021, since March 2019.

6.     The Daily Mail is a British daily middle-market tabloid newspapers published in London with its principal place of business at Northcliffe House, 2 Derry Street, London, W8 5TT, England. It publishes The Daily Mail and DailyMail.com which, as of December 2023, ranked tenth among the top news websites in the United States. That translates as 116.3 million visits from an American audience.[1]

7.     DailyMail.com (a/k/a MailOnline), plus its local US and Australian versions, are owned by DMG Media, an intermediate holding company for Associated Newspapers, Northcliffe Media, Harmsworth Printing, Harmsworth Media and other subsidiaries of the Daily Mail and General Trust and that has an office in New York at 51 Astor Place, New York, New York 10003.

8.     Daily Mail and General Trust PLC is a public company engages in digital, information, events, and media businesses. Defendant Daily Mail and General Trust PLC has an American headquarters at 600 5th Avenue, 7th floor, New York, New York 10020.

---

[1]  dmg media, "MailOnline best-ranked UK newsbrand in US", January 22, 2024 (last visited 10/27/24).

9.    Noa Halff is a journalist employed by Daily Mail News Online who have registered offices at 51 Astor Place, New York, New York 10003. Noa Halff is the journalist who wrote the Daily Mail Article entitled "New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen'" that appeared on DailyMail.com on May 19th, 2023.

10.    The Daily Beast Company LLC describes itself as delivering "award-winning original reporting, fact-informed analysis, and sharp opinion in the arena of politics, pop-culture, and power and reaches more than 1 million readers a day. Our journalism is non-partisan but not neutral, skeptical but never cynical. Hugh Dougherty is Executive Editor, Ben Sherwood is Publisher and Chief Executive Officer, and Joanna Coles is Chief Creative and Content Officer. The Daily Beast is based in New York and is an operating business of IAC (NASDAQ: IACI)."[2] The Daily Beast shares an address with its parent company, IAC, at 555 West 18th Street, New York, New York 10011.

11.    Amanda (AJ) McDougall is employed as a Breaking News Reporter at The Daily Beast, whose address is 555 West 18th Street, New York, New York, 10011. Per her LinkedIn profile[3], AJ McDougall went from being a "Cheat Sheet Intern" (August 2021 – May 2022) to being a "Breaking News Reporter" (June 2022 to date), a position she has held for two years and five months. AJ McDougall was the journalist who penned the "breaking news" story in The Daily Beast entitled,

---

[2] https://www.thedailybeast.com/company/about/ (last visited 10/26/24).
[3] https://www.linkedin.com/in/aj-mcdougall/ (last visited 10/26/24).

"Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park" on May 18th, 2024.

12.    Ben Sherwood is a co-owner, the Publisher and Chief Executive Officer of The Daily Beast whose registered address is 555 West 18th Street, New York, New York 10011. Ben Sherwood has co-owned The Daily Beast (along with Joanna Coles and Barry Diller) since April 2024 and has a minority stake in said news and opinion site[4].

13.    Joanna Coles is a co-owner (along with Ben Sherwood and Barry Diller) and Chief Creative and Content Officer of The Daily Beast since April 2024 and has a minority stake in said news and opinion site[5] Defendant Joanna Coles has a principal place of business at The Daily Beast, 555 West 18th Street, New York, New York 10011.

14.    Tracy Connor is the Editor-in-Chief of The Daily Beast, whose registered address is at 555 West 18th Street, New York, New York 10011.

15.    IAC Inc. is home to dozens of popular online brands and services used by millions of consumers each day, including co-Defendant The Daily Beast. The IAC HQ is at 555 West 18th Street, New York, New York 10011.

16.    Barry Diller is the Chairman and Senior Executive of IAC, which co-owns The Daily Beast (along with Ben Sherwood and Joanna Coles), and whose address is 555 West 18th Street, New York, New York 10011.

---

[4] https://variety.com/2024/digital/news/daily-beast-ben-sherwood-joanna-coles-iac-1235971445/ (last visited 10/26/24).
[5] Ibid

17.    Bevan Hurley was a senior Reporter for The Independent based in New York from October 2021 to March 2024. Bevan Hurley is currently a Senior Reporter for The Times in London and whose registered address is 1 London Bridge Street, SE1 9GF, London, England and continues to be based in New York.

18.    The Independent is a digital-only publication with two addresses in London, England: i) Alphabeta Building, 14-18 Finsbury Square, London, EC1A 1AH, England; and, ii) 2 Derry Street, London, W8 5HF, England. The former address appears to be The Independent's main headquarters.

19.    Geordie Greig is the current editor-in-chief at The Independent in England.

20.    Louise Thomas is currently an Editor at The Independent, US, and is based in New York. The Independent US address is not immediately apparent, and the last registered address is 1450 Broadway, Room 702, New York, NY 10018.

21.    Richard Best is the Managing Editor of The Independent.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1338(a) because Plaintiff asserts claims arising under federal copyright law. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

23.    Personal jurisdiction exists over all of the Defendants because they either have offices in New York, conduct business in New York, and/or directed their activities toward New York residents in connection with the articles at issue.

24.    This Court has subject matter jurisdiction over this suit under 28 U.S.C. § 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. §101, et. seq. Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

25.    This Court has personal jurisdiction over Dailymail.com under N.Y. CPLR § 302 because it has a principal place of business at 51 Astor Place, 9th Floor, New York, NY 10003.

26.    The Court has personal jurisdiction over Noa Halff under N.Y. CPLR § 301 who is employed by DailyMail.com, with a principal place of business at 51 Astor Place, 9th Floor, New York, NY 10003.

27.    This Court has personal jurisdiction over Daily Mail and General Trust under N.Y. CPLR § 302 because Defendant has a principal place of business at Northcliffe House, 2 Derry Street, London W8 5TT, England. Defendant Daily Mail and General Trust owns Trepp, whose headquarters are at 600 Fifth Avenue, 7th Floor, New York, New York 10020[6], and while DMGT is headquartered in London, England, Trepp is DMGT's primary operational entity in New York.

28.    This Court has personal jurisdiction over The Daily Beast Company LLC under N.Y. CPLR §§ 301 and 302 because it is a foreign limited liability company registered with offices at 555 West 18th Street, New York, NY 10011. Defendant is registered to conduct business in New York and maintains and agent for service of process in New York. Moreover, Plaintiff's claims in this case arise

---

[6] https://craft.co/dmgt/locations (last visited 10/26/24).

from Defendant's act of transacting business in New York and of researching and publishing the defamatory publication which is the subject of this case in New York.

29.     This Court has personal jurisdiction over AJ McDougall under N.Y. CPLR §302 because she has her principal place of business and employment as a reporter at The Daily Beast's offices in New York City.

30.     This Court has personal jurisdiction over Ben Sherwood under N.Y. CPLR §302, because he has his principal place of business and employment as co-owner of and Publisher and Chief Executive Officer at The Daily Beast's headquarters in New York City.

31.     This Court has personal jurisdiction over Joanna Coles under N.Y. CPLR §302, because she has her principal places of business and employment as a co-owner of and Chief Creative and Content Officer at The Daily Beast's headquarters in New York City.

32.     This Court has personal jurisdiction over Tracy Connor under N.Y. CPLR §302, because its principal executive offices are at 555 West 18th Street, New York, New York 10011.

33.     This Court has personal jurisdiction over IAC Inc. under N.Y. CPLR §302, because its principal executive offices are at 555 West 18th Street, New York, New York 10011. Per the IAC website, "IAC is home to dozens of popular online brands and services used by millions of consumers each day[7], which includes The Daily Beast. Barry Diller is its Chairman and Senior Executive.

---

[7] IAC, About Us, https://www.iac.com/about-us (last visited 11/04/24).

34.    The Court has personal jurisdiction over Defendant Barry Diller under N.Y. CPLR §302, because he has his principal place of business and employment as the Chairman and Senior Executive of IAC, which has its principal place of business at 555 West 18th Street, New York, NY 10011. Barry Diller is a co-owner of The Daily Beast, which is also listed on the IAC website as an IAC brand.[8].

35.    The Court has personal jurisdiction over the Independent Defendants because they have directed their activities to New York residents, and New York residents are able to access the Articles via the respective Defendants' websites on the Internet.

36.    The instant Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

36.    The instant Defendants actively seek readers among New York residents.

37.    Defendants, individually and collectively, have generated [substantial] revenue from the exploitation of the Tweets in New York.

38.    New York has considerable interest in the adjudication disputes wherein New York residents are the target of the sensationalist "yellow journalism".

39.    Although several of the Defendants are based in the U.K., they facilitated the infringing acts occurring in the U.S. and actively participated in a scheme aiding, inducing, and contributing to copyright infringement in the U.S.

---

[8] IAC, Meet Our Brands, https://www.iac.com/ (last visited 11/04/24).

40.    The instant Defendants not only infringed the copyright of the Plaintiff, but, perversely, used the infringing copyright to cyberbully and harass Plaintiff.

41.    The result of the Defendants' cyberbullying and harassment was to chill Plaintiff's speech by shaming and bullying her into silence, and, because of the New York Supreme Court's unfathomable Anti-SLAPP laws that have effectively thrown out eight hundred years of the canon of defamation law, the New York Supreme Court, as at the time of filing, has refused to apply orthodox defamation laws to the injuries suffered by Plaintiff at the hands of Defendants, demanding that Plaintiff "sacrifice herself on the altar of a free press", thus deleteriously impacting and obstructing Plaintiff's First Amendment Rights and her right to due process under the Fifth and Fourth Amendments.

42.    The instant Defendants plastered her pictures and, in the case of The Daily Mail Defendants, published her home address (which is also her solo practice address) and email address, which invited additional cyber bullying, hate mail and harassment, exacerbating the pile-on that occurred on X after the publication of the Tweet and tweets, and extrapolating the cyberbullying onto their own platform.,

43.    The instant Defendants were unjustly enriched by their respective commercial exploitation and copyright infringement as their respective business models monetize content such as the Tweet and tweets via ad sales and/or giving readers access to their content via tiered subscriptions.

44.    Venue is proper in the County of New York pursuant to N.Y. CPLR § 503 in that Plaintiff resides at resides at 825 West End Avenue, New York, NY 10025 and therefore resides in the County of New York.

## STATEMENT OF FACTS

45.    Plaintiff is a New York-licensed attorney with over 20 years of international legal experience. On May 17, 2023, Plaintiff posted on X.com (formerly Twitter) about an encounter with unlicensed food vendors in Riverside Park. The post went viral, leading to intense online backlash. On May 18 and 19, 2023, Defendants published articles about the incident that portrayed Plaintiff in a false and harmful light.

46.    Defendant journalists, namely AJ McDougall (of TDB), Noa Halff (of DailyMail.com), and Bevan Hurley (then of The Independent) - on the respective Defendant platforms, The Daily Beast (https://thedailybeast.com), DailyMail.com (https://www.dailymail.co.uk/ushome/index.html), and The Independent UK (.https://www.independent.co.uk/news/world/americas/food-stall-lawyer-sonya-shaykhoun-new-york-b2342213.html).

47.    The articles relied heavily on inflammatory social media responses while ignoring or misrepresenting key facts. Defendants failed to conduct proper fact-checking or allow Plaintiff adequate opportunity to comment. The articles caused Plaintiff to receive hate mail, threats, and harassment. Her professional reputation and law practice have suffered severe damage as a result.

48.   The actions of the defendants not only damaged Plaintiff's reputation but also threaten the very foundations of free speech and due process in our digital age.

49.   Plaintiff seeks redress for egregious violations of her constitutional rights, including First Amendment infringements, copyright violations, and breaches of privacy, among other serious claims.

50.   As a New York-licensed attorney with a commitment to integrity and a rule of law, Plaintiff found herself at the epicenter of a manufactured controversy that spiraled into an international scandal.

51.   Defendants The Daily Mail, DailyMail.com, Daily Mail and General Trust PLC, Noa Halff are "The Daily Mail Defendants".

52.   Defendants The Daily Beast Company LLC, Amanda J. McDougall (a/k/a AJ McDougall), Ben Sherwood, Joanna Coles, Tract Connor, IAC Inc., and Barry Diller are "The Daily Beast Defendants".

53.   Defendants Bevan Hurley, The Independent, Georgie Greig, Louise Thomas, Richard Best are "The Independent Defendants".

54.   AJ McDougall, a journalist for The Daily Beast, authored the incendiary article that The Daily Beast published on May 18, 2023, with the headline, "Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park" on May 18, 2023 ("Daily Beast Article") (Exhibit 1). Noa Halff, a journalist for DailyMail.com per her LinkedIn profile[9], authored the article with the headline,

---

[9] https://www.linkedin.com/in/noahalfff/ (last visited October 26th, 2024)

"New York City lawyer is roasted for calling 911 on two female vendors selling food on Upper West Side without a permit: 'Get a life, Karen'" at 14:05 EDT, on May 19th, 2023 (and updated at 19:35 EDT, Mary 19th, 2023)[10] ("DailyMail.com Article") (Exhibit 1). Bevan Hurley authored "NYC lawyer roasted on Twitter for reporting illegal food stand rails against city's 'rapid deterioration' ("Independent Article") (Exhibit 1). Each article is an "Article" and collectively the "Articles".

### *Background – What Happened? From Viral Tweet to International Scandal and Intense Cyberbullying by Defendants*

55. The case resulted from a tweet and subsequent tweet ("Tweet" and/or "Tweets") that Plaintiff made about a brief incident that happened when Plaintiff was going back home after playing tennis at the clay tennis courts with her friend and was walking back up the hill from Hudson River on May 17th, 2023.

56. Just as she was reaching the plateau, a young Hispanic American woman approached her and asked her, in perfect New York-accented English, if she wanted to buy some food from her ("Unlicensed Vendor"). Plaintiff looked at the set-up, which was messy and haphazard. Plaintiff thought the two women were setting up for a private party because it did not look like a professional set-up. Plaintiff, (being a lawyer who has spent a lot of time in her career as a senior lawyer working in both contracts departments and compliance departments in global companies in

---

[10] A third news outlet, Independent UK, covered this "story" with an article entitled "NYC lawyer roasted on Twitter for reporting illegal food stand rails against city's 'rapid deterioration'" authored by Bevan Hurley and published on May 19th, 2024 at 18:11 BST, https://www.independent.co.uk/news/world/americas/food-stall-lawyer-sonya-shaykhoun-new-york-b2342213.html (last visited October 26th, 2024). Plaintiff is filing a motion to add the Independent et al to this lawsuit.

Bahrain and Qatar and whose whole personality is about all about integrity and following the rules) politely asked the Unlicensed Vendor automatically if she had a food permit to sell food in the park.

57. The Unlicensed Vendor pretended to reach into her purse and then immediately became very argumentative and hostile toward Plaintiff and the Unlicensed Vendor and started yelling at Plaintiff, demanding to know "How is that your business?" and cursing at and verbally abusing Plaintiff. Plaintiff replied with words to the effect that, if the Unlicensed Vendor wanted her to buy from her, it was Plaintiff's right to know if the Unlicensed Vendor had a food license. Ultimately, the Unlicensed Vendor could not procure a food vending license and was spitting venom at Plaintiff. The tiff escalated and ended in both exchanging heated words and walking off from one another. It was the kind of argument New Yorkers have with one another a thousand times a day.

58. Plaintiff walked off toward the stairs to Riverside Drive on 99th Street, and, when she was safely away from the combative Unlicensed Vendor, about seventy-five to one hundred feet away, Plaintiff turned around and took a picture of the mess the Unlicensed Vendor and her co-unlicensed vendor with a view toward uploading the pictures to 311 and filing a complaint. The Unlicensed Vendor saw Plaintiff taking pictures from far away and came chasing after her, stuck her phone in Plaintiff's face, and started arguing loudly with Plaintiff about why she needed a food vending license.

59.    Plaintiff replied very calmly, without using foul language or raising her voice, that, without a food vendor's license, "How do I know you don't have a cat at home that's walking all over the counter where you prepare the food?" to which the Unlicensed Vendor snapped back, "I don't have a cat", totally missing the point. The argumentative Unlicensed Vendor was intent on harassing Plaintiff and Plaintiff realized it would quickly escalate to physical violence if Plaintiff did not take immediate preventative action.

60.    Plaintiff advised Unlicensed Vendor that if she did not get away from her, she would call the police. The Unlicensed Vendor, who insisted, was present when Plaintiff called the cops to report the perceived imminent violence and then finally, the Unlicensed Vendor rushed off as did Plaintiff. The exchange lasted not more than five minutes. There were no witnesses (or at least no other passersby intervened or joined the argument).

61.    Plaintiff lives close to Riverside Park and was home when the cops called her back on an "Unknown Number" to ask her what happened that caused Plaintiff to call 911. Plaintiff explained what happened and the police officer said he would go and take care of it. Not anticipating that the event would quickly blow up into an international scandal – in large part thanks to the Defendants - Plaintiff did not ask the police officer's name and badge number so she could not follow up later or have proof that she indeed called the cops and filed a report about the harassment.

62.    When Plaintiff arrived home, upset and shaken about the harassment she had just experienced in Riverside Park, Plaintiff took to X.com to report the

incident as an example of how the "quality of life" in NYC was on a rapid decline. The Tweet described the incident and included photographs of the illegal vendors (Exhibit 2).

63. Plaintiff uses her X account @SonyaShaykhoun a/k/a *The Commercially Savvy Lawyer*,(a moniker Plaintiff also uses on LinkedIn and Substack) to discuss issues that arise in transactional law, in Plaintiff's long experience as a NY licensed cross-border transactional attorney working in the technology, media and telecommunications industries in the Middle East.- In May 2023, Plaintiff was increasingly using X to highlight the rampant non-compliance with the laws in New York City and the neighborhood in which she grew up. Plaintiff developed a following of equally disgruntled and disheartened New Yorkers who continue to talk about the quality of life and other issues plaguing our home City.

64. The backlash to the Tweet was surprisingly immediate, and trolls were many. Plaintiff still not imagining that the Tweet would go viral to the extent that it did, made the fatal "rookie" error on X of engaging with the "haters" and arguing back. Plaintiff stopped engaging when the tweets at her multiplied and became abusive and nasty, blocking people who were threatening and saying ugly things. Plaintiff made her account, which had usually been public, private hoping that it would deflect the negative attention. Plaintiff has felt compelled to keep her account private to preserve what is left of her good name and to keep her physically safe in an increasingly unsafe New York City.

### *The Articles, Bots on X, Journalistic Hypocrisy, Turning Plaintiff into the "Karen of Riverside Park" and Intensified Cyberbullying*

65.    As the responses, both negative and positive, to the Tweet intensified, Plaintiff debated with herself and her mother about the sagacity of both a) leaving the Tweet up and not deleting it, and b) keeping her X account public and exposing herself to further vitriol, reputational damage and potential violence in real life. Ultimately, the desire to stay safe and anonymous to the extent possible after the Tweet and its consequences made manifest in the Articles and responses thereto came home to roost. Plaintiff vacillated over the next few days after the Tweet and especially after the publication of the Articles, the objectives of which were clearly to shame and silence her thus preventing her from entering the public debate about what was happening in New York City (i.e., to chill her speech). Plaintiff finally settled on keeping her X account private because she did not want to get assassinated, beat up, targeted online, receive any more hate mail or hate phone calls, or be further excluded from society and "othered" because of the publication of the Articles.

66.    Plaintiff could never have anticipated the national and international papers would pick up the "story" about her Tweet much less present such a one-sided story, turning Plaintiff to Riverside Park what Amy Cooper was to Central Park[11], even though the fact patterns between

---

[11] Ayana Archie, "The woman who called 911 on a Black bird watcher wasn't wrongfully fired, judge rules", September 23, 2022, NPR, https://www.npr.org/2022/09/23/1124657916/amy-cooper-central-park-job (last visited 10/27/2024).

67.    Defendants tried to turn Plaintiff's story into another "Karen" story like the Amy Cooper story, even though the facts were completely different. Plaintiff continued to "get it in the neck" from other X users about the Articles, which have become weaponized against her, and continued to wonder in amazement and astonishment from her private X account about the weaponization of the Western press against people whose political views are "too conservative" (note the account is private, the lock to the right of the blue check indicates "private account"):



And



Plaintiff learned the hard way how dangerous it is to be targeted by tabloids like Defendants.

68.    Plaintiff was at the receiving end of a lot of racist attacks during what she dubbed "Unlicensed Vendor-Gate" which underscored the hypocrisy of the X storm. The inherent racism in many of the antagonistic responses to the Tweet was shocking and terrifying, many telling her to "go back to Qatar" where she worked for eight years even though she grew up on the Upper West Side and is not Qatari (but half Irish and half Egyptian).

69.    The following response from another X user demonstrates the racism in action and the support that other users had for what the Tweet highlighted, i.e., the health and safety hazards inherent in the unlicensed selling of food putting the public at risk during the tail-end of the Covid-19 Pandemic that normalized wearing face-masks, standing six feet apart, slathering hands with hand sanitizer, and

becoming hypochondriacs, taking experimental vaccines, and cancelling people who questioned the mainstream media narrative. But it was OK to buy food from unlicensed vendors and abuse anyone with an Arabic last name. The backlash to the Tweet was the essence of cyberbullying by bots and other X users. In republishing the Tweet and vitriolic responses to it, Defendants participated in, amplified and extended the cyberbullying in a way that exacerbated the emotional and psychological impact on Plaintiff.

See post on next page.



The gratuitous hypocrisy, nastiness, racism, and stupidity that is rife on the X platform is what propelled the Tweet to "viral status". It also proves that Jean-Paul Sartre was right when he wrote, "hell is – other people". Sadly, the cultural rot that X reflects back to society is not at issue in this case, rather it is Defendants' explicit decision to focus on the digital pile-on that abused and caused damage to Plaintiff and not the very real, very serious cultural issues that the Tweet exposed (the proliferation of unlicensed food vendors).

70.    Defendants cyberbullied Plaintiff via the Articles; they did so for profit and at the expense of Plaintiff's reputation, personal and professional life. The Articles encouraged further online harassment. Defendants included many pictures of Plaintiff to ensure that her face would forever be associated with the "Karen" moniker. The Daily Mail published a tweet that included Plaintiff's home address and email address and "doxxed" Plaintiff. The Defendants' doxxing of Plaintiff facilitated more cyberbullying by people who hurl the Articles at Plaintiff like a grenade on X, on LinkedIn and on her law firm email.

71.    Defendants' Articles were replete with mistakes and inaccuracies that have not been corrected. Defendants brazenly leave the Articles online despite Plaintiff writing to ask them to be taken down because the Articles constitute an ongoing threat to her physical safety and continual cyberbullying and harassment. In the words of Anna Maria Chavez, "Cyber bullies can hide behind a mask of anonymity online, and do not need direct physical access to their victims to do unimaginable harm." In the instant case, while the cyber bullies on X could bully

Plaintiff anonymously, Defendants cyber bullied Plaintiff with their masks off and in breach of universal journalistic ethics to minimize harm. Instead, Defendants maximized the harm they did to Plaintiff by extrapolating the cyberbullying onto their respective platforms.

72. The Tweet got nearly 7 million views; it went "viral". That said, it is well-known that Twitter has a "bot" problem that distorts the numbers of actual views and engagements with real human beings, thus casting doubt on the veracity of the responses to the Tweet.

73. On September 8th, 2023, Josh Taylor wrote in his article, "Bots on X worse than ever according to analysis of 1m tweets during first Republican primary debate" on The Guardian, that:

> Bot activity on the platform formerly known as Twitter is worse than ever, according to researchers, despite X's new owner, Elon Musk, claiming a crackdown on bots as one of his key reasons for buying the company.[12]

Bot activity is a key element in undermining potential defenses available to Defendants. Bots on X do not have First Amendment rights nor can New York's anti-SLAPP laws offer protection to bots.

74. Defendants jumped on the Tweet and the waves of hate that were directed at Plaintiff to put Plaintiff in the same category as the notorious "Central Park Karen" named Amy Cooper. Referencing the Amy Cooper debacle is important

---

[12] Josh Taylor, "Bots on X worse than ever according to analysis of 1m tweets during first Republican primary debate", The Guardian, September 8th, 2023 (last visited November 10, 2024).

to the larger context of what the actress Justine Bateman recently described as "Woke Oppression":



The second paragraph is particularly *a propos* to the cyberbullying the Defendants committed against Plaintiff with their scathing Articles.

75.     The X platform is a particularly nasty cauldron where people go to debate issues and risk getting not only called terrible names on the platform but "doxxed" in real life off the X platform (as what happened to Plaintiff thanks to the Defendants' dissemination of the Articles nationally and internationally). Plaintiff recalled high school history lessons on how Maoists bullied fellow citizens into

compliance. This cyberbullying was a violent, Maoist cyberbullying attack aimed to have maximum impact on Plaintiff.

76.     In the thirty years when Plaintiff lived abroad (1990 to 2019), the America that Plaintiff grew up in (where her history teacher at Dalton taught her that Communism was illegal in America) disappeared and was replaced by an unrecognizable country where individual rights are subsumed by the rights of the mob, by unconstitutional laws and policies (like the New York anti-SLAPP laws and the elimination of the centuries' old defamation law canon). When Plaintiff returned home from her global travels, she felt like she had landed on another planet. The culture had completely changed.

77.     The larger social and social media context are important backdrops to the Tweet, the response thereto, and the Articles.

78.     Julian Assange once said that "What is special about WikiLeaks is that it's not just another damn story, it's not just another damn journalist putting their damn byline, advertising themselves and their position on another damn story" and that "**newspapers publish nothing more than 'weaponized text'**"[13] (emphasis added). Newspapers trade in cyberbullying, which is against journalistic ethics not to mention offends laws against cyber bullying and harassment.

79.     Scandals like the Amy Cooper scandal (an exchange between a black birdwatcher, Mr. Christian Cooper, who asked Amy Cooper to keep her dog on a

---

[13] Clare Reilly, "WikiLeaks founder Julian Assange 'verry happy' about fake news narrative", CBS News, February 20, 2017, https://www.cbsnews.com/news/julian-assange-wikileaks-very-happy-about-fake-news-narrative/ (last visited November 11th, 2024).

leash in Central Park) informs that larger socio-political context and demonstrates the weaponization of social media and newspapers against individuals (whether the individual is right or wrong). Incensed at being told what to do, Ms. Amy Cooper called the cops on Mr. Christian Cooper and lied to the cops about Mr. Christian Cooper physically aggressing her all because Mr. Christian Cooper asked Ms. Amy Cooper to abide by the NYC Park Rules leashing dogs during certain hours[14]. Plaintiff watched this horrifying story unfold and wondered how Amy Cooper could be such a manipulative, lying racist and bully. Plaintiff is herself a product of a bi-religious (i.e., Catholic and Muslim) and bi-cultural (i.e., Irish and Egyptian) home and was raised to be respectful to people (but not to be a pushover when someone on the street or park aggressed her as what happened with the Unlicensed Vendor in Riverside Park).

80.    The perverse irony about the Amy Cooper/Christian Cooper saga is that, applying the dual Cooper roles to Plaintiff /Unlicensed Vendor scenario, like, it was Plaintiff who was minding her own business in Riverside Park when the Unlicensed Vendor interrupted her walk back home. In the Amy Cooper/Christian Cooper scenario, Amy Cooper (whose response to Christian Cooper was admittedly vile) was minding her own business (though apparently not following the rules of the NYC Parks – that say that dogs have to be on the leash from 9 am to 6 pm[15]), and it

---

[14] Skyler Caruso, "The True Story Behind Christian Cooper and Amy Cooper's Central Park Birdwatching Incident", People.com, June 13th, 2023, https://people.com/the-true-story-behind-christian-cooper-and-amy-cooper-s-central-park-birdwatching-incident-7510993 (last visited 10/27/24).
[15] Official Website of the New York City Deparktment of Parks & Recreation, https://www.nycgovparks.org/parks/central-park/facilities/dogareas (last visited 11/03/24).

was Christian Cooper who interrupted Amy Cooper's morning to tell her to put her dog on the leash (which was correct). Christian Cooper did not deserve to have Amy Cooper call the cops on him and lie in furtherance of her entitlement and racist machinations. Amy Cooper is admittedly and obviously a nasty piece of work and Christian Cooper was lucky he had the good sense to record the incident.

81.     In Riverside Park scenario in which Plaintiff= was a protagonist – she was minding her own business, the Unlicensed Vendor started harassing her the minute she got to the clearing and would not leave her alone until Plaintiff left Riverside Park. Plaintiff's mistake was to engage with the Unlicensed Vendor in the first place rather than just walking by. The whole incident was unnecessary in large part because of the immaturity and hotheadedness of the Unlicensed Vendor who seemed intent on "going viral" or exploiting the incident for Internet fame. This because apparent when Plaintiff repeatedly got direct messages from another X user who kept pestering Plaintiff to apologize to the Unlicensed Vendor publicly.

82.     The irony, and the misogyny of the Amy Cooper/Christian Cooper story is that no one called Christian Cooper a "Karen" (or the male equivalent) for demanding that Amy Cooper to follow the park rules by putting her dog on a leash (although it may have been the case that Christian Cooper got it wrong because dogs are allowed off the leash before 9 am and the Cooper scandal happened before 9 am apparently). Yet, applying the rules of the Defendants, isn't that what Christian Cooper was, though? Wasn't Christian Cooper, who complained to another person in the park, to follow the rules of the park, not technically a "Karen" by the definition

applied by Defendants? Yet it was Amy Cooper who was cancelled and whose life was ruined (though again, Amy Cooper's behavior was despicable, and no human being deserves to be threatened the way that Amy Cooper threatened Christian Cooper, using Christian Cooper's color against him). We cannot tolerate behavior like that of the Amy Coopers of the world anywhere – not in Riverside Park, not in Central Park – nowhere. That said, the reason why Plaintiff called 911 on the afternoon of May 17th, 2023, was because the Unlicensed Vendor was getting very excitable and hostile, and it looked like she was about to get violent.

83.    Defendants twisted the Tweet and the facts surrounding the Tweet into a pretzel so that they could capitalize on and monetize their very own "Amy Cooper"-esque story in their misleading and damaging Articles, regardless of the truth or where the real public interest lay. The Articles were what Julian Assange called "weaponized text"[16]. Defendants pilloried Plaintiff for expressing her views about unlicensed food vendors on X and damaged her unnecessarily.

84.    Another differentiating factor between the Amy Cooper/Christian Cooper saga and Plaintiff's Tweet debacle was that Amy Cooper faced misdemeanor charges for abusing 911 as Amy Cooper's actions were patently racially motivated and wrong. Plaintiff did not use any racist language against the Unlicensed Vendor, did not use racial or racist language in the Tweet or her responses that could whisper a hint of racism.

---

[16] Claire Reilly, "WikiLeaks founder Julian Assange 'very happy' about fake news narrative", February 20th, 2017, CBS, https://www.cbsnews.com/news/julian-assange-wikileaks-very-happy-about-fake-news-narrative/ (last visited 11/17/24).

85.    Plaintiff grew up in the Upper West Side neighborhood and had spent a lot of time in Riverside Park as a small child with her classmates from P.S. 75 on 96th Street and West End Avenue and St. Hilda's and St. Hughes on West 114th Street, which classmates were of every race, color and creed. Plaintiff has lived in far-flung places that many New Yorkers would hesitate to set foot in (Egypt, Bahrain, Qatar) and, in her fifty-two years of living, no one has ever accused her of being a racist, much less called her a "Karen".

86.    Nothing happened on the afternoon of Wednesday, May 17th, 2023, after the Tweet beyond the X combustion. As stated, Plaintiff made the "rookie" mistake of arguing with detractors, which admittedly did not help matters, and she vacillated about whether to keep her X account public or make it private.

87.    At 4:45 pm on the afternoon of Thursday, May 18th, 2023, AJ McDougall (a/k/a Amanda J. McDougall), The Daily Beast "breaking news" reporter who writes under the moniker AJ McDougall, emailed Plaintiff on sonya@shaykhounlaw.com with the subject "Re: Media Query: Unlicensed Vendor in Riverside Park". AJ McDougall wrote a polite email in which she wrote, "I saw your tweet from yesterday regarding the ad hoc food seller in Riverside Park, and I'm very interested in learning more about what happened and how you feel about the reactions the post has spurred" (Exhibit 3).

88.    Plaintiff responded to AJ McDougall with a well thought out and detailed response, including evidence of the hate mail that Plaintiff had received

thus far (Exhibit 4). In her response to Defendant AJ McDougall, Plaintiff wrote, *inter alia*, that,

First of all, let me just say, I am flummoxed by the viral nature of the tweet. Last I checked, it got 5.2 million views. All because I described a brief exchange in Riverside Park with a girl (part of a duo) selling food and drinks in the Park. I live just up the street and I had never seen them - or any other such food vendors in Riverside Park ever. There is a food truck, further up on 101st St but they get driven into the park as it's a proper enclosed wagon. One of the girls was very pushy and walked toward me to try to get me interested in her wares. I asked her very neutrally and politely if she had a food permit. I was not aggressive. I was not rude. And for the record, she sounded like she was from NYC, too. She pretended to go to her purse for her food permit and then she started to ask me why I needed to see it. And I told her it was because she has to have a permit to sell food as it's the law. And if she wanted me to buy from her, I needed to see the permit. Then I walked away and I turned back to take a picture to load to 311. That is when things got icky. She came running after me with her phone and started videoing me, demanding to know why I needed to see her permit. I said because it's against the law. And how do I know she's not preparing the food on a counter that her cat has walked all over and potentially pooped on. When she got aggressive, that is when I decided to call the police. The police called me as they were about to attend the matter and they did not admonish me for calling them for this matter. I explained that she was harassing me and her behavior was getting aggressive, filming me and not leaving me alone for asking a simple question. I grew up in this neighborhood and I feel particularly attached to the park. It breaks my heart to see so much abuse of the parks, the laws are destroyed by dogs off the leash defecating all over the place, and the total lack of respect for the space and for others.

Page 31 of 178

That is what happened, and Plaintiff has never deviated from that description of what happened on May 17ᵗʰ, 2023, in Riverside Park (even though the Tweet was shorthand for what happened). Regardless, Plaintiff is a rule of law enthusiast and is constantly saddened and frustrated by the lack of enforcement in NYC that is damaging the City.

89.    Plaintiff expected, perhaps naively, that AJ McDougall might have included at least some of her comments into AJ McDougall's Daily Beast Article to make it a balanced article that showed both sides of the story, i.e. a story of true public concern. Much to the chagrin and humiliation of Plaintiff, none of the comments or hateful and threatening messages that Plaintiff shared with Defendant AJ McDougall made it into The Daily Beast Article.

90.    It is important to note that AJ McDougall was now put on notice that Plaintiff was already a target of vicious cyberbullying on X, but that cyberbullying had spilled over into real life and resulted in hate mail, and threatening text messages and emails (Exhibit 5). Knowing that Plaintiff was already a target of very ugly cyberbullying and harassment and the extent of that cyberbullying and harassment, The Daily Beast Defendants knowingly published the Article that amplified the ugliness rather than present a balanced picture of the issues at hand and put Plaintiff square in harm's way.

91.    The result was that The Daily Beast Article was an extension of the pile-on that had happened on X, it was not "breaking news" unless one traffics in gossip, and it contained lies and innuendos, repeating abuse as though it were the

gospel truth, and painted a false picture of Plaintiff as a racist "Karen". Neither AJ McDougall nor anyone from The Daily Beast got in touch with her afterward or respond to her email or her voicemail (Plaintiff tried to call AJ McDougall).

92.    The "license to bully" slant of The Daily Beast Article emanates from The Daily Beast's reason for being encapsulated in its Code of Ethics and Standards ("Code") (Exhibit 6) which unapologetically announces (in a noticeably contradictory and smug, holier-than-thou manner) that,

> The Daily Beast is dedicated to independent journalism, pursued without fear or favor.
>
> We value an inclusive culture, committed to the public good. A core part of our mission is to confront bullies, bigots and hypocrites. We believe that skepticism is a virtue and cynicism is a vice. Above all, our goal is to tell the truth.
>
> To that end, journalists must strive to hold themselves to high ethical standards: aiming for honesty, fairness and accuracy while avoiding conflicts of interest.
>
> That's why The Daily Beast is publishing its Code of Ethics and Standards, so our readers can know where we stand. This is a living document, and will be updated as our mission requires.

93.    The Daily Beast Defendants see and write everything through the prism of smugly and hypocritically picking on those around them whom they deem "bullies, bigots and hypocrites" from high on their proverbial horse. How does this self-described modus operandi square with journalistic ethics and truth-telling? And

how can The Daily Beast act on this modus operandi without becoming bullies, bigots and hypocrites themselves? This applies to all The Daily Beast Defendants.

94. The Code is the essence of hypocrisy. The Daily Beast Defendants say they "value an inclusive culture" and "are committed to the public good"; but the Article demonstrates that it only applies to people so long as s/he sees and believes things the way The Daily Beast Defendants do, or else they will confront the person as a bully, bigot and hypocrite and make that person rue the day s/he ever dared to exercise his/her free speech and contribute to any kind of public debate on X or anywhere. Apparently, if one is an Irish Egyptian American citizen who has lived in Bahrain and Qatar for fifteen years before returning home to NYC with the surname "Shaykhoun", one is not afforded the courtesy of inclusion. That is, The Daily Beast Defendants will chill your speech for you if you do not align with their values. They lack the self-awareness to realize that they engage in "rules for thee but not for me" journalism, only being fair, honest and accurate when it does not compromise the story and narrative they want to perpetuate, as in the case of The Daily Beast Article, regardless of the truth or the measure of damage they do to their "subjects". There is something vampiric about The Daily Beast Defendants' approach to journalism.

95. Hindsight is 20/20 and Plaintiff regrets not trying to stop the publication of The Daily Beast Article before it happened (i.e., when Defendant AJ McDougall first reached out to her on May 18th, 2023).

96. Plaintiff was oblivious to the publication of the Articles until her Irish cousin, who lives in Washington, D.C., called Plaintiff mother on May 20th, 2023, to discuss it and express his concern about the Articles. It was humiliating for all of us, even though Plaintiff's cousin has a different surname (luckily for him).

97. Plaintiff did not receive any phone calls from either The Daily Beast or The Daily Mail either before or after the publication of the Articles.

98. In the Daily Beast Article, Noa Halff wrote an Article that only served to cast shade on Plaintiff. Noa Halff's Article blindsided Plaintiff and, despite Noa Halff's claims that "DailyMail.com reached out to Shaykoun [Halff misspelled Shaykhoun's surname, missing the "h" after the "k"] for comment but did not hear back."

99. Both AJ McDougall and Noa Halff inferred that Plaintiff lied about making a police report. The police did call Plaintiff immediately after Plaintiff called 911 to avoid a physical attack. The police did not come to her house, nor did they make a report.

100. Despite having worked as a Senior Legal Counsel at Al Jazeera Media Network in Doha, Qatar for four years from 2011 to 2014 and having advised the Al Jazeera newsroom on *inter alia* defamation and regulatory issues around the globe, Plaintiff could not have anticipated that the damning tenor, timbre, and tone of the Daily Beast Article and The Daily Mail Article. Nor could Plaintiff have anticipated the damage the disparaging Articles would do to Plaintiff.'s professional and personal opportunities. Everyone knows that the first thing potential employers and

clients do is to take to Google to investigate a potential hire. When anyone Googles

"Sonya Shaykhoun", the Articles are at the top of the search on the first two pages:


**See post on the next page.**







101.    Plaintiff was flattened, frightened, humiliated, and shamed by the Articles, taking the Articles as an assault on her character, her law license and practice, and on her name and the good will in her name. The Articles "othered" Plaintiff for the sole reason that she made a Tweet that other X users (or bots) took as "racist", and Defendants compounded that mischaracterization and opened the door to the damage outlined in this Complaint. The difference between the Tweet and the Articles is that Plaintiff is in control of her X account and can change her privacy settings from "public" to "private" in an instant. When Plaintiff made her X account private, she hoped it would be the end of it. **It would have been the end of it, BUT FOR the DEFENDANTS' Articles** which dragged out the cyberbullying and opened the door to continued harassment since the Articles because weapons that other social media users on X and LinkedIn hurled at her.

102.    Part of what motivated Plaintiff to make the Tweet in the first place was that she was a founding member of a civic action group called Save New York City Working Group since February 2023, a group of alarmed and concerned civic-minded New Yorkers, who were and are very concerned about the lawlessness and quality of life issues in NYC and so Plaintiff felt that shedding light on the illicit vendors in Riverside Park, the last bastion of old New York, was a good way to shed light on the issue. Plaintiff could not have anticipated what international drama would unfold over the next few days to date.

103.    The Defendants, especially the journalists, only focused on the disparaging replies to the Tweet. The Defendants did not include the voices that

agreed with Plaintiff or who had something to say about the real dangers of allowing illegal food vendors to sell without regulation.

104.    The fact that Defendants focused only on the very negative responses to the Tweet illustrated their commitment to cyberbullying Plaintiff. The following replies demonstrate the "other side" that Defendants could have included in the Articles but chose not to because they were vested in painting her as a "bully, bigot, and hypocite":

**See next page.**



One can only thank goodness that Charu T. Khopkar is not a food inspector of vendors in NYC Parks.

105.    Defendants completely ignored the opportunity to discuss the dangers of selling food to the public without the necessary permits and food safety training, but there were plenty of X users commenting on said dangers:



There was a very real debate to have of real public interest around the dangers of allowing unlicensed vendors to sell food in NYC, but Defendants decided that the story was about how Plaintiff was a racist and the pile-on by the other X users, many of whom are known to be bots.

106.    In the immediate aftermath of the publication of The Articles, Plaintiff received alarming hate mail (Exhibit 5) and voice messages and was kicked out of a civic organization in her neighborhood by a lady who had read the Articles and deemed her a racist (Exhibit 7).

107.    The bottom line is Plaintiff did nothing wrong in calling the NYPD and the NYPD did not prosecute Plaintiff for calling 911 on an aggressive and physically threatening Unlicensed Vendor. Notwithstanding, Defendants subjected Plaintiff to a trial and sentencing by cyberbullying that X users subjected her to. The punishment hardly fits the so-called crime.

108.   Plaintiff is not a silly person. Rather, she is a high-achieving serious lawyer with a career replete with successes and important contributions to her clients and society.

### Supreme Court Case – 100558/2024 – the Unconstitutional New York Anti-SLAPP Laws

109.   After recoiling from the public sphere and smarting from the exacerbation of the attacks by Defendants, Plaintiff took steps to restore her good name and her reputation.

110.   On February 20th, 2024, Plaintiff emailed a "Take Down Notice" to Tracy Connor, Editor-in-Chief of The Daily Beast (Exhibit 8). The take-down notice included legal, ethical and personal arguments as to why I believed (and still believe) that The Daily Beast Defendants should take down The Daily Beast Article because of the imbalanced ratio of harm to Plaintiff to public interest. Plaintiff's appeal to The Daily Beast's Editor in Chief fell on deaf ears as did Plaintiff's February 26, 2024 follow-up email (Exhibit 9). Although Plaintiff sent this Take Down Notice "Without Prejudice", the fact that Tracy Connor ignored the letter told Plaintiff that no conversation would be forthcoming.

111.   On February 26th, 2024, Plaintiff filed an informal complaint with The Daily Mail via its online complaint form. One Ms. Katrina Bell, Deputy Head of Compliance, responded to Plaintiff on February 27, 2024, asking her to "Please set out what specific points in the article you think are inaccurate, along with what you believe is the corresponding correct position" (Exhibit 10).

112.    On February 28, 2024, Plaintiff sent Ms. Katrina Bell a "Take Down Notice" and supporting attachments (Exhibit 11). Although Plaintiff sent this Take Down Notice "Without Prejudice", the fact that Katrina Bell ignored the letter told Plaintiff that no conversation would be forthcoming. Ms. Katrina Bell of the Daily Mail never responded to Plaintiff's "Take Down Notice" and Plaintiff followed up on April 30th, 2024, to no avail (Exhibit 12).

113.    On October 19th, 2024, Plaintiff filed an online complaint with The Independent. Richard Best, the Managing Editor of said publication responded and refused to take down the Article or even entertain the idea that Plaintiff had been damaged by the Articles (Exhibit 13). Plaintiff begs to differ and has evidence to prove that indeed she has been damaged and continues to be damaged by the Articles, which have ruined her reputation and turned her into a "meme".

114.    Unfortunately, Plaintiff delayed filing her case until the last minute and, because of the intractability of the bench in the New York Supreme Court, she is filing in the Federal Court to seek justice for the damage caused by the Defendants.

### *New York's Unconstitutional Anti-SLAPP Laws and Defendants' Lack of Journalistic Ethics*

115.    In the twenty years of working as a legal consultant and, from 2008, as a licensed New York attorney, this was one of the rare times that a takedown notice went unnoticed and it is Plaintiff's humble opinion that it speaks to the arrogance, lack of empathy and humanity on the part of Defendants and the assumption that they can hide behind "free speech" and New York's anti-SLAPP laws to demolish

unsuspecting victims like Plaintiff about who they decide to write or, in this instance, take down to further an agenda. The X users who attacked Plaintiff for being a petty and vindictive Karen have nothing on the pettiness and vindictiveness of the Defendants by shining a light on the Tweets and making a mockery of Plaintiff by cyberbullying her in their destructive Articles.

116.    Plaintiff noted that the "journalists", AJ McDougall and Noa Halff, are both young, striving women at the relative start of their careers. Their respective bosses may have told them to write about Plaintiff's Tweets or they may have pitched the idea – it matters not how it came to be. What matters is that neither Defendant "journalist" treated the subject matter of the Tweet, which was unlicensed food vendors in New York City's public parks, but rather emphasized the retributive X responses against Plaintiff, without considering the more reasonable responses or the impact on Plaintiff.

117.    The Independent Article was only slightly less toxic. While it is a fact that Plaintiff provided comments to Bevan Hurley while he was still with The Independent, which comments he included in the Article, Plaintiff did not anticipate that the Independent Article would also be weaponized against her ad infinitum.

118.    That Defendants AJ McDougall and Noa Halff would write about Plaintiff, a lawyer who has had a not insignificant international legal career, with such disdain and in such a targeted and ostensibly coordinated fashion, trying to twist her Tweet into a racist tweet that a "Karen" might make is lacking in both personal and journalistic ethics. One imagines that these are the type of people who

start talking about one the minute one steps out the door; "mean girls" who have become "mean faux journalists".

119.    In the New York Supreme Court, Plaintiff was alarmed to find that the bench applied the New York Anti-SLAPP laws blindly, effectively throwing out 800 years of defamation law in favor of policy and politics. The New York anti-SLAPP laws are unconstitutional because they deny victims of defamation and defamation per se the rights to due process and the right to privacy. Plaintiff withdrew her case from the New York Supreme Court because of the pervasive application of the anti-SLAPP laws that enable publications to defame people with impunity and very limited recourse to victims.

120.    Plaintiff asserts that Defendants failed to address the quality-of-life issue in New York City posed by unlicensed vendors, not to mention that we were technically still in the Covid-19 Pandemic, which should have made selling unlicensed food anathema to the public at large. That these two young women at the cusp of their respective careers – the AJ McDougall and Noa Halff - would write such eviscerating articles about a respectable and high-achieving New York lawyer in good standing for clicks and monetization was horrifying. The Articles themselves were a statement about where society is at large, where people breaking the law are held up as proverbial saints while people trying to comply with the law are demonized and "othered" as Plaintiff was by the Defendants.

121.    The Tweet was nothing more than a castigation of the increasing lawlessness of New York City. Since Plaintiff had formed Save NYC Working Group

with other X users and a small active group of followers of @SonyaShaykhoun, the Tweet really spoke to those specific followers and group members.

122.    AJ McDougall and Noa Halff blatantly violated journalistic standards requiring reporters to tell the truth, in the case of Defendant The Daily Beast the paper's credo (i.e., the Code) and Defendants' privacy policies[17], and, in the instance of The Daily Mail Article, Noa Halff lied about having reached out to Plaintiff for comment, something which never happened as the latter has no record of any phone calls, voice mails, or emails from Noa Halff seeking comment. AJ McDougall sought comment from Plaintiff but, unfairly, did not allow for ample time to respond during business hours and failed to include her comment in The Daily Beast Article.

123.    It was with great reluctance that Plaintiff decided to sue Defendants. Plaintiff did not want to relive the entire emotionally draining, humiliating, and frustrating demolition by cyberbullying at the hands of Defendants that opened the door to harassment from third parties out in the world. Plaintiff's reluctance to sue and retrace her steps through the social media detritus is reflected in the fact that she waited until the May 16th, 2024, a few days before the statute of limitations on the defamation and defamation per se causes of action ran out, to file this lawsuit. The thought of having to reread the Articles and the horrible response tweets has been emotionally draining and upsetting for Plaintiff, as well as having to face the stark continuum of the damage wrought on Plaintiff by the Defendants, the effects

---

[17] The Daily Beast Privacy Policy, https://www.thedailybeast.com/company/privacy-policy/ (last visited 11/18/24); DailyMail.com, Privacy Policies, https://www.dailymail.co.uk/home/article-7759273/Privacy-Cookies-Policy-Policy.html (last visited 11/18/24).

of which she still feels to date. Fighting for her rights has been a daunting task for Plaintiff who, despite being a proficient transactional lawyer, is not a litigator. It is necessary, however, because the damage that Defendants caused to Plaintiff is multilayered, extensive and long-lasting.

### *Plaintiff Is a Serious Lawyer with a Significant International Career – The Articles Have Damaged Her Name, Reputation and Prospects*

124.    Plaintiff has spent most of her adult life in Europe and the Middle East. Plaintiff has had a prestigious career so far and the Articles serve to undermine her national and international reputation. The name "Sonya Shaykhoun" is vested with decades of goodwill.

125.    From 2004 to 2008, Plaintiff advised a pan-Arab pay satellite TV company on technology, media, and telecommunications matters called Orbit. Orbit was where Plaintiff cut her teeth on commercial satellite contracts, content licenses, intellectual property matters, and all manner of back-office contracts required to run a pan-Arab pay satellite TV company. Plaintiff was one of a three-lawyer team and between them, they managed the legal matters of Orbit and its MENA-based bureaus without the assistance of outside counsel. From the get-go, Plaintiff was able to handle complex, high value contracts, whether in Bahrain or a cross-border basis, across the technology, media, and telecommunications industries as well as the aviation industry. Orbit was one of the first commercial satellite companies in the world and Plaintiff handled many of their most complex and high-value satellite contracts. Orbit's employees in Bahrain hailed from Africa, all over the Arab world,

India, Italy, the Philippines, Europe and America. It was the ultimate "melting pot" and everyone got along well, including Plaintiff.

126. From 2008 to 2010, Plaintiff worked as an attorney for a British law firm where she was seconded to the Telecommunications Regulatory Authority and Gulf Air, respectively. Plaintiff assisted not only with contracts and client services, but with business development, a skill that came naturally to her and Plaintiff was able to land large Arab and European companies as clients. Plaintiff has a track record of building a law practice and should not have had the difficulties she faced when trying to build the Law Offices of Sonya Shaykhoun, Esq. in NYC and beyond after Covid died down.

127. From 2011 to 2014, Plaintiff was Senior Legal Counsel for Al Jazeera Media Network in Doha, Qatar. Plaintiff's employment with Al Jazeera Media Network coincided with the beginning of the Arab Spring. Plaintiff's work involved everything from contract work, big projects (including satellite contracts), investigations, and corporate work. Plaintiff worked closely with global law firms around the world and had colleagues from all over the world. Plaintiff was never tagged with the "Karen" moniker or anything of that ilk because, as per her training at home and her education, Plaintiff treated everyone with the same respect and politesse.

128. From 2015 to 2017, Plaintiff had a "hiccup" in that she took a job with a start-up in Doha, Qatar that turned out to be less than above board and after five months of abusive tactics (i.e., specifically not paying her full salary), Plaintiff left

the start-up after they tried to further reduce her salary and she sued the start-up in the Qatari Civil Courts in Arabic and without the assistance of a Qatari lawyer. After nearly eighteen months (during which time, Plaintiff was not able to leave Qatar because she no longer had a sponsor), she won her case and the monies owed to her by the shady start-up and survived a very strenuous two years barely scathed but with enough street smarts to earn a "Ph.D. in Street Smarts".

129.    From 2017 to 2019, Plaintiff joined Qatar Airways in Doha, Qatar as a Senior Legal Specialist. Working at Qatar Airways required grit and patience because it had strict working conditions (i.e., one had to be at their desk at 7 a.m. sharp) and a rigorous and diverse culture. Plaintiff rapidly proved her work ethic and reliability, and management assigned to her some of the most high-value and complex projects for Qatar Airways and Hamad International Airport.

130.    Plaintiff, who began her career in 2004 as a Senior Legal Counsel at Orbit in Bahrain, had a steep climb ahead of her, one that she successfully conquered and earned the esteem of her bosses and peers. Orbit was one of the first commercial satellite countries in the world and Plaintiff handled many of their most complex and high-value satellite contracts. This was the beginning of a stellar career in the Middle East and one without incident in the tabloids.

131.    Plaintiff's last role in Qatar was as a Senior Legal Specialist at Qatar Airways in Doha, Qatar (January 2017 to May 2019). The role was initially in the Contracts Department where Plaintiff handled a wide range of corporate and commercial matters all over the world (i.e., wherever Qatar Airways flew – more

than 180 countries). Qatar Airways was a fast-paced and demanding environment and Plaintiff quickly established herself as a problem-solver and a more than "safe pair of hands". When one colleague had more than 400 outstanding matters that needed to be resolved, Plaintiff was one of the few lawyers from the larger department pulled in to assist with the clean-up.

132. Within a year of joining Qatar Airways, Plaintiff was recruited to help the then Chief Legal Officer to set up Qatar Airways' first-ever global Compliance Department with a few other lawyers. This period overlapped the period when Plaintiff was pursuing her second LL.M. in Corruption, Law and Governance at the University of Sussex and the Rule of Law and Anti-Corruption Center (ROLACC) in Doha, Qatar. Consequently, Plaintiff was tasked with drafting anti-corruption and anti-bribery policies and advising on ESG and regulatory matters on a global basis.

133. The entirety of Qatar Airways – including Qatar Airways Contracts Department and the Qatar Airways Compliance Department - is comprised of professionals from all over the world, including Africa, America, Australia, Bangladesh, France. India, Netherlands, Philippines, Sri Lanka and Qatar. It was not a place for the "racist Karen" that the Defendants portrayed Plaintiff as. The impact of the Qatar Airways Compliance Department was immediate. Legal500 GC Powerlist recognized the cohort in which Plaintiff was a member for Middle East Teams 2018 – Transport and infrastructure[18]:

---

[18] Legal500, GC Powerlist, Middle East Teams 2018 – Transport and infrastructure, https://www.legal500.com/gc-powerlist/middle-east-teams-2018/qatar-airways-group/ (last visited 11/05/24).

**SEE NEXT PAGE.**

## Qatar Airways Group

| Qatar Airways Group
QATAR
AIRWAYS القطرية

Sponsored by

## About

Chief legal and compliance officer of Qatar Airways Group Ben Swagerman (a GC Powerlist: Middle East 2017-featured lawyer) has grown the company's legal, risk and compliance (LRC) department from a single luminous member to a

the business with ceaseless support', according to one of three senior legal specialists supporting the LRC department, Sonya Shaykhoun. The LRC team's major successes during this time are many and varied, filling a compliance vacuum that was not there before Swagerman's arrival. Shaykhoun mentions three successfully completed projects, led by Swagerman, as among the team's best work: 'Firstly, the development and implementation of meaningful compliance policies aligned with global best practices; secondly, the ongoing development of new policies, including anti-money laundering, anti-child labour, human trafficking and data protection; and thirdly, the establishment, oversight and guidance on the implementation of GDPR across the Qatar Airways Group'. In addition, the team has been heavily involved with corporate social responsibility surveys, gathering information from across the business, to ensure the group is in line with international standards. Alongside Swagerman and Shaykhoun, key team members who are also permanent members of the contracts department, include senior legal specialists Nadia Salem and Daniella Sankar, the former notable for writing the Qatar Airways Group anti-bribery, anti-corruption and anti-human trafficking policies, and the latter for supporting Qatar Airways Group's data protection efforts. Marlene van Brummelen is data protection manager, in charge of providing specialist data protection expertise to the team, while Shaykhoun has completed 14 years in the Gulf, working at notable companies such as Al Jazeera Media Network.

134. Throughout the entire fifteen years she lived and worked in the Arabian Gulf, Plaintiff had not only held senior and responsible transactional roles and singlehandedly handled multi-million and multi-billion-dollar contracts (i.e., the first-ever multi-billion-dollar WIFI satellite contract between Qatar Airways and Inmarsat for two fleets of planes, which she handled alone, without inside or outside counsel assistance) but has also advised on a raft of non-contentious issues including compliance matters, defamation issues for global companies in the Arabian Gulf including Al Jazeera Media Network and Qatar Airways. Since graduating from SOAS in 2003, Plaintiff has breathed, eaten, and slept "law". It is wrapped up with her identity. Plaintiff is very "correct", it was how she was raised, how her professional career shaped her and how living in the rules-based Gulf States impacted her world views.

135. Living in the Gulf States means living, working, and socializing with people from all over the world. It is not a target destination for "racist Karens" and this jargon and its implications was foreign to Plaintiff until March 2019 when she returned home for good.

136. In every company that Plaintiff has worked, she has quickly become a "trusted adviser" and the "go-to person" to solve tough legal and/or commercial issues and her work ethic and quality of work garnered her a reputation for being a reliable and technically apt lawyer. In the MENA region, from where Plaintiff still hopes to procure clients, as in the West - reputation is EVERYTHING. On May 18th and 19th,

2023 respectively, Defendants stole Plaintiff's reputation when they broadcast their ugly "Karen" stories nationally and internationally.

137. In 2016, while still living in Doha, Qatar and working for Qatar Airways, Plaintiff embarked on her second LL.M. in Corruption, Law and Governance offered by the University of Sussex and the Rule of Law and Anti-Corruption Center in Doha, Qatar. Plaintiff was guided to undertake this second LL.M. by her strong personal integrity and regard for the Rule of Law and her too-close-for-comfort brushes with corruption in the Middle East. At the time of writing the Tweet, Plaintiff has almost twenty years of legal experience abroad and is a consummate transactional and contracts attorney who has single-handedly negotiated, drafted and finalized many complex multi-million and multi-billion-dollar contracts for clients in the Arabian Gulf in the technology, media, telecoms (including satellites) and aviation spaces. Of note, is a highly skilled, highly trained and experienced lawyer who emphasizes client service and accuracy.

138. Plaintiff is a New York licensed attorney (4633293) who swore into the New York State Bar in September 2008. The New York State Bar had accommodated Plaintiff's timing because she was in New York City (instead of Bahrain where she was working at the time) because her younger sister had committed suicide on August 17th, 2008.

139. Plaintiff worked hard for her qualifications and has excelled in her legal career, overcoming many obstacles, and she has always taken pride in being a "by

the book" lawyer who believes passionately about the rule of law and dedicated a lot of time and effort studying corruption.

140. While working in the Arabian Gulf, Plaintiff realized she had a knack for sniffing out corruption on a large scale and was instrumental in pulling proverbial strings that unraveled massive transnational cross border organized crime. Sniffing out corruption is Plaintiff's legal "superpower".

141. For three decades, Plaintiff lived in international cities in far-flung places. Living abroad sounds glamorous, and it can be. However, to thrive while living abroad, one needs to be adaptable, curious, open-minded and respectful of other cultures. Throughout the years, Plaintiff has had and continues to have friends from every continent in the world. Further, Plaintiff took advantage of her location to travel around the Arab world and to Asia.

142. In 2019, Plaintiff decided to return home to New York City after living abroad on and off for nearly thirty years. It was just time to come home. Plaintiff hung out her own shingle, the Law Offices of Sonya Shaykhoun, Esq. to capitalize on her global legal experience and the extensive goodwill in her name. Making the transition back to living and working in America was not as easy as Plaintiff had anticipated. Despite her education and global experience, Plaintiff has had an extremely difficult time building her practice or getting a job because of the Articles. Plaintiff holds an MA Honours Degree from the University of St. Andrews (Scotland), a BA in Arabic and Law and an LL.M. in Corporate and Commercial Law from the School of Oriental and African Studies (SOAS), University of London and

an LL.M. in Corruption, Law and Governance from the University of Sussex and the Rule of Law and Anti-Corruption-Center in Doha, Qatar. Both SOAS and the University of Sussex are top law schools in the UK.

143.    Making the transition back to American life after many years living abroad in – variously - Italy, the UK, Egypt, Bahrain and Qatar was not as easy as Plaintiff anticipated would be in that it was a cultural shock. It certainly did not help that the Covid-19 Pandemic lockdowns started in March 2020.

144.    Despite the social issues that impacted the entire world, Plaintiff joined the New York City Bar Association and was a member of the New York City Affairs Committee for two years and has been a member of the Aviation Committee for two years.

145.    As part of her law practice-building, Plaintiff started writing a law-related blog on LinkedIn and Substack under the heading, "The Commercially Savvy Lawyer" and has an eponymous YouTube channel. Plaintiff also teaches a "Commercially Savvy Lawyer Bootcamp" on the Maven platform to teach lawyers and non-lawyers how to draft and negotiate contracts which has been generally well-received.[19]

146.    The Articles were published just as the Covid Pandemic was ending and the world was reopening. All chances of Plaintiff growing her international law practice now that the world was opening again were dashed by the Defendants making Plaintiff an "international Karen" and painting her as a bully, bigot and

---

[19]  Maven, https://maven.com/the-commercially-savvy-lawyer/the-commercially-savvy-lawyer (last visited 11/16/24).

hypocrite (the Code). Plaintiff asserts that there is a causal connection between the publication of the Articles and her law practice's lack of growth. While she was forced to do doc review to make ends meet during the Lockdown (and still does it), any hopes of growing the Law Offices of Sonya Shaykhoun, Esq. have been thwarted by the impact of the Articles.

147.    Plaintiff takes her reputation seriously and, because she spent the greater part of thirty years abroad, she did not grasp the social changes in New York City and America that resulted in the kind of social justice activism and related concepts like "political correctness" and very real consequences of "cancel culture" in its extreme form. After the publication of the Articles, Plaintiff now fully comprehends the extent to which social media and newspapers can be and are weaponized because she has felt the full brunt of Defendants' weaponization of their brand of "journalism".

148.    Plaintiff continues to strive as a lawyer and her commitment to the rule of law. Plaintiff had many opportunities to veer off the "straight and narrow path" while living in the Middle East, but she steered clear of danger. In June 2024, Plaintiff was admitted to the Southern District of New York. In July 2024, Plaintiff was admitted to the Eastern District of New York. Plaintiff remains in good standing with the New York State Bar. Plaintiff sees everything through the prism of

compliance and the rule of law, which in the lack of which in NYC is a well-publicized fact, as Councilman Robert Holden wrote in the New York Post in May 2023[20].

149.    From 2004 to 2019, Plaintiff had lived and worked in the Arabian Gulf. From 2004 to 2011, Plaintiff lived in Bahrain working for both Orbit, a pan-Arab pay satellite TV company (which is now OSN in Dubai), where she handled technology, media, and telecoms issues, including satellite contracts, and Charles Russell LLP, an English law firm that had opened an office in Manama. From 2011 to 2014, Plaintiff worked as a senior lawyer at Al Jazeera Media Network during the Arab Spring and Qatar Airways (2017-2019), where she worked in both the Contracts and the Compliance Departments respectively.

150.    Life in the Arabian Gulf is highly ordered, rules-based, and people are expected to adhere to the laws of the land strictly or pay the price. The experience of living in the Arabian Gulf necessarily changed Plaintiff and she hoped that, through her civic action via Save NYC Working Group, she could make a positive change on the city – New York City - where she grew up. Plaintiff grew up on the Upper West Side, attended P.S. 75 on 96th Street and West End Avenue from first to fourth grades, St. Hilda's and St. Hughes on West 114th Street for fifth and sixth grades, Southampton Middle School for seventh and eighth grades, and Dalton on East 89th Street for high school and St. Stephen's School in Rome, Italy for her final semester.

---

[20] Robert Holden, "Yes: This IS the most lawless NYC has ever been", New York Post, May 12, 2023, https://nypost.com/2023/05/12/yes-this-is-the-most-lawless-nyc-ever-been/ (last visited October 27, 2024).

151.    While it is true that Plaintiff's parents were hyper-successful immigrants from Egypt and Ireland (both had arrived in NYC in 1969 and 1970 respectively, met and fell in love), Plaintiff's father lost his considerable wealth in 1990 when his venture capital fund failed. Plaintiff's father went bankrupt, and the family never recovered. The doorman in Plaintiff's building still talks about seeing her father crying in devastation at having lost everything even though it happened thirty-four years ago. Plaintiff had the silver spoon yanked out of her mouth abruptly and she had to work her way through college and take loans to fund her education. Sadly, Plaintiff's father rapidly succumbed to leukemia in 2001, her sister was date-raped in 1996 and ultimately committed suicide in 2008. Plaintiff's time in the Arabian Gulf was not a glamorous ride in the park, it was where she got her proverbial "Ph.D. in Street Smarts". Because of the struggle that was involved in the making of her reputation, Plaintiff's good name is her most prized possession.

***Plaintiff Sonya Shaykhoun, Esq.'S Tweet Went Viral Despite Her Having a Very Small Account, Was And Is Not a Public Figure, And Is Not Even a Limited Public Figure.***

152.    Despite being a Technology, Media, and Telecommunications Lawyer who has advised the likes of Al Jazeera Media Network in Doha, Qatar on a wide variety of complex corporate and commercial, Plaintiff did not understand the dangers of X in 2023 because Bahrain and Qatar do not tolerate the kind of cyberbullying that happens online in America and Plaintiff did not anticipate being made a national and international laughingstock by Defendants via the Articles.

153.    The Tweets instigated a lot of hate and abusive responses that amounted to cyberbullying and harassment. As stated, DailyMail.com doxxed

Plaintiff by publishing her home/solo practice address and email address. This was an invitation to the entire readership of Defendants to harass Plaintiff off-line. The Articles continue to be weaponized against at Plaintiff, the cyberbullying and harassment are a continuum as the Articles are still on the Defendants' platforms.

154. New York's anti-SLAPP laws prevent victims of defamation (and any related cause of action like injurious falsehood) from getting justice because, rather than apply the laws from the eight-hundred-year-old canon of defamation law, the anti-SLAPP laws appear to operate as "policy" instead of "law". In attempting to seek justice in the New York Supreme Court, Plaintiff discovered, to her chagrin, that anti-SLAPP laws have become politicized to the extent that judges seem to discount defamation laws in favor of applying Anti-SLAPP laws with the expectation that defamation victims should "sacrifice" themselves on the altar of free press. Thus, the New York anti-SLAPP laws deny the Constitutional protections embedded in the First, Fourth, Fifth and Fourteenth Amendments.

155. The New York anti-SLAPP laws are so over-protective of journalists and newspapers that they encroach dangerously on the Constitutional rights of individuals; everything is "up for grabs" as even abusive tweets incorporated in abusive and defamatory articles, like the problematic Articles, The Articles, will be exempt from penalization because New York's Anti-SLAPP laws stipulate that "any speech on a matter of public concern, no matter where, when or how it occurs"[21]. Even if, as in the case of the Articles, the portrayal of the Plaintiff is as a bigoted,

---

[21] "How Anti-SLAPP Laws Protect Your Right to Free Speech", Kevin Goldberg, Freedom Forum, https://www.freedomforum.org/anti-slapp-laws/ (last visited 10-23-24).

racist "Karen" (i.e., in the way that The Daily Beast cast her through the prism of their "bigot, bullies, and hypocrites" modus operandi), New York's anti-SLAPP laws will prevail, despite trampling on inviable Constitutional rights. Sadly, and in the words of Kevin Goldberg, "[t]hese strong anti-SLAPP laws will also give the speaker the benefit of the doubt that the speech is about a matter of public concern"[22], the demolition of a subject's reputation (i.e., Plaintiff) will always be justified because of policy over legal application, even if the damage wrought by defendants like the Defendants is so complete and so consequential that it could not justify the interests of "public concern" protections conditionally offered by New York's updated Anti-SLAPP laws.[23]

### The Tweet Was Met with Intense Cyberbullying on X and Other Social Media Platforms, Hate Mail, Crank Calls, And Real-Life Exclusion from Society

156.    The X users who reacted badly to the Tweet reacted as though Plaintiff had murdered someone or committed some other terrible crime. All Plaintiff did was ask that we follow the rule of law because, as she saw and still sees it, the quality-of-life issues we are facing in NYC are in large part a result of not following the law.

157.    Plaintiff asserts that the New York anti-SLAPP laws trample on the Constitutional rights of people in New York while protecting the rights of abusive users of the X platform, including bots. Bots do not have First Amendment rights. In practice, this means that bots have stronger First Amendment rights than citizens, even if bots are not real people.

---

[22] Id.

[23] Reporters Committee for Freedom of the Press, "New York", https://www.rcfp.org/anti-slapp-guide/new-york/ (last visited 11/03/24).

158.   AJ McDougall stretches the truth when she writes, "she did not immediately return a request for comment from The Daily Beast on Thursday." Again, and to underscore the extent to which The Daily Beast stretches the truth, AJ McDougall wrote to Plaintiff at 4:45 pm on Thursday, May 18, 2023 (fifteen minutes before close of business) and Plaintiff responded five and a half hours later at 10:14 pm. The Daily Beast Article was published at 8:06 pm on Thursday, May 18, 2023, thus giving Plaintiff a little more than three hours to respond after close of business. That is unreasonable.

159.   Plaintiff did not see the May 18th, 2023, email from AJ McDougall requesting comment until later that day and she responded with a detailed email, sharing the hate messages that Plaintiff had received. Plaintiff explained in detail that stipulated that the reaction was "hugely hypocritical" and that, "I got calls and tweets all day long from all over the country...Many of the abusive tweets came from out of state and out of the City. They followed a template of either screaming 'Karen' or accusing me of being a racist (I'm not) or being 'a bitch' or a classist, etc. I reported an incident because it annoyed and aggrieved me to see the park being abused like this."

160.   Further, in her response to AJ McDougall on May 18th, 2024, Plaintiff expressed her shock at the name-calling and the apparent need to "other people" whom we dislike: "On a micro level, it is surprising and [it makes me] very angry that people have targeted my law license. While doing the same thing they were accusing me of doing. But at a very extreme ratio. You don't like my tweet? Okay,

tell me. But try to get me disbarred? Really? This is where we are now? destroy each other for having a divergent opinion from others? When I was at Dalton from 86-90, I had many a heated debate about the contentious issues with people and still be cordial after the fact". Plaintiff further lamented to AJ McDougall the extent to which Plaintiff's safety was threatened. Sadly, despite making herself available to AJ McDougall, AJ McDougall did not include any of what Plaintiff shared with AJ McDougall and an Article in which AJ McDougall painted Plaintiff as a racist liar who did not call the police because there was no report. Again, Defendant AJ McDougall never called Plaintiff Sonya Shaykhoun, Esq. nor did she either reply to Plaintiff's response to her or include any of Plaintiff's comments or concerns about her physical safety.

161.    The Code stipulates that The Daily Beast Defendants would give subjects about whom they write "a reasonable time to respond"[24],

> **Requests for Comment:** Individuals and organizations that are the primary subjects of original reporting should be customarily contacted with request for their comment before publication and given a reasonable time to respond.

A few hours after close of business does not amount to "a reasonable time to respond". How is this in line with The Daily Beast's "request for comment" policy? How is this fair to Plaintiff to ask for a comment after hours and claim that Plaintiff did not have a chance to respond, to give her permission to use the Tweet and tweets, or to engage with AJ McDougall, who asked the question fifteen minutes to close of business immediately.

---

[24] The Daily Beast, https://www.thedailybeast.com/company/code-of-ethics/ (last visited 10/27/24).

162. Plaintiff responded to AJ McDougall a mere five or six hours later, but Plaintiff's comments were painfully and noticeably absent from The Daily Beast's damning and life-and-reputation-ruining Article despite AJ McDougall claiming in said Article, that she reached out for comment, but that Plaintiff had failed to respond. This is false; it is a lie. This "gotcha" move resulted in depriving of her due process rights, without giving Plaintiff an opportunity to defend herself. Plaintiff has witnessed how the New York Supreme Court applies the Anti-SLAPP laws, and it is clearly offensive to procedural due process and substantive due process. Thus, eight hundred years of defamation laws are reduced to nothing so that a state policy of allowing a radically free press can thrive, at the expense of individual liberties and rights.

163. Similarly, AJ McDougall created the same stark contrast between the Tweet, the hateful responses (including Plaintiff 's previous non-sequitur tweet about the fall-down drunk) and Plaintiff's credentials:

> An online biography for Shaykhoun describes her as a New York City native with more than 18 years working overseas on "high-value contracts in technology, media, and telecommunications." According to her LinkedIn, she previously worked as senior legal counsel to Al Jazeera Media Network and in the contracts department of Qatar Airways.

Rereading this clause, Plaintiff fears that AJ McDougall was playing to her audience's unconscious bias against Qatar as Plaintiff had experienced online vilification for having worked in the Arabian Gulf and especially Qatar. In Plaintiff's

experience, there is precious little difference in the human rights abuses in Qatar and the human rights abuses in America.

164. The bottom lines is that AJ McDougall did not reach out to Plaintiff on a timely basis and Noa Halff of Noa Halff did not reach out to Plaintiff at all. How is his in line with The Daily Beast's "request for comment" policy? How is this fair to Plaintiff to ask for a comment after hours and claim that Plaintiff did not respond immediately. It is a disingenuous statement and disingenuous "journalism".

### *Plaintiff Sonya Shaykhoun, Esq. Was Horrified When the Articles Were Published. AJ Mcdougall Did Not Reach Out To Plaintiff On A Timely Basis And Noa Halff Of Dailymail.Com Did Not Reach Out To Plaintiff At All. The Independent Worked with Plaintiff, But The Independent Article Also Gets Weaponized Against Her To Date.*

165. The larger social context informs the toxicity of social media platforms. The social upheaval especially since the BLM riots and the weaponization of social media and related censorship before Elon Musk bought X in March 2022 was both a phenomenon and a hotbed of fake news, privacy breaches, and the impact of social media on mental health of users. It is not for nothing that TikTok is entangled in multiple lawsuits over the harm TikTok has/is doing to teens. Pre-Elon X and social media was a war zone. Post-Elon X is less combative. Today, in the UK and the EU, the government is imprisoning people for "politically incorrect social media posts":



When social commentators say that we are living in the manifestation of George Orwell's dystopian fictional novel 1984, they are not far from the truth.

166. Plaintiff could make her X account private or public at her sole discretion and protect herself, her identity, her safety and her reputation. Plaintiff, despite trying to get the Defendants to take down the Articles, could not remove the Articles and stope the attendant damage and various risks to Plaintiff.

167. Plaintiff received hate mail on LinkedIn, at her law firm email (sonya@shaykhounlaw.com), and by text from readers of the Articles. The hate mail and weaponization of the Articles continue to date, more than a year after the Tweet and the publication of the offending Articles.

168. Given the nature of the hate mail, that the hate mail reached Plaintiff at her home address, on her work email (sonya@shaykhounlaw.com) and her phone number that she uses for both work and personal matters, it was reasonable for Plaintiff to fear for her physical safety as well as her reputation, psychic, psychological, and emotional health and safety.

169. Plaintiff could make her X account private or public at her sole discretion and protect herself, her identity, her safety and her reputation. Plaintiff, despite trying to get the Defendants to take down the Articles, could not remove the Articles and stope the attendant damage and various risks to Plaintiff.

170. Given the nature of the hate mail, that the hate mail reached Plaintiff at her home address, on her work email (sonya@shaykhounlaw.com) and her phone number that she uses for both work and personal matters, it was reasonable for Plaintiff to fear for her physical safety as well as her reputation, psychic, psychological, and emotional health and safety.

### *Defendants Breached Plaintiff's Privacy; The Daily Mail Doxxed Plaintiff; Defendants Breached The X.Com Terms And Conditions And Privacy Policy*

171. §50 of the New York State Civil Rights Law makes it a misdemeanor for "a person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor" N.Y. Civ. Rights Law § 50 ("N.Y. Civ. Rights Law § 50 Amended by New York Laws 2024, ch. 58,Sec. MM-A-1, eff. 4/20/2024.

172. As digital newspapers using ads-based and/or subscription-based revenue models, Defendants monetized not only the Tweet, which is Plaintiff's intellectual property and governed by the X Terms of Service ("TOS"), but they used her name, the name of her law firm and her pictures (not just one) without her consent. To be clear, had the Defendants asked for her consent to use her name, law firm name, and picture, Plaintiff would have refused her consent. (Defendants' breach of copyright is discussed below).

173. §51 of the New York Civil Rights Laws allows for a person whose name, portrait, picture, likeness or voice is used within New York State for advertising or trade purposes without written consent to: a) maintain an equitable action in the New York Supreme Court to prevent and restrain such use; and, b) to sue and recover damages for any injuries sustained by reason of such use. N.Y. Civ. Rights Law § 51 ("N.Y. Civ. Rights Law § 51").

174. Plaintiff asserts that the Defendants not only breached the §50 of the New York Civil Rights Laws, but also breached the X.com rules and polices on "Private Content", which stipulate,

> You may not threaten to expose, incentivize others to expose, or publish or post other people's private information without their express authorization and permission, or share private media of individuals without their consent.
>
> Sharing someone's private information online without their permission, sometimes called "doxxing," is a breach of their privacy and can pose serious safety and security risks for those affected.

Additionally, posting images is an important part of our users' experience on X. However, where individuals have a reasonable expectation of privacy in an individual piece of media, we believe they should be able to determine whether or not it is shared. When we are notified by individuals depicted, or their authorized representative, that they did not consent to having media shared, we will remove the media. This policy is not applicable to public figures."

The X.com platform precludes "doxxing" on its platform, it should follow that Tweets republished on other platforms like The Daily Mail and the Daily Beast should not be utilized to dox or breach the privacy of users of the X.com platform. Plaintiff asserts that the X.com privacy policies apply to Defendants by virtue of the sublicense of the Tweet per the X TOS.

175. Alarmingly, Defendant Noa Halff included Plaintiff's home address in The Daily Mail Article. Plaintiff has used her home address for her solo practice address since the Covid Pandemic (which a lot of lawyers do). Plaintiff has just not had the money to have a corporate office and is eager to change her registration to avoid personal harm. It is clearly a breach of privacy – and invites danger and additional harassment from its readership – to have published Plaintiff's work/home address.

176. Plaintiff received hate mail at that address and there is nothing to stop someone from coming to her house and attacking her when she comes and goes from her building. Had Noa Halff reached out to Plaintiff (she did not as she averred in The DailyMail.com Article: "DailyMail.com reached out to Shaykoun for comment

but did not hear back"). Noa Halff could not even get the spelling of Plaintiff's last name right much less tell the truth about reaching out – Plaintiff never heard from DailyMail.com in any fashion whatsoever. If Noa Halff cannot even spell Plaintiff's name properly, what does that say about her ensuring she has not been malicious or published the Article with reckless disregard for the truth?

177.  The lawlessness of Defendants is revealed in their approach to data privacy laws and how they have taken advantage of the extremely broad New York Anti-SLAPP laws. Though the New York courts do not have jurisdiction over the breaches by The Daily Mail Defendants and The Independent Defendants of The UK GDPR, it is telling that these Defendants completely disregarded their UK GDPR limitations and how UK entities like The Daily Mail Defendants and The Independent Defendants mishandled US citizens' personal data as in the instant case. For the sake of illustration purposes only, an address and pictures would be considered personal data under the UK GDPR. For illustrative purposes only, to be compliant with the UK GDPR, for a newspaper like The Daily Mail Defendants to lawfully publish the pictures and home address of a US citizen, they can only do so if there are "legitimate interests" to do so. It appears that the UK concept of "legitimate interests" is similar to the "public interest" concept in New York's anti-SLAPP laws. Even so, the United States and New York State do have its data privacy laws.

178.  The perennial dichotomy between public interest/right to privacy operates in this case. When Plaintiff filed her complaint with The Independent on

October 19th, 2024, its Managing Editor Richard Best insisted that the Independent Article did not damage Plaintiff's good name and ability to build a business but also that "the article refers to events that took place in the public domain" and that Plaintiff had "willingly co-operated" in the preparation of the Article (Exhibit 1). That the brief exchange with the Unlicensed Vendor in Riverside Park would be "part of the public record" even after Plaintiff made her X account private (which it still is) is baffling – especially coming from a London-based newspaper. Don't they have newsworthy stories in London? This ruthless response was galling as Defendants published Articles that have damaged Plaintiff's reputation and economic prospects but Defendants – including The Independent – have monetized her Tweets and published her photos without her express consent to do so. That Defendants demolished her in the public forum while making money on it is extremely perverse, deeply unfair and unethical.

179.  Plaintiff asserts that neither the New York nor the UK-based newspapers like The Daily Mail Defendants and The Independent Defendants could possibly have a legitimate interest or public interest in the Tweet that arose out of a very local event that occurred on the Upper West Side in Riverside Park in Manhattan. Further, it is neither fair nor reasonable for The Daily Mail Defendants to publish Plaintiff's address, much less a gamut of her pictures without her consent and in the context of such an ugly portrayal of Plaintiff. The fact is The Daily Mail Defendants' breach of privacy exposed her to harm on an international, trans-Atlantic basis. On balance, the "public" or "legitimate" interest in the Tweet and

incendiary responses from other X users did not justify the gross breach of privacy committed by The Daily Mail Defendants who published Plaintiff's home address and other personal identifying information. Defendants' malfeasance as described above is further galvanized by the universal ethics that govern journalists worldwide, which they breached, and the contractually binding X TOS and Privacy Policy (Exhibit 14).

180.   There is no plausible public interest justification for The Daily Mail Defendants to have published Plaintiff's home address. It was either malicious and/or reckless disregard on The Daily Mail Defendants' part to not fact check the dual nature of Plaintiff's home/office address, which is increasingly common in the post-Covid world. Reposting a tweet that doxxed Plaintiff by publishing her home address (which is also her law firm address) is certainly reckless. Defendants are not idiots; they had to know what the impact would be vis-à-vis Plaintiff when the doxxed Plaintiff. Plaintiff left the office space she used before the Covid-19 Pandemic and did not return because her business has suffered because of the bad press from the Articles.

181.   It is alarming that – even after sending the take down notice - the Dailymail.com Article still includes this because it is a breach of English and American privacy laws, the X TOS, X's privacy policy, the DailyMail.com's privacy policy[25], and a breach of, *inter alia*, the New York Privacy Act and, for illustrative purposes only, the UK GDPR. That the Defendants variously ignored and rejected

---

[25] id. at 33.

the take down notice in which Plaintiff highlighted that they had published her home address in The Daily Mail Article smacks of malice. Had Noa Halff done her due diligence per her journalistic ethical obligations and reached out to Plaintiff as she falsely claimed, Noa Halff could have asked and learned that Plaintiff uses her home address as her law firm address. Even if the address that Noa Halff and Dailymail.com included in The Daily Mail Article were solely her work address, it was unreasonable and inexplicable to include her address – to what end did Defendants to that? How is that reasonable journalism or a "public interest"? It certainly appears to be an effort to put Plaintiff on a blacklist and damage her professional reputation and business.

182.    It is difficult to determine which of the Articles is more damaging and contains more serious breaches of privacy because each Article focused on the most incendiary comments and did not include the other side of the argument (i.e., that Plaintiff was right to ask the Unlicensed Vendor for her permit and that the backlash and abuse was uncalled for). We see below how Defendants breached their respective journalistic ethics obligations.

183.    The Articles include the Tweet itself and the responses as well as pictures of Plaintiff, which X.com does not even allow i.e., X.com will not allow third parties to repost or post pictures of other X users and will quickly take them down and sometimes sanction the user who posted such pictures without the subject's consent.

184.    It is difficult to determine which of the Articles is more damaging and contains more breaches of privacy because each Article focused on the more incendiary comments and did not include the other side of the argument (i.e., that Plaintiff was right to ask the Unlicensed Vendor for her permit and that the backlash and abuse was uncalled for).

185.    The Articles include the Tweet itself and the responses as well as pictures of Plaintiff, which X.com does not even allow i.e., X.com will not allow third parties to repost or post pictures of other X users and will quickly take them down and sometimes sanction the user who posted such pictures without the subject's consent.

***In The Year Since the Publication Of The Articles, Plaintiff Continues To Face The Weaponization Of The Articles On Social Media, Her Law Practice Failed To Grow, And Her Countless Job Applications Failed Either Completely Or Stopped Abruptly Once The Process Started. Plaintiff Blames the Articles And The Related Negative Backlash.***

186.    Plaintiff felt shy around new people and, in some cases, had to warn new connections of the negative Articles. It was a humiliating cross to bear. And hardly a commensurate punishment for having strong opinions on the rule of law as they pertain to unlicensed food vendors in the streets and public parks of NYC.

187.    Plaintiff's efforts to progress her career and build her law practice failed in the year since publication of the Articles and that failure is thanks to Defendants' ruining her name in the public form and internationally. There is a causal connection between the public humiliation that Defendants subjected her to in the Articles and her inability to launch her practice and her American professional career post-Covid-19. There is no other plausible reason why a New York attorney with such significant

and substantial experience as what Plaintiff has cannot move forward and is relegated to poorly paid and demoralizing doc review projects.

188. Like anyone who is targeted by social media and tabloids such as Defendants, Plaintiff has wondered why Defendants targeted Plaintiff so viciously knowing how damaging to Plaintiff the Articles would be. Plenty of X users post about the deterioration of the quality-of-life issues in New York City without being turned into an "international Karen". Why did Defendants not write about other X users who post about unlicensed food vendors and the dangers they pose to the public? Was Plaintiff targeted because of her strong rule of law opinions that do not align with the progressive views of the likes of the Defendants and the fact that she worked in Bahrain and Qatar? Did Defendants' racism make them target Plaintiff?

***Plaintiff Took Action: In February 2024, She Sent "Take Down Notices" to The Daily Beast and The Daily Mail; They Ignored Her. The Independent Dismissed Plaintiff's October 2024 Request Outright.***

189. Plaintiff felt the direct impact of the Articles on her personal life and professional reputation and rather than continue to bury her head in the sand, she decided to take massive action and advocate on her own behalf, despite having very limited litigation experience. Plaintiff drafted a detailed "take down notice" that she sent to both The Daily Beast and The Daily Mail and that she hoped would move the Defendants to take down the Articles.

190. The Daily Beast ignored Plaintiff.

191. The Daily Mail did respond to the initial outreach, but went silent after receiving the take down notice.

192. In stereotypical English fashion, Richard Best dismissed Plaintiff's complaint and request brusquely.

193. It took all Plaintiff's courage, self-belief and faith to muster up the energy to face this lawsuit, hence why she waited until May 16th, 2024, the last day before the statute of limitations on the defamation and defamation per se causes of action expired, to pursue her claims in court.

194. The Articles caused direct damage to Plaintiff's earning power was severely limited and she could barely cover her expenses much less pay the $210 filing fees.

195. Although Plaintiff is a lawyer with substantial legal experience, her wheelhouse is transactional and cross border transactions, not litigation. Lack of funds and litigation experience notwithstanding, Plaintiff recovered from the depression and emotional reaction to the publication of the Articles and took legal action to restore her good name and place in society after an extremely long year of rejections, social media attacks, and having to tell new acquaintances that if they Google her, they will find ugly stories about her that are not true.

196. Plaintiff asserts that most of the possible defenses that Defendants could assert in defense of the use of the Tweets must be quashed by the fact that Plaintiff owns the intellectual property in the Tweets that Defendants included in the Articles. While Defendants did have a sublicense from the X TOS to use the Tweets, the X TOS sublicense does not include the right to monetize the Tweets

without Plaintiff's explicit written consent. Such consent was never procured by Defendants, nor was it given or offered by Plaintiff to Defendants.

197.   Defendants undoubtedly monetized the sublicense from X.com illicitly because – like all publications - Defendants' businesses run on either an ads-based and/or a subscription model. Defendants definitely monetized the Tweets illicitly; at no time did Plaintiff give Defendants written or oral permission to commercialize the Tweets as they did when they used them in the Articles and stuck them behind a paywall (as in the case of The Daily Beast Defendants).

198.   Defendants breached Plaintiff's copyright explicitly outlined in the X.com sublicense and the quasi-contract and contract between Plaintiff and Defendants in respect of the sublicense of the Tweets. At which point, the First Amendment rights of Defendants and conditional protections offered by New York's anti-SLAPP laws become secondary to the rules of contract law that govern the sublicense of the Tweets by Defendants from X.com and Plaintiff.

199.   Defendants might argue that by having a public-facing X account, Plaintiff might have expected her Tweets to be picked up by newspapers once it started to go viral. Nothing could be further from the truth; Plaintiff has worked at a reputable news organization, namely, Al Jazeera Media Network, in Doha, Qatar, and has adjudicated matters internally that are real news (not the fake, stupid news the Defendants fabricated in their respective Articles to create another "Amy Cooper" for their own profit and smug satisfaction). Defendants clearly did not read

the X.com TOS that stipulate the terms on which third parties can utilize tweets like the Tweet.

200. The X TOS stipulate the following:

**Your Rights and Grant of Rights in the Content**

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to (i) analyze text and other information you provide and to otherwise provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.[26]

201. Importantly: a) Plaintiff retains the right to the Content (the Tweets) by virtue of the X TOS; b) X grants X Licensees a "**a worldwide, non-exclusive,**

---

[26] X Terms of Service, https://x.com/en/tos (last visited 10-23-24).

**royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose.**" The term "any purpose" should be caveated with "in good faith"; c) "to make Content submitted to or through the Services available to other companies, organizations or individuals... **subject to our terms and conditions for such Content use**"; and, d) the consideration provided by X for such license is the X user's "use of Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein". The fact that the license is "royalty-free" means that X Licensees can "use the licensed material without paying any ongoing fees or royalties."[27]

202.    The respective Defendants monetize content differently: (i) The Daily Beast Defendants use different tiers of subscriptions[28] and ad sales[29]; The Daily Mail Defendants and The Independent appear to make money on ad sales[30]. Content monetization via ads is described as follows: "Ads: Monetizing with ads is another tried and true monetization model for content-heavy brands, from websites to TV channels to apps (more on this in a minute). Ads can be paid per ad, or paid per view (usually called RPM=revenue per mille)."[31] Thus the Defendants monetized the

---

[27] "Understanding license agreements for Creators", Ryan Fairchild, July 12, 2023, Odin Law and Media, https://odinlaw.com/understanding-license-agreements-for-creators/ (last visited 10-23-24).

[28] Subscriptions of The Daily Beast go for between $1 trial and then $4.99 per month thereafter; $35 per year (that auto-renews at $49.99 per year); $100 per year (the Ad-Free Plan), The Daily Beast, https://www.thedailybeast.com/membership/ (last visited 10-23-24).

[29] The Daily Beast, https://www.thedailybeast.com/advertising/ (last visited 10-23-24).

[30] Mail Metro Media, https://www.mailmetromedia.co.uk/ (last visited 10-23-24)

[31] "Monetize. Monetization. How It Works + Examples (2024)", Mighty Team, April 12, 2024, Mighty Team, https://www.mightynetworks.com/resources/monetization-model (last visited 10-23-24).

Articles at the expense of Plaintiff's name, goodwill and reputation, personal safety, and economic opportunities. Plaintiff wonders and would like to know how much Defendants made on the Articles that they refused to take the Articles down after Plaintiff made the take down requests in February 2024. Plaintiff notes that the news reports that Barry Diller has taken his yacht to the Caribbean for the 2024 holiday season.[32] Presumably the fact that Defendants refuse to take the Articles down means that the Articles have made money for them and paying in some small part for Barry Diller's superyacht. It hardly seems ethical that Barry Diller et al. should monetize the Tweets at Plaintiff's reputational, professional, and economic expense.

203.    Plaintiff owns the Tweets that she posted on X.com whose TOS grant a worldwide, non-exclusive, **royalty free license** (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods, etc." Defendants, as X Licensees, used said license to republish Plaintiff's Tweet and other tweets in Articles on their respective platforms. The license granted does not grant X Licensees to monetize the Content. **Therefore, Defendants are in breach of the X TOS and have breached Plaintiff's copyright in the Tweets.**

204.    Defendants – online newspapers (though "tabloids" is more apt) make money on ad sales – or clicks. AJ McDougall and Noa Halff each wrote a

---

[32] Jim Dobson, "Billionaire Superyacht Showdown: Who's In The Caribbean For New Year's Eve", Forbes, December 20, 2024, https://www.forbes.com/sites/jimdobson/2024/12/20/billionaire-superyacht-showdown-whos-in-the-caribbean-for-new-year-2025/ (last visited 12-23-24).

sensationalized, not-so-factual article harping on a non-public concern issue (i.e., Plaintiff getting roasted on X) – to attract eyeballs and "clicks" resulting in revenue for Defendants. Bevan Hurley's Article was only slightly fairer – the proof of the damage done is in the fact that third parties have weaponized the Articles – all three Articles – against Plaintiff. This is a clear breach of the X.com license and the case law that provide that monetizing a free license breaches copyright law and unjustly enriches the Defendants.

205.    Finally, sublicensees are still subject to X TOS, even if they republish the Content on their platforms. The New York Anti-SLAPP laws do not trump the contractual rights that Plaintiff has by virtue of the X TOS and the X Privacy Policy. Additionally, all the Defendants breached the X TOS by doxxing Plaintiff (publishing her picture and in the case of The Daily Mail Defendants – publishing her work/home address, phone number and email thus inviting the harassment and unwanted abuse that Plaintiff suffered in real life and that Plaintiff asserts are causally connected to the publication of the Articles).

206.    Thus, Defendants might argue that including the Tweets in the Articles falls under the "fair use" exception (such as reporting news or providing commentary). However, the use of the Tweet in a way that directly generates revenue (through subscriptions, ad revenue, etc.) exceeds fair use, especially if the Defendants use the Tweet without adding significant value or transformation (like commentary, critique, or reporting). The reporting in the instant case was cyberbullying, injurious falsehood, and infringing Plaintiff's copyright in the Tweets.

207. If the X platform meant to allow sublicensees to monetize the sublicense, the X TOS would have explicitly outlined those rights. The license provided by X to the sublicensees likely serves the purpose of ensuring that Plaintiff's content can be distributed within the ecosystem of the X platform, allowing others to share, retweet, or embed Plaintiff's content in ways that are consistent with the nature of social media. Plaintiff asserts that the national and international "take-down" of Plaintiff and the bad-faith mischaracterization of her as a "Karen" by Defendants are beyond the scope of the intention of the X sublicense.

208. Plaintiff asserts that Defendants' use of the Tweets by inclusion in the damaging Articles is unauthorized commercial use, as the platform's terms are meant to enable users to engage with the content owner's content in a way that enhances the use of the service, not for third parties to repurpose the content for malicious purposes and/or for direct financial gain (although X does allow transformation of the content – but again, is silent on monetization) and/or for social justice warrior activities.

209. Aside from the bad faith monetization of the Tweets, and the interplay with the breach of the sublicense and the actual malice standard required to neutralize the anti-SLAPP laws, Plaintiff asserts that Defendants, most of whom are seasoned media professionals, had to know what the impact of the Articles would be on Plaintiff's reputation and Plaintiff's life. In the context of the illicit commercialization of the Tweets, Defendants put their profit over the obvious harm that the Articles certainly would and did cause Plaintiff. Plaintiff's 80-year-old

mother cannot talk about the Article without crying. Defendants damaged not only Plaintiff but Plaintiff's family. Plaintiff cannot even buy a watermelon from a watermelon vendor without pushback as a direct result of the Articles. Plaintiff asserts that that the resulting damages were both foreseeable and inevitable and the fact that Defendants went ahead with publishing the Articles anyway, is a clear marker of Defendants' malice and reckless disregard for the truth of the statement.

210. Plaintiff has been striving to build a law practice in NYC since 2019. Plaintiff's name is in the name of her sole proprietorship: The Law Offices of Sonya Shaykhoun, Esq. There is at least twenty years' **goodwill** in Plaintiff's good name. For Defendants to target Plaintiff as a "Karen" in a digital age when everyone Googles one another before engaging with them and digital press has a global not just local reach is nothing more than digital violence, a digital, ("quasi")-journalistic ("quasi" because Defendants are tabloids at best) assault on a private citizen who noticed a hallmark of the deterioration of her neighborhood and the greater City and took to X, the "Virtual Town Square", to highlight it. Rather than encountering a healthy debate, Plaintiff was viciously assaulted. Plaintiff's name literally is her business. Defendants destroyed Plaintiff's name and economic prospects. Defendants made Plaintiff less safe in the world. The weapons were the Articles.

211. Plaintiff's name is unmistakably Middle Eastern in nature and begs the question, was this take-down racially motivated because Plaintiff's name is "Shaykhoun" and had lived in Bahrain and Qatar for a total of fifteen (15) years? It

would not be the first time Plaintiff endured abuse on social media for her name and Arabian Gulf experience.

212.    Plaintiff wrote a post about the entire humiliating experience on her Substack blog, "Who The Fuck Do You Think You Are?" which is now unpublished as Plaintiff tries to move on from this entire nightmare (Exhibit 15). Although Plaintiff is mentally tough and resilient and does not rely and never has relied on anti-depressants after all the trauma she has experienced in her life (who hasn't?), she is painfully aware of how fragile the human mind is. Plaintiff has seen what abuse like the cyberbullying Plaintiff experienced at the hands of the other X users post-Tweet and the Defendants via publication of the Articles can do to a human, how it can wear a person down and catapult them into a psychotic break, depression and/or suicidal ideation.

213.    The cyberbullying in this case reminds Plaintiff of a friend she had at Al Jazeera Media Network – a bright star journalist from New Zealand who had her whole life ahead of her. Sadly, when she moved to TRT (a Turkish news network like Al Jazeera Media Network) in Istanbul, Turkey, she had a nervous breakdown after being bullied so badly by colleagues that she threw herself from her bedroom window and died. Plaintiff has already described how her younger sister took her own life after a date-rape that precipitated a nervous breakdown and a long mental health struggle. The thing about nervous breakdowns, they can happen to anyone at any time, it just needs the right trigger. Defendants exposed Plaintiff to public ridicule which has put a proverbial "scarlett K" on her bosom. While it is not an actionable

cause of action, it is important to note that calling an accomplished professional woman like Plaintiff a "Karen" is deeply misogynistic and nasty. Is where we are as a society now? We are free to verbally and digitally abuse each other without being able to avail of the protections of the 800-year-old canon of defamation law?

214. Defendants each commercially exploited the Tweets in such a damaging way to Plaintiff, destroyed her erstwhile good name, and caused her unquantifiable damage to her career, business, goodwill, name, and emotional distress.

215. The cyberbullying, harassment and exclusion of Plaintiff from society that the Articles incited highlights the fact that the Articles are less "journalistic" and more "calls to action against the Defendant" motivated by an overarching drive to squash perceived "bullies, bigots and hypocrites". In other words, the Defendants hid behind the moniker of "journalism" to cyberbully Plaintiff.

***The Daily Beast Attorneys Dismissed the Lawsuit as "Frivolous" and on The Basis Of Late Service And Asserted The New York Anti-SLAPP Laws. The Statute of Limitations on The Defamation and Defamation Per Se Causes Of Action Have Now Run Out and Plaintiff Is Suing Defendants For Cyberbullying In The Southern District Of New York.***

216. After Plaintiff served Defendants, Plaintiff received an email from Lindsey Cherner, one of the two The Daily Beast Attorneys (Exhibit 16). In her first letter, Lindsey Cherner asserted a few issues. First, Lindsey Cherner asserted that because of the late service, "this matter is now concluded, and the Daily Beast Defendants have no need to demand a complaint".

217. Next, Lindsey Cherner asserted that "your lawsuit would be governed by New York's recently expanded anti-SLAPP statue, which provides for the speedy dismissal of lawsuits, such as this one, aiming to chill free speech about matters of public interest and *requires* that attorneys' fees and costs be recovered against the plaintiff by a prevailing defendant. See. N.Y.Civ. Rights Law §§70-a, 76-a. Under the anti-SLAPP law, which plainly applies because the Article reports on a matter of public interest, you would need to demonstrate a substantial basis for each and every element of your defamation claim." Lindsey Cherner also addressed her opinion that Plaintiff "could not establish by clear and convincing evidence that the Daily Beast Defendants acted with actual malice in publishing the Article". New York's anti-SLAPP laws are unconstitutional because they unfairly favor newspapers and journalists and deny victims of such newspapers' and journalists' targeted smears the right to, *inter alia*, due process and the right to privacy under the United States Constitution and corresponding Amendments.

218. Lindsey Cherner further opined that "mere allegations that The Daily Beast failed to investigate during the course of its reporting would be insufficient to establish actual malice." Lindsey Cherner concluded her October 1st, 2024, letter with the conclusion that, "In sum, there is nothing actionable here." Plaintiff believes there are actionable issues in her lawsuit for a variety of reasons; Plaintiff was both alarmed and perplexed that Judge d'Auguste in the New York Supreme Court refused to engage with the individual causes of action – specifically the copyright infringement which relies in part on the actual X.com TOS – and dismissed the case

in an "off the record" pre-trial conference on November 20th, 2024 with the misogynistic and demeaning conclusion that the lawsuit is based on "hurt feelings" and that Plaintiff is "emotional" (without regard for Plaintiff's twenty-year-long international career where Plaintiff has never been emotional), and that she should sacrifice herself for "free press".

219.    Plaintiff reread The Daily Beast Article several times and very carefully. The Daily Beast Article focuses entirely on the nasty responses to Plaintiff's Tweet, not the matter of public concern that the Tweet covered (i.e., unlicensed vendors). Since the defamation and defamation per se causes of action are no longer available to her, Plaintiff asserts that Defendants are liable to Plaintiff for cyberbullying.

220.    On October 3rd, 2024, Lindsey Cherner sent a follow-up email to Plaintiff in which she expounded on the anti-SLAPP laws and warned her that, "In the event you choose and are able to proceed with your untimely claim, the Daily Beast defendants will move to dismiss it... **Inasmuch as you are an attorney with purported familiarity with the law of defamation in the state of New York, you are amply warned**." In her final response to Lindsey Cherner's October 3rd, 2024, email, Plaintiff reminded Lindsey Cherner that there are more causes of action besides defamation. Curiously, The Daily Beast Attorneys did not address those other Causes of Action in their bullying missives to Plaintiff. The other Causes of Action are strong enough to stand on their own and vindicate Plaintiff.

221. Even more curious, Judge James d'Auguste refused to engage with the additional and very plausible causes of action on the pre-trial conference on November 20th, 2024. Alarmingly, Judge James d'Auguste threatened to make Plaintiff pay Defendants' legal fees, accused Plaintiff of being "emotional" and writing a complaint based on "hurt feelings" which was perturbing on several levels. At the behest of Judge James d'Auguste, Plaintiff studied the anti-SLAPP laws and nowhere did she read that they should be applied as a blanket immunity for newspapers and journalists from defamation lawsuits. It beggars belief.

222. Plaintiff believes that the New York anti-SLAPP laws do apply to the Defendants (including for the injurious falsehood Cause of Action). Lindsey Cherner, in her October 3rd, 2024 email, insisted that the Tweets that Defendants turned into Articles is a matter of public interest and consequently Defendants are absolved from all liability without any regard to the other causes of action included in this lawsuit:

> There is no question that the Article relates to a matter of public interest. The anti-SLAPP law broadly applies to actions arising from "any communication in a place open to the public or a public forum in connection with an issue of public interest; or any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest. . . ." N.Y. Civ. Rights Law § 76-a. Under the anti-SLAPP law, a "matter[] of 'public interest'" is "broadly construed" to be "anything other than a 'purely private matter.'" *Sackler v. Am. Broad. Cos.*, 71 Misc. 3d 693, 697 (Sup. Ct. N.Y. Cnty. 2021) (quoting *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020)). Here, the Article was published by the Daily Beast, a news media website which is a quintessential public forum. *See Balliet v. Kottamasu*, 76 Misc. 3d 906, 922 (Sup. Ct. Kings Cnty. 2022) (news media website is "undoubtedly a public forum" under New York's anti-SLAPP law), *aff'd*, 81 Misc. 3d 132(A) (2d Dep't 2023). In addition, the Article clearly implicates a matter of public

interest given that it reports on your complaint about an unlicensed food stand in Riverside Park, a complaint you also claim to have made to the New York Police Department. *See Reeves v. Associated Newspapers*, 228 A.D.3d 75, 84 (1st Dep't 2024) (holding that "allegations of criminal conduct" are matters of "public interest" under the anti-SLAPP law and citing *Hayt v. Newsday, LLC*, 176 A.D.3d 787, 787 (2d Dep't 2019)); *Abitbol v. Rice*, 2024 N.Y. Misc. LEXIS 4886, at *4 (Sup. Ct. N.Y. Cnty. July 8, 2024) ("Allegations of criminal conduct . . . constitute an issue of public interest pursuant to the anti-SLAPP law."). Regardless of whether you are a public figure, you will need to satisfy the actual malice standard. We are confident you will not be able to do so, and therefore your action will not survive a motion to dismiss.

The lawsuit is about more than defamation and defamation per se but includes other contractual and commercial causes of action that are every bit as valid as the defamation causes of action.

223. Further, the Articles were personal attacks on Plaintiff that smack of malice and reckless disregard to the consequences as each Article made a point of highlighting Plaintiff is a New York attorney and included her business in their condemnation of her. The malice is inherent in the Articles. For example, if, as Lindsey Cherner insisted, the Articles are about a public interest matter (i.e., a variation on Plaintiff and her altercation with the Unlicensed Vendor that prompted a call to 911), why then did Defendant AJ McDougall include a non-sequitur (i.e., the other tweet Plaintiff made about a fall down drunk in front of her building) in The Daily Beast Article that can only be intended to maliciously portray and malign Plaintiff as a "racist"? Rather than focusing on the actual subject of public concern (i.e., whether that be unlicensed food vendors and the public health menace they pose or migrants in New York City and America), Defendants focused on the

negative tweets in response to the Tweets to portray her using systemic injurious falsehoods.

224.    The previous tweet that Defendant AJ McDougall included in the Daily Beast Article confirms that Defendant The Daly Beast intended to portray her as a racist, "Shaykhoun previously attracted a smaller swarm of negative attention on Twitter in February, when she complained about "a fall-down-drunk South American man" outside her apartment building, suggesting he was an "illegal." After firing off that tweet, she spent the following days similarly waging war in her reply section." If The Daily Beast Article is about the Tweet, why reference the previous Tweet. This starts to get personal here and supports the assertion that Defendants engaged in cyberbullying not real journalism. It also serves to shame Plaintiff for engaging on X and to chill her speech, while Defendants (and the very pro-anti-SLAPP laws Judge in the New York Supreme Court) insist that they must be a "free press" even at the expense of the defamation law canon.

225.    In the Supreme Court case, Defendants insisted that New York's anti-SLAPP laws shielded them from culpability for defamation and defamation per se. Plaintiff asserted that  publishing the tweets that troll, demonize, and 'other' Plaintiff did not constitute a "public concern" but were an extrapolation of the trolling on X; in fact, the republication was/is cyberbullyling magnified because of Defendants' respective reach. How is noticing increasing social problems personified on her doorstep an act of racism? Objectively speaking, The Daily Beast Defendants engaged in injurious falsehood and cyberbullying the moment they mentioned the

second tweet about the fall-down drunk, at which point, The Daily Beast Article became about how Plaintiff must be a racist and a "Karen" and not about the issue in the Tweet, unlicensed vendors selling food to the public illegally at the tail-end of Covid.

226. Plaintiff demanded to know why and how Defendant Noa Halff, The Daily Mail, DailyMail.com, and Daily Mail and General Trust ("Daily Mail Defendants") felt it was justifiable to publish Plaintiff's home address? Plaintiff asserts that nothing of what Defendants published in the Articles was justifiable and was instead cyberbullying and checked the boxes of all the Causes of Action.

227. DailyMail.com's Article was unforgiving, using the title, "New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen'". This, too, was cyberbullying.

228. This is what is called in the world of news, "disinformation". Plaintiff only interacted with the Unlicensed Vendor, not both vendors.

229. Plaintiff did not at all "unleash her wrath upon two female street vendors allegedly selling food without a permit in an Upper West Side park". There was no wrath from Plaintiff. Rather, it was the Unlicensed Vendor who unleashed her wrath on Plaintiff hence why Plaintiff called 911. This was harassment that was about to turn into an assault.

230. Plaintiff asserts that Defendants just made things up and exaggerated facts to ride on the coattails of Plaintiff's viral Tweets. Secondly, again using sarcastic quotations in a mocking way, Noa Halff wrote, "Sonya Shaykhoun, who

labels herself as "Esq.", online". Plaintiff is a member of the New York State Bar, it follows that Plaintiff is in fact an "Esquire". What about that deserves the mocking quotations?

231.    Noa Halff went on to write (inaccurately) that,

In her tweet, she shared photos of two women who appeared to have a small table set up at the side of a park path. She then expresses her dissatisfaction about seeing a person selling food in a public park without showing their permit.

She then claimed to have called 911 and reported the vendors, who have not been identified, to the police.

Noa Halff basically called Plaintiff a liar and misstated the reason why Plaintiff called the cops, which was not because the Unlicensed Vendor was setting up a vending stand in the park without a license but because the Unlicensed Vendor chased her and would not leave her alone, making Plaintiff. afraid for her physical safety with good reason.

232.    What Noa Halff omits is a crucial fact – that the Plaintiff only called 911 once the Unlicensed Vendor with whom the Plaintiff interacted chased her down the park path when that Unlicensed Vendor saw her taking pictures of their illegal food stand. Plaintiff immediately called 911 because she was frightened that the previously brief verbal exchange about the permit with the Unlicensed Vendor was about to become a physical assault. The Unlicensed Vendor started yelling at her and shoving her phone in the Plaintiff's face (in fact that Unlicensed Vendor posted the voice recording under the first Tweet and it was clear that Plaintiff was

not yelling or being aggressive, merely pointing out in a reasonable tone of voice, that selling food to the public without a permit, is unsafe for the public - not to mention exposing the vendor to untold liability should anyone get sick from her food).

233. The Tweets by Plaintiff and reprinted by DailyMail.com did not accurately reflect what happened vis-à-vis the NYPD. The NYPD did in fact call Plaintiff on the afternoon of the incident (May 17th, 2023) and asked what happened and what they proposed to do (i.e., to go speak to the vendors and remove them from the park). The police officers did not call Plaintiff back to update the Plaintiff after the initial call.

234. Like The Daily Beast Article, Noa Halff's Article only repeated the nastiest of tweet responses: "Many were mocking her self-righteousness. One user posted a checklist made for children: 'Is someone in danger? Is someone hurt? Did you try to solve the problem on your own? Were you minding your own business?'" In fact, Plaintiff had been minding her own business until one of the vendors approached her to buy her food. Plaintiff ultimately did feel she was in danger after the Unlicensed Vendor chased her down the park path and stuck her phone in her face. Plaintiff did try to solve the problem by walking away. Plaintiff addressed all of these issues in the Tweets but the other X users and Defendant Noa Halff ignore them, choosing only to emphasize the nastiest responses making Plaintiff look like the Wicked Witch of the Upper West Side.

235. Defendant DailyMail.com published some of Plaintiff's responses — including one that was meant as a public service announcement:

Next time you're tempted to buy food from unlicensed vendors, let's hope it doesn't end up like the customers in this story who bought the vendor's burgers made with human remains: allthatsinteresting.com/joe-metheny.

The law is there for your protection. How do you know the food isn't laced with fentanyl or other harmful toxins? You can't even trust licensed vendors how you gonna trust unlicensed vendors?

But sure, make me the Twitter Anti-Hero of the Week. But if you buy a burger off the street from Mr. or Ms. Unlicensed Vendor and bite into a human toe or an eyeball, don't come crying to me because, clears throat, I … told you so.

It is still difficult to fathom that Defendants decided to take the Tweet off of X and make a mockery of Plaintiff like this. Why? The Articles seemed strangely coordinated.

236. The Independent (which Plaintiff admittedly cooperated with) is only slightly less derogatory toward Plaintiff and still gets weaponized against Plaintiff, which proves the damage it has wrought against her.]

237. Plaintiff brings this suit against Defendants for cyberbullying. Publishing only the nastiest comments made by the other X users on the X platform reduced Defendants and nasty bullies themselves. The Articles sensationalized what Plaintiff described happened in the Tweet, only focusing on the mean tweets, and then juxtaposing Plaintiff's credentials that contributed to a deleterious impression. The Articles paint the Plaintiff as a bigot and racist (despite being half Irish and half

Egyptian and having lived, worked and travelled in far-flung places like Bahrain, Qatar, Cambodia – would a bigoted racist go to such places?)

238.   The Articles omitted the pro-Plaintiff perspective – repeating and emphasizing only the false narrative that Plaintiff is a bigot, a racist and a "Karen". Can someone with the last name "Shaykhoun" be a "Karen"? Which begs the question, is this damaging framing of the Plaintiff racially motivated, because Plaintiff is half Egyptian and lived sixteen years in Bahrain and Qatar respectively?

239.   That the Articles omit the pro-Plaintiff perspective is glaringly obvious even though many of the responses to the Tweets supported the Plaintiff and understood what had happened.

240.   The Articles fail to account for the context and that we live in a post-Covid, when only less than two weeks before the publication of the Articles, the WHO announced that "Covid-19 is no longer a global health emergency"[33] . Surely, in the germophobic world that was the Pandemic, unlicensed vendors selling food in the park would be anathema and picked up by activist journalists like those employed by and writing for Defendants. Not only was this sensationalist journalism, but this was irresponsible journalism.

241.   On March 23rd, 2023, the New York Post published an opinion entitled, "We're fighting illegal street vending to keep NYC clean and safe for all"[34]. The

---

[33] CNN Health, "Covid-19 Pandemic Timeline Fast Facts", CNN Editorial Research, 9/4/24, https://www.cnn.com/2021/08/09/health/covid-19-pandemic-timeline-fast-facts/index.html        (last visited 11/18/24).
[34] Jessica Tisch and Marjorie Velazquez, "We're fighting illegal street vending to keep NYC clean and safe for all", New York Post, March 23rd, 2023, https://nypost.com/2023/03/23/were-fighting-illegal-street-vending-to-keep-nyc-clean-and-safe-for-all/ (last visited 11/18/24).

readers' comments are less incendiary than the responses to the Tweet, but they give a temperature check of where New Yorkers stand on the issue of unlicensed vendors, from, "Would you like a side of Hep A with your sandwich sir? Its free" to "The street vendors likewise have no respect for health or sanitation laws. Most outside all day without access to running water to wash hands. They operate in filth" to "Fight crime instead" which got the following response, "That is a crime. Quality of life crime and quality of life criminals".

242.    Plaintiff spent most of her adult life abroad. When she left America to study in the UK in 1990, she left an America that did not have social media, where free speech was respected, and where people celebrated differences in opinion, not tried to destroy one another for having different opinions. Censorship was *au fait* in the Arabian Gulf, but Plaintiff had not yet experienced what the piranha pool of social media was until she returned to America in May 2019 and noticed some very alarming socio-political changes.

243.    On the one hand, Plaintiff operated on the basis that, as an American citizen in America, free speech was afforded to everyone, she had not yet experienced the full effect of what it means to be "doxxed" on social media until the aftermath of the publication of the Articles. As stated, Plaintiff had attended The Dalton School for high school and remembers vividly how her history teacher, Mr. Harrison, had taught her and her classmates about Maoist China, the Cultural Revolution and how Communism is illegal in America. This was a belief that Plaintiff carried with her on her travels around the world.

244. When Plaintiff returned to America in March 2019, she was alarmed by the social changes she had not noticed during her previous trips home to NYC. Concepts like "Antifa", "Identity Politics", and "Social Justice Warriors" were very foreign to her. But the lessons of her tenth and eleventh grade history lessons were clear – when the statues of America's historical figures started to come down around the country and the George Floyd riots occurred everywhere with cities burning down and people threatened with violence if they uttered the wrong opinions, Plaintiff flashed back to her history classes on the Bolshevik Revolution and Mao's cultural revolution where party members were encouraged to terrorize one another into obedience of the "Party Line".

### New York's Anti-SLAPP Laws – Blanket Applicability in New York Supreme Court and Denial of Due Process – When Journalism is Cyberbullying

245. The New York State Constitution does not have specific provisions directly addressing defamation, but it does include provisions protection free speech. For example, Article I, Section 8 of the New York State Constitution specifically addresses freedom of speech and press. It states: "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." While that affords newspapers and journalists the right to report freely, it also protects people like Plaintiff and her right to express her opinion without being cyberbullied and doxxed.

246. While defamation and defamation per se are no longer available causes of action to Plaintiff, it is important to demonstrate the extent to which the application of the New York anti-SLAPP laws interfere with and deny victims of defamation the right to due process and privacy under the US and NY Constitutions. "University of Denver professors Penelope Canan and George Pring created the term SLAPP in the 1980s to refer to a lawsuit whose primary purpose is harassment and intimidation".[35] The scenario envisaged by the coiners of the phrase is quite the opposite of what is happening in this case in that they sought to protect the underdogs from powerful public figures and/or corporations with deep pockets, not vice versa as in the instant case.[36]

247. Cyberbullying comprises: i) the use of electronic communication to bully a person; ii) sending or posting text or images intended to hurt or embarrass another person; iii) using technology such as the internet, cell phones, or other devices to intentionally harm others through hostile behavior. Further, "the National Crime Prevention Counsel defines cyber-bullying as 'the process of using the Internet, cell phones or other devices to send or post text or images intended to hurt or embarrass another person.'"[37] Additionally, "Cyber-bullying could be limited to posting rumors or gossips about a person in the internet bringing about hatred in other's minds; or

[35] Id.

[36] Id. "The goal is to force someone to take back a critical statement – or not make it in the first place – or else face an expensive lawsuit...Both the financial and emotional toll are often greater for the defendant than the plaintiff, the person bringing the suit. Most SLAPP suits are filed by powerful people or corporations to protect their reputations against criticism from average people. They are often well-resourced and able to rely on their legal teams to do all the work. Defendants have less money to pay lawyers and must actively participate in their own defense."

[37] https://definitions.uslegal.com/c/cyber-bullying/ (last visited 12/20/24(.

it may go to the extent of personally identifying victims and publishing materials severely defaming and humiliating them."[38]

### *New York's Anti-SLAPP Laws Open the Door to Cyberbullying*

248.   In the land of legal orthodoxy, the laws of defamation would have applied to the instant case in the New York Supreme Court (and not the anti-SLAPP Laws). That is, because the Defendants cannot avail of any of the defenses to defamation because the Articles are inherently flawed, it follows that the New York anti-SLAPP laws do not apply because – like equity – one can only avail of the anti-SLAPP protections with proverbial "clean hands". However, New York State is unorthodox and insists on an ultra-free press, come what may. And in the instant case, the elements of the now inapplicable defamation and defamation per se causes of action overlap somewhat with the cyberbullying cause of action.

249.   The Maoist modus operandi of organizations like Defendants is clear – shame and bully "dissenters" into silence. That technique lacks civility, is incredibly destructive, but significantly, denies their victims the right to free speech, the right to privacy, and, perversely, the interplay between the monied and politicized publications and the inherently politicized judiciary, ultimately denies the right to due process.

250.   The Articles' structure, tone, and juxtaposition of information can contribute to a defamatory impression. In the instant case, the Articles mock and

---

[38] Id.

undermine the point of Plaintiff's Tweet (a call to action to follow the rule of law). The "before and after" of the Articles and the impact in Plaintiff's life is such that people online continue to weaponize the Articles against her and that she is unable to progress her professional life, despite her immense experience and education. There is a causal link between the Articles and the acceptance as fact by too many people that Plaintiff is in fact a "Karen". How could Defendants prove that is true anyway (assuming defamation and defamation per se were still valid and they tried to use the truth defense)? That is the impact of the cyberbullying wrought on Plaintiff by Defendants with their weaponized Articles.

251. While free speech and a free press are hallmarks of our Constitutional Republic, those rights must be balanced against an individual's right not to be harmed or targeted by an abusively free press. That is what the canon of defamation laws are for, but New York State seem to have thrown the defamation laws out the window in favor of the New York anti-SLAPP laws.

252. Courts consider how a reasonable person would interpret the text as a whole factoring in content, assessment of harm and context. The question is whether the overall effect of the Articles would tend to lower the plaintiff in the estimation of right-thinking members of society and whether it crossed the line from minor teasing or reasonable reporting to speech that is harmful enough to warrant legal intervention (i.e., a judicial order to take the Articles down coupled with damages for pain and suffering). The hate mail and exclusion from society that Plaintiff was and is subject to as a result of the Articles support Plaintiff's assertion that the

Articles have demoted Plaintiff in society on multiple fronts – both nationally and internationally (where Plaintiff is trying to build her international law practice).

253. The repetition or emphasis of certain themes throughout an article can amplify its deleterious impact. The Articles cast Plaintiff in a very negative light, amplifying the abuse she suffered on X.com as well as disseminating the information far and wide while also monetizing it thus infringing her copyright in the Tweets.

254. What is left out of an article can contribute to negative impression, especially if it presents a one-sided or incomplete picture. By not including the responses to the Tweet that agreed with Plaintiff, the Articles offer up as fact that everyone in NYC agrees that unlicensed food vendors should be permitted to sell their wares freely without food handling training and without the licenses that other food vendors need to procure to sell food to the public and that Plaintiff is a "Karen" and all that connotes for calling it out on X.com.

255. The headline, subheadings, and overall structure of an article can shape readers' interpretations and contribute to a damaging effect.

256. Even if an article contains some positive or neutral content, if an article impacts the reputation of the subject, it could be considered cyberbullying.

257. Plaintiff affirms that the collateral damage of the Articles continues to date.

258. The Daily Beast Article and The Daily Mail contrasted the Tweet with the hateful responses to the Tweet, and capped it off by almost mocking, sarcastic-sounding statements that serve to ridicule Plaintiff. For example, The Daily Mail

Article ends its recap of the social media sludge thrown in the direction of Plaintiff with the following jarring statement: "She describes herself as an 'award-winning NY-qualified attorney doing cross-border transactions; tech, media, telecoms, & satellites; aviation; big contracts; & compliance and author of upcoming book, 'The Commercially Savvy Lawyer.'" Objectively speaking, this reads like The Daily Mail is laughing at Plaintiff. The portrayal of Plaintiff in the Articles would make one think that Plaintiff was a chainsaw murderer, not a lawyer trying to uphold the rule of law in her local, childhood park.

259.   The Articles not only extended the digital excoriation of Plaintiff by holding her up for ridicule and mockery (the respective comments sections in the Articles attest to this), but the Defendants republished her images without her consent. Defendants wanted to make absolutely sure that anyone and everyone – **nationally and internationally** - would recognize Plaintiff should they happen upon her in the public realm nationally and internationally. It is a fact that this rendered Plaintiff very vulnerable to attack and public ridicule on an international level which is where her legal experience and legal aspirations lie. Why would Defendants go to this vicious extent to eviscerate Plaintiff over the viral Tweets?

260.   As a Senior Legal Counsel for various global companies in Bahrain and Doha, Qatar, Plaintiff has always been very vigilant about her reputation, minding who she spent time with and what she did or said on social media because, simple social media errors could have serious criminal consequences. Plaintiff never

imagined that she would be litigating to protect her own reputation in the New York State and US Federal Courts respectively.

261.    Despite successfully navigating the minefields of social media presence in the Arabian Gulf, Plaintiff had not quite clocked on to the fact that social media in America had become a digital war zone since leaving America to pursue her higher education and later her international legal career. Plaintiff has strong opinions, which opinions are rooted in her multi-religious upbringing but mostly based on her understanding of and strong belief in the rule of law. Plaintiff attributes her success in the Middle East (and some of her problems) to the fact that she is very "correct" and will not bend rules or engage in corrupt practices. It was this steadfastness that prompted her to do her second LL.M. in Corruption, Law and Governance at the University of Sussex and the Rule of Law and Anti-Corruption Center in Doha, Qatar (2016-2018).

262.    In America, trying to be a beacon of anti-corruption only attracted trouble because in recent years, we have seen the erosion of the rule of law and compliance with the laws and how that erosion promotes "cancel culture". hat Plaintiff has had to take legal action to undo the very real damage she has experienced because of the Articles demonstrates the extent to which her fanaticism about the rule of law is both a blessing and a curse.

263.    Plaintiff started to feel targeted on social media specifically because she has in her biography that she had worked in Bahrain and Qatar. During the "Twitterstorm" that ensued her making the Tweets, other users repeatedly slammed

her for having worked in Qatar, which they likened to a slave state where women have no rights and told her things like "go back to the Middle East". Perhaps it is the lawyer in her that made her stubbornly dig her heels in and insist on having an X account. Plaintiff asserts that the Articles are in part a function of Defendants' implicit and unconscious bias against people who have Arabic names and have lived and worked in the Middle East. Some of the abuse included herein demonstrates the racist nature of the abuse Plaintiff suffered post-Tweets.

264    Plaintiff observed the many cases of cancellation of citizens around America in the aftermath of George Floyd. Suddenly, everyone was racist and racism was weaponized in the same way that "Karen" was/is weaponized. Plaintiff is still wondering how/why labelling someone a "Karen" on the World Wide Web is acceptable journalism – or acceptable in society given how misogynistic a term it is. Defendants are misogynists. Sadly, that is not a cause of action under anti-discrimination laws (but perhaps it should be).

265.    Plaintiff experienced the brunt of cyberbullying in the immediate aftermath of the publication of the Articles to the extent that she often felt paranoid that people would recognize her and harass and attack her physically walking in her neighborhood and around New York City. It was an extremely painful and confusing period for Plaintiff because others had made similar tweets on X and were not turned into "international Karens".

266.    Because Attorney Lindsey Cherner already engaged in litigating the New York Supreme Court case in her October 1st and 3rd emails to Plaintiff, Plaintiff

began researching the relevant legal issues immediately and she wanted to make sure who would be responsible to her for the damages she suffered because of the Articles. Plaintiff found assurance that the **republication doctrine** allows individuals, newspapers, magazines, broadcast news stations, and others who repeat lies – in this case injurious falsehood to be "treated as the publisher of that falsehood and [those individuals or entities] can be held liable to the same extent as the original speaker."[39]. Defendants can also be held liable under the republication doctrine for digital republication where the potential for widespread harm is significant and liability for republishing damaging content even if they were not the original authors of the content.

267.    By framing Plaintiff as a "Karen" and staying laser-focused on the negative responses on the Tweets without giving life to any of the pro-Plaintiff comments, Defendants' Articles galvanized the take-down and opened the door to additional abuse both on and off the X platform. Taken in light of their self-avowed Code and the characterization by Perplexity.ai of The Daily Beast having a "left-leaning bias", the question arises if the Defendants are journalists at all and not activists posing as journalists and hiding behind the New York anti-SLAPP Laws to damage the lives of private citizens like Plaintiff because they are politically divergent from their (i.e., Defendants') views. Even Noah Shachtman, The Daily

---

[39] Republication in the Internet Age, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/journals/news-media-and-law-summer-2014/republication-internet-age    (last visited 10/25/24).

Beast's editor-in-chief from 2018 to 2023 characterized Defendant The Daily Beast as a "high-end tabloid"[40].

268.    Thus, the argument from the The Daily Beast Attorneys that the Defendants are shielded from a lawsuit because they are journalists and therefore covered by the anti-SLAPP laws in New York Statement cannot avail of that protection because they work for a "high-end tabloid" that peddle in gossip and news that is of "public concern". Moreover, the New York anti-SLAPP laws do not apply because the Articles are fallacious and de facto defamatory. However, the anti-SLAPP laws do not shield Defendants from the cyberbullying Causes of Action.

269.    In the instant case, the Articles were clearly written to make fun of, humiliate, ruin and mock Plaintiff. By including the name of Plaintiff's law firm in the Articles, Defendants invited readers to harass her offline. The fact that The Daily Mail Defendants doxxed Plaintiff by printing her home address is proof of both sloppy and negligent journalism (at the very least) and the reckless disregard necessary to prove "malice" was at play in the writing of The Daily Mail Article, the use of the "Karen" moniker, publishing the article to the entirety of the Western world could only be seen as cyberbullying to the reasonable person.

270.    Indeed, Plaintiff could not even buy a watermelon from the watermelon vendor on Lenox Avenue without potentially being excluded from society (Exhibit 17) because of the Article by The Daily Beast Defendants. Only someone lacking

---

[40] Eric Johnson, "Is the Daily Beast the new Gawker?", Vox, November 13th, 2018, https://www.vox.com/2018/11/13/18090172/noah-shachtman-daily-beast-gonzo-spirit-gawker-trump-steven-perlberg-recode-media-podcast (last visited 11/18/24).

integrity would not consider the Articles inherently damaging. The Articles were clearly hit pieces, plain and simple. The question is "why?"

271. However, because the reasonable man on the street (i.e., the Watermelon vendor and the civic organizer in Plaintiff's neighborhood, Maxine De Seta) read the Articles and took them as facts instead of opinions of many supposed outraged X users (many of which were likely bots and bots can have neither opinions nor First Amendment Rights), the harm caused to Plaintiff by the Articles is self-evident.

272. Plaintiff was made a "Karen" in the eyes of the public by those Articles, even if that is entirely untrue. While "Karen" might be an opinion, it is often weaponized speech, is inherently ageist, discriminatory, misogynistic, and chills speech that certain elements in society would rather not hear. It is not a crime to have strong opinions, but in sensationalizing the Tweet, Defendants marked her as an "untouchable" in what they perceive "civil society" should look like.

273. Last time Plaintiff checked, she was still living in the United States of America, a free country. Defendants made Plaintiff both a national and an international "Karen" and put an abrupt halt to any social, economic, and professional opportunities where "Googling" people is *de rigueur*. And anyone Googling Plaintiff would be fed the stories that she is a "Karen".

274. Inpreparing the Complaint, Plaintiff sought a copy of the police report related to the incident on October 18, 2024, at 6:30 pm. Plaintiff called the 24th Precinct at 212-678-1811 and discovered that there was no report corresponding to

her name and number. The police officer who spoke with Plaintiff on the phone, Officer R. Singh whose shield number is 25649 and has been a cop for three and a half years mostly at the 24th Precinct, explained to Plaintiff that he regularly polices the area where Plaintiff lives and where the incident occurred. While not averring to the fact of what happened on May 17, 2023, he advised that – although there is no protocol *per se* for handling such disputes - typically what he would do in similar situations is he would call the complainant (as what happened on May 17, 2023) and he would investigate the matter. If he found people, like the vendors that Plaintiff encountered in Riverside Park, he would have kicked them out of the park without issuing a summons or arresting them – Officer Singh said, "without hammering them in public". If he went back and found she returned to the park, that is when he would have issued a summons and/or written a report. But since there was no report, Officer R. Singh opined that the officers who handled my complaint on May 17, 2023, probably did the same as what he would have done based on how I described the dispute and that the officers probably resolved the issue on the spot. Officer Singh suggested that Plaintiff do a FOIL request to see if such a report exists. The FOIL request that Plaintiff filed on October 18th, 2024, did not reveal the police report in respect of the May 17th, 2023, incident in Riverside Park.

275.    The Daily Beast Articles was syndicated to Yahoo! News, widening the damage footprint.[41] May 18th, 2023, must have been a very slow news day indeed

---

[41] Yahoo! News, "Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park", AJ McDougall, May 18, 2023 (last visited 11/03/24).

that "journalists" needed to trawl X for "breaking news". If it were not so devastating to Plaintiff, it would be laughable.

276. Defendants might argue that the Articles did not damage Plaintiff and that she was willing to tweet about the incident with the Unlicensed Vendor in Riverside Park from her then-public X account then she had to anticipate that the public would read the Tweets and it would be "fair game". At the time of writing the Tweets, Plaintiff had barely 5,000 X followers (it is now closer to 3,000 followers) and was typically speaking to a small audience of loyal followers of about twenty accounts, including the members of the civic group she founded, Save NYC Working Group.

277. Additionally, Defendants damaged the good will in her solo practice, the Law Offices of Sonya Shaykhoun, Esq., which seeks to capitalize on her name and the reputation that she assiduously built as a senior lawyer working on a global basis in the Arabian Gulf, people in NYC actively avoid her and do not want to deal with her because once they Google her they read the Articles and believe the lies in the Articles. Thinking that she might be able to find a permanent job in NYC since her name was put in the proverbial meat grinder by Defendants, nothing has materialized on that front either because Defendants did such a comprehensive job of ruining her name and reputation by smearing her in their Articles for reach, clicks, and money from their perch of moral superiority. Note that The Daily Beast Defendants are self-proclaimed (witch)hunters for "bigots, bullies, and hypocrites".

***Tabloids Are Not "Newspapers" and Therefore Do Not Have the Same Legal Protections as Newspapers – Copyright Infringement by Gossip Hungry Tabloid Journalists***

278. The fact is the Articles were written by tabloid journalists who deliberately misunderstood the Tweets to further some kind of agenda (see The Code) and to make money for the respective Defendants' platforms and "for clicks" and profit. This contravenes the "worldwide license" in the X TOS. The Daily Beast Article seemed to have been riding on the coattails of Plaintiff's viral Tweet, even stating that, "As the responses piled up, the tweet quickly went viral, accruing more than four million view and 6,000 replies." Plaintiff is guided in her life and profession by Cicero's quote, "We are bound by the law so we may be free". The Articles made Plaintiff look like an unhinged and racist lunatic. In the context of the Articles, calling Plaintiff a "Karen" is a derogatory moniker based on her gender.

279. Plaintiff conducted an Internet search to see how Defendants are rated. When asked what kind of newspaper is The Daily Beast?" and the Internet's answer was, *inter alia*, "Political Bias: The Daily Beast is generally rated as having a left-leaning bias. It often publishes stories that favor liberal perspectives and may use emotionally charged language" (Exhibit 18).

280. The Internet search on whether "DailyMail.com is a serious newspaper" produced a similar result (Exhibit 19), "while the Daily Mail is a widely read publication and has received some accolades, its reputation for sensationalism and questionable reliability raises concerns about its seriousness as a news source. Readers are often advised to approach its content critically and verify information through more reliable sources". The London School of Economics and Political

Science (LSE) published a Commentary on August 17, 2023, entitled, "Daily Mail exploits failing regulatory system to mislead its readers"[42]. Ad Fontes Media gave The Daily Mail middling marks for reliability[43]. Media Bias Fact Check labeled The Daily Mail as a "questionable source" that "exhibits one or more of the following: Extreme bias, consistent promotion of propaganda/conspiracies, poor or no sourcing of credible information, a complete lack of transparency, and/or is fake news[44].

281.    It is extremely relevant to the instant case that The Daily Mail is considered "fake news" which is the *deliberate attempt* to publish hoaxes and/or disinformation for profit or influence...Sources listed in the Questionable Category *may* be very untrustworthy and should be fact-checked on a per-article basis" (emphasis added).[45]

282.    The Daily Mail is a UK-based newspaper. Given that The Daily Mail is a UK-based newspaper, how is what happened in Riverside Park in NYC between Plaintiff and the Unlicensed Vendor one afternoon on May 17th, 2023 of public concern to the British readership? That is nonsensical and a stretch indeed. The damage has been done, though, to Plaintiff's reputation internationally. Readership stats presented by Press Gazette in the UK only reports on UK readership: "The Daily Mail's website reaches some 24 million readers per month in the UK (around

[42] London School of Economics, Grantham Research Institute on Climate Change and the Environment, "Daily Mail exploits failing regulatory system to mislead its readers", August 17th, 2023, https://www.lse.ac.uk/granthaminstitute/news/daily-mail-exploits-failing-regulatory-system-to-mislead-its-readers/ (last visited 11/18/24).
[43] Ad Fontes Media, "Daily Mail Bias and Reliability", https://adfontesmedia.com/daily-mail-bias-and-reliability/, undated (last visited 11/18/24).
[44] Media Bias Fact Check (https://mediabiasfactcheck.com/daily-mail/) (last visited 10/24/24).
[45] Media Bias Fact Check (https://mediabiasfactcheck.com/daily-mail/) (last visited 10/24/24). id.

half the online audience). This equates to a daily online audience of around four million in the UK."[46] <u>How is what Plaintiff does in her local park in Manhattan of interest to the British populace or an audience beyond NYC (even with an American readership that is tabulated at 113 million website visits in September 2024)</u>[47]? The Articles seem to advocate for a lawless society.

283.    Surprisingly, The Independent is not rated as a tabloid, rather it is considered as being a left-leaning newspaper that is reliable.[48]

284.    Where the errors are so egregious as in the instant case, Defendants cannot avail of First Amendment rights and New York's Anti-SLAPP Laws and the laws cyberbullying and breach of privacy must apply. It is important to revisit the New York anti-SLAPP laws because their failure to protect Plaintiff against Defendants is the reason why she withdrew the case from the New Yoork Supreme Court and refiled in the SDNY even though that meant forfeiting the defamation and defamation causes of action, which are out of the statute of limitations now. The Daily Beast Defendants have argued that they are protected by New York's anti-SLAPP laws which "provide procedural mechanisms that deter meritless suits filed to chill speech or petitioning activity".[49] The New Yor anti-SLAPP laws allow journalists to invade the privacy of its unwitting subjects and deny due process and

---

46        https://pressgazette.co.uk/publishers/nationals/who-reads-the-daily-mail-circulation-and-readership/ (last opened 10/23/24)
47        https://pressgazette.co.uk/media-audience-and-business-data/media_metrics/most-popular-websites-news-us-monthly-3/ (last visited 10-24-24).
48 Ad Fontes, "The Independent Bias and Reliability", https://adfontesmedia.com/independent-bias-and-reliability/ (last visited 12/26/24).
49 https://nysba.org/new-yorks-anti-slapp-law-is-only-a-slap-on-the-wrist-will-new-legislation-make-it-sting/ (visited 10/22/24).

the right to privacy to victims of hit pieces like the Articles. This legal climate encouraged Defendants to push the Articles to the nasty limit to which they pushed them. The politicized nature of the anti-SLAPP laws means they do the exact opposite of what they are supposed to do: they harm victims and protect perpetrators of defamation like Defendants.

285. NY's initial anti-SLAAP scheme was adopted in 1992[50] to "discourage 'strategic lawsuits against public participation' (SLAPPs) filed to silence critics on matters of public concern. It is notable that courts apply the 1992 anti-SLAPP scheme in federal court applied the law so narrowly that it gave no support to defendants.[51] Governor Cuomo signing the anti-SLAPP bill into law, but "[C]ourts narrowly interpreted the 1992 anti-SLAPP scheme… they held that because the anti-SLAPP scheme was in derogation of the common law, it must be strictly construed, and they rarely awarded attorney's fees… As one court wrote fifteen years after the law's adoption, '[T]here has bever been a case in which a newspapers successfully came under the umbrella protection of this statute.' Still, federal courts regularly applied the narrowly construed law in cases before them."[52] Plaintiff is not a litigator but a transactional attorney and was in a hurry to file the case before the statute ran out and did not file in the Federal Court at the same time as she filed in the Supreme Court, which might have been more effective to get justice for the defamation and defamation per se causes of action in the first instance. Nor did

---

[50] https://www.journaloffreespeechlaw.org/schafer.pdf p.574
[51] Id., 574
[52] Id. 580

Plaintiff understand the mood of the judges in the Supreme Court toward the New York anti-SLAPP laws.

286.    Likewise, the 2020 amended anti-SLAPP received equally chilly reception in NY Courts, giving it "a narrow compass"[53] and "for the first time, some are even refusing to apply some provisions of the law in federal court". The aim of anti-SLAPP laws is "to protect citizens from meritless lawsuits targeting the exercise of constitutional rights".[54] Is cyberbullying other X users a "constitutional right"? It is not, especially considering that X has a stringent Privacy Policy which, extrapolated to this case, means that the Defendants breached X's Privacy Policy, demolished Plaintiff's name and character, etc. in the name of "public interest". Likewise, the anti-SLAPP laws are like bail reform wherein murderers, robbers, and rapists can commit heinous crimes and are released on low or no bail almost immediately. Anti-SLAPP laws do not automatically grant favor to the Defendants to steamroll over Plaintiff, damage her name, print her pictures and home address, and open the door to abuse and weaponization of the Articles against Plaintiff. At what cost to Plaintiff is "free press"?!

287.    The sponsors of the 2020 anti-SLAPP Scheme sought to widen the net of protections to "better protect citizens from frivolous litigation that is intended to silence their exercise of the right [ ] of free speech."[55] The 2020 NY Anti-SLAPP law

---

[53] Id., 574
[54] Id., 576
[55] "Senator Brad Hoylman-Sigal and Assembly member Helene Weinstein sponsored the bill. In her sponsor memo, Weinstein explained that the bill's purpose was 'to extend the protection' of the 1992 law. The amendments would better 'protect citizens from frivolous litigation that is intended to silence their exercise of the right [ ] of free speech.' Holyman-Sigal added that the 1992 law 'failed to

was not meant to be a free-for-all, however, allowing defamation and all manner of consequent abuses as in this lawsuit.

288. C.R.L. §76-a expands the anti-SLAPP scheme, defining SLAPP lawsuits as those that are over '[any]] communication in a place open to the public or a public forum in connection with an issue of public interest' or '[a]ny other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.'"[56] The bill advises that "public interest" should be "construed broadly", meaning "any subject other than a purely private matter"[57]. This broad approach opens the door to a lot of abuses by news organizations and journalists. Specifically, the New York anti-SLAPP laws do not trump the other discrete causes of action in the New York Supreme Court case but because of the politicization of the New York Supreme Court, Plaintiff has lost her right to due process for defamation and defamation per se.

### *Copyright Infringement*

289. Plaintiff's Tweets on the X.com platform are Plaintiff's intellectual property per the X TOS and are subject to a worldwide license to everyone. A distinguishing feature of X.com is that an account owner has the immediate option at its sole discretion to make her account "Private" such that only those X users who

---

accomplish' its objective of ensuring 'the utmost protection for free speech rights, 'particularly where such rights are exercised in a public forum with respect to issues of public concern.'" *ibid*, 581.
[56] Id., 582. NY CLS Civ R § 76-a(1)(a)
[57]https://www.duanemorris.com/alerts/new_york_bolsters_antislapp_protections_defendants_sued_f ree_speech_1120.html (last visited 10-22-24); NY CLS Civ R § 76-a(1)(d).

actively follow a "Private User" can see her Tweets. An X user can (i) mute and block other users, and b) limit who can reply to a tweet. Although it is a proverbial "town square", X is still subject to the X user's controls, subject to X's Policies.

290. Thus, C.R.L. 76-a does not fully apply to the X platform because each X user can adjust other X users' access from "private" to "public" and vice versa. This privacy feature, which the Plaintiff has applied to her X account @SonyaShaykhoun for most of May 17, 2023 (Plaintiff made her X account private on and off for a week beyond the date of the Tweet and finally left it private) to date, renders the New York anti-SLAPP laws inapplicable because a private account necessarily has less impact on public discourse.

291. Plaintiff's intention in going private was to mitigate the damage and abuse that she experienced, despite a wide range of responses from extremely supportive and likeminded X users. Despite that, the downright abusive X users won out and Plaintiff went private. When the hate mail and third-party cyberbullying started coming in and after the publication of the Articles, Plaintiff weighed the damage to her reputation and business against her need to stand up for herself and choose safety, freedom from verbal abuse, and privacy. Much of the abuse Plaintiff suffered on X was from other users who lambasted her for calling the police on the unlicensed food vendor because she was an immigrant (she was not, she was American and spoke perfect English with a New York accent). The truth is, Plaintiff called 911 because the Unlicensed Vendor got hostile, chased after her, got physically aggressive and stuck her phone in her face to record her saying what she said about

not knowing if her kitchen was clean or if she had a cat that walked all over the counter and the food. In republishing these tweets to underscore their false hypothesis that Plaintiff is a racist, bigoted "Karen" and calling the cops on the unlicensed vendors was proof of that state of being a "Karen", they published a false and defamatory narrative that still haunts Plaintiff to date. Defendants published inaccuracies -- not just in New York or America but internationally - that readers took as facts, and the Defendants perpetuated the abuse and damage against Plaintiff via the Articles and without speaking to Plaintiff about what happened.

292.    Finally, parsing the Articles, one quickly realizes that the subject matter – which the respective Defendants would have readers believe is a) illegal migrants and the Upper West Side ("UWS") Karen, and/or, b) illegal migrants selling food without a license and the UWS Karen, and/or, c) unlicensed vendors and the UWS Karen who abused them. In reality, the Articles are an extension of the pile-on that occurred on X and a proverbial rubbing Plaintiff's nose in the voluminous nasty responses. What are the Articles really about? "Roasting a Karen", a theme both Articles share, is not a matter of public interest and a serious matter for public discourse. Had the Articles fleshed out the social-economic issues of the moment (i.e., the raging debate in the media about illegal migrants and NYC's sanctuary city status, and the issue of rampant unlicensed vendors around NYC), then the Anti-SLAPP laws may have applied. But the Articles seek to further humiliate and defame Plaintiff by proverbially underscoring the nastiest emails.

293. There was no debate on the pros and cons of unlicensed food vending – only a debate on the extent to which Plaintiff was a "Karen". While the incident took place in Riverside Park, a public space, and relate to issues involving unlicensed vendors in public spaces relating to local regulations and community standards, the Articles did not tell that story. Similarly, a public discussion about behavior in shared spaces and interactions between community members could be deemed protected speech relating to public concern matters – but in the instant case, Plaintiff called 911 when Unlicensed Vendor's behavior turned from verbally aggressive to physically threatening – this important omission by Defendants - falsely rendered Plaintiff a racist, bigoted, Karen and the effect was to ruin Plaintiff's name, relationships, business opportunities, and status in the community.

294. On balance, is the right of the public and tabloids like the Defendants to cyberbully, harass, and taunt, a community member outweighed by that community member's right to live in peace and safety and with her good name intact? Especially since the cause of the damage was Articles written to depict Plaintiff in a false light (for clicks and monetary gain?) At least get the facts right. But they got the facts wrong.

295. Given that The Daily Mail is a UK-based newspaper, how is what happened in Riverside Park in NYC of public concern to the British readership? That is nonsensical and a stretch indeed. Readership stats presented by Press Gazette in the UK only reports on UK readership: "The Daily Mail's website reaches some 24

million readers per month in the UK (around half the online audience). This equates to a daily online audience of around four million in the UK."[58]

296.   At the time of publication of the Articles, Plaintiff had a small account of not more than 5,000 users which today is less than 4,000; it is certainly not an "influencer account" although Plaintiff made some money on the Tweets but not in the $100s of dollars.  The fact that Plaintiff's X moniker is "Commercially Savvy Lawyer" (the same moniker Plaintiff uses on LinkedIn and Substack) puts readers on notice that her tweets are about legal matters, which sometimes includes NYC laws and compliance issues.

297.   Defendants missed an opportunity to have a serious and meaningful public debate about an issue that has increasingly plagued NYC government, unlicensed street vending. Street vending "is frequently subject to intense public debate" and the laws on NYC street vending are strict. [59]

298.   That the Tweet attracted almost seven million views in a short period of time only speaks to the public's fascination with digital "car crashes", slowly driving by while gawking at the bloodied scene (i.e., a perverse public interest, not a valuable public interest). Taunting Plaintiff further while disingenuously hiding behind the anti-SLAPP laws and, in The Daily Beast Defendants' case, the hifalutin Code with its lofty ideals (how is it "inclusive" to demean a law-abiding citizen in

---

[58]      https://pressgazette.co.uk/publishers/nationals/who-reads-the-daily-mail-circulation-and-readership/ (last opened 10-23-24)

[59] https://www.nyc.gov/assets/dca/downloads/pdf/partners/SVAB-Report-2022.pdf (last opened on 10-23-24)

NYC as a "Karen"? Isn't that misogynistic?) – is not a matter of public concern and the Articles, by only reprinting the nastiest responses, doxxing the Plaintiff by publishing her pictures and her home address, phone number and email, cannot convincingly assert they are journalists reporting on a public concern. Noah Shachtman (Defendant The Daily Beast editor from 2018 – 2021) called Defendant The Daily Beast a "high-level tabloid"[60]. Tabloids are not newspapers, rather they are sensationalists that peddle in "yellow journalism" for money (which further offends the X worldwide license to reprint but not to monetize without the IP owner's consent).

299. In summary, the public might have been interested in the Tweet, but it was not of public interest. Reputable news organizations follow ethical guidelines that caution against publishing personal information like home addresses, particularly when it could cause harm or distress. Further, The Society of Professional Journalists (SPJ) Code of Ethics calls on journalists to "minimize harm" and be sensitive to the privacy and safety of individuals when publishing information.

### *Defendants Breached Their Respective Journalistic Ethical Duties, Especially the Duty to "Minimize Harm"*

300. It is important to characterize Defendants properly because it determines the extent to which they can avail of the protections afforded to

---

[60] id. at 94.

Page 121 of 178

traditional, orthodox newspapers. Typically, tabloids are not considered to be on a par with newspapers.

301.    In the case of Defendants, they peddle sensationalist stories whose aim is to attract eyeballs because their respective business models depend on advertising revenue and/or subscriptions.

302.    Plaintiff asserts that the Defendants are not in fact orthodox journalists, but social justice warriors ("SJWs") and not in a good way. When is a journalist really an SJW? "The name itself – social justice warrior – seems to refer to people who fight on behalf of society's downtrodden. The term social justice warrior is governed by connotations as well. According to the Oxford Dictionary, a social justice warrior is a derogatory term of 'A person who expresses or promotes socially progressive views.'"[61] The term "social justice warrior" has negative connotations now; if someone thinks another person is an SJW, it "implies that the accuser thinks the other person is an unreasonable, hostile, and self-interested internet user with a progressive agenda".[62] This can certainly be said not only of those X users (bots included) whose comments and verbal assaults belied a progressive agenda that is incompatible with the rule of law.

303.    Contrast the definition of "social justice warrior" with The Daily Beast's Code in light of the received concept of "journalistic ethics". Journalistic ethics call

---

[61] Abigail Herbst, "How the Term 'Social Justice Warrior' Became an Insult", August 13th, 2013, Foundation for Economic Education, https://fee.org/articles/how-the-term-social-justice-warrior-became-an-insult/ (last visited 11/16/24).
[62] Id.

on journalists to practice "ethical journalism"[63], which – as is of particular importance to this lawsuit - entails, *inter alia*, verifying information before publication, "neither speed nor format excuses inaccuracy"[64], provide context and be careful not to misrepresent or oversimplify in promoting[65], previewing or summarizing a story[66], avoid stereotyping, never deliberately distort facts, including visual information[67].

304.    Like lawyers, journalists are bound by a universal code of conduct that commands them to adhere to ethical conduct, integrity, and social responsibility in their reporting. Unlike lawyers, there is no certifying or licensing body to vet, approve, and license "journalists".

305.    "Minimizing harm" is a key element in journalism. Wikiversity outlines the tenets of minimizing harm from journalism, which, also includes the need to "Consider Potential Consequences", "Exercise Sensitivity and Discretion", "Respect Privacy and Dignity", and "Avoid Stereotypes and Stimatization". The call to "Consider Potential Consequences" is particularly *a propos*; it stipulates that "responsible journalists carefully consider the potential consequences of their reporting on individuals, communities, and society as a whole. They weigh the public interest value of the story against the potential harm it may cause and exercise

---

[63]  Society of Professional Journalists, SPJ Code of Ethics, September 6, 2014, https://www.spj.org/ethicscode.asp (last visited 11/16/24).
[64] Id.
[65] Id.
[66] Id.
[67] Id.

discretion and judgment in their decision-making".[68] Based on the many errors made by AJ McDougall and Noa Halff in drafting the respective Articles to characterize Plaintiff, herself an international lawyer with years of experience and an unblemished professional record, as a "Karen" and disseminate that story nationally and internationally, failed miserably in upholding the many elements comprising journalistic ethics because they apparently failed to consider any of their journalistic ethical duties in writing the Articles for national and international publication.

306.    It is one thing to champion civil rights[69], it is quite another to bungle the facts to fit a narrative as the Defendants did, completely ignore journalistic ethics, and destroy an entire human being in the process. Other markers of SJWs posing as journalists include: prioritizing activism over objective reporting (i.e., the Articles focus on the name-calling and shielding a presumed migrant from criticism and not the fact that selling food to the public in NYC without a license is not only a health hazard, especially at the tail-end of a global pandemic, but against the law); advocating for a cause instead of impartial reporting; engaging in "cancel culture" (including writing an article, like the Articles, in such a way that it results in public shaming and cancellation); using sensationalized headlines or sensationalized reporting techniques; focusing on identity politics (the Articles erroneously implied the Unlicensed Vendor was a "migrant"); an over-commitment to political

---

[68] Wikiuniversity.org, "Evaluating Journalism Standards/Minimizing Harm from Journalism", https://en.wikiversity.org/wiki/Evaluating_Journalism_Standards/Minimizing_Harm_from_Journalism (last visited 11/16/24).
[69] Freedom Forum, "Seven Pioneering Journalists Who Championed Civil Rights", https://www.freedomforum.org/civil-rights-journalists/ (last visited 11/16/24).

correctness over journalistic integrity; and, taking stances on social issues primarily to enhance their own reputation rather than out of genuine concern. In the instant case, we see in The Daily Beast's Code that, by definition, they take a position of moral superiority.

307. It is widely accepted that journalists are subject to core principles of ethics and integrity. The Society of Professional Journalists guides journalists to seek the truth and report it; minimize harm; act independently; and, be accountable and transparent[70]. Other calls to action include accuracy and fact-checking; independence from commercial or political interests; protecting sources and respecting privacy; correcting errors promptly; ensuring a free exchange of accurate, fair and thorough information; building trust and credibility; helps distinguish journalism from other content; verifying information before publishing; providing context to avoid misrepresentation; identifying sources clearly when possible; using anonymous sources carefully and sparingly; avoiding undercover or deceptive newsgathering methods, labeling opinion and commentary separate from news.[71] The overall goal is to serve the public interest through accurate, fair and independent journalism that people can trust. Maintaining high ethical standards is seen as crucial for journalism's credibility and societal role. Defendant journalists' emphasis on the "Karen" accusations against Plaintiff breached many of the aforementioned

---

[70] Society of Professional Journalists, SPJ Code of Ethics, https://www.spj.org/ethicscode.asp (last visited 11/03/24).
[71] International Federation of Journalists, "Global Charter of Ethics for Journalists", https://www.ifj.org/who/rules-and-policy/global-charter-of-ethics-for-journalistsm (last visited 10/29/24).

journalistic ethics, **including the requirement that journalists "minimize harm"** (emphasis added).

308.  It is helpful to look at other newspapers' code of ethics. The Al Jazeera Media Network Code of Ethics[72] stipulates that, *inter alia*, it will "Adhere to the journalistic values of honesty, courage, fairness, balance, independence, credibility and diversity, giving no priority to commercial or political over professional consideration" and "Present the diverse points of view and opinions without bias and partiality."[73] Even Al Jazeera strives to present a diversity of opinions, rather than hammering home one very negative opinion with a predictable end result of ruining a reputation and damaging economic and social opportunities, as Defendants did to Plaintiff with the Articles.

309.  Notably, The Daily Mail does not include a "code of conduct" on its websites as does The Daily Beast.

310.  This question of whether journalists who fail to adhere to journalistic ethics to further an agenda or specific perspective (i.e., are SJWs) can avail of the same protections (i.e., New York Anti-SLAPP laws) that those journalists operating within the framework of the orthodoxy (i.e., those who have and follow journalistic ethics) can is an important one. Is it possible to be an SJW posing as a journalist and "minimize harm" per the received standards of journalism? It seems like a contradiction in terms. At a minimum, Defendants breached the universally received journalistic ethics The Daily Mail declared itself a social justice warrior in its

_____

[72] AlJazeera, "Code of Ethics", https://www.aljazeera.com/code-of-ethics/ (last visited 11/03/04).
[73] Id.

oxymoronical Code ("We value an inclusive culture, committed to the public good. A core part of our mission is to confront bullies, bigots and hypocrites"). Ironically, it is Plaintiff's assertion that Defendants, in humiliating Plaintiff by emphasizing the cyberbullying on X that saw her called a "Karen" multiple times over, Defendants became the virtue-signaling "hall monitors" and "Karens".

***Personal Rights to Privacy and Protection From Cyberbullying; or, When Newspapers With Deep Pockets Destroy A Person's Reputation and Thinks They Will Get Away with It Because Most People Cannot Afford or Do Not Have The Courage To Litigate.***

311.    The Daily Beast Defendants have already argued that they are protected by the anti-SLAPP laws that were updated in New York in 2020. The argument that media companies like the corporate Defendants with deep pockets should be shielded from litigation for publishing a "matter of public interest" that attracts litigation from the victims of their fallacious and sensationalist stories, victims who do not have equally deep pockets, is ridiculous. It seems against the spirit of the NY anti-SLAPP laws to deny victims of garrulous and life-ruining Articles the right to fight tooth and nail for their right to clear their name. Defendants did actual damage to Plaintiff on multiple levels and did so either maliciously and/or with reckless disregard as to the truth and with the hubristic reliance on the Anti-SLAPP laws that are meant to protect the likes of Plaintiff not deep-pocketed Defendants whose very business and profitability relies on sensationalist stories about so-called "Karens in local parks".

312.    Journalists do not have the unmitigated right to lie and exaggerate to grab attention. That is what Defendants did – there is nothing of

public interest in mean tweets unless one is President Donald Trump and clearly, Plaintiff is not President Donald Trump.

### *The Republication Rule - Vicarious Liability – Breach of Privacy*

313. The ridicule, abuse, and weaponization of the Articles targeting Plaintiff, escalated to the point where Plaintiff feared for her safety. As a result, she permanently set her X.com account, @SonyaShaykhoun, to private, a status it retains to this day.

314. By May 2023, Plaintiff was fully aware of the hostile nature of X (formerly "Twitter"). Having experienced its volatility with previous accounts, Plaintiff had often stepped away to avoid the risks associated with the platform. During her time in Bahrain and Qatar, Plaintiff avoided Twitter altogether, as even minor perceived errors could result in severe consequences, including criminal charges and incarceration. Upon her return to the United States in 2019, Plaintiff believed she could exercise free speech without fear of such repercussions. However, this assumption proved disastrously incorrect.

315. Encouraged by Elon Musk's promotion of X as a "town square," Plaintiff cautiously returned to the platform. Yet, she could not have foreseen the viral nature of her tweet, which led to its coverage in national and international media. The subsequent backlash turned Plaintiff into a subject of ridicule, overshadowing her previous recognition for her work with globally prominent companies, especially in satellite law and related industries.

316.    Defendants' treatment of Plaintiff are examples of cyberbullying and are profoundly disrespectful. "Journalists" AJ McDougall and Noa Halff had numerous ways to cover the Tweet and ensure the protections of New York's Anti-SLAPP laws, which emphasize communications in public forums about issues of public interest (2020 N.Y. Senate Bill No. 52-A/Assembly Bill No. 5991A). Instead, said Defendants opted to sensationalize the story, amplifying harm to Plaintiff's reputation, over a truly public interest matter – an opportunity to have an impactful debate which Defendants lost in favor of sensationalism. Soon after the publication of the Articles and continuing to date, the NYC Mayor Eric Adams initiated a campaign on illegal food vendors and illegal vendors of other goods all around New York City[74]. So what did Plaintiff do wrong that was worthy of the intense ridicule and cyberbullying at the hands of Defendants? The Independent is inherently damaging and the proof of that is in the subsequent weaponization of The Independent Article against Plaintiff (Exhibit 20).

317.    Defendants' coverage was vindictive and malicious, clearly intended to damage and mock Plaintiff's reputation, goodwill, and business prospects. The derogatory titles and "Karen" accusations in the Articles underscored this intent, driving international attention that exacerbated the harm to Plaintiff.

318.    The Articles caused severe damage to Plaintiff's professional and personal reputation. Unable to secure clients, Plaintiff has been forced to take low-

---

[74] Haidee Chu, "NYPD Dragging Many More Vendors to Criminal Court, Data Shows", February 5th, 2024, The City, https://www.thecity.nyc/2024/02/05/nypd-vendors-criminal-summonses-court-spike/ (last visited 11/18/24).

paying document review work ($30–$50 per hour), a stark contrast to her previous career. Financial difficulties prevented Plaintiff from promptly purchasing the Index Number for this case. Although Plaintiff filed a Poor Person Order in May 2024, it was rejected in June 2024. She eventually secured the Index Number in August 2024 but faced delays in serving documents due to clerical issues.

319. Despite the long-reaching harm caused, The Daily Beast's Attorney, Lindsey Cherner, dismissed Plaintiff's claims as frivolous, asserting that the outlet stands by its reporting.

320. Plaintiff refutes this assessment. Defendants' actions were malicious, with reckless disregard for the truth. For instance, AJ McDougall ignored Plaintiff's comments provided on May 18, 2023, which clarified that she only called 911 after feeling physically threatened. AJ McDougall failed to incorporate these comments, producing a biased and misleading article.

321. Similarly, Noa Halff falsely claimed to have reached out to Plaintiff for comment in The Daily Mail Article. This piece also violated privacy laws, including but not limited to New York Civil Rights Law §§50 and 51 and the UK GDPR, by publishing Plaintiff's personal details, such as her home and law firm address, without consent. While UK GDPR enforcement falls outside this Court's jurisdiction, it highlights Defendants' reckless handling of Plaintiff's data and reputation.

322. The republication rule holds individuals and entities liable for repeating defamatory falsehoods. According to the Reporters Committee for Freedom of the Press, the doctrine treats republication as equivalent to original

publication, exposing the "republisher" to liability. This is the basis for Defendants' vicarious liability to Plaintiff.

323.    Defendants' use of Plaintiff's images in their publications violated New York Civil Rights Law §§50 and 51. These statutes prohibit using a person's name, portrait, or picture for advertising or trade purposes without written consent. Defendants exploited Plaintiff's images to monetize their publications, violating her right to privacy.

324.    §51 of the law provides for injunctive relief and damages for unauthorized use of a person's likeness. Defendants' actions in republishing Plaintiff's name, image, and social media content meet the criteria for such violations (*Messenger v. Gruner + Jahr Printing & Publishing*, 94 N.Y.2d 436 [2000]).

325. Defendants violated their own privacy policies by republishing Plaintiff's photographs without consent, further compounding the harm to her reputation and privacy.

### *Defendants Breached the X Terms of Service and Privacy Policy by republishing the Tweet without Plaintiff Sonya Shaykhoun, Esq.'s express written consent.*

326.    Significantly, all Defendants breached the X TOS and privacy policies of the X Platform, both of which policies apply to the republication of the Tweet and Plaintiff's images without her consent and which X considers impermissible "doxxing".

327.    Egregiously, all Defendants breached the worldwide free license that X grants "the rest of the world" in the section of the X TOS entitled, "Your Rights and

Grant of Rights in the Content", the Defendants when they republished the Tweet for money (all Defendants either have a subscription model in which they charge readers to access content, such as the Articles, or an ad-based model, whereby Defendants get paid by advertisers for eyeballs on content and ads).

328.   Plaintiff asserts that the Articles, when published, not only defamed her, additionally breached her contractual rights in her intellectual property in her Tweet and photos, breached her privacy, and caused her severe emotional, psychological, and financial damage.

329.   This is not a frivolous lawsuit; the claims are real and provable. Plaintiff thought long and hard before taking this action to redeem herself on the global stage after Defendants shredded her reputation, her name, and flattened her business, economic opportunities, and standing in the community. Plaintiff closed the door on the digital world when she made her @SonyaShaykhoun – The Commercially Savvy Lawyer X account private. Defendants opened the door to hecklers, trolls, and the unhinged when they published their respective Articles. It is a miracle for which Plaintiff is eternally grateful that no one wrote to the New York State Bar to try to get her disbarred (or if they did, which is not beyond the realm of possibility, the New York State Bar did not choose to sanction her)..

330.   Plaintiff takes the protection of her family name, "Shaykhoun", very seriously as it is the legacy of her Egyptian father, who died of leukemia in 2001, after living a life of achievement and loss. Plaintiff feels the dishonor to her and her father's name and Egyptian family very deeply.

331. Rather than Plaintiff trying to chill Defendants' free speech under New York's anti-SLAPP Laws, Defendants attempted to chill Plaintiff's free speech by shaming her in their respective Articles, which were a clear national and international pile-on, exacerbating the worst of the responses Plaintiff had received. It is impossible to assess the extent of the damage Defendants did to Plaintiff's name, reputation, law firm and social and economic opportunities by publishing the Articles on the World Wide Web (a/k/a the Internet).

332. The Articles damaged Plaintiff and she asserts that, because both Articles emphasized the vicious roasting and not the public interest and that Defendants acted with malice and/or reckless intent as to the veracity of the so-called "facts" repeated and asserted in the Articles. Plaintiff spent a total of thirteen years living and studying in the United Kingdom. That the Article was publicized internationally and not just locally made the experience especially poignant for and distressing for Plaintiff who has friends and professors whose respect she values in the United Kingdom. After The Daily Mail Defendants published their damning Article including her home address and many pictures in their international tabloid Plaintiff will now have to take action to a) change her law firm address, and b) hide her home address to protect herself and her mother against potential physical attacks.

333. The troll guerilla army on X.com decided that Plaintiff had committed a social justice offense and launched a major attack on her X account, made hate calls and sent hate emails and direct messages to sonya@shaykhounlaw.com. It was

an insane and unhinged response. By the end of two days, the Tweet had almost seven million views, which was an obvious reason for tabloids like Defendants to want to monetize and commercially exploit.

334. Defendants were not interested in hearing all the sides of the "unlicensed vendors in NYC" debate, they were patently interested in a) rubbing Plaintiff's face in the nasty tweets, and b) monetize the bullying Plaintiff experienced in the response to her Tweet and off the X.com platform.

335. Each Article sensationalized the Tweet starting with their respective titles. The Daily Beast used the sneering title, "Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park". Why did TDB think it was necessary to put the word "unlicensed" in quotes thus inferring that the vendor was in fact licensed? The title oozes sarcasm; surely if they really wanted to engage in a balanced public discourse, they would have used a more balanced title like, "Lawyer Causes Heated Debate about Unlicensed Food Vendors, One of Whom Nearly Assaulted Her in a NYC Park"?

336. The Daily Beast Article eviscerated Plaintiff by presenting her as an unhinged racist, essentially mocking her. The Daily Beast Article used a small sample of the nastiest responses without countering them with the responses on the other side of the spectrum. As such, it was an unfair depiction (sic. ambush) of Plaintiff and her Tweet that elicited a variety of responses, many of which were mean and ugly, but many of which focused on the dangers of allowing unlicensed food vendors to sell food in the park without the mandatory permits. Many like-

minded X users chimed in to express how unfair it is that unlicensed vendors get away with so much when people in New York City who follow the rules and laws have had to fight hard and paid a lot of money to get their food vendor licenses (Exhibit 21). Defendants missed an important opportunity to have an impactful debate about a matter of true public interest – unlicensed vendors – as opposed to amplifying mean tweets.

337. If, as The Daily Beast Attorneys disingenuously assert, The Daily Beast Article was really about a public interest rather than making an example of Plaintiff as what Defendants saw as a "bully, bigot and hypocrite" as their Code demands, they would have focused on the social issues that the Tweet obviously spoke to (unlicensed food vendors). But they missed the mark; they focused on and amplified the cyberbullying and not in a way that was a public interest. AJ McDougall talked about the Tweet, in which she mischaracterized the Unlicensed Vendor as an illegal migrant (she was a native New Yorker based on her unmistakable accent). That she also referenced another tweet that Plaintiff had made that had nothing to do with unlicensed vendors supports the theory that AJ McDougall was writing a story about racism against illegal immigrants.

338. Plaintiff's previous tweet about a fall-down drunk man who was in front of her building on West End Avenue, a sight Plaintiff had never seen before and Plaintiff questioned if said fall-down drunk was an illegal migrant because, at the time, the Councilwoman for District 6 (the District in which Plaintiff lives), Gale Brewer was not answering questions about how many migrants were living in the

neighborhood. Plaintiff felt this was another marker of corruption and a quality-of-life decline in both her neighborhood and NYC. Again, AJ McDougall might well have entitled her Article, "Look at Sonya Shaykhoun, a racist bigot, and ruthlessly bully her any way you can!" All Defendants might well have written the same in their Articles respectively. Because that is the impact of the Articles on Plaintiff since publication to date.

### Social Media Suffers From An Anger Problem - The "Negative Filter Bubble" Mechanism - A Nebulous Ratio Of Humans/Bots - First Amendment and Anti-SLAPP Laws Defenses - Bots Do Not Have Such Rights.

339. In the words of Father Dan Rehill, "Twitter peddles anger".[75] Angry tweets, however, are not a "public concern" as envisaged by New York's 2020 anti-SLAPP Laws and therefore, Defendants cannot avail of the protection of said anti-SLAPP Laws that would protect them from Plaintiff's claim of injurious falsehood.

340. It is telling that, like other social media platforms, X.com has long had a "negative filter bubble" problem. A "filter bubble" refers to a more secretive filtering process that isn't based on a user's explicit choices in the content that they'd prefer to see, but rather the algorithmic process of a piece of code analyzing a user's metadata and making guesses on what type of content that user is going to be more engaged with in the future (Pariser, 2011)."[76] Often, the "filter bubble" or "bubble" is employed by a platform ostensibly to engineer a "viral tweet". That is, "Negative

---

[75] "Father Dan Rehill – Inside the Demonic World with an Exorcist SRS #141", Shawn Ryan Show, YouTube, October 28, 2024, https://youtu.be/0svd0YPi-9I?si=9vsmQ3qt6B3vnCRD (last visited 10/28/24).
[76] Sebastian E. Lamerichs, "Social Media Bubbles Reinforce Negative Behavior", Curtin University, https://networkconference.netstudies.org/2018OUA/2018/04/22/social-media-bubbles-reinforce-negative-behaviour/ (last visited 11/13/24).

content having such an advantage over positive content in terms of viewership (and thus success) encourages an all-out assault of negativity. Marketing research into online reactions show that social media is far more prone to backlash and negativity than traditional communication mediums, and that this negativity propagates and grows much faster than positive sentiments (Pfeffer, Zobrach, & Carley, 2014), in a phenomenon known as 'online firestorms'".[77]

341.    It is one thing to have an "online firestorm" on a discrete platform like X.com where users can instantly make their profiles "private" for their own safety when "debates" get too heated, volatile or abusive. It is another thing to extrapolate an "online firestorm' into digital newspapers with national and/or global footprints like those of the Defendants to intensify and aggrandize the "online firestorm". It is even worse to do such an egregious thing for profit and at the expense of someone's reputation, good name, business, good will, emotional, physical, and psychological safety.

342.    Because The Daily Beast Attorneys already started litigating the case, Plaintiff thought about the free speech considerations and the impact of algorithms and "bots" on social media platforms like X. "Negative filter bubbles" coupled with "bots" results in toxic consequences or "online firestorms" like the kind that erupted around the Tweet. This begs the question of how many of those responding to the Tweet were humans as opposed to bots, which raises additional questions about the applicability of, *inter alia*, the First Amendment and the anti-SLAPP laws to tweets

---

[77] Id.

made by non-human bots. It is universally known and understood that "bots" are a plague on social media, especially on the X platform. Thus, it is difficult to say with any certainty that the responsive tweets that formed the "online firestorm" were human or digital and in light of this, the extent to which free speech rights and the Anti-SLAPP laws protections apply to digital bots. The nebulousness of the human/bot ratio on the X platform undermines the Free Speech/First Amendment and Anti-SLAPP laws defense asserted by the The Daily Beast Attorneys.

343. The opaqueness of the "negative filter bubble" mechanism on the X platform also galvanizes the David/Goliath dynamic of the regular user, like Plaintiff who cannot afford to hire a specialized litigator, versus media platforms with deep pockets who can afford litigation costs. X users like Plaintiff whose social media content get sensationalized for profit by the likes of the Defendants who do not care if they put people like Plaintiff under a cloud of shame and infamy without a real cause are at a disadvantage three times: once by the negative filter bubble; once by the bots which are rife on X.com; and, once by the SJWs-cum-tabloid journalists who cannot or will not adhere to their journalistic code of ethics. Defendants print stories like the Articles because they can and they think, rightly, that no one will stand up to them.

344. The Articles and the Defendants caused Plaintiff such extreme emotional distress that she gained weight, she lost friends, and she lost interest in socializing with people, building her law practice, or looking for a real job.

## CAUSES OF ACTION
### (In order of their importance)

## COUNT ONE: COPYRIGHT INFRINGEMENT (USE OF LICENSED CONTENT WITHOUT PERMISSION)

345. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

346. Plaintiff and Defendants have a contract and quasi-contract per the X TOS for the Tweets. Defendants have a free, worldwide license per the X TOS but that license precludes the monetization of the Tweets without the express written permission of Plaintiff, which express written was not (and would never) be procured by Defendants.

347. Defendants – perversely – used Plaintiff's copyrighted content (i.e., the Tweets) to damage Plaintiff's reputation, damage her legal business, and cause her other kinds of damage elucidated in this Complaint.

348. The damage caused by Defendants to Plaintiff has been pervasive and international in nature and the damages are difficult to quantify because the damage has been so extensive.

349. Plaintiff requested Defendants take down the Articles, but those requests were variously rejected or ignored.

350. Plaintiff has been damaged by Defendants' copyright infringement.

## COUNT TWO: CYBERBULLYING

351.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

352.    Plaintiff has a right to participate in the proverbial digital town square without experiencing violence and cyberbullying by other users, much less have that violence extrapolated onto international digital publications like The Daily Beast, DailyMail.com, and The Independent UK.

353.    The damaging nature of the Articles is inherent in the Articles but also in the way the Articles continue to be weaponized against Plaintiff by individuals (not just trolls but other real people) who think that weaponized speech is an acceptable and civil way to communicate.

354.    Plaintiff requested that Defendants take down the damaging Articles. Defendants have variously rejected or ignored Plaintiff's take down requests.

355.    Defendants have damaged Plaintiff in innumerable ways through their respective cyberbullying Articles and that damage is difficult to quantify.

## COUNT THREE: BREACH OF CONTRACT AND QUASI-CONTRACT

360.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

361.    By virtue of the X TOS, Plaintiff and Defendants had a valid and enforceable contract and quasi contract.362.    The terms X TOS do not provide that licensees can monetize the content like the Tweets.

362. Case law provides that free worldwide licenses such as that granted by the X TOS cannot be monetized without the prior written consent of the licensor, which is, in this case, Plaintiff.

363. Defendants monetized the Tweets in the Articles for national and international publication on their respective platforms by virtue of their respective business models.

364. Defendants damaged Plaintiff by breaching the contract and quasi contract conferred by the X TOS.

365. It is difficult to quantify the extent of the damage Defendants did to Plaintiff by virtue of the breach of contract and breach of quasi-contract.

## COUNT FOUR: INJURIOUS FALSEHOOD

366. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

367. Plaintiff's name is integral to her business, the Law Offices of Sonya Shaykhoun, Esq., a sole proprietorship based in NYC.

268. Defendants' Articles all harp on the fact that Plaintiff is a New York attorney and include the name of her law firm.

369. Defendants damaged Plaintiff by injurious falsehood in that they maliciously made false statements with the intent to harm Plaintiff or without regard to the consequences thereof.

370. A reasonably prudent person would have or should have anticipated that damage to the plaintiff would result.[78]

371. Injurious falsehood arises when a person makes a false representation about another person's goods or services. For an injurious falsehood claim to succeed, the representation can be written or spoken, and the person must encourage other people not to use the goods or services of another person, which then causes that provider to suffer damage. Injurious falsehood is different to defamation which involves damage to a person's reputation.[79] The fact that each of The Daily Beast Article and The Daily Mail Article included the nasty emails and ended with a *précis* of Plaintiff's credentials casts a long shadow on Plaintiff's business.

372. Plaintiff Sonya Shaykhoun, Esq. has been striving to build a law practice with a "global reach". That Defendants published the damning Articles internationally has had a devastating impact on Plaintiff's ability to grow her law practice.

## COUNT FIVE: BREACH OF PRIVACY

373. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

374. Federal and New York State laws protect the privacy (including data privacy) of individuals. For example, N.Y. Civil Rights Law §50 prohibits the use of an individual's name, portrait or picture for advertising or trade purposes. In

---

[78] https://nylitguide.com/guide-chapters/injurious-falsehood/
[79] https://www.armstronglegal.com.au/commercial-law/national/litigation/injurious-falsehood/

printing Plaintiff's likeness without her express written consent, Plaintiff is entitled to the injunctive relieve of §51.

375. By reason of the facts and circumstances, Defendants have breached Plaintiff's privacy (i.e., illicit use of likeness, public disclosure of private facts without a legitimate purpose). It is particularly poignant and alarming that The Daily Mail published a tweet that included her home address in The Daily Mail Article.).

376. Defendants received hate mail at her home address and her email and Defendants opened the door to this abuse by virtue of their breaching Plaintiff's privacy.

377. Defendants have damaged Plaintiff by the multiple ways in which they breached Plaintiff's privacy.

## COUNT SIX: PRIMA FACIE TORT (INTENTIONAL OR MALICIOUS HARM) FOR INTENTIONAL INFLICTION OF HARM WITHOUT EXCUSE OR JUSTIFICATION

378. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

379. Defendants are culpable for a prima facie tort (intentional or malicious harm) for intentional infliction of harm without excuse or justification, resulting in special damages.

380. Defendants intentionally inflicted harm on Plaintiff without excuse or justification and resulting in special damages. In pursuing their respective Articles, by virtue of their respective identities as "tabloids", their overarching motive was a de facto disinterested malevolence which characterizes all other causes of action in

this case. The disinterested malevolence characterizes Defendants' modus operandi in writing smear pieces about law-abiding citizens who make so-called controversial tweets, like the Tweet, and, driven by a hypocritical Code, like The Daily Beast's Code, results in the harm Defendants caused Plaintiff. *LSG 105 W. 28th LLC v Sinclair*, 2020 NY Slip Op. 31764(U).

381. By reason of the foregoing, Plaintiff is entitled to special damages.

## COUNT SEVEN: NEGLIGENT MISREPRESENTATION CAUSING HARM

382. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

383. Defendants damaged Plaintiff by negligent misrepresentation causing harm when they published their respective Articles including false statements without reasonable grounds for believing it to be true, even if they honestly believe it is true.

384. Elements of a negligent misrepresentation claim in New York include:

    a. A misrepresentation of a material fact

    b. Made with intent to induce reliance by another party

    c. Justifiable reliance on the misrepresentation by the plaintiff

    d. Resulting in damage to the plaintiff.

385. Defendants did misrepresent the events that led to the Tweet. AJ McDougall and Noa Halff wrote their respective Articles published on Defendants" platforms with a view toward making the public, nationally and internationally, believe that Plaintiff is a racist, bigoted "Karen" who calls the cops on unlicensed

vendors "just because she doesn't like the way they look". Beven Hurley's Article in The Independent was only slightly less toxic but continues to be weaponized against Plaintiff by people who try to shut her down when she voices an opinion on social media (not just X).

386. Part of the social contract of every individual is not to be gossiped about in national and international papers. For example, Plaintiff naively trusted Defendant McDougall would not portray her as a problematic character when she shared what her perspective was on the events that led to the Tweet. Plaintiff's naïve trust in AJ McDougall damaged Plaintiff in countless ways (reputationally, economically, and emotionally).

387. By reason of the facts and circumstances stated above, Defendants damaged Plaintiff by negligent misrepresentation causing harm.

## COUNT EIGHT: FRAUDULENT INDUCEMENT

388. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

389. Defendants have damaged Plaintiff by fraudulent inducement. To establish fraudulent inducement in New York, a plaintiff must prove:

a. A misrepresentation or material omission of fact;

b. The defendant knew the statement was false;

c. The statement was made to induce reliance by the plaintiff;

d. The plaintiff justifiably relied on the misrepresentation; and,

e. The plaintiff suffered damages as a result.

In the instant case, Defendants made up stories in their respective Articles and twisted the truth to transform Plaintiff into the "Karen of Riverside Park" even though, in the case of AJ McDougall, Plaintiff had clarified the events and AJ McDougall failed to reflect such clarifications in The Daily Beast Article.

390.    In the case of The Daily Mail Article, it was full of such laughable lies and exaggerations that it can hardly be called journalism. There was no wrath. Plaintiff only engaged with the Unlicensed Vendor, not two unlicensed vendors, and the call to 911 was made because of the Unlicensed Vendor's hostility and threatening behavior not because Plaintiff did not like the look of them. Plaintiff relied on the expected good faith use by Defendants of the X license, that in posting the Tweet, sublicensees would not republish such Tweet in bad faith or cause the damages that Defendants caused Plaintiff. Plaintiff asserts that Defendants' misrepresentations were:

   a. Collateral to the contract;

   b. A misstatement of present fact (not just a promise of future performance); and

   c. Not merely a failure to perform contractual duties.

Indeed, the misrepresentations were collateral to the X license/sublicense, Defendants misstated their intent and failed to act in good faith and with journalistic standards.

391.    By reason of the facts and circumstances stated above, Defendants damaged Plaintiff by fraudulent inducement causing harm.

## COUNT NINE: FRAUD AND DECEIT

392.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

393.    Defendants are culpable for fraud and deceit against Plaintiff based on copyright infringement per the X TOS and breach of contract and breach of quasi-contract by virtue of:

      a.  Material misrepresentation;

      b.  Knowledge of falsity;

      c.  Intent to deceive;

      d.  Justifiable reliance by the victim; and,

      e.  Damages resulting from the fraud.

394.    Plaintiff asserts that Defendants published the Articles in which they made material misrepresentations about Plaintiff's integrity, character, and being a "Karen", and they knew from the context and the Plaintiff's Tweet and related tweets that what they published was false because Plaintiff had tweeted about the surrounding circumstances and had directly told AJ McDougall the specifics of what had happened in the park.

395.    They published those misrepresentations based on an intent to deceive the public because Defendants were more vested in publishing a profitable story in their respective online newspapers. Plaintiff had a good faith reliance that Defendants, as sublicensees of the X Terms and Conditions, would not portray her

badly when they republished her Tweet, and that fraud and deceit caused her damages resulting from the Defendants' fraud.

396.   By reason of the facts and circumstances stated above, Defendants damaged the Plaintiff by fraud and deceit.

## COUNT TEN: EQUITABLE FRAUD

397.   Plaintiff hereby incorporates by reference allegations in paragraphs 1-348..

398.   Defendants committed equitable fraud in monetizing the sublicense of Plaintiff's Tweet per the X TOS.

399.   Defendants are culpable for elements of equitable fraud against Plaintiff in respect of the sublicense of the Tweet per the X TOS by virtue of:

      a.   Defendant's misrepresentation;

      b.   Justifiable reliance by the plaintiff; and,

      c.   Resulting in injury or damage.

400.   When Defendants republished the Tweet and monetized it on their respective platforms, they mispresented themselves as good faith contracting parties in X sublicense, Plaintiff justifiably relied on Defendants' implicit misrepresentations of good faith that resulted in Plaintiffs injury and damage.

401.   By reason of the facts and circumstances stated above, Defendants damaged the Plaintiff by equitable fraud.

## COUNT ELEVEN: EQUITABLE ESTOPPEL

402.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.403.    The doctrine of equitable estoppel prevents Defendants from denying that they misconstrued Plaintiff's Tweet and mischaracterizing her as a "Karen" because it would be unfair to do so.

404.    Allowing Defendants to monetize the Tweet would offend not only the X TOS governing the sublicense but also offend the doctrine of equity.

405.    Defendants made false representations or concealment of material facts about their intended use of the Tweet by virtue of the X TOS making them a sublicensee and misconstrued what had transpired in Riverside Park between Plaintiff and the Unlicensed Vendor. Defendants knew the truth of the matter because Plaintiff had clarified what had happened in the tweets under the Tweet, Defendants relied on the good faith conduct (expected) of Defendants in their respective sublicense of the Tweet per the X TOS. Defendants injured and prejudiced Plaintiff. Equity does not allow those with unclean hands to benefit from their misrepresentations.

406.    By reason of the facts and circumstances stated above, Defendants are liable to Plaintiff by equitable estoppel.

## COUNT TWELVE: PROMISSORY ESTOPPEL

407.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

408.    The doctrine of promissory estoppel allows enforcement of a promise even without a formal contract.

409.    In the instant case, Defendants made a good faith contract to sublicense the Tweet and to not utilize that sublicense to damage or harm Plaintiff. Plaintiff relied on that good faith belief that Defendants would not damage Plaintiff in their use of the Tweet. In agreeing to such sublicense, and consequent to Defendants' breach of the sublicense per the X TOS, Plaintiff reasonably relied on the Defendants' respective implicit promises not to breach the X TOS by infringing Plaintiff's copyright in the Tweet and the contractual principle of good faith.

410.    By reason of the facts and circumstances stated below, Defendants are liable to Plaintiff in promissory estoppel.

## COUNT THIRTEEN: QUASI-CONTRACT/BREACH OF CONTRACT/PRIMA FACIE TORT (INTENTIONAL OR MALICIOUS HARM TO PLAINTIFF).

411.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348..

412.    The X TOS creates a worldwide free license that Defendants could use to use the Tweet but the New York Civil Laws (Privacy) and caselaw preclude them from monetizing the Tweet and other tweets.

413. Where Defendants monetize the Tweet, it is a copyright infringement of Plaintiff's ownership of her intellectual property and breach of contract because they breached the terms of the sublicense per the X TOS.

414. X's Terms and Conditions (https://x.com/en/tos) specifically stipulate that, "There are Intellectual Property Licenses in these Terms: You retain ownership and rights to any of your Content you post or share, and you provide use with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same".

415. That said, the X TOS do not extend to third-party licensees who use a licensor's content to malign and defame the licensor nor does it permit the "rest of the world" (including The Daily Mail and The Daily Beast) from commercial exploitation of the proprietary tweets such as the Tweet.

416. By reason of the facts and circumstances stated above, Defendants damaged the Plaintiff by quasi-contract/breach of contract/prima facie tort (intentional or malicious harm to Plaintiff.

## COUNT FOURTEEN: VICARIOUS LIABILITY

417. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

418. Plaintiff asserts that Defendants are liable for two forms of vicarious liability: i) liability for republication; and b) vicarious liability by virtue of employment.

419. The republication rule holds individuals and entities liable for repeating injurious falsehoods. According to the Reporters Committee for Freedom of the Press, the doctrine treats republication as equivalent to original publication, exposing the "republisher" to liability. Because Defendants republished the Tweet and other third-party tweets from X users who abused Plaintiff for her Tweet, Plaintiff asserts that Defendants are liable for damage caused by that republication.

420. Vicarious liability is a form of secondary liability where one person may be held liable for the acts of another person, i.e., an employer can be held responsible for the defamatory actions of its employees if those actions occur within the scope of employment D'Amico v. Christie, 71 N.Y.2d 76 (1987), Liberman v. Gelstein, 80 N.Y.2d 429 (1992). Defendants (barring Defendants AJ McDougall and Noa Halff) are liable for the defamatory acts of said respective employees.

421. In view of the foregoing, Plaintiff is entitled to damages for her pain and suffering and punitive damages.

### COUNT FIFTEEN: UNJUST ENRICHEMENT

422. Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

Defendants were unjustly enriched because they:

   a.    received a benefit (i.e., clicks, ad/subscription revenue);

   b.    at Plaintiff's expense (damages caused by the publication of the Articles); and,

c.    under circumstances that make it unjust for the defendant tor etain the benefit without compensation.

423.    It is evident from the facts that, by breaching the X TOS and publishing the Articles for commercial use and causing severe multi-faceted harm to Plaintiff in the meantime, Defendants were unjustly enriched by the republication of the Tweet.

424.    By reason of the facts and circumstances stated above, Defendants damaged Plaintiff and Defendants were unjustly enriched by their actions against and involving Plaintiff.

## COUNT SIXTEEN: EMOTIONAL DISTRESS

425.    Plaintiff hereby incorporates by reference allegations in paragraphs 1-348.

426.    By publishing Plaintiff's home address in The Daily Mail Article on DailyMail.com, The Daily Mail Defendants caused Plaintiff extreme emotional address, on top of the considerable emotional distress the entire episode (which continues to date). Publishing someone's home address without their consent is a patent invasion of privacy under the legal theory of public disclosure of private facts. This applies when private information that is not of public concern is made public in a way that would be offensive to a reasonable person.

427.    The publication of the Articles and consequent abuse and exclusion from society that Plaintiff suffered caused Plaintiff serious emotional damage and distress.

428. By reason of the facts and circumstances stated above, Defendants damaged Plaintiff and caused her emotional distress and Plaintiff is entitled to damages (including punitive damages to deter Defendants from repeating the behavior that is the subject of this lawsuit.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor, and against Defendants as follows:

(i) That the Defendants be compelled to unpublish the Articles and to provide a written confirmation of the judgment so that Plaintiff can write to the Wayback Machine to remove the Articles from the Internet archive;

(ii) A perpetual gag order against Defendants to never write about Plaintiff Sonya Shaykhoun, Esq. ever again in any context;

(iii) Actual, presumed, compensatory, statutory, punitive damages, including damages for emotional distress in the amount of USD500,000,000 plus interest from May 19th, 2023;

(iv) All costs, disbursements, fees, and interest; and

(v) Such other additional remedies as the Court may deem to be just and proper.

CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny any motions to dismiss and allow her claims to proceed to discovery.

Dated:       December 26th, 2024
             New York, New York


                                    Respectfully submitted,


                                    


                                    _____
                                    Attorney    Pro    Se/Plaintiff    Sonya
                                    Shaykhoun, Esq.
                                    Law Offices of Sonya Shaykhoun, Esq.
                                    825 West End Avenue,
                                    New York, NY 10025
                                    Email: sonya@shaykhounlaw.com
                                    Tel: 929-408-4531

## AFFIRMATION

I, Sonya Shaykhoun, Esq., affirm this 26ʰ day of December 2024 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_/s/ Sonya Shaykhoun, Esq._
Sonya Shaykhoun, Esq.
Law Offices of Sonya Shaykhoun, Esq.
825 West End Avenue,
New York, NY 10025
Tel: 929-408-4531
Email: sonya@shaykhounlaw.com

_Plaintiff/Attorney Per Se_

**EXHIBIT 1: THE DAILY BEAST ARTICLE, THE DAILY MAIL ARTICLE, THE INDEPENDENT ARTICLE**

# INDEPENDENT

Support Now


Menu

NEWS          SPORTS          VOICES          CULTURE          LIFESTYLE          TRAVEL          PREMIUM

News > World > Americas

# NYC lawyer roasted on Twitter for reporting illegal food stand rails against city's 'rapid deterioration'

Sonya Shaykhoun told *The Independent* she stood by her viral tweet and would continue to raise concerns about 'hyper-leftist ideology'

Bevan Hurley  •  Friday 19 May 2023 18:11 BST  •  4  Comments

    



New York mayor condemns 'reckless' paparazzi over Harry and Meghan 'car chase'

## Your support helps us to tell the story

Read more ∨

**SUPPORT NOW**

A New York lawyer who was roasted on Twitter after posting that she called police to report an unlicensed food vendor says she was trying to highlight the "rapid deterioration" of life in New York City.

Sonya Shaykhoun told *The Independent* that she stood by her viral tweet in which she described getting into a confrontation with two women selling food in Riverside Park after demanding to see their permit on Tuesday.

Ms Shaykhoun said via email she was unfazed about becoming the "Main Twitter Character" of the day, and would continue to raise concerns about what she described as the "hyper-leftist ideology" of successive city administrations.

The brouhaha began on Wednesday when Ms Shaykhoun tweeted she had come across an "ad hoc unlicensed food stand" at 99th St in Riverside Park while returning from a game of tennis the previous day.

"They were calling out to people to buy from them and I asked them, 'where's your permit' cuz we all know the permit has to be displayed," Ms Shaykhoun wrote.

**RECOMMENDED**

George Santos accused of scamming fellow GOP candidates in fraud scheme

Disney cancels $1bn Florida theme park extension amid war with DeSantis

Salman Rushdie makes emotional first in-person public appearance since stabbing

Duelling stories, palace silence and Diana's shadow: What really happened in Harry and Meghan's paparazzi car chase?

She claimed that the stall holder became "belligerent" and started filming her.

"I called her a name. Then I called 911," she wrote.

Ms Shaykhoun tagged an NYPD Twitter account, asking: "What happened with this? The officers never called me back."

"We have beautiful parks, if you see ppl defacing them by setting up illegal stands, call the police. Time to take back our beautiful City."

The tweet, viewed 6.1 million times in less than 48 hours, received thousands of responses from New Yorkers ranging in tone from anger to mockery.

⊙
Not found

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got... pic.twitter.com/EWwXnrayW4

— Sonya Shaykhoun, Esq. (@SonyaShaykhoun) May 17, 2023

"This is petty and vindictive. Leave people alone. Do not call 911 and post someone's face for selling food," wrote one.

"Please leave NYC. We don't want you here," another posted.

"Jesus Christ Karen," a third user wrote. "Get a life and leave others alone."

"People are struggling in this country to feed them selves, and they have to hustle so they keep a roof over their head and you decided that it was your business to harass these people," said another.



2

Lawyer Sonya Shaykhoun went viral after posting that she had called police to report an unlicensed food vendor in New York's Riverside Park *(Courtesy of Sonya Shaykhoun)*

When one person commented that it was nice to see people still playing tennis, she responded: "The one thing in the city the communists haven't completely

destroyed."

An unapologetic Ms Shaykhoun responded directly to many of her detractors on Twitter, trading insults, sharing anecdotes, and lamenting about what she described as the decline of New York City.

A minority were also supportive of her stance.

Describing the Riverside Park incident, Ms Shaykhoun told *The Independent* she had seen two women cooking what appeared to be corn on an open fire.

After asking to see their permit, she said she taken a photo of the food vendor while walking away to upload to the city's 311, where residents can report quality of life issues.

She claimed one of the food vendors had pursued her, became aggressive, and started filming her. Ms Shaykhoun said the vendor accused her of calling her a b****, but that she didn't recall saying that.

Ms Shaykhoun said the police had told her they were in the park and would "deal with it", but she hadn't heard any more from them.

"A lot of people won't call the police even if they want to because they don't want to get the kind of attention I have had," she told *The Independent.*

"But if no one calls the police and nips this issue in the bud, the entirety of Riverside Park will be taken over by entitled and belligerent unlicensed vendors who will yell and curse at you if you ask them why they are there without a license."



Sonya Shaykhoun said she had formed a civic group of concerned New Yorkers to "to fight corruption and its byproducts". *(Getty Images)*

Ms Shaykhoun said that as a lawyer, and the daughter of an Egyptian father and an Irish mother, she enjoyed engaging in robust debates on Twitter.

She said she and a group of like-minded associates on Twitter had formed the Save NYC Working Group in February "to fight corruption and its byproducts".

"Part of my pointing out the illegal vendors was to highlight that even a small infraction like that will upset the functionality of NYC," she told *The Independent.*

Ms Shaykhoun said she had received a lot of abusive messages since posting the tweet calling her a Karen, a fascist, and worse.

One text message said they were happy that her sister had died, along with an obituary. Others tried to target her law licence.

"Like why do that? It's distressing and sinister," she told *The Independent.*

*The Independent* requested comment about the incident from the NYPD, who did not respond.

**More about:**   New York   NYPD   Twitter

**Join our commenting forum**

Join thought-provoking conversations, follow other Independent readers and see their replies

4 | Comments

U.S. NEWS ⊕

# Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park

| BETWEEN RIVERSIDE AND KAREN |

**After a contract lawyer complained on Twitter about stumbling across an "ad hoc unlicensed food stand" after a game of tennis, users flooded in to criticize her.**

**AJ McDougall**
Breaking News Reporter Published May 18, 2023 8:06PM EDT

f   X   ✉   🔖





Photo Illustration by Thomas Levinson/The Daily Beast/Getty

John Roberts' Secret Trump Memo Revealed in Huge SCOTUS Leak

CORBIN BOLIES

CNN Shuts Down Vance's Pets Claim in Blistering Fact-Check

CORBIN BOLIES

Trump Declares Hatred for T-Swift in Wild Truth Social Post

CLAY WALKER

Martha Stewart Just Made a Rare Presidential Endorsement

EBONI BOYKIN-PATTERSON

A lawyer in New York City was snowed under with criticism this week after taking to Twitter to grumble about a person selling food in a public park, with users calling her "petty and vindictive" for calling emergency services on the vendor.

It began with Sonya Shaykhoun, Esq., as her screen name reads, and a Wednesday tweet.

  
"Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand," she wrote alongside two photos of a pair of women with a table set up along a walking path.

"They were calling out to people to buy from them and I asked them, 'where's your permit' cuz we all know the permit has to be displayed," Shaykhoum continued, alleging that one of the women then "got belligerent and started filming me and refused to show me her permit."

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc

has to be displayed. Well, the woman in blue
got... pic.twitter.com/EWwXnrayW4
— Sonya Shaykhoun, Esq. (@SonyaShaykhoun) May
17, 2023

"I called her a name," the lawyer added, without specifying what word she'd used. "Then I called 911." She implied she'd been put in touch with the NYPD, who she said did not follow up on the case with her. (A spokesperson for the department said they had no record of a complaint like the one she'd described as of Thursday evening.)

"We have beautiful parks, if you see ppl [sic] defacing them by setting up illegal stands, call the police," Shaykhoum said. "Time to take back out beautiful City."

Rather than respond to her call, the replies to her tweet—many of them from self-professed New Yorkers—were by turn mocking, scathing, and despairing. As the responses piled up, the tweet

  
"Jesus Christ Karen," one user wrote. "Get a life and leave others alone."

Another added, "Here's a wild take: Leave people alone, strangers don't owe you anything, purchase something or keep it moving."

"i feel like maybe you should get a life," another said.

  
you decided that it was your business to harass these people. I don't think I would feel very good about myself if I did that."

There's cool people, then there's you. Kindness matters.
— ErzsieTheMexiGarian (@Erzsebizzle) May 18, 2023

Shaykhoun spent part of Wednesday and Thursday deep in her own reply section, scrapping with her critics. In response to Jacob Silverman, a freelance journalist who called her "petty and vindictive" over the matter, Shaykhoun replied, "Do you know what is petty and vindictive? The whole Antifa-Con that landed on this tweet - because now apparently it's OK to break the law so long as you are a

Silverman wrote. "Sorry you can't handle a Twitter pile-on."

"I can handle it, I just find it hypocritical and ridiculous," Shaykhoun snapped, going on to call it "stupid and racist" that some people "think the rules don't apply to people of color and consequently, we should all suck it up and live in a society where only some rules are applied and not others, and definitely not on people of color."

She also posted through it, doubling down on her original post in later tweets. "Any good lawyer knows that you need to have a permit at the very least to sell anything to the public," she tweeted on Thursday morning, posting a link to a city government page about permits in parks.

Shaykhoun previously attracted a smaller swarm of negative attention on Twitter in February, when she complained about "a fall-down-drunk South American man" outside her apartment building, suggesting he was an "illegal." After

as a New York City native with more than 18 years working overseas on "high-value contracts in technology, media, and telecommunications." According to her LinkedIn, she previously worked as senior legal counsel to Al Jazeera Media Network and in the contracts department of Qatar Airways.

She did not immediately return a request for comment from The Daily Beast on Thursday.



**AJ McDougall**
Breaking News Reporter
X @oldmcdougall
✉ amanda.mcdougall@thedailybeast.com

Got a tip? Send it to The Daily Beast here.

# Daily Mail
## .com

Home | Showbiz | TV | Femail | Royals | Sports | Health | Science | Politics | Money | U.K. | Video | Travel | Puzzles | Shopping

Breaking News   Australia   Video   University Guide   China   Debate   Meghan Markle   Prince Harry   King Charles III   Weather   Most read                    Login

# New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen'

○Site ○Web  Enter your search

## TOP STORIES

▶ Trump is rushed to safety after Secret Service agents 'fired on man with a gun' at his Florida golf course while he was playing



- **Sonya Shaykhoun ignited a firestorm of criticism when she tweeted about vendors selling food without a permit in Riverside Park**
- **The lawyer told her followers that she had called the police on the food vendors**
- **Her tweet received over 6,000 replies: 'Get a hobby and leave society alone you absolute crazy person,' one user said**

▶ Huge Supreme Court docs leak exposes chief justice meddling in Trump's January 6 and election cases – read his memos



By NOA HALFF FOR DAILYMAIL.COM
**PUBLISHED:** 14:05 EDT, 19 May 2023 | **UPDATED:** 19:35 EDT, 19 May 2023

**42**
shares

**77**
View comments

▶ Donald Trump Jr. is 'caught kissing' glamorous Palm Beach socialite Bettina Anderson during brunch date without fiancée Kimberly Guilfoyle



A New York City lawyer is facing relentless backlash this week after she took to Twitter to unleash her wrath upon two female street vendors allegedly selling food without a permit in an Upper West Side park.

Case 1:24-cv-09978-ALC    Document 1    Filed 12/27/24    Page 178 of 195

Sonya Shaykhoun, who labels herself as "Esq." online, ignited a firestorm of criticism when she complained about the presence of a simple food stand in Riverside Park on Twitter, triggering accusations of pettiness and entitlement among New Yorkers.

In her tweet, she shared photos of two women who appeared to have a small table set up at the side of a park path. She then expresses her dissatisfaction about seeing a person selling food in a public park without showing their permit.



Read More

She then claimed to have called 911 and reported the vendors, who have not been identified, to the police.

But users swiftly criticized her for being "petty and vindictive". 'Get a hobby and leave society alone you absolute crazy person,' one user said.



Expert issues warning to parents donating their kids' old items to Goodwill: 'I never thought about this, so scary'



Who is Kimberly Guilfoyle? Firebrand lawyer, 55, was married to Gavin Newsom and embroiled in shock sex scandal at Fox... before dating Don Jnr



Taylor Swift arrives at Chiefs-Bengals game after being scorched by Trump when she back Kamala Harris



**EXCLUSIVE** Selling Sunset star Mary Fitzgerald Bonnet admits traumatising sexual assault left her with issues – and says she may never be able to have more kids



Trump tears into Taylor Swift in blazing Truth Social rage after pop megastar endorsed Kamala Harris



Kamala Harris speaks out after gunman shot at on Trump golf course while former president played



Case 1:24-cv-09978-ALC    Document 1    Filed 12/27/24    Page 179 of 195



**Sonya Shaykhoun, Esq.**
@SonyaShaykhoun

· · ·

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got belligerent and started filming me and refused to show me her permit. She started filming me and getting increasingly aggressive. I called her a name. Then I called 911. @nypd24 what happened with this? The officers never called me back.

This was at the 99th street entrance. We have beautiful parks, if you see ppl defacing them by setting up illegal stands, call the police. Time to take back our beautiful City.



🖊 Last edited 5:47 PM · May 17, 2023 · **6.2M** Views

**+11**
View gallery





▶ Black Friends star makes shock race claim against the show



▶ Inside Carolyn Bessette-Kennedy's favorite New York apothecary - the oldest in America



▶ DEAR JANE: I found something horrifying hidden in my boyfriend's underwear drawer... But am I in the wrong for invading his privacy?






▶ New tiny village sparks uproar after neighbors make

**Sonya Shaykhoun claimed to have called 911 and reported the vendors, who have not been identified, to the police**

## TRENDING







**Shots fired at Trump National Golf Club with former president on site**

**Supreme Court leak exposes chief justice meddling in Trump's cases**

**Experts warn parents who are donating their kids' items to Goodwill**

**51.9k viewing now**

**15.1k viewing now**

**3.1k viewing now**

Shaykhoun wrote: 'Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got belligerent and started filming me and refused to show me her permit. She started filming me and getting increasingly aggressive. I called her a name. Then I called 911.'

But a spokesperson for the police department said there was no record of such complaint.

Her Tweet continued: 'What happened with this? The officers never called me back. This was at the 99th street entrance. We have beautiful parks, if you see ppl defacing them by setting up illegal stands, call the police. Time to take back our beautiful City.'

Yet instead of drawing the support she may have expected, Shaykhoun's tweet became the target of scathing ridicule and disdain from fellow New Yorkers, who were quick to call out her seemingly trivial criticisms.

staggering claim

▶ Four people are shot including a cop at major subway station during horrific daylight gunfight



▶ J.D. Vance hints at tension between him and Donald Trump: 'I've learned my lesson'

▶ Girl, 15, is left fighting for her life in a coma after horrific accident while excitedly celebrating homecoming



▶ Dating guru's top 10 tips for finding love after 50



▶ Horrifying moment Texas woman is struck unconscious in sick broad daylight attack

▶ Bombshell UFO hearings to take place in Congress as new



Many were mocking her self-righteousness. One user posted a checklist made for children: 'Is someone in danger? Is someone hurt? Did you try to solve the problem on your own? Were you minding your own business?'

footage emerges of 'huge' craft near US nuclear weapons base



▶ Charming Southern city could disappear forever and take Civil War landmark with it, terrifying new study claims



▶ Emotional moment high school janitor receives SHOCK surprise from students



▶ Why Royal Family posts to Prince Harry on his 40th birthday show 'NO evidence of defrosting relationship', expert claims

▶ Horror as river otter drags child off a dock and underwater in vicious attack... before beast met grim end




▶ Sofia Vergara puts on a busty display in leopard print dress after grabbing lunch with friends in Beverly Hills



▶ Kim Kardashian speaks out on the 'struggle' of being a




parent of a child with a learning difference

▶ Netflix fans go wild over 'must watch' thriller series that is 'one of the best' on the best on the platform

▶ Bride who found stained $25 wedding dress at a thrift store reveals how she transformed it into the gown of her dreams

▶ How Taylor Swift's hometown could help decide the 2024 presidential election

▶ Trump family member issues venomous attack on him and reveals the election blow he'll never get over'

▶ Florida swamp volcano mystery leaves scientists baffled

▶ Kansas City Chiefs rule out star wide receiver Marquise











Sonya Sha[...] herself as "Esq." online, ignite[...] n of criticism when she complaine[...] [...]ce of a simple food stand in Rive[...] [...]rk on Twitter

© Sonya Shaykhoun

**+11**
View gallery

'Hollywood' Brown for the ENTIRE season in huge injury blow



▶ Finance guru gives caller sharp wake up call after saying he wanted to retire at 58 with NO savings



▶ Travis Kelce arrives in Kansas City for Chiefs-Bengals after girlfriend Taylor Swift gets online hate from Donald Trump



▶ The four tops every woman over 50 needs – including the most flattering Breton stripe, by the Mail's style expert SHANE WATSON

▶ I'm an American living in the UK... a VERY big mistake I made in a coffee shop left me mortified

EXCLUSIVE Sasha Obama, 23, looks thoughtful as she steps out in jean cut-offs before puffing on a cigarette in her car in Beverly Hills



▶ Receding hairlines be gone! The 'lunch hour hair transplant'





promises to restore thinning locks – but would YOU try it?



**EXCLUSIVE** What Marilyn told Bobby Kennedy the night she died – as a new book reveals bombshell transcript



▶ Anti-hangover drink 'scientifically proven' to take effect in 30 mins.... so did it work on our health writers?

▶ Rebel Wilson's daughter Royce, one, makes red carpet event debut at The Deb premiere during TIFF



**EXCLUSIVE** Dave Grohl accused wife Jordyn Blum of having a 'flirty' relationship with her 'hot' tennis coach to detract from his own infidelity before shock baby reveal



▶ Horrific moment woman discovers giant rat staring up at her from the toilet while she was using it



▶ Sickening moment predator hunters



Case 1:24-cv-09978-ALC    Document 1    Filed 12/27/24    Page 185 of 195



**Shaykhoun claimed to have reported the vendors to the police but cops denied receiving a complaint**

+11
View gallery



confront 57-year-old man they claim tried to meet up with 13-year-old girl



▶ Southern boom town that is just 24 miles away from dangerous canyon contaminated by plutonium



▶ Mystery as ancient American mountain town is ravaged by widespread illness and cancer amid sinister claim about cause



▶ Laura Loomer issues fierce denial after Bill Maher jokes about her 'arranged relationship' with Donald Trump



▶ Ben Affleck and Jennifer Lopez have tense conversation as they reunite for the FIRST time amid divorce at Beverly Hills Hotel with their children





▶ Ohio wildlife officials reveal details behind SHOCK photo of man dragging dead geese through streets

▶



Shocking demand from elementary school teacher arrested for making out with student

▶ Nicole Kidman's younger sister Antonia runs errands in Sydney's northern suburbs after the death of their beloved mother Janelle



▶ Paris Jackson shows off her incredible figure in a slinky nude gown at Vogue World during London Fashion Week



▶ James McAvoy reveals he 'might never watch a film with an audience again' because people 'threw things at the screen' after premiere of Speak No Evil



▶ Lose weight in weeks with these powerful thermogenic herbal supplements on Amazon that users are saying give them 'endless energy'
SHOPPING



▶ Ciao bella! Sofia Vergara, Heather Graham and Teresa Giudice as well as JLo, Kylie Jenner and Angelina Jolie lit up



**Social media users were quick to wade in, with one telling Shaykhoun to 'get a hobby and leave society alone you absolute crazy person'**



© sonyashaykhounesqilm.substack.com

**+11**
View gallery

Italy this summer





**EXCLUSIVE** Rob Kardashian and Blac Chyna clash with family over fears daughter Dream will become a 'cash cow' for the reality TV dynasty



▷ Tammy Hembrow compared to a young Pamela Anderson as she busts out of her racy skintight dress after latest breast implant surgery

▷ This deal BITES! Get 50% off this viral handheld Shark Vacuum that comes with included cleaning tools when you this exclusive code **SHOPPING**

▷ Saoirse Ronan says she had 'high expectations' of actor husband Jack Lowden while they co-produced her harrowing new drama - after claiming there's 'still time' for the Scots star to play James Bond





▷ Naomi Campbell, 54, catches up with her former fiancé Flavio Briatore at the F1 Grand Prix in Azerbaijan more than two decades after she called off their engagement

**Shaykhoun is a lawyer at the Law Offices of Sonya Shaykhoun, Esq., according to her LinkedIn**

Britney Spears reveals she cut people out of her life over 'mind games'... as ex Sam Asghari moves on with mystery blonde after divorce



The cruel legacy of 'heroin chic': A generation of 90s stars were branded 'fat' thanks to skinny catwalk models - leaving some to suffer from eating disorders



Couples that dress together, stay together! A look at how Brad Pitt and girlfriend Ines de Ramon coordinate their stylish ensembles



All the times Taylor Swift and Brittany Mahomes have been spotted together - as fans wait to see if they'll reunite at Arrowhead today



The Emmy Awards' most shocking and memorable moments from Donald Trump's skit to on stage proposals as ceremony returns for 76th year




'I wish I hadn't done it': Jennie Garth admits she regrets taking part in Beverly Hills, 90210 reboot



 **Classical Liberal Caucus** ☑
@LP_CLC

Is someone in danger?

Is someone hurt?

Did you try to solve the problem on your own?

Were you minding your own business?

Call the cops...

Before you ~~tell the teacher~~...

➡ Is someone in danger?

➡ Is someone hurt?

➡ Did I try to solve the problem on my own?

➡ Am I minding my own business?


▶ Quinta Brunson flashes cleavage in sheer top as she joins glam Ella Purnell and Jodie Foster at BAFTA North America's TV Tea Party in LA


▶ Netflix's The Perfect Couple takes top streaming spot with 3.4 BILLION minutes watched in its first week - dethroning Rings Of Power


▶ Get lost in the music with JLab's new open earbuds: Stay aware of your surroundings without missing a beat for just $50 (plus FREE shipping)
SHOPPING


▶ Nikki Garcia's twin sister Brie 'encouraged' her to leave Artem Chigvintsev after domestic violence arrest


▶ Arnold Schwarzenegger and Uma Thurman have Batman & Robin reunion 27 years after film's release


▶ Emmy nominees Naomi Watts and Jamie Lee Curtis party at the FX and Vanity Fair

Others expressed despair over her frivolous complaint, especially in this economic climate, as many New Yorkers are struggling to make a living.

One said: 'This poor woman is trying her best to survive this latest economic collapse. Maybe millions of people wouldn't be in quite the same dire circumstances if our government didn't require taxes, fees and permits for everything. Please, please consider not being so cruel.'

2:22 PM · May 18, 2023 · **52.4K** Views

+11
View gallery

As the online frenzy escalated, Shaykhoun's tweet quickly went viral, gaining 6,000 replies by Thursday evening.

Some users were outraged: 'Jesus Christ Karen. Get a life and leave others alone.'

'There's cool people, then there's you. Kindness matters.'

Many online also shared their appreciation for food vendors: 'When I am in Mexico 100% chance I am stopping for food when I see a lady selling food out of the trunk of her car from tupperware bowls. Some of the best food ever,' one said.

Shaykhoun continues to relentlessly tweet back in response to her criticizers.

bash on the eve of TV's big night



▶ The difference a decade makes: As Prince Harry turns 40, how his life has changed since he marked his 30th birthday partying with William at Clarence House



▶ Natalie Portman, 43, wows in a glittering gown at the Deauville American Film Festival in France as she receives a major award



▶ Baby Reindeer's Jessica Gunning and Richard Gadd mingle with Hollywood stars at Emmys party as they celebrate their show's 11 nominations

▶ Jeff Bezos and fiancee Lauren Sanchez sit cageside in Vegas for UFC's debut at The Sphere... as incredible images show results of Dana White's $20m night



▶ Treat acne, inflammation, eczema, psoriasis, and more with these barrier-restoring creams that improve skin cell communication - and save $21 today



← **Tweet**



**Tara Harris** ✔
@realTaraHarris

···

This poor woman is trying her best to survive this latest economic collapse. Maybe millions of people wouldn't be in quite the same dire circumstances if our government didn't require taxes, fees and permits for everything.

Please, please consider not being so cruel. 😭 🙏

11:56 AM · May 18, 2023 · **34.4K** Views

**+11**
View gallery

**5** Retweets    **752** Likes    **2** Bookmarks

---

**Hannah Cox** ✔
@HannahDCox

···

Get a hobby and leave society alone you absolute crazy person

2:41 PM · May 18, 2023 · **12.9K** Views

**5** Retweets    **727** Likes

---

**SHOPPING**

▸ Revealed: The scathing descriptions of how 'Duchess Difficult' Meghan Markle treats staff as she faces new claims of diva behavior ahead of husband Harry's 40th



▸ Jane's Addiction CANCELS next tour stop after band's lead singer Perry Farrell PUNCHED guitarist Dave Navarro on stage

**EXCLUSIVE** Celebrity 'best friends' are the latest Hollywood publicity strategy - but how can you tell the real friendships from the fake ones?



▸ Little House On The Prairie's Melissa Gilbert to return to small screen 11 years after she left Hollywood for farm life

▸ Perry Farrell's wife Etty Lau breaks her silence to reveal the REAL reason Jane's Addiction singer punched guitarist Dave Navarro on stage



▸ January Jones shares rare photo of son Xander as they celebrate his 13th

Case 1:24-cv-09978-ALC    Document 1    Filed 12/27/24    Page 192 of 195



**LorettaFaucher**🏴 C C ▬ ☻ ☺  ···
@lorettafaucher

Jesus Christ Karen. Get a life and leave others alone.

10:10 AM · May 18, 2023 · **27.9K** Views

**9** Retweets    **2,833** Likes    **2** Bookmarks

💬          ↻          ♡          🔖          **+11**
View gallery

---



**ErzsieTheMexiGarian**  ···
@Erzsebizzle

There's cool people, then there's you. Kindness matters.

12:02 PM · May 18, 2023 · **203.3K** Views

**19** Retweets    **4,622** Likes    **1** Bookmark

💬          ↻          ♡          🔖          **+11**
View gallery

---

birthday



▸ Save big with LaserAways limited time BOGO package that will give you the silkiest skin of your life without breaking the bank
SHOPPING

**EXCLUSIVE** What it's REALLY like being married to J~Lo, by her first husband who arrived in America on a raft



**EXCLUSIVE** Howard Stern's hidden jab at Aubrey Plaza revealed after 'disaster' interview

▸ Hailey Bieber's father Stephen Baldwin reveals if he's met her newborn son with Justin Bieber



**EXCLUSIVE** Decline of Barbra Streisand's stepson laid bare as photos reveal dumpster diving and years of living rough despite family's fortune into the millions

▸ Lil Tay 'recovering from open-heart





**\*Comedienne\* Mistress Scarlet** ✅
@WIMissScarlet

···

When I am in Mexico 100% chance I am stopping for food when I see a lady selling food out of the trunk of her car from tupperware bowls. Some of the best food ever. 🤤

3:13 PM · May 18, 2023 · **30.8K** Views

**439** Likes

One twitter user posted the address of Shaykhoun's law offices and she responded: 'Okay, let's turn lemons into lemonade. Selling food to the public without the necessary permits is not only a health risk, but it's also prohibited. If you need help with your food license applications, I am happy to help you. If you are financially disadvantaged, we can work out a deal. Feel free to email me or call me with your licensing requirements. Many thanks, Sonya'

She added this to her original tweet: 'Next time you're tempted to buy food from unlicensed vendors, let's hope it doesn't end up like the customers in this story who bought the vendor's burgers made with human remains.'

'The law is there for your protection. How do you know the food isn't laced with fentanyl or other harmful toxins? You can't even trust licensed vendors how you gonna trust unlicensed vendors? But sure, make me the Twitter Anti-Hero of the Week. But if you buy a burger off the street from Mr or Ms Unlicensed and bite into a human toe or an eyeball, don't come crying to me because, clears throat...'

surgery' as she shares photos from hospital bed - a year after death hoax



▶ Britney Spears pens sweet birthday tribute to her sons Sean, 19, and Jayden, 18, with throwback photos



▶ TALK OF THE TOWN: Dua Lipa goes demure for dinner date with Callum Turner



▶ Britney Spears' ex Sam Asghari sparks dating rumors with a mystery woman in Beverly Hills one year after divorce



▶ Former child star JoJo who rose to fame at age 13 recounts how she became a sex addict hooked on drugs and booze



▶ Huge rise in support for Prince Harry permanently returning to Royal duties - but 60 per cent are still opposed to or undecided about a comeback, poll finds



▶

 **Sonya Shaykhoun, Esq.**
@SonyaShaykhoun                                                    ...

Okay, let's turn lemons into lemonade.

Selling food to the public without the necessary permits is not only a health risk, but it's also prohibited.

If you need help with your food license applications, I am happy to help you. If you are financially disadvantaged, we can work out a deal.

Feel free to email me or call me with your licensing requirements.

Many thanks,
Sonya

**octocryptid of the wike mob** @cryptidocto · 21h
Interesting  twitter.com/SonyaShaykhoun...
Show this thread

# LAW OFFICES OF SONYA SHAYKHOUN, ESQ.

## 825 West End Avenue, New York, NY 10025

### +1 929-408-4531

Chrissy Teigen calls John Legend her 'favorite person' as she marks their 11th wedding anniversary


We found a miracle anti-cellulite lotion that will give you the youngest looking skin of your life and the best part is it's only $25 SHOPPING


Ana de Armas admits to leaving a friend's wedding to take a business call from Eden director Ron Howard


Khloe Kardashian, 40, puts on a VERY busty display in low-cut black corset dress



Emily in Paris fans reveal the character they've 'always hated' after Season 4 ends on a high note


Halsey suffers lupus flare-up after VMAs performance as she takes 'mandatory rest day' to avoid spiraling


## ← Tweet

**Sonya Shaykhoun, Esq.**
@SonyaShaykhoun                                                    ...

Next time you're tempted to buy food from unlicensed vendors, let's hope it doesn't end up like the customers in this story who bought the vendor's burgers made with human remains:
allthatsinteresting.com/joe-metheny

The law is there for your protection. How do you know the food isn't laced with fentanyl or other harmful toxins? You can't even trust licensed vendors how you gonna trust unlicensed vendors?

But sure, make me the Twitter Anti-Hero of the Week. But if you buy a burger off the street from Mr or Ms Unlicensed and bite into a human toe or an eyeball, don't come crying to me because, clears thro ˙ ˙f    **+11**
told you so.                                                  View gallery

Shaykhoun is a lawyer at the Law Offices of Sonya Shaykhoun, Esq., according to her LinkedIn.

She describes herself as an 'award-winning NY-qualified attorney doing cross-border transactions; tech, media, telecoms, & satellites; aviation; big contracts; & compliance and author of upcoming book, "The Commercially Savvy Lawyer."'

DailyMail.com reached out to Shaykoun for comment but did not hear back.

New York    Twitter

**Share or comment on this article: Outrage erupts as NYC lawyer unleashes fury on vendors selling food without permit in local park**



Shannen Doherty is remembered by Beverly Hills, 90210 cast at 90s Con following her death at age 53



▷ Pharrell Williams and Chad Hugo 'no longer speaking' amid legal battle over the rights to using The Neptunes name



▷ Selling Sunset's Mary Fitzgerald says she is 'still haunted' by sexual assault: 'It will never 100 percent go away'



▷ Mariah Carey climbs the Great Wall of China in five-inch heels with 13-year-old twins Monroe and Moroccan



ANYTIME, ANYWHERE, **Mail**Online ON YOUR IPHONE TRY IT FOR FREE FOR 60 DAYS ▸

 LIVE TOP STORIES

Click here to view more