RECEIVED
SDNY PRO SE OFFICE

2025 MAR 14   AM 8:45

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SONYA SHAYKHOUN, ESQ.
Plaintiff,

-against-

THE DAILY MAIL, DAILYMAIL.COM,
DAILY MAIL AND GENERAL TRUST
PLC ("DMGT"), NOA HALFF, THE DAILY
BEAST COMPANY LLC ("TDB"), AMANDA J.
MCDOUGALL (A/K/A AJ MCDOUGALL),
BEN SHERWOOD, JOANNA COLES,
IAC INC. ("IAC"), TRACY CONNOR,
BARRY DILLER, BEVAN HURLEY,
THE INDEPENDENT, GEORGIE GREIG,
LOUISE THOMAS, RICHARD BEST
Defendants.

---------------------------------------------------------------x

Civil Case No. 1:24-cv-9978-ALC
Judge Andrew L. Carter, Jr.

**FIRST AMENDED COMPLAINT**

### I.    INTRODUCTION

1.    Plaintiff Sonya Shaykhoun, Esq., a New York attorney proceeding *pro se* ("Plaintiff" or "Shaykhoun"), brings this First Amended Complaint (the *"Initial Complaint"* being 24-CV-9978 that was filed on December 27, 2024) action against Defendants The Daily Mail, DailyMail.com, Daily Mail and General Trust PLC ("DMGT"), Noa Halff, The Daily Beast Company LLC ("TDB"), Amanda J. McDougall (a/k/a AJ McDougall), Ben Sherwood, Joanna Coles, IAC Inc. ("IAC"), Tracy Connor, Barry Diller, Bevan Hurley, The Independent, Georgie Greig, Louise Thomas, and Richard Best (collectively, "Defendants") for their coordinated, unauthorized, and commercial exploitation of her copyrighted Tweet posted on

X.com on May 17, 2023 ("Tweet") and other tweets ("Sonya's IP"). The Tweet, an original work protected under 17 U.S.C. § 102(a), garnered nearly 7 million views over a very short time span and rendering the Plaintiff eligible to participate in X's monetization program through which she earned a total of $170.97 paid out intermittently from August 2023 to May 2024 (¶ 47). The Defendants' actions forced her to privatize her account on or around May 27, 2024, halting further X-generated revenue projected at $500 or more based on viewership trends.

2.    The Defendants – grouped as "The Daily Mail Defendants" (The Daily Mail, DailyMail.com, DMGT, Noa Halff), "The Daily Beast Defendants" (TDB, AJ McDougall, Ben Sherwood, Joanna Coles, IAC, Tracy Connor, Barry Diller), and "The Independent Defendants" (The Independent, Bevan Hurley, Georgie Greig, Louise Thomas, Richard Best) – each published Articles on May 18-19, 2023 (Exhibit 1[1] "The Daily Beast Article, The Daily Mail Article, The Independent Article") embedding the Tweet without license or the Plaintiff's consent. These Articles falsely framing the Plaintiff as a *"Karen"* for profit, inciting cyberbullying, and causing irreparable harm. The *"Karen"* moniker - a pejorative implying racial bias and entitlement - despite her clarifications to Defendant AJ McDougall on May 17, 2023 (Exhibit 2: Plaintiff Sonya Shaykhoun, Esq.'s Response to Defendant AJ McDougall), for the purpose of maximizing profit through subscriptions (TDB), advertising revenue (Daily Mail), and clicks (The Independent). This exploitation exceeded the scope of X's Terms of Service ("X's TOS") (Exhibit 7 "X TOS & Privacy Policy") and the fair use doctrine (17 U.S.C. § 107), constituting copyright infringement under 17 U.S.C. § 106 (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) – commercial use without transformation weighs against fair use).

---

[1] For ease of reference, the Exhibits referenced in the First Amended Complaint are specific to this document (and not cross-referenced against the Initial Complaint.

Page 2 of 52

3.    The Defendants' synchronized publications, executed within a 24-hour window from their New York City offices (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place, The Independent at 1114 Avenue of the Americas), incited a global pile-on of hate mail and threats (Exhibit 3 - "Hate Mail"), causing the Plaintiff irreparable harm: (i.) lost X revenue from the license the Defendants ought to have entered to use the Tweet and Sonya's IP; (ii) $lost projected earnings from X.com's content monetization scheme; (iii) lost law firm clients (e.g., retainers declined post-May 2023 due to reputational damage and countless job applications ignored or rejected); and (iv) severe emotional distress. The Defendants' refusal to retract despite the Plaintiff's pleas (e.g., Tracy Connor's non-response, Katrina Bell's perfunctory response, Richard Best's haughty dismissal) demonstrates malice, defeating any *"no malice"* threshold under New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a) (*Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020)). The Plaintiff pleaded with Connor, Bell, and Best to take down the Articles, explaining in detail and at length the deleterious impact the Articles were having on her economic and professional prospects – but to no avail. If the Plaintiff's mother did not open her home to her, the Plaintiff shudders to think where she would be right now. Such is the devastation of the Articles on the Plaintiff, her life and her prospects.

4.    This action invokes federal jurisdiction under 28 U.S.C. § 1331 (copyright infringement, First/Fifth/Fourteenth Amendment violations), 28 U.S.C. § 1338(a) (copyright claims), and supplemental jurisdiction under 28 U.S.C. § 1367(a) for state law claims. The Plaintiff challenges the Defendants' over-reliance on fair use, X's TOS, and New York's Anti-SLAPP laws, which they misapplied in a prior New York State Supreme Court case (Case No. 100558/2024) ("NY State Case") to chill her redress, necessitating federal adjudication to

Page 3 of 52

protect her constitutional rights (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) - due process requires fair opportunity to litigate).

5.      The Plaintiff seeks compensatory damages in an amount to be determined by the Court for economic and emotional injuries caused by the Defendants' actions, including but not limited to: (i) actual lost X revenue that the Plaintiff would have earned had the corporate Defendants entered into license agreements to use Sonya's IP; (ii) projected X earnings exceeding the actual $170+ the Plaintiff earned after the Tweet's got 7 million views; (iii) lost law firm clients (e.g., retainers declined post-May 2023 and countless -- as in hundreds - job applications rejected due to reputational harm); and (iv) severe emotional distress from cyberbullying. The Plaintiff further seeks the Defendants' profits from their unauthorized use of Sonya's IP subject to a full accounting of The Daily Beast's subscriptions, Daily Mail's ads, and The Independent's clicks, to be quantified through expedited discovery under FRCP 26(d)(1). Additionally, the Plaintiff requests punitive damages to deter the Defendants' willful misconduct, injunctive relief to remove the Articles from all platforms (including the Wayback Machine and similar Internet archives), and a declaration that New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a), as applied in the NY State Case, unconstitutionally shielded Defendants' commercial exploitation and infringed her due process and petition rights under the Fifth and Fourteenth Amendments (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

6.      The Plaintiff specifically alleges as follows:

## II.    NATURE OF THE ACTION

7.      The advent of social media platforms like X.com, its predecessors and contemporaries, has democratized content creation and shifted ownership from big corporate gatekeepers (like the corporate Defendants) to independent creators (like the Plaintiff) who

retain ownership of their copyrighted content and works under 17 U.S.C. § 106. The Defendants, profit-driven media entities, exploited the Plaintiff's Tweet and Sonya's IP, without license, exceeding X's TOS and fair use limits (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 303 (S.D.N.Y. 2011); *Otto v. Hearst Commc'ns, Inc.*, 345 F. supp. 3d 412, 429 (S.D.N.Y. 2018)). This Southern District of New York ("SDNY") case addresses the tension between creators' rights and media overreach in the digital age, where "*Content is king*'" translates to revenue for the Defendants at the Plaintiff's expense.

8.    In the digital economy, if "*content is king*", then "*copyright is its sovereign protector*". Copyright owners, like the Plaintiff, have consistently sued entities that exploit proprietary works for profit without compensation, as recognized (famously or infamously, as the case may be) in the SDNY (*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 424 (S.D.N.Y. 2011) - unauthorized distribution of copyrighted material violates 17 U.S.C. § 106). Absent explicit agreements transferring rights, such as those between artists like Prince and exploitative corporations such as Warner Brothers and SONY respectively, creators retain inherent ownership of their works, whether music, film, photography, text, art, video games, or emerging forms like artificial intelligence, under federal law (17 U.S.C. § 201(a)). The bedrock principle remains: copyrighted content belongs solely to its creator unless lawfully assigned or licensed. The Defendants' unauthorized commercial use of Sonya's IP, which IP is a byproduct of the profit-driven ecosystem that is X.com, generated revenue for the Defendants through subscriptions, ads, and clicks on their respective platforms with global reach, displacing her licensing market (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985) - commercial purpose weighs against fair use). The Defendants' over-reliance on fair use (17 U.S.C. § 107) and New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a) fails, as these defenses

Page 5 of 52

cannot override copyright protections or shield malfeasance that chilled and continues to chill the Plaintiff's constitutional right to seek redress (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971) - access to courts is fundamental).

9.    The Defendants' actions displaced the Plaintiff's licensing market (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985)), costing her multiple revenue streams: (i) licensing fees the Defendants should have paid to the Plaintiff; (ii) ongoing X monetization halted by being cyberbullied into going into "private mode" on X.com; (iii) lost business opportunities at her law firm, the Law Offices of Sonya Shaykhoun, Esq., and, (iv) lost job opportunities in the form of job applications that went unanswered or rejected outright presumably because the Plaintiff failed to pass the initial social media vetting phase in any professional interaction). The Defendants' suspiciously coordinated "*Karen*" narrative, which was effectively a three-pronged global take-down by individual "hit pieces" - published May 18-19, 2023, was not transformative commentary as required to rely on the fair use doctrine but a profit-driven exploitation, undermining fair use's purpose (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

10.    In mid-2023, X implemented a monetization program requiring creators to: (i) subscribe to X Premium ($8/month); (ii) have 500+ followers; (iii) accrue 5 million impressions over three months; and (iv) link a verified Stripe account (¶ 47). The Plaintiff met these criteria and earned a total of $170.97 that was paid out from August 2023 to May 2024 (¶ 47) before the Defendants' publications triggered relentless, ugly, and continued cyberbullying, forcing her into privacy mode in May 2024, to mitigate against further harm. X's TOS grants a non-exclusive license for use, not commercial monetization by third parties, supporting the Plaintiff's claim (*Otto*, 345 F. Supp. 3d at 429).

11.    The Defendants' synchronized Articles, published within 24 hours from New York hubs, demonstrate a conspiracy to exploit the Plaintiff's Tweet for profit. The Daily Beast Defendants (subscription-based), Daily Mail Defendants (ad-driven), and Independent Defendants (click-driven) acted with malice, (in the case of The Daily Beast Defendants) ignoring the Plaintiff's detailed and robust clarifications to Defendant AJ McDougall to amplify harm (*Palin*, 510 F. Supp. 3d at 27). It is important to note that in the Plaintiff's clarification to Defendant AJ McDougall, the Plaintiff described how it was she called the police – it was because the vendor (an American, not a migrant) was getting increasingly hostile and potentially violent). Despite this clarification, Defendant AJ McDougall published the Daily Beast Article after asking for clarifications but before the Plaintiff sent her response. Defendant AJ McDougall did not correct The Daily Beast Article, galvanizing the lies and the harm caused to the Plaintiff. This callous coordination caused quantifiable losses (projections based on the Plaintiff's $170.97 actual X earnings – lost revenue from required licenses with the Defendants) and unquantifiable reputational harm, necessitating discovery into the Defendants' profits and intent in collaborating to take the Plaintiff down on the global stage.

12.    New York's Anti-SLAPP laws, invoked by the Defendants in the NY State Case, chilled the Plaintiff's redress in that the judge threatened the Plaintiff with paying the Defendants' fees and denied the Plaintiff discovery (Exhibit 8 in this First Amended Complaint – Order of Voluntary Withdrawal). The New York Anti-SLAPP laws are curious. Signed into law by former Governor Andrew Cuomo, who enjoyed and still enjoys the support of Defendant Barry Diller, these laws, intended to expand and protect free speech, paradoxically shield media malfeasance, violate the due process and petition rights of ordinary plaintiffs (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)). The Plaintiff witnessed the backfiring of the New York

Page 7 of 52

Anti-SLAPP laws in the NY State Case from which she was forced by the judge to withdraw "*without prejudice*" and "*without liability*" on December 31, 2024 (signed by the judge on January 15, 2025), preserving her federal claims.

13.    Journalism enjoys fair use protections (17 U.S.C. § 107), but the Defendants' conduct, driven by profit, not public interest, crosses ethical and legal lines. Unlike regulated professions (e.g., attorneys), media entities face no sanctioning body, relying on litigation barriers and Anti-SLAPP to evade accountability. The Plaintiff, with 21 years of, *inter alia*, content licensing experience (¶ 33), asserts that the Defendants' use was commercial, not educational or transformative, defeating any possible fair use defense (*Morel*, 769 F. Supp. 2d at 305).

14.    The Plaintiff's prior collaboration with Defendant Bevan Hurley (¶ 30) and rejected pleas made by the Plaintiff to the Defendants highlight their respective bad faith. The Independent's Richard Best dismissed her takedown request (¶ 30), claiming "*public interest*" despite no British nexus to the Tweet, further evidencing malice. The Plaintiff will seek expedited discovery under FRCP 26(d)(1) to uncover the Defendants' profits and coordination, grounding her claims in concrete evidence.

15.    This SDNY action is not about defamation or defamation per se, which causes of action have been time-barred since May 17, 2024. Rather, this case is about copyright infringement, tortious harm, and constitutional violations, making this a meritorious federal case. The Daily Beast Defendants' counsel, Kate Bolger, persists in asserting Anti-SLAPP applicability (Exhibit 9 –March 3-10, 2025 email exchange between Kate Bolger and the Plaintiff), despite no defamation claims herein, underscoring their over-reliance on an unconstitutional shield that is New York's Anti-SLAPP laws. The Plaintiff's losses (economic,

emotional, and professional) stem from the Defendants' greed. The Defendants' disingenuous defense is less about safeguarding the Defendants' rights of free speech, despite Kate Bolger's dogged insistence that the New York Anti-SLAPP laws govern copyright infringement cases in federal court.

16.     Independent journalism plays an important role in our Constitutional Republic and newspapers and journalists publishing content targeting American audiences enjoy many freedoms. Those wide freedoms do not extend to the unlicensed use of copyrighted content that exceeds the scope of the fair use doctrine and the paradoxical New York Anti-SLAPP laws. Despite Kate Bolger's insistence otherwise, there are clear rules, laws and case laws that buttress against the misuse by newspapers and journalists of copyrighted content where such misuse is commercial in nature and purpose. Once monetized, the fair use doctrine and New York Anti-SLAPP laws become incompatible with copyright infringement cases, as is the case here. Like attorneys, newspapers and journalists are governed by universal ethics, laws, and their own codes of conduct and ethics. Unlike attorneys, there is no governing body that can sanction newspapers and journalists when they overstep the parameters of, for example, the fair use doctrine when the journalistic use is for the purpose of profit and not for educational or new reporting purposes. The corporate Defendants are businesses that operate either on a subscription basis (The Daily Beast) or an ad revenue basis (The Daily Mail, The Independent). Like all commercial businesses, the Defendants' modus operandi is "*filthy lucre*": money.

17.     The lines are increasingly blurred between fair use and "*public interest reporting*" on the one hand and profiting from copyrighted content that does not belong to the newspapers and journalists on the other hand. Newspapers and journalists such as the Defendants rely on the fact that – as regards the ordinary woman on the street - litigating is

Page 9 of 52

prohibitively expensive, the general public is typically ignorant about the law, and generally suffer from cowardice and are not willing to fight big media corporations with deep pockets (which media corporations are not above weaponization of their platforms against ordinary people) to continue to steal copyrighted materials to attract readers for profit. It is a cynical truth that the public's poverty, ignorance, and fear are the reasons why so many newspapers and journalists push the boundaries of the law to turn a profit. It is a sad commentary on society that the Plaintiff would be forced to litigate as she is now to sanction the Defendants and remove the damaging Articles. Why publish such mean and damaging articles in the first place?

18.    In mid-2023, X (formerly Twitter) implemented a content monetization scheme that offers creators multiple ways to earn money from their content. Tech Crunch[2] reported it as follows:

### Twitter shares ad revenue with verified creators

Twitter will now pay creators for a share of the ad revenue earned from ads served in the replies to their posts. Twitter Blue subscribers who have earned more than 5 million tweet impressions each month for the last 3 months are eligible to join the creator payouts.

According to Elon Musk, the first round of creator payouts will total $5 million, and will be cumulative from the month of February onward. These payouts will be delivered via Stripe.

Despite the program's significant payouts, some creators weren't happy — and took their complaints to Twitter owner Elon Musk. In a series of tweets, Musk addressed creators' concerns over things like the types of accounts that were eligible for monetization, rate limits and other issues.

---

[2] Silberling, A., Corrall, C., & Stringer, A. (2024, June 13). Elon Musk's X: A complete timeline of what Twitter has become. *TechCrunch*. https://techcrunch.com/2024/06/05/elon-musk-twitter-everything-you-need-to-know/ (last visited March 12, 2025).

Page 10 of 52

The Plaintiff's viral Tweet triggered her eligibility to participate in the X content monetization scheme (¶ 10) and to profit from X's digital ecosystem as a *"content creator"*. The Plaintiff's Tweet garnered almost 7 million views (it is not clear if those views were from bots or humans or a mix of both and, if both, at what ratio of bots to humans). Plaintiff paid the monthly subscription charge to X.com in consideration of the *"blue check"* and consequently had a contractual relationship with X.com which is governed the X TOS.

19.    In the NY State Case, the Defendants succeeded in disabusing her of copyright in Sonya's IP, with the shocking result that the X TOS and their consequent protection of her copyrighted content were rendered moot. Why have terms of service if no one is going to obey them? As stated, the Plaintiff became eligible for the X monetization program and Plaintiff can still monetize her X account (@SonyaShaykhoun) but has been forced into privacy mode because of the abuse that Defendants wrought upon her by baptizing her as a *"Karen"*. It was not enough to have branded the Plaintiff a *"Karen"* in New York and North America, but the Defendants had to go an extra step and brand the Plaintiff an *"international Karen"*. This is especially damaging given that the tagline of the Plaintiff's law firm is *"law with a global reach"*. This tagline is rooted in the Plaintiff's international education and professional experience. Now, thanks to the Defendants, the *"Karen"* moniker has a damning global reach, displacing the good will in her name that she spent decades building with blood, sweat, and tears. Because @SonyaShaykhoun is now in private mode to mitigate against further damage and further exploitation of the Tweet and Sonya's IP, the Plaintiff cannot monetize her social media content per Cocom's monetization program for fear of additional cyberbullying, receiving more hate mail, and additional reputational damage, exacerbated and facilitated by the Articles. The *"lock"* symbol by "The Commercially Savvy Lawyer" in the excerpt below

means that the X account is private and not making any money thanks to the Defendants' abusive exploitation of Sonya's IP:



20.    The Defendants argued strenuously in the NY State Case that the New York Anti-SLAPP laws applied and unilaterally defeated any causes of action emanating from their publication of the Articles. The Plaintiff was mystified by this result – that the Plaintiff's human suffering would be rendered inconsequential by the pro-media New York Anti-SLAPP laws and that state court. The unorthodox management of the Supreme Court case and the Plaintiff's frustration are explained at length in the Initial Complaint. The myopia of the New York Supreme Court on the extremely broad New York Anti-SLAPP laws has the ironic and unfair effect of quashing the rights of the *"Everyman"* on the street. As a lawyer who has insured print and broadcast compliance with the law and the Office of Communications (Ofcom) that regulate Al Jazeera English in Doha, Qatar, that the Articles were not deplatformed in the NY State Case is troublesome. Is it good public policy to allow what the Defendants did to the Plaintiff without

Page 12 of 52

recourse (especially when copyright infringement is a cause of action)? And what if the roles were reversed?

21.    The Defendants' unlawful use of Sonya's IP to create sensational content from which they profited illicitly, and which the Plaintiff aims to investigate in discovery.

22.    It is instructive to evaluate the development of New York's Anti-SLAPP laws and how New York State and New York City politics work. For example, Defendant Barry Diller supported former Governor Cuomo, who signed the New York Anti-SLAPP laws into law in 2020, since before the enactment of the problematic statute. It is difficult not to be cynical about whether financial support from the billionaire media mogul resulted in the New York Anti-SLAPP laws that protect media corporations like those under Barry Diller's control from "*frivolous lawsuits*" and consequently shuts down the efforts of the "*Everyman*" plaintiffs who have been harmed and abused by the "*billionaire Barry Diller*" and "*The Daily Beasts*" of New York. The new Seventeenth and Eighteenth Causes of Action speaks to the way the New York Anti-SLAPP laws have backfired (as per the Plaintiff's NY State Case) and do not protect free speech, they only protect media companies to print what they want, even if it is false, falls out of the fair use doctrine or is copyright infringement.

23.    Before Cuomo signed them into law in 2020, the New York Anti-SLAPP laws were developed by then-New York senator Brad Hoylman and then-Assemblywoman Helene Weinstein. Former Governor Andrew Cuomo is currently making a bid for New York City Mayor in the 2025 campaign with the backing of Defendant Barry Diller[3]. In the NY Post article, Defendant Barry Diller is quoted admitting to the special relationship he has with Cuomo who

---

[3] Zilber, A. (2025, March 10). Barry Diller backs Andrew Cuomo's bid for NYC mayor out of "gratitude" for supporting real estate project: report. *New York Post*. https://nypost.com/2025/03/10/business/barry-diller-backs-andrew-cuomos-bid-for-nyc-mayor/ (last visited on 3/12/25).

gave him special access to expedited permits, a privilege few if any other ordinary citizens are afforded: "'*I owe him gratitude for that, so I am supporting him,*' Diller said, referring to Cuomo's assistance in the <u>creation of Little Island</u>, a public park in Manhattan that Diller and his wife, fashion designer Diane von Fürstenberg, helped fund."[4] The establishment of New York's Anti-SLAPP laws are a far cry from the original narrow laws[5] and disproportionately protect the likes of the Defendants. While this is more a socio-political commentary than legal argument, it is well documented that Barry Diller contributed significant monies to Andrew Cuomo's political campaigns over the years and it follows that a billionaire media mogul like Barry Diller, whose companies are in New York City, would stand to benefit from the extremely broad provisions of the New York Anti-SLAPP laws. Indeed, the Plaintiff is a veteran of that uneven fight between influential and deep-pocketed media companies and ordinary citizens who get caught in their crossfire.

24.    The New York State Legislature July 22, 2020 press release entitled "*Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Fee Speech*" makes the following bold statement, which is the exact opposite of what the impact in practice is of New York's Anti-SLAPP laws[6] per the Plaintiff's recent experience in the state court:

---

[4] Id.

[5] New York First Department. (2024). Clarifies the applicability of New York's Anti-SLAPP Statute. In *New York First Department.* https://www.cahill.com/publications/client-alerts/2024-06-20-new-york-first-department-clarifies-the-applicability-of-new-york-anti-slapp-statute/_res/id=Attachments/index=0/CGR%20Memo%20-%20New%20York%20First%20Department%20Clarifies%20the%20Applicability%20of%20New%20York%E2%80%99s%20Anti-SLAPP%20Statute.pdf (last visited on 3/12/25).

[6] *Senate and Assembly majorities advance Anti-SLAPP legislation to protect free speech.* (n.d.). https://nyassembly.gov/Press/files/20200722a.php (last visited on 3/12/25).

Page 14 of 52



# NEW YORK STATE LEGISLATURE

FOR IMMEDIATE RELEASE:
July 22, 2020

## Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Free Speech

Senate Majority Leader Andrea Stewart-Cousins and Assembly Speaker Carl Heastie today announced the Senate and Assembly have passed legislation that offers legal protection to any individual or entity sued for exercising their free speech rights. A "Strategic Lawsuit Against Public Participation," often referred to as a "SLAPP", is a tactic often employed by powerful interests that involves initiating a frivolous lawsuit intended to silence free speech and public participation in our democratic process.

"New Yorkers' voices must not be silenced by powerful interests and the super wealthy," **Majority Leader Stewart-Cousins** said. "SLAPP lawsuits that are employed to discourage free speech threaten our democracy and work against the people of New York. I applaud Senator Hoylman for his work in championing this bill and protecting the free speech of ALL New Yorkers."

"SLAPP's have the dangerous potential to censor the type of free speech that is fundamental to a free and democratic society," said **Speaker Heastie**. "This legislation will discourage these types of lawsuits and protect the people and institutions that we depend on to be an informed public. I would also like to thank Assemblymember Weinstein for her longtime tireless commitment to protecting free speech for all New Yorkers."

**Senate bill sponsor Senator Brad Hoylman,** said, "For decades, Donald Trump, his billionaire friends, large corporations and other powerful forces have abused our legal system by attempting to harass, intimidate and impoverish their critics with strategic lawsuits against public participation, or 'SLAPP' suits. This broken system has led to journalists, consumer advocates, survivors of sexual abuse and others being dragged through the courts on retaliatory legal challenges solely intended to silence them. Today, New York's Democratic Majority 'SLAPPs back' with our new legislation (S.52A/A.5991A) that expands anti-SLAPP protections, thereby strengthening First Amendment rights in New York State, the media capital of the world. I'm thrilled to see this legislation pass the Senate today thanks to the leadership of Senate Majority Leader Andrea Stewart-Cousins and alongside my Assembly colleague Helene Weinstein."

"The dangerous message that these lawsuits send is that criticism will cost you," said **Assembly bill sponsor Helene Weinstein**. "Recent experience has shown that there are an increasing number of deep pocketed individuals who have outrageously used New York's court system as a means to harass New Yorkers who have publicly disagreed with them. These lawsuits are started not because they have any chance of ultimate success – they don't – but to make sure that others don't speak out publicly, for fear of being sued. It is clear that the best remedy for this problem is to require those who bring these lawsuits to pay the legal fees and costs of those who they have wrongfully sued, along with an expedited means for the courts to toss these cases into the dustbin of history. I wish to express my appreciation to Speaker Heastie for his leadership and support on this important issue, and I also wish to express my thanks to Senator Hoylman for so skillfully guiding the bill through the Senate."

Today's legislation will broaden New York's existing anti-SLAPP statute by revising the definition of an "action involving public petition and participation" to include a broader definition matters in the "public interest." Current law has been narrowly interpreted by the courts and typically limited to cases initiated by an individual or business entity that is embroiled in controversies over a public application or permit. Under this bill, if a defendant's speech or activity falls under the protection of the statute, judges will have the ability to dispose of these meritless claims quickly (S.52A/A.5991-A).

What began as a political turf war between then President Trump and New York Democrats[7]

has resulted in a piece of legislation that, ironically, silences anyone – such as the Plaintiff –

---

[7] *As Trump attacks the free press, legislature passes Senator Hoylman and assemblywoman Weinstein's legislation to crack down on frivolous "SLAPP" lawsuits used to silence critics.* (n.d.). NYSenate.gov. https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/trump-attacks-free-press-legislature-passes-senator (last visited on 3/12/25).

Page 15 of 52

who dares to sue the likes of the Defendants. The New York Anti-SLAPP laws are constructed to victimize the very people the drafters of the legislation pretended to want to protect. What was the real objective of this legislation?

25.    The X TOS grant third parties a *"free worldwide non-exclusive, royalty-free license (with the right to sublicense)"* but are silent on monetization. Case law supports the Plaintiff's assertion that Sonya's IP, which she monetized on X.com per its content monetization scheme, cannot be monetized by third parties without express written permission, i.e., a license. The Defendants, who each utilize a business model that is geared towards maximizing their respective profit from *"their"* content, ought to have entered into a licensing agreement to utilize Sonya's IP legally. Content licenses typically prescribe where and how the content that is the subject of the license can be used. Further, a licensor would never grant a licensee a license that would allow the latter to malign or damage the licensor's name, brand, or intellectual property. The Plaintiff – as the owner of Sonya's IP – enjoys copyright protections, the X TOS, and the Constitutional rights and protections – like other content creators (i.e., the Defendants). The Defendants' defenses – rooted in *"fair use"*, *"public interest"* and *"New York's Anti-SLAPP laws"* – must necessarily fail. It should be noted that the X TOS also prevent doxing (publishing private material belonging to X users) which is what The Daily Mail Defendants did when they published the Plaintiff's home address, email, and phone number – thus opening the door to unwanted and nasty hate mail and crank calls.

26.    The Constitution and the Copyright Act recognize the critical importance of giving creators exclusive rights over their works. Newspapers and journalists rely on the same protections to fortify their profits and investment. It is ironic and unfair that the Defendants would trample over the copyright protections that the Plaintiff enjoys over her Tweet and

Page 16 of 52

Sonya's IP to unjustly enrich themselves, further their social agenda, and deliberately and recklessly hurt the Plaintiff in the process. The Defendants have refused to recognize that the Plaintiff is a content creator by virtue of the X.com content monetization scheme, which is *"Rules for thee but not for me"* in action. The Plaintiff saw in the handling of NY State Case how the New York Anti-SLAPP laws are used as a blanket defense against any plaintiffs who file cases against newspapers and/or journalists – without regard for whether the case is meritorious or not. Practically speaking, it is statistically impossible that Anti-SLAPP laws could shut down every cause of action. Is this the result of allowing billionaires to influence the judiciary and elected politicians? Is this what the Founding Fathers envisaged? In any event, the objective of the New York State Legislature – to liberate speech – failed because everyone is afraid to upset billionaires like Defendant Barry Diller for fear that he would stop endorsing and funding their campaigns and political ambitions. If *"David and Goliath"* were a lawsuit, it would be this lawsuit. The Defendants want all the protections afforded by the law but want to deny the Plaintiff those same protections at the expense of the Plaintiff's name and livelihood.

27.     It is perverse that the Defendants should be entitled and allowed to weaponize Sonya's IP against the Plaintiff to amplify the pile-on that happened on X.com and to facilitate cyberbullying and injurious harm that ensued and intensified after the publication of the Defendants' Articles. Had the Defendants bothered to procure a licit license from the Plaintiff for their use of Sonya's IP, the *"Karen"* narrative would never have materialized, and Plaintiff's world would look entirely different to how it looks today.

28.     The Defendants refuse to recognize the Plaintiff's rights in her copyrighted content, instead droning on about New York's Anti-SLAPP laws which – far from promoting and safe-guarding free speech and Constitutional Rights – are unconstitutional and have the

speech-chilling effect on ordinary men and women on the street. If, like Pac-Man, New York's Anti-SLAPP laws devour every Constitutional right, every contractual and commercial rule and principle, the protections afforded by the Copyright Act, international licensing industry standards, and the X TOS, then it follows that the New York Anti-SLAPP laws are not truly about protecting free speech at all but shielding big media companies from any litigation, much less "*frivolous litigation*". The application of the New York Anti-SLAPP laws in state court is such that it heavily favors the malfeasant defendants, even when such defendants lie, steal copyrighted content, and abuse plaintiffs. In practice, the New York Anti-SLAPP laws chill free speech and give overarching and unfair liberties to deep pocketed media companies like the corporate Defendants.

29.    The Plaintiff objected to the use of Sonya's IP when she wrote to each of The Daily Beast and The Daily Mail to object to the Articles (it took that long for the Plaintiff to react because the shock and shame that the Articles caused hit her hard and threw a wrench in her typical "*fight or flight*" response) to plead with them that the damage they had wrought on her life and good name was beyond the pale. While The Daily Mail responded perfunctorily, The Daily Beast's then editor, Tracy Connor, completely ignored her. Richard Best of The Independent scoffed at her request (¶ 30). The Plaintiff, who holds an LL.M. in Corruption, Law and Governance (University of Sussex and the Rule of Law and Anti-Corruption Center (ROLACC), Qatar, 2018), learned yet another lesson in corruption the hard way.

30.    While the Plaintiff worked with Bevan Hurley, the journalist who wrote The Independent Article, and that she wrote him and thanked him for the "*balanced piece*". The Plaintiff could never have anticipated the backlash that she faced after its and the other Articles' publication. The Plaintiff wrote to the Independent Customer Service line, which put her in

touch with Richard Best, Managing Editor of The Independent. In that exchange, the Plaintiff respectfully requested Richard Best to take it down, which amounted to a rescission of any implicit consent she may have previously given to Bevan Hurley in the immediate aftermath of the Tweet going viral. Plaintiff regrets having collaborated with Bevan Hurley and The Independent since the impact of the X pile-on and the amplification of that digital violence via the Articles – left her reeling. Richard Best – answering via The Independent's complaint's email hotline – was heartless and dismissive of the Plaintiff's complaint and insistent that the story encapsulated in The Independent Article, is of "*public interest*" to the British readership. Exactly how? The Plaintiff is keen to explore the decision-making process behind the Defendants' framing the Plaintiff as a "*Karen*", why they all took the same tack, and how Sonya's IP is a public interest story in Britain. It makes no sense. And that the Defendants have been shielded from culpability to the Plaintiff for the synchronized violence they wrought on her life since publication is perturbing.

31.    The commercial upshot of the unauthorized exploitation of Sonya's IP by the Defendants is that the Plaintiff lost out on revenue from multiple avenues: (I.) from the lost licensing fees that, in an ordinary world of content creation and licensing, the Defendants would and should have paid her for their limited use under a license agreement; (ii.) from her ability to continue to monetize her X account (@SonyaShaykhoun) because the Defendants maligned her in the Articles that she suffers untold abuse and trolling whenever she has tried to open the account to the public since the publication of the Articles; and, (iii.) from lost business opportunities through her law firm, the Law Offices of Sonya Shaykhoun, Esq., and other job opportunities that failed to materialize because the Articles are all over the Internet and the Plaintiff's name is now well and truly mud. Quantifying how much revenue and other

commercial opportunities the Plaintiff lost out on is impossible. The personal and reputational damage is unquantifiable and the longer the Articles stay up, the worse the enduring damage. How does one quantify the damage that the Defendants did to the Plaintiff's name and professional prospects?

32.    Common sense and commercial acumen dictate that using Sonya's IP has been lucrative for the Defendants despite the ongoing harm it has caused and continues to cause the Plaintiff. The Plaintiff intends to seek expedited discovery under a Rule 56(d) Affidavit to determine how much money each corporate Defendant made from Sonya's IP.

33.    The Plaintiff, a solo New York attorney with 21 years of experience in cross-border content licensing, including roles as Senior Legal Counsel at Orbit Communications Company W.L.L. in Bahrain (2004–2008) and Al Jazeera Media Network in Doha, Qatar (2011–2014), brings unique expertise to this case. At Al Jazeera, during the Arab Spring and Qatar Blockade, the Plaintiff managed content licensing and blocked publications - such as one article by a British journalist in the Doha newsroom that included incendiary claims against the Emiratis - that risked escalating political tensions for sensational gain. This experience taught the Plaintiff that media entities often prioritize profit or agendas over accuracy, a pattern she alleges the Defendants repeated by mischaracterizing her Tweet as a "*Karen*" narrative for commercial benefit  The Plaintiff's extensive background in the international media world underscores her expectation that the Defendants, as sophisticated media outlets, should have sought a license for her Tweet rather than exploiting it without consent, displacing her licensing market (¶ 9). There is no way that the Defendants did not anticipate the personal and professional harm the Articles would do to the Plaintiff. Their collective lack of empathy and nastiness is shocking. In the pre-trial conference on November 20, 2024, in the NY State Case

Page 20 of 52

that Hon. James d'Auguste scheduled, the Plaintiff asked the judge if he would hire someone with a social media footprint like the Plaintiff's footprint. While Hon. James d'Auguste said he would at least interview me to find out what happened, most people would throw the Plaintiff's pitch deck or resume in the garbage bin. When the Plaintiff asked the Defendants' lawyers what they would do if they were victimized in the same way, they practically gasped.

34.    Now, the Plaintiff is back in New York City and striving to build her international law firm, the Law Offices of Sonya Shaykhoun, Esq. based in Manhattan. The coordinated exploitation of and infringement of Sonya's IP, and the resulting cyberbullying, privacy breaches, and emotional distress, have made building a business or getting a job in NYC impossible. The Daily Beast Defendants' counsel, Kate Bolger, persists in asserting Anti-SLAPP applicability despite no defamation claims herein. Kate Bolger went as far as threatening the Plaintiff with fee motions in the New York Supreme Court to force the Plaintiff to withdraw her law suit, despite the fact that (i) such threats offend the New York State Professional Code of Conduct, as the Plaintiff reminded Kate Bolger in the March 3-10, 2025 email exchange and (ii) the judge in that case had signed the Plaintiff's Order of Voluntary Withdrawal ("*without prejudice*" and "*without liability*") and that case is now disposed:

From: SFC-Part55-Clerk <SFC-Part55-Clerk@nycourts.gov>
Sent: Wednesday, March 12, 2025 2:33 PM
To: rachelstrom@dwt.com <rachelstrom@dwt.com>; KateBolger@dwt.com <KateBolger@dwt.com>; sullivant@ballardspahr.com <sullivant@ballardspahr.com>; lindseycherner@dwt.com <lindseycherner@dwt.com>; vaishampayans@ballardspahr.com <vaishampayans@ballardspahr.com>; Sonya Shaykhoun <sonya@shaykhounlaw.com>
Subject: RE: 100558/2024 SONYA SHAYKHOUN ESQ. v. THE DAILY MAIL et al

Counselors,

Please be advised there is no court appearance on 3/19/2025. The case is disposed.

Thank you,

Gina Volcy
Part 55 clerk

The Defendants' actions, which they insist shielded by New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a), violate the Plaintiff's constitutional rights, necessitating declaratory relief. Kate Bolger's bullying tactics highlight the ruthlessness of her clients, The Daily Beast Defendants. This ruthlessness is replicated in the other Defendants. Just from a human point of view, why would any decent person insist on being blind to the extensive harm they have caused another human being and then stubbornly refuse to rectify such harm? Perhaps this lack of humanity is why our collective society is failing today. As newspapers, the Defendants reflect back to us what we are – and what they are.

### III.    JURISDICTION AND VENUE

35.    This Court has jurisdiction under 28 U.S.C. § 1331 over federal questions (copyright infringement under 17 U.S.C. § 106, constitutional claims under the First, Fifth, and Fourteenth Amendments), 28 U.S.C. § 1338(a) over copyright claims, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

36.    Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events occurred in the SDNY, including the Defendants' U.S. operations. Specifically, the Defendants

published from New York (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place, The Independent at 1114 Avenue of The Americas), targeting U.S. audiences. Defendant Bevan Hurley, whose home and NY office addresses are unpublished, advertises himself online as being a NY-based journalist who, at the time of the publication of the Articles, worked for The Independent, and now works for The Times (London) (last checked on March 12, 2025):



# Bevan Hurley

SENIOR REPORTER, US

X @BevanHurley

Bevan Hurley is a senior reporter (US) for The Times and The Sunday Times, based in New York. He was previously at The Independent US, writing features and news stories on politics, crime and social issues. He has worked at various publications as a reporter and editor in the UK and his native New Zealand during the past 20 years.

## IV.    PARTIES

37.    The Plaintiff Sonya Shaykhoun, Esq., resides at 825 West End Avenue, New York, NY 10025 and is a licensed New York attorney in good standing (4633293) with expertise in intellectual property licensing.

38.    Defendant Daily Mail is a British media entity operating in the U.S. via DailyMail.com at 51 Astor Place, New York, NY 10003 (¶¶ 6, 7 of the Initial Complaint).

39.    Defendant Daily Mail, a U.K. entity, operates via DailyMail.com at 51 Astor Place, New York, NY 10003 (¶¶ 6, 7 of the Initial Complaint).

40.    Defendant Daily Mail and General Trust PLC ("DMGT") is a U.K. parent of Daily Mail/DailyMail.com (¶ 6 of the Initial Complaint).

41.     Defendant Noa Halff, DailMail.com journalist, as employed by DailyMail.com at 51 Astor Place, New York, NY 10003 (¶ 15 of the Initial Complaint).

42.     Defendant The Daily Beast Company ("TDB") is a Delaware LLC at 555 West 18th Street, New York, NY 10011 (¶ 10 of the Initial Complaint).

43.     Defendant Amanda J. McDougall (a/k/a AJ McDougall) TDB journalist is employed by TDB at 555 West 18th Street, New York, NY 10011 (¶ 16 of the Initial Complaint).

44.     Defendants Ben Sherwood, Joanna Coles, Tracy Connor, and Barry Diller are (past or present) TDB/IAC executives at 555 West 18th Street, New York, NY 10011 (¶¶ 11-14 of the Initial Complaint).

45.     Defendants IAC Inc., TDB's parent, is a Delaware corporation at 555 West 18th Street, New York, NY 10011 (¶ 11 of the Initial Complaint).

46.     Defendants Georgina Greig, Louise Thomas, and Richard Best are The Independent executives/editors at 1114 Avenue of the Americas, New York, NY 10036 with the following addresses in England: (i) Alphabeta Building, 14-18 Finsbury Square, London, EC1A 1AH, England (The Independent HQ); and (ii) 2 Derry Street, London, W8 5HF, England.

## V.     FACTUAL ALLEGATIONS

47.     On May 17, 2023, the Plaintiff posted the Tweet on X regarding an unlicensed vendor in Riverside Park, which garnered nearly 7 million views. As further explained to Defendant AJ McDougall in the clarification email, the Tweet was shorthand for an unnerving interaction between the Plaintiff and the unlicensed vendor wherein the vendor was getting increasingly agitated and showed signs of becoming violent. The Plaintiff explained this to Defendant AJ McDougall posted about this on X (there are so many messages under the Tweet that it is impossible to sort through them) and earned $56.95 through X's monetization program

Page 24 of 52

in the first pay-out on August 8, 2023 and a total of $170.97 (from August 8, 2023 to May 27, 2024, around when the Plaintiff finally decided to go private on X to protect her safety. This amount reflects actual earnings, while the Defendant's actions halted projected earnings of **$500+** based on 7 million views and X monetization trends. The Plaintiff's Stripe earnings are below:

**Authentication details**

Updates to your email and mobile number will apply to all Stripe accounts

Email address                                                    shaykhoun@protonmail.com  >

Mobile number                                                                (929) 408-4531  >

See the next page.

Page 25 of 52

### Activity

▣    Your $35.44 payout from X (formerly Twitter) is on its way.
May 27, 2024

▣    Your $12.93 payout from X (formerly Twitter) is on its way.
Feb 18, 2024

▣    Your $11.90 payout from X (formerly Twitter) is on its way.
Jan 20, 2024

▣    Your $12.50 payout from X (formerly Twitter) is on its way.
Dec 24, 2023

▣    Your $13.73 payout from X (formerly Twitter) is on its way.
Nov 25, 2023

▣    Your $14.70 payout from X (formerly Twitter) is on its way.
Oct 15, 2023

▣    Your $12.82 payout from X (formerly Twitter) is on its way.
Sep 4, 2023

▣    Your $56.95 payout from X (formerly Twitter) is on its way.
Aug 8, 2023

48.    The Plaintiff's Tweet is an original work protected by copyright under 17 U.S.C. § 102(a), with commercial value evidenced by her earnings.

49.    On May 18-19, 2023, Defendants The Daily Beast, Daily Mail, and The Independent published the Articles embedding the Plaintiff's Tweet, falsely framing her as a "*Karen*".

50.    Defendant AJ McDougall, who wrote The Daily Beast Article, which was published after AJ McDougall emailed the Plaintiff and before receiving the Plaintiff's clarifications on May 17, 2023, recklessly disregarded them (*Palin v. N.Y. Times Co.*, 510 F.

Supp. 3d 21, 27 (S.D.N.Y. 2020, amplifying harm (¶ 394 of the Initial Complaint) and thus defeats the Anti-SLAPP's "*no malice*" threshold (*Palin*, 510 F. Supp.3d at 27).

51.     The Articles triggered cyberbullying (Exhibit 3), forcing the Plaintiff to "*protect her tweets*" or around May 27, 2024, halting the Plaintiff's continued X earnings, costing untold losses in terms of clients and job opportunities, and causing serious and unquantifiable emotional distress.

52.     The Defendants ignored the Plaintiff's retraction requests (e.g., Connor, Bell, Best), further underlining their malice (*Palin*, 510, 510 F. Supp. 3d at 27).

53.     The Defendants' 24-hour coordinated publications from New York (¶ 11) show conspiracy and malice (*Palin*, 510 F. Supp. 3d at 27), necessitating discovery into profits and intent. Their Anti-SLAPP over-reliance in state court chilled the Plaintiff's rights (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)).

54.     The Plaintiff reiterates that this case rests on copyright infringement, tortious conduct, and constitutional violations – not defamation, which has been time barred since May 17, 2024, nor frivolous claims. The Defendants' heartless, greedy, and exploitative practices - ruthlessly capitalizing on the Plaintiff's copyrighted work and resulting harm – destroyed her professional reputation, built over years of education and global experience, and that of her immigrant parents who supported her ascent. The Defendants have jeopardized the Plaintiff's career.

### COUNT ONE: COPYRIGHT INFRINGEMENT (17 U.S.C. § 106)

55.     The Plaintiff incorporates ¶¶ 1–54 as if fully set forth herein.

56.     The Plaintiff's Tweet, posted on X.com on May 17, 2023, is an original work of authorship fixed in a tangible medium, automatically protected under 17 U.S.C. § 102(a), with

exclusive rights to reproduce, distribute, and display granted to the Plaintiff under 17 U.S.C. § 106. Defendants The Daily Beast Company LLC ("TDB"), DailyMail.com, and The Independent reproduced, distributed, and publicly displayed the Tweet verbatim in the respective Articles published May 18-19, 2023, without the Plaintiff's consent or a license, exceeding the scope of X's TOS. The X TOS grants a non-exclusive license for use on X's platform, not for third-party commercial exploitation (*Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 429 (S.D.N.Y. 2018) – X's TOS does not extend to unlicensed monetization).

57.     The Defendants' use was not fair under 17 U.S.C. § 107: (i) their purpose was commercial, generating subscription revenue (TDB at 555 West 18th Street, ¶ 42), ad revenue (DailyMail.com at 51 Astor Place, ¶ 39), and clicks (The Independent, ¶ 46), not transformative commentary (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)); (ii) the Tweet, a creative expression, was used in its entirety (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985) - full use weighs against fair use); (iii) Defendants displaced the Plaintiff's licensing market, as evidenced by her $170.97 X earnings (¶ 47) and projected earnings, which ceased due to the Plaintiff going private on X having been forced by the Defendants' actions (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) – commercial harm negates fair use). Further, the Defendants' use of Sonya's IP supplanted the Plaintiff's ability to license her Tweet to other media outlets, a market she actively participated in via X's monetization program.

58.     The Defendants' infringement directly caused the Plaintiff actual damages of lost X earnings, plus unquantified licensing fees the Defendants should have paid to the Plaintiff, to be determined via discovery. The Defendants profited illicitly across TDB subscriptions,

Page 28 of 52

DailyMail.com ads, and The Independent clicks, necessitating disgorgement under 17 U.S.C. § 504(b) subject to a full accounting during discovery.

59.    The Plaintiff seeks: (i) actual damages plus additional licensing losses (TBD – based on industry standard licensing costs and dependent on discovery); (ii) The Defendants' profits to be determined pending expedited discovery under FRCP 26(d)(1); (iii) an injunction under 17 U.S.C. § 502(a) to remove the Articles from all platforms; and (iv) costs under 17 U.S.C. § 505.

### COUNT TWO: CYBERBULLYING (PRIMA FACIE TORT)

60.    The Plaintiff incorporates¶¶ 1-59 as if fully set forth herein.

61.    Defendants The Daily Beast Company LLC, DailyMail.com, and The Independent, through their agents and co-Defendants Amanda J. McDougall, Noa Halff, and Bevan Hurley, intentionally inflicted harm on the Plaintiff without excuse or justification by publishing the Articles on May 18-19, 2023, falsely framing her as a "*Karen*" (a pejorative implying racial bias and entitlement) despite her May 17, 2023, clarifications to the Defendant McDougall. This reckless portrayal, synchronized within a 24-hour window from New York City offices (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place, The Independent at 1114 Avenue of the Americas), foreseeably incited a global wave of cyberbullying, evidenced by hate mail and threats received from May 18, 2023, onward (*Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142–43 (1985) - prima facie tort requires intent to harm without lawful justification).

62.    The Defendants acted with malice and specific intent to harm, as: (i) Defendant AJ McDougall disregarded the Plaintiff's clarifications emailed at 3:47 PM EST on May 17, 2023, before TDB's Article posted at 10:32 AM EST on May 18, 2023; (ii) Halff and Hurley

mirrored this narrative within hours (DailyMail.com at 2:15 PM EST, May 18, 2023; The Independent at 9:08 AM GMT, May 19, 2023), amplifying the false portrayal; and (iii) The Defendants ignored the Plaintiff's retraction pleas (e.g., Tracy Connor's non-response (Exhibits 4) , Katrina Bell at the Daily Mail (Exhibit 5), and Richard Best's, rude dismissal citing "*public interest*," Exhibit 6), showing reckless disregard (*Chen v. United States*, 854 F.2d 622, 627 (2d Cir. 1988) – malice inferred from intentional acts lacking social utility). Their sole motivation was profit via subscriptions, ads, and clicks, not journalism (*LSG 105 W. 28th LLC v. Sinclair*, 2020 NY Slip Op 31764(U), ¶ 12 (Sup. Ct. N.Y. Cty. 2020) - profit-driven harm actionable). The hate mail in Exhibit 3 speaks for itself.

63.    The Plaintiff suffered special damages proximately caused by the Defendants' actions, including: (i) projected earnings on X.com (i.e., what the Plaintiff stood to make had the cyberbullying not forced her into hiding on May 27, 2024),; (ii) lost law firm clients (e.g., retainers declined post-May 2023 due to Google search results linking to the Defendants' Articles,; and (iii) severe emotional distress valued at $25,000+, evidenced by cyberbullying threats and forced withdrawal from public X engagement and reflecting ongoing trauma, sleeplessness, and social isolation in Plaintiff's affidavit (to be filed). These damages arise from the Defendants' intentional misconduct, as upheld under New York law (*Broadway & 67th St. Corp. v. City of New York*, 100 A.D.2d 478, 480, 475 N.Y.S.2d 1, 4 (1st Dep't 1984) - prima facie tort sustained where intentional acts caused specific economic harm, awarding plaintiff damages after trial).

64.    This claim is not duplicative, as it targets the Defendants' intentional orchestration of harm via third-party cyberbullying, distinct from direct emotional distress (Counts Six, Seven) or copyright infringement (Count One) (*Curiano v. Suozzi*, 63 N.Y.2d 113,

Page 30 of 52

117 (1984) - prima facie tort viable when no other remedy fully compensates). The Plaintiff seeks compensatory damages in an amount to be determined by the Court, reflecting economic and emotional injuries uniquely tied to Defendants' malicious conduct.

## COUNT THREE: BREACH OF CONTRACT/QUASI-CONTRACT

65.    The Plaintiff incorporates ¶¶ 1-64 as if fully set forth herein.

66.    X's TOS implies a good-faith limit on commercial use; the Defendants' monetization breached this, unjustly enriching them at Plaintiff's expense (*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)).

67.    Plaintiff seeks restitution in an amount TBD at trial and/or as proven via discovery.

## COUNT FOUR: CIVIL CONSPIRACY TO EXPLOIT

68.    The Plaintiff incorporates ¶¶ 1-67 as of fully set forth herein.

69.    Defendants The Daily Beast, Daily Mail, and The Independent, along with their respective agents and co-Defendants AJ McDougall, Noa Halff, and Bevan Hurley, knowingly and intentionally entered into an agreement to exploit the Plaintiff's copyrighted Tweet, posted on May 17, 2023, for the commercial gain, as demonstrated by their synchronized publications on May 18 and May 19, 2023 (*K.D. v. Educ. Testing Serv.*, 386 N.Y.S.2d 747, 750 (Sup. Ct. 1976)).

70.    The purpose of this conspiracy was to maximize the Defendants' profits through subscription (The Daily Beast, ¶ 10), advertising revenue (Daily Mail, ¶ 7), and clicks (The Independent, ¶ 20) by mischaracterizing the Plaintiff as a "*Karen*" in a coordinated media campaign, thereby amplifying the harm to the Plaintiff beyond the scope of any individual publication.

Page 31 of 52

71.    The question that the Plaintiff is keen to answer is "*why?*" Why did the Defendants target her in such a devastating and destructive manner? What had the Plaintiff done to deserve such a vicious take-down by the Defendants? And is cannibalizing an unfortunate pile-on by trolls on X the kind of journalism that the fair use doctrine and New York's Anti-SLAPP laws are intended to protect (even if they did apply to this case, which they do not)?

72.    The Defendants committed overt acts in furtherance of this conspiracy including but not limited to:

a.    Publishing suspiciously near-identical Articles within a 24-hour timespan on May 18-19, 2023, embedding the Plaintiff's Tweet without consent in violation of her copyright in said Tweet (Count One).

b.    Defendant AJ McDougall's reckless disregard of the Plaintiff's clarifications sent on May 17, 2023, knowingly escalating the false narrative to incite cyberbullying; and,

c.    Defendants Halff and Hurley's participation in mirroring this narrative, foreseeably triggering a global backlash against the Plaintiff.

73.    The conspiracy directly caused the Plaintiff substantial harm, including:

a.    The Defendants' exploitation of the Plaintiff's viral Tweet and subsequent illicit profiting from the Tweet, loss of continued X monetization revenue due to forced privatization of her account on or about May 20, 2024 (the Plaintiff intermittently dipped her toes into the X waters until the cyberbullying and harassment got too much and too menacing);

b.    Receipt of hate mail and threats from May 18, 2023, onward (including on the professional networking site, LinkedIn), exacerbating emotional distress;

Page 32 of 52

c.    Reputational damage, including lost clients and billings to be determined by the Court based on the Plaintiff's law firm has not been able to generate substantial business despite her global connections, time and money invested into building her practice and she was unable to obtain steady job opportunities as social media checks is a universally standard part of vetting protocols;

d.    Under New York law, civil conspiracy requires an agreement and an underlying tort (*K.D. v. Educ. Testing Serv.*, 386 N.Y.S.2d 747 (Sup Ct. 1976)). Here, the Defendants' conspiracy is tethered to the underlying wrongs of copyright infringement (Count One) and cyberbullying as a prima facie tort (Count Two), rendering them jointly and severally liable for the resulting damages; and,

e.    The Plaintiff seeks compensatory damages for her economic and emotional injuries, as well as punitive damages to deter Defendants' willful and malicious conduct, jointly and severally from all Defendants.

74.    The introduction of a new "Count Four: Conspiracy to Exploit" and the necessary emphasis on the copyright, contractual, commercial, and equitable breaches committed by the Defendants and consequence Constitutional abuses and infringements on the Plaintiff's rights necessitate an amendment of the original counts as follows:

a.    Original "Count Four (Injurious Falsehood)" becomes "Count Five Injurious Falsehood".

b.    Original "Count Five: Breach of Privacy" becomes "Count Six: Intentional Infliction of Emotional Distress".

c.     Original "Count Six: Prima Facie Tort (Intentional or Malicious Harm) For Intentional Infliction of Harm Without Excuse or Justification" becomes "Count Seven: Negligent Infliction of Emotional Distress".

d.     Original "Count Seven: Negligent Misrepresentation Causing Harm" becomes "Count Eight: Breach of Privacy (Public Disclosure of Private Facts)".

e.     Original "Count Eight: Fraudulent Inducement" becomes "Count Nine: Tortious Interference with Prospective Economic Advantage".

f.     Original "Count Nine: Fraud and Deceit" becomes "Count Ten: Unjust Enrichment".

g.     Original "Count Ten: Equitable Fraud" becomes "Count Eleven: Misappropriation of Intellectual Property".

h.     Original "Count Eleven: Equitable Estoppel" becomes "Count Twelve: Violation of New York Civil Rights Law § 51 (Right of Publicity)";

i.     Original "Count Twelve: Promissory Estoppel" becomes "Count Thirteen: Fraudulent Misrepresentation".

j.     Original "Count Thirteen: Quasi-Contract/Breach of Contract/Prima Facie Tort (Intentional or Malicious Harm to Plaintiff" becomes "Count Fourteen: Conversion".

k.     Original "Count Fourteen: Vicarious Liability" becomes "Count Fifteen: Negligence".

l.     Original "Count Fifteen: Unjust Enrichment" becomes "Count Sixteen: Abuse of Process".

m.  Original "Count Sixteen: Emotional Distress" becomes Count Seventeen: Violation of First Amendment Rights (Under Color of State Law)".

n.  Count Eighteen: Declaratory Relief – Unconstitutionality of NY Anti-SLAPP Laws.

## COUNT FIVE: INJURIOUS FALSEHOOD

75.  The Plaintiff incorporates¶¶ 1-74 as if fully set forth herein.

76.  The Defendants published false statements in their May 18-19, 2023, Articles, labeling the Plaintiff a "*Karen*," a term implying racial bias and entitlement, despite knowing or recklessly disregarding the Plaintiff's clarifications that her Tweet addressed a legitimate public concern about an unlicensed vendor and the violence with which the vendor threatened her.

77.  These falsehoods were published with malice, as evidenced by Defendant McDougall's refusal to correct her narrative post-clarification (*Halperin v. Selvan*, 117 A.D.2d 554, 556 (N.Y. App. Div. 1986): malice inferred from reckless disregard).

78.  The Plaintiff suffered special damages, including projected lost X revenue, unquantifiable lost business opportunities at her law firm, and job opportunities due to reputational harm from the persistent online presence of the Articles.

79.  Relief: Compensatory damages for economic loss and reputational harm in an amount TBD at trial and/or as proven via discovery.

## COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

80.  The Plaintiff incorporates ¶¶ 1-79 as if fully set forth herein.

Page 35 of 52

81. The Defendants' coordinated "*Karen*" framing and publication of the Tweet were extreme and outrageous, foreseeably inciting a global pile-on of hate mail and threats (*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993) - conduct must exceed all bounds of decency).

82. The Defendants acted with intent or reckless disregard, amplifying harm via their profit-driven narrative, as the Plaintiff's pleas for retraction were ignored.

83. The Plaintiff suffered severe emotional distress, including shock, shame, and fear, necessitating privacy mode on X and disrupting her personal and professional life.

84. Relief: Compensatory and punitive damages.

## COUNT SEVEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

85. The Plaintiff incorporates ¶¶ 1-84 as if fully set forth herein.

86. The Defendants owed the Plaintiff a duty to report accurately and avoid foreseeable harm, given their journalistic influence and access to her clarifications (*Sheila C. v. Povich*, 11 A.D.3d 120, 130 (N.Y. App. Div. 2004) - duty arises from special relationship or foreseeable risk).

87. The Defendants breached this duty by negligently publishing false "*Karen*" narratives, proximately causing the Plaintiff emotional distress via cyberbullying.

88. Relief: Compensatory damages.

## COUNT EIGHT: BREACH OF PRIVACY (PUBLIC DISCLOSURE OF PRIVATE FACTS)

89. The Plaintiff incorporates ¶¶ 1-88 as if fully set forth herein.

90. The Defendants disclosed private facts by embedding the Plaintiff's Tweet and identifying her in a manner that exposed her to public scorn, despite her status as a private individual (*Finger v. Omni Publ'ns Int'l, Ltd.*, 77 N.Y.2d 138, 142 (1990) - privacy actionable when disclosure is not newsworthy).

Page 36 of 52

91.    The disclosure was not of legitimate public concern, as the Defendants' profit motive (subscriptions, ads, clicks) outweighed any news value, and the Plaintiff's clarifications were disregarded.

92.    The Plaintiff suffered humiliation and economic loss as a result.

93.    Relief: Compensatory damages and injunction to remove the Articles.

## COUNT NINE: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

94.    The Plaintiff incorporates ¶¶ 1-93 as if fully set forth herein.

95.    The Plaintiff had prospective business relationships through her law firm, prospective job applications, and X monetization, disrupted by the Defendants' false publications (*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) - interference requires wrongful means).

96.    The Defendants acted with wrongful means - copyright infringement and malice causing lost clients, job opportunities, and lost projected X revenue.

97.    Relief sought: Compensatory damages.

## COUNT TEN: UNJUST ENRICHMENT

98.    The Plaintiff incorporates ¶¶ 1-97 as if fully set forth herein.

99.    The Defendants were enriched by profiting from the Tweet without licensing it, at the Plaintiff's expense, as her revenue stream was curtailed (*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) - enrichment unjust where benefit retained without payment).

100.    Equity demands the Defendants disgorge profits, as X's TOS and case law do not permit such commercial use (*Morel*, 769 F. Supp. 2d at 305).

101.    Relief: Restitution of the Defendants' profits from the Tweet, to be quantified via discovery under FRCP 26(d)(1) (estimated at $30,000 per Prayer for Relief, subsection c).

Page 37 of 52

### COUNT ELEVEN: MISAPPROPRIATION OF INTELLECTUAL PROPERTY

102.    The Plaintiff incorporates ¶¶ 1-101 as if fully set forth herein.

103.    The Defendants misappropriated the Plaintiff's Tweet, a valuable intellectual property, for commercial gain without consent *(Roy Exp. Co. v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982) – common law protects against unauthorized use).

104.    This misappropriation caused the Plaintiff economic and reputational harm.

105.    Relief: Compensatory damages in an amount TBD at trial and/or as proven via discovery.and injunction.

### COUNT TWELVE: VIOLATION OF NEW YORK CIVIL RIGHTS LAW § 51 (RIGHT OF PUBLICITY)

106.    The Plaintiff incorporates ¶¶ 1-105 as if fully set forth herein.

107.    The Defendants used the Plaintiff's name and Tweet for commercial purposes (advertising, subscriptions) without consent, violating her right of publicity (N.Y. Civ. Rights Law § 51; *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866, 868 (2d Cir. 1953)).

108.    The Plaintiff suffered economic and dignitary harm as a result.

109.    Relief: Compensatory damages and injunction.

### COUNT THIRTEEN: FRAUDULENT MISREPRESENTATION

110.    The Plaintiff incorporates ¶¶ 1-109 as if fully set forth herein.

111.    The Defendants falsely represented the Plaintiff as a *"Karen"* in the Articles, knowing or recklessly disregarding the truth (*Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 178 (2011) – fraud requires intent to deceive).

112.    The Plaintiff relied on The Defendants' initial engagement (e.g., with Bevan Hurley) to her detriment, suffering reputational and economic harm.

113.    Relief: Compensatory and punitive damages.

Page 38 of 52

## COUNT FOURTEEN: CONVERSION

114.   The Plaintiff incorporates ¶¶ 1-113 as if fully set forth herein.

115.   The Defendants wrongfully exercised dominion over the Plaintiff's Tweet by publishing it for profit, depriving her of its economic value *(Colavito v. N.Y. Organ Donor Network, Inc.,* 8 N.Y.3d 43, 49-50 (2006) – conversion applies to intangible property).

116.   The Plaintiff suffered damages (lost projected profits from continued use of Sonya's IP).

117.   Relief: Compensatory damages and return of property (injunction).

## COUNT FIFTEEN: NEGLIGENCE

118.   The Plaintiff incorporates ¶¶ 1-117 as if fully set forth herein.

119.   The Defendants owed the Plaintiff a duty of care to avoid misusing her Tweet and causing foreseeable harm *(Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 344 (1928)).

120.   The Defendants breached this duty by negligently publishing false narratives, proximately causing the Plaintiff economic and emotional harm.

121.   Relief: Compensatory damages.

## COUNT SIXTEEN: ABUSE OF PROCESS

122.   The Plaintiff incorporates ¶¶ 1-121 as if fully set forth herein.

123.   The Defendants misused New York's Anti-SLAPP laws in state court (Case 100558/2024) to threaten fees and silence the Plaintiff's meritorious claims, an improper purpose *(Curiano v. Suozzi,* 63 N.Y.2d 113, 116 (1984) - abuse requires ulterior motive).

124.   The Plaintiff suffered harm, including forced withdrawal from the NY State Case and chilled speech because of the Defendants' actions.

125.   Relief: Compensatory damages.

## COUNT SEVENTEEN: VIOLATION OF FIRST AMENDMENT RIGHTS (UNDER COLOR OF STATE LAW)

126.    The Plaintiff incorporates ¶¶ 1-125 as if fully set forth herein.

127.    The Defendants, in concert with New York's Anti-SLAPP laws (state action), chilled the Plaintiff's First Amendment right to petition by leveraging an unconstitutional statute (*West v. Atkins*, 487 U.S. 42, 49 (1988) – private actors liable when entwined with state). The Defendants' invocation of Anti-SLAPP in the New York State Case, enforced by forced Order of Voluntary Withdrawal, constitutes state action entwined with private conduct.

128.    The Plaintiff's speech and access to courts were suppressed, causing harm.

129.    Relief: Compensatory damages and declaratory relief.

## COUNT EIGHTEEN: DECLARATORY RELIEF - UNCONSTITUTIONALITY OF N.Y. ANTI-SLAPP LAWS

130.    The Plaintiff incorporates ¶¶ 1-129 as if fully set forth herein.

131.    N.Y. Civ. Rights Law §§ 70-a, 76-a, as applied, violate due process (Fifth/Fourteenth Amendments) by denying discovery and imposing fees, chilling the Plaintiff's First Amendment petition right (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)). The statute's fee provision (N.Y. Civ. Rights Law § 70-a) deterred the Plaintiff from pursuing meritorious claims, as evidenced by her forced withdrawal (Exhibit 8).

132.    Relief: Declaration of unconstitutionality as applied.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgement against each Defendant as follows:

a.    Compensatory damages, including: (i) $500+ in lost projected X revenue after May 27, 2024 (Counts One–Seventeen); (ii) $10,000+ in lost law firm clients

Page 40 of 52

(Counts Two, Four, Nine); (iii) $25,000+ in emotional distress from cyberbullying (Counts Two, Six, Seven), all TBD at trial.

b.  Statutory damages up to $150,000 per willful infringement under 17 U.S.C. § 504(c) (Count One), at Plaintiff's election.

c.  Restitution of Defendants' profits from the Tweet, estimated at $30,000+, via discovery (Counts One, Three, Ten).

d.  Punitive damages to deter willful misconduct (Counts Two, Four, Six, Thirteen).

e.  Injunctions under 17 U.S.C. § 502(a) removing the Articles from all platforms, including archives (Counts One, Five, Nine, Eleven, Twelve, Fourteen).

f.  Declaratory relief that N.Y. Civ. Rights Law §§ 70-a, 76-a are unconstitutional as applied (Count Eighteen).

g.  Costs and expenses, including future attorneys' fees under 17 U.S.C. § 505.

h.  Such other relief as the Court deems just.

Dated: March 13, 2025
New York, NY

Filed via ECF pursuant to SDNY Local Rule 5.2

Respectfully submitted,

*/s/ Sonya Shaykhoun*
Sonya Shaykhoun, Esq.
Law Offices of Sonya Shaykhoun, Esq.
825 West End Avenue,
New York, NY 10025
Tel: 929-408-4531
Email: sonya@shaykhounlaw.com

*Plaintiff/Attorney Pro Se*

Page 41 of 52

**AFFIRMATION**

I, Sonya Shaykhoun, Esq., affirm this 13th day of March, 2025, under penalty of perjury under

the laws of New York, which may include a fine or imprisonment, that the foregoing is true,

and I understand that this document may be filed in an action or proceeding in a court of law.

/s/ *Sonya Shaykhoun*
Sonya Shaykhoun, Esq.
Law Offices of Sonya Shaykhoun, Esq.
825 West End Avenue,
New York, NY 10025
Tel: 929-408-4531
Email: sonya@shaykhounlaw.com

*Plaintiff/Attorney Pro Se*

**EXHIBITS**

*For ease of reference, the Exhibits1-7 that have been attached to the Initial Complaint are reattached to this First Amended Complaint as set forth below*

- o  Exhibit 1: (Exhibit 1 of the Initial Complaint (Articles, ¶ 2))

- o  Exhibit 2: (Exhibit 4 of the Initial Complaint (Email to AJ McDougall, ¶ 2))

- o  Exhibit 3: (Exhibit 5 of the Initial Complaint (Hate Mail, ¶ 3))

- o  Exhibit 4: (Exhibit 8–9 of the Initial Complaint (Emails to Tracy Connor, ¶ 62))

- o  Exhibit 5: (Exhibit 10–12 of the Initial Complaint (Emails to Katrina Bell, ¶ 62))

- o  Exhibit 6: (Exhibit 13 of the Initial Complaint (Richard Best's Response, ¶ 62))

- o  Exhibit 7: (Exhibit 14 of the Initial Complaint (X TOS & Privacy Policy, ¶ 2))

- o  Exhibit 8: (NY State Case 100558/2024 Order of Voluntary Withdrawal)

- o  Exhibit 9: (Email Exchange between Kate Bolger and the Plaintiff)

**EXHIBIT 1 (EXHIBIT 1 OF THE INITIAL COMPLAINT (ARTICLES, ¶ 2))**

 

U.S. NEWS ⊙

**READ THIS LIST**

# Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park

| BETWEEN RIVERSIDE AND KAREN |————————

**After a contract lawyer complained on Twitter about stumbling across an "ad hoc unlicensed food stand" after a game of tennis, users flooded in to criticize her.**

**AJ McDougall**
Breaking News Reporter

Published May 18, 2023 8:06PM EDT

  



Photo Illustration by Thomas Levinson/The Daily Beast/Getty

 **What to Watch, Binge, See, & Skip**   NEWSLETTERS    SUBSCRIBE    LOG IN

**ALL    CHEAT SHEET    TRUMP TRIAL    OBSESSED    ROYALS    POLITICS    ENTERTAINMENT    OPINION    INNOVATION    U.S. NEWS    SCOUTED**

Enter your email    **SIGN UP**

By clicking "Sign Up" you agree to Terms of Use and Privacy Policy.

A lawyer in New York City was snowed under with criticism this week after taking to Twitter to grumble about a person selling food in a public park, with users calling her "petty and vindictive" for calling emergency services on the vendor.

It began with Sonya Shaykhoun, Esq., as her screen name reads, and a Wednesday tweet. "Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand," she wrote alongside two photos of a pair of women with a table set up along a walking path.

"They were calling out to people to buy from them and I asked them, 'where's your permit' cuz we all know the permit has to be displayed," Shaykhoun continued, alleging that one

OBSESSED | What to Watch, Binge, See, & Skip | DAILY BEAST   NEWSLETTERS    SUBSCRIBE    LOG IN

ALL   CHEAT SHEET   TRUMP TRIAL   OBSESSED   ROYALS   POLITICS   ENTERTAINMENT   OPINION   INNOVATION   U.S. NEWS   SCOUTED

show me her permit.

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got... pic.twitter.com/ EWwXnrayW4
— Sonya Shaykhoun, Esq. (@SonyaShaykhoun) May 17, 2023

"I called her a name," the lawyer added, without specifying what word she'd used. "Then I called 911." She implied she'd been put in touch with the NYPD, who she said did not follow up on the case with her. (A spokesperson for the department said they had no record of a complaint like the one she'd described as of Thursday evening.)

"We have beautiful parks, if

 
Shaykhoum said. "Time to take back out beautiful City."

Rather than respond to her call, the replies to her tweet —many of them from self-professed New Yorkers— were by turn mocking, scathing, and despairing. As the responses piled up, the tweet quickly went viral, accruing more than four million views and 6,000 replies by Thursday evening.

I agree that NYC is a beautiful city, and it would be even better if we didn't have people like you here.

Leave us alone. Don't call us names.
— Ben Guralnik (@BenGurr74) May 18, 2023

"Jesus Christ Karen," one user wrote. "Get a life and leave others alone."

Another added, "Here's a wild take: Leave people alone, strangers don't owe

 

"i feel like maybe you should get a life," another said.

"People are struggling in this country to feed them selves," a fourth user wrote, "and they have to hustle so they keep a roof over their head and you decided that it was your business to harass these people. I don't think I would feel very good about myself if I did that."

There's cool people, then there's you. Kindness matters.
— ErzsieTheMexiGarian (@Erzsebizzle) May 18, 2023

Shaykhoun spent part of Wednesday and Thursday deep in her own reply section, scrapping with her critics. In response to Jacob Silverman, a freelance journalist who called her "petty and vindictive" over the matter, Shaykhoun replied, "Do you know what is petty and vindictive? The

 
OK to break the law so long as you are a person of color or any other so-called minority."

"Again, you did a bad thing and tried to harm people who were doing nothing to bother you," Silverman wrote. "Sorry you can't handle a Twitter pile-on."

"I can handle it, I just find it hypocritical and ridiculous," Shaykhoun snapped, going on to call it "stupid and racist" that some people "think the rules don't apply to people of color and consequently, we should all suck it up and live in a society where only some rules are applied and not others, and definitely not on people of color."

She also posted through it, doubling down on her original post in later tweets. "Any good lawyer knows that you need to have a permit at the very least to sell anything to the public," she tweeted on Thursday morning, posting a link to a city government page about

 
of negative attention on Twitter in February, when she complained about "a fall-down-drunk South American man" outside her apartment building, suggesting he was an "illegal." After firing off that tweet, she spent the following days similarly waging war in her reply section.

An online biography for Shaykhoun describes her as a New York City native with more than 18 years working overseas on "high-value contracts in technology, media, and telecommunications." According to her LinkedIn, she previously worked as senior legal counsel to Al Jazeera Media Network and in the contracts department of Qatar Airways.

She did not immediately return a request for comment from The Daily Beast on Thursday.

  **NEWSLETTERS**    **SUBSCRIBE**    LOG IN

**ALL    CHEAT SHEET    TRUMP TRIAL    OBSESSED    ROYALS    POLITICS    ENTERTAINMENT    OPINION    INNOVATION    U.S. NEWS    SCOUTED**

Subscribe Now

 **AJ McDougall**
Breaking News Reporter
X @oldmcdougall
✉ amanda.mcdougall@thedailybeast.com

Got a tip? Send it to The Daily Beast here.

**Loading...**

# INDEPENDENT

Support Now    ☰ Menu

**NEWS**    **SPORTS**    **VOICES**    **CULTURE**    **LIFESTYLE**    **TRAVEL**    **PREMIUM**

News > World > Americas

# NYC lawyer roasted on Twitter for reporting illegal food stand rails against city's 'rapid deterioration'

Sonya Shaykhoun told *The Independent* she stood by her viral tweet and would continue to raise concerns about 'hyper-leftist ideology'

Bevan Hurley  •  Friday 19 May 2023 18:11 BST  •  4  Comments



New York mayor condemns 'reckless' paparazzi over Harry and Meghan 'car chase'

## Your support helps us to tell the story

Read more ∨

**SUPPORT NOW**

A New York lawyer who was roasted on Twitter after posting that she called police to report an unlicensed food vendor says she was trying to highlight the "rapid deterioration" of life in New York City.

Sonya Shaykhoun told *The Independent* that she stood by her viral tweet in which she described getting into a confrontation with two women selling food in Riverside Park after demanding to see their permit on Tuesday.

Ms Shaykhoun said via email she was unfazed about becoming the "Main Twitter Character" of the day, and would continue to raise concerns about what she described as the "hyper-leftist ideology" of successive city administrations.

The brouhaha began on Wednesday when Ms Shaykhoun tweeted she had come across an "ad hoc unlicensed food stand" at 99th St in Riverside Park while returning from a game of tennis the previous day.

"They were calling out to people to buy from them and I asked them, 'where's your permit' cuz we all know the permit has to be displayed," Ms Shaykhoun wrote.

### RECOMMENDED

George Santos accused of scamming fellow GOP candidates in fraud scheme

Disney cancels $1bn Florida theme park extension amid war with DeSantis

Salman Rushdie makes emotional first in-person public appearance since stabbing

Duelling stories, palace silence and Diana's shadow: What really happened in Harry and Meghan's paparazzi car chase?

She claimed that the stall holder became "belligerent" and started filming her.

"I called her a name. Then I called 911," she wrote.

Ms Shaykhoun tagged an NYPD Twitter account, asking: "What happened with this? The officers never called me back."

"We have beautiful parks, if you see ppl defacing them by setting up illegal stands,

call the police. Time to take back our beautiful City."

The tweet, viewed 6.1 million times in less than 48 hours, received thousands of responses from New Yorkers ranging in tone from anger to mockery.

Ⓘ

Not found

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got... pic.twitter.com/EWwXnrayW4

— Sonya Shaykhoun, Esq. (@SonyaShaykhoun) May 17, 2023

"This is petty and vindictive. Leave people alone. Do not call 911 and post someone's face for selling food," wrote one.

"Please leave NYC. We don't want you here," another posted.

"Jesus Christ Karen," a third user wrote. "Get a life and leave others alone."

"People are struggling in this country to feed them selves, and they have to hustle so they keep a roof over their head and you decided that it was your business to harass these people," said another.



Lawyer Sonya Shaykhoun went viral after posting that she had called police to report an unlicensed food vendor in New York's Riverside Park *(Courtesy of Sonya Shaykhoun)*

When one person commented that it was nice to see people still playing tennis, she responded: "The one thing in the city the communists haven't completely

destroyed."

An unapologetic Ms Shaykhoun responded directly to many of her detractors on Twitter, trading insults, sharing anecdotes, and lamenting about what she described as the decline of New York City.

A minority were also supportive of her stance.

Describing the Riverside Park incident, Ms Shaykhoun told *The Independent* she had seen two women cooking what appeared to be corn on an open fire.

After asking to see their permit, she said she taken a photo of the food vendor while walking away to upload to the city's 311, where residents can report quality of life issues.

She claimed one of the food vendors had pursued her, became aggressive, and started filming her. Ms Shaykhoun said the vendor accused her of calling her a b****, but that she didn't recall saying that.

Ms Shaykhoun said the police had told her they were in the park and would "deal with it", but she hadn't heard any more from them.

"A lot of people won't call the police even if they want to because they don't want to get the kind of attention I have had," she told *The Independent.*

"But if no one calls the police and nips this issue in the bud, the entirety of Riverside Park will be taken over by entitled and belligerent unlicensed vendors who will yell and curse at you if you ask them why they are there without a license."



Sonya Shaykhoun said she had formed a civic group of concerned New Yorkers to "to fight corruption and its byproducts". *(Getty Images)*

Ms Shaykhoun said that as a lawyer, and the daughter of an Egyptian father and an Irish mother, she enjoyed engaging in robust debates on Twitter.

She said she and a group of like-minded associates on Twitter had formed the Save NYC Working Group in February "to fight corruption and its byproducts".

"Part of my pointing out the illegal vendors was to highlight that even a small infraction like that will upset the functionality of NYC," she told *The Independent.*

Ms Shaykhoun said she had received a lot of abusive messages since posting the tweet calling her a Karen, a fascist, and worse.

One text message said they were happy that her sister had died, along with an obituary. Others tried to target her law licence.

"Like why do that? It's distressing and sinister," she told *The Independent.*

*The Independent* requested comment about the incident from the NYPD, who did not respond.

**More about:**    New York    NYPD    Twitter

### Join our commenting forum

Join thought-provoking conversations, follow other Independent readers and see their replies

4    Comments

**OUR PRODUCTS**

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

**OTHER PUBLICATIONS**

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

The Standard

**GET IN TOUCH**

Contact us

**LEGAL**

Code of conduct and complaints

Contributors

Cookie policy

Donations Terms & Conditions

Privacy policy

User policies

Modern Slavery Statement

**EXTRAS**

Advisor

Puzzles

All topics

Betting Offers

Voucher codes

Competitions and offers

Independent Advertising

Independent Ignite

Syndication

Working at The Independent

10/24/24, 10:18 PM

Privacy Policy | Feedback   Follow 22.6M          Friday, Mar 14th 2025 7AM **41°F**    10AM **42°F**    5-Day Forecast



.com

Home | Showbiz | TV   Politics   Femail | Sports | Health | Science | Royals | Money | Real Estate | Media | U.K. | Video | Shopping |

Donald Trump   Joe Biden   Politics Newsletter   Breaking News                                                    Login

ADVERTISEMENT

# New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen'

Site  Web  Enter your search

ADVERTISEMENT

- **Sonya Shaykhoun ignited a firestorm of criticism when she tweeted about vendors selling food without a permit in Riverside Park**
- **The lawyer told her followers that she had called the police on the food vendors**
- **Her tweet received over 6,000 replies: 'Get a hobby and leave society alone you absolute crazy person,' one user said**

By NOA HALFF FOR DAILYMAIL.COM
PUBLISHED: 14:05 EDT, 19 May 2023 | UPDATED: 19:35 EDT, 19 May 2023

**42**
shares

**77**
View comments

A New York City lawyer is facing relentless backlash this week after she took to Twitter to unleash her wrath upon two female street vendors allegedly selling food without a permit in an Upper West Side park.

ADVERTISEMENT

Sonya Shaykhoun, who labels herself as "Esq." online, ignited a firestorm when she complained about the presence of a simple food stand in Riverside Twitter, triggering accusations of pettiness and entitlement among New

In her tweet, she shared photos of two women who appeared to have a set up at the side of a park path. She then expresses her dissatisfaction a person selling food in a public park without showing their permit.







▷ Joshua Riibe claims he saved Sudiksha Konanki from drowning at Punta Cana beach after sharing a romantic kiss



▷ Elon Musk's Tesla sends bombshell letter to Trump admin warning about tariffs as stock price plummets

EXCLUSIVE
Could this be what REALLY sparked Blake Lively-Justin Baldoni war? Insiders spill on the 'very offensive' behavior that's left actress in 'physical pain'

ADVERTISEMENT

She then claimed to have called 911 and reported the vendors, who have not been identified, to the police.

But users swiftly criticized her for being "petty and vindictive". 'Get a hobby and leave society alone you absolute crazy person,' one user said.

---

 **Sonya Shaykhoun, Esq.**    ...
@SonyaShaykhoun

Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got belligerent and started filming me and refused to show me her permit. She started filming me and getting increasingly aggressive. I called her a name. Then I called 911. @nypd24 what happened with this? The officers never called me back.

This was at the 99th street entrance. We have beautiful parks, if you see ppl defacing them by setting up illegal stands, call the police. Time to take back our beautiful City.



🖋 Last edited 5:47 PM · May 17, 2023 · **6.2M** Views

MAUREEN CALLAHAN: Michelle Obama's rage-filled new podcast betrays the truth about her marriage... and, oddly, it all seems to tie back to Meghan Markle!



▷ The bra you've been waiting for: Meet the range of cotton bras that is leading a comfort REVOLUTION!
**SPONSORED**



▷ Scientists warn massive US volcano could erupt in WEEKS

**Sonya Shaykhoun claimed to have called 911 and reported the vendors, who ha[ve been] identified, to the police**



ADVERTISEMENT



Joshua Riibe claims he tried to save Sudiksha Konanki from drowning

11.3k viewing now



RICHARD EDEN: What Kate Middleton told me after she split from William

54.6k viewing now



Musk's Tesla sends letter to Trump admin warning about tariffs

4.8k viewing now



Shaykhoun wrote: 'Yesterday I was coming back from tennis in Riverside Park and came upon this ad hoc unlicensed food stand. They were calling out to people to buy from them and I asked them, "where's your permit" cuz we all know the permit has to be displayed. Well, the woman in blue got belligerent and started filming me and refused to show me her permit. She started filming me and getting increasingly aggressive. I called her a name. Then I called 911.'

But a spokesperson for the police department said there was no record of such complaint.

Her Tweet continued: 'What happened with this? The officers never called me back. This was at the 99th street entrance. We have beautiful parks, if you see ppl defacing them by setting up illegal stands, call the police. Time to take back our beautiful City.'

Yet instead of drawing the support she may have expected, Shaykhoun's tweet became the target of scathing ridicule and disdain from fellow New Yorkers, who were quick to call out her seemingly trivial criticisms.

Many were mocking her self-righteousness. One user posted a checklist made for children: 'Is someone in danger? Is someone hurt? Did you try to solve the problem on your own? Were you minding your own business?'



myfitnesspal

Nutrition tracking for

DOWNLOAD NOW

It was the last slice of idyllic LA, their 'humble hidden secret' razed by the fires... now Shark Tank's Barbara Corcoran is among hundreds facing a heartbreaki...



Biden's three word warning to Kamala Harris that prevented her from throwing aging president under the bus before her first debate with Trump



Joe Rogan reveals the perplexing topic he will never discuss with his wife and children: 'Too weird'



Top notch travel ideas for every style and budget





▶ Trump are secretly dating
**Shock romance started at Thanksgiving**



Inside America's terrifying fleet of top secret DOOMSDAY PLANES... and why they could leave Trump in danger if WWIII breaks out

▶ Preacher's unbelievable response as a trans woman pulls a gun on him after he said 'God made men to be men'



▶ EXCLUSIVE  Simone Ashley reveals she's 'defying the social expectations' women face to settle down in their 30s - after declaring she's in her 'single era'

▶ Gigi Hadid suffers wardrobe malfunction at NYC event after rare Bradley Cooper romance remarks



Sonya Shaykhoun, who labels herself as "Esq." online, ignited a firestorm of cr
she complained about the presence of a simple food stand in Riverside Park on



**Shaykhoun claimed to have reported the vendors to the police but cops denied receiving a complaint**

ADVERTISEMENT



myfitnesspal'

Nutrition tracking for

DOWNLOAD NOW

▷ American Airlines plane erupts in flames at Denver Airport as terrified passengers are forced to escape onto wing



I've known Gene Hackman and wife Betsy for 18 years. I know what happened on the day they died - and their dog is key to the mystery: Bombshell interview that s...

▷ Busty Jessica Simpson's rude message to haters as she attempts comeback amid divorce



▷ Daycare worker accused of leaving bald patch on one-year-old





Social media users were quick to wade in, with one telling Shaykhoun to 'get a hobby and leave society alone you absolute crazy person'

children think he's after their inheritance - but I don't care



▶ Inside abandoned Mexican drug cartel 'training camp' littered with charred bones and desperate farewell letters hinting at unimaginable horrors




LADY VICTORIA HERVEY: What Trump privately told me about the royal family... and other thrilling insights from my intimate evening at Mar-a-Lago




▶ US tourist who enraged the world after manhandling a baby wombat flees Australia



▶ EXCLUSIVE  Bonnie Blue sparks outrage with latest career move
Notorious porn star




ADVERTISEMENT





Shaykhoun is a lawyer at the Law Offices of Sonya Shaykhoun, Esq., according to her LinkedIn



that could make him the greatest leader of a lifetime... and his odds just shifted





▸ JD Vance savagely booed during Kennedy Center music event

▸ Kourtney Kardashian admits it's hard to keep up with Travis Barker in candid confession about marriage



▸ My genitals shrank and changed shape. Doctors discovered surprise culprit that should terrify men



I ate nothing but meat, eggs and 'dripping' to try to calm my brain after reading plant 'toxins' can ruin mental health. The results are astonishing, reveals KA...



▸ Meryl Streep and Martin Short 'ARE dating' and 'have been together for 'over a year'



▸ All DEI hires at the FAA put on notice by Sean Duffy after bombshell leaked audio



▸ ABC News staff fuming as star gets shock new promotion amid mass layoffs



Revealed: Newcastle to build new 65,000-capacity super stadium and leave St James' Park after 133





Classical Liberal Caucus ✅
@LP_CLC

Is someone in danger?

Is someone hurt?

Did you try to solve the problem on your own?

Were you minding your own business?

2:22 PM · May 18, 2023 · **52.4K** Views

View gallery



▸ being framed by the real killer

▸ Haunting final moments of Delphi murder victims revealed for first time in new video



A reclusive heir to the Rothschild banking dynasty was found mysteriously dead in an LA fire. Now a DNA test has revealed the truth...



EXCLUSIVE
Rachel Zegler's career on the brink: Insiders spill on actress's deepest fears if 'woke' Snow White flops... and say 'it's one massive headache after another'

▸ Uncle of man 'kept captive by stepmother for decades' reveals the horror he saw when they were reunited



ADVERTISEMENT

Others expressed despair over her frivolous complaint, especially in this economic climate, as many New Yorkers are struggling to make a living.

One said: 'This poor woman is trying her best to survive this latest economic collapse. Maybe millions of people wouldn't be in quite the same dire circumstances if our government didn't require taxes, fees and permits for everything. Please, please consider not being so cruel.'

As the online frenzy escalated, Shaykhoun's tweet quickly went viral, g replies by Thursday evening.

Some users were outraged: 'Jesus Christ Karen. Get a life and leave otl

'There's cool people, then there's you. Kindness matters.'

Many online also shared their appreciation for food vendors: 'When I ar 100% chance I am stopping for food when I see a lady selling food out her car from tupperware bowls. Some of the best food ever,' one said.

Shaykhoun continues to relentlessly tweet back in response to her criticizers.

---

← **Tweet**

 **Tara Harris** ✅  ⬤
@realTaraHarris                              ...

This poor woman is trying her best to survive this latest economic collapse. Maybe millions of people wouldn't be in quite the same dire circumstances if our government didn't require taxes, fees and permits for everything.

Please, please consider not being so cruel. 😭🙏

11:56 AM · May 18, 2023 · **34.4K** Views

**5 Retweets**   **752 Likes**   **2 Bookmarks**                View gallery

---

 **Hannah Cox** ✅
@HannahDCox                                  ...

Get a hobby and leave society alone you absolute crazy person

2:41 PM · May 18, 2023 · **12.9K** Views

**5 Retweets**   **727 Likes**

---

 **LorettaFaucher** ⬤⬤⬤⬤⬤⬤⬤ ⬤
@lorettafaucher                              ...

Jesus Christ Karen. Get a life and leave others alone.

10:10 AM · May 18, 2023 · **27.9K** Views

**9 Retweets**   **2,833 Likes**   **2 Bookmarks**

    ◯         ⇄         ♡         ⬚        View gallery

---

 **ErzsieTheMexiGarian**
@Erzsebizzle                                 ...

There's cool people, then there's you. Kindness matters.

12:02 PM · May 18, 2023 · **203.3K** Views

**19 Retweets**   **4,622 Likes**   **1 Bookmark**

    ◯         ⇄         ♡         ⬚

---

 I sold all my belongings to live off-grid inside a shipping container in rural Scotland - and now nearly half self-sufficient

 Cowboys fans left exasperated with Jerry Jones' latest attempt to fix poor run game with 'washed' free agent

 Shark Tank star KEVIN O'LEARY reveals the first thing he's doing after the stock market crisis... and Trump's subtle message to Canada that everyone's missed

 I spent 30 years in prison for a murder I didn't commit... now I've hatched a plan to catch the real killer using a clue that was in the victim's pocket all alo...

 Gene Hackman uttered seven terrifying words that still make me shiver... it was just the start of a lunch of staggering confessions

 Legendary sports reporter John Feinstein dead at 68... just hours after his final column was posted online

 I've cut my dress size from 24 to 10 WITHOUT Ozempic by going on a radical diet and changing one medication. My sex life is now great - and I'm happier than eve...

Karen Read retrial rocked by shock double jeopardy ruling as judge denies request to dismiss two charges

 Chaos at Milwaukee high school as parents



**\*Comedienne\* Mistress Scarlet** 🏵️     ...
@WIMissScarlet

When I am in Mexico 100% chance I am stopping for food when I see a lady selling food out of the trunk of her car from tupperware bowls. Some of the best food ever. 🚗

3:13 PM · May 18, 2023 · **30.8K** Views

**439** Likes

One twitter user posted the address of Shaykhoun's law offices and she responded: 'Okay, let's turn lemons into lemonade. Selling food to the public without the necessary permits is not only a health risk, but it's also prohibited. If you need help with your food license applications, I am happy to help you. If you are financially disadvantaged, we can work out a deal. Feel free to email me or call me with your licensing requirements. Many thanks, Sonya'

She added this to her original tweet: 'Next time you're tempted to buy food from unlicensed vendors, let's hope it doesn't end up like the customers in this story who bought the vendor's burgers made with human remains.'

'The law is there for your protection. How do you know the food isn't laced with fentanyl or other harmful toxins? You can't even trust licensed vendors how you gonna trust unlicensed vendors? But sure, make me the Twitter Anti-Hero of the Week. But if you buy a burger off the street from Mr or Ms Unlicensed and bite into a human toe or an eyeball, don't come crying to me because, clears throat...'

My dad was a government scientist working on a secret mind-control program... then the CIA murdered him. Here's the gruesome evidence I believe proves it



▶ Kristin Cavallari flashes cleavage in sparkly mini after latest steamy sex confession



I'm a security guard for the 1 percent. These are the dangerous Spring Break hotspots I'd never allow my kids near



▶ Airline companies reveal the REAL reason for plummeting plane ticket sales



 **Sonya Shaykhoun, Esq.**
@SonyaShaykhoun                                    ...

Okay, let's turn lemons into lemonade.

Selling food to the public without the necessary permits is not only a health risk, but it's also prohibited.

If you need help with your food license applications, I am happy to help you. If you are financially disadvantaged, we can work out a deal.

Feel free to email me or call me with your licensing requirements.

Many thanks,
Sonya

🟢 **octocryptid of the wike mob** @cryptidocto · 21h
Interesting  twitter.com/SonyaShaykhoun...
Show this thread

# LAW OFFICES OF SONYA SHAYKHOUN, ESQ.

## 825 West End Avenue, New York, NY 10025
## +1 929-408-4531

## sonya@shaykhounlaw.com

3:50 PM · May 18, 2023 · **224.8K** Views                  ⚘77
View gallery

---

← **Tweet**

 **Sonya Shaykhoun, Esq.**
@SonyaShaykhoun                                    ...

Next time you're tempted to buy food from unlicensed vendors, let's hope it doesn't end up like the customers in this story who bought the vendor's burgers made with human remains:
allthatsinteresting.com/joe-metheny

The law is there for your protection. How do you know the food laced with fentanyl or other harmful toxins? You can't even trus vendors how you gonna trust unlicensed vendors?

But sure, make me the Twitter Anti-Hero of the Week. But if you burger off the street from Mr or Ms Unlicensed and bite into a h or an eyeball, don't come crying to me because, clears throat...I told you so.



 ...... ........ of woke Washington Post journalist who's vowed never to write for paper again

EXCLUSIVE  I was cuckolded by my wife Faye Dunaway... she even bedded a leading man while I waited: Rock legend's explosive new memoir

 ⏵ Jack Nicholson's son Ray reveals 'traumatic experience' with Kobe Bryant which left him in tears

 How to survive a plane crash: The deadly common seatbelt error... why you should NEVER wear cotton if flying over the ocean... and where to sit

ADVERTISEMENT

Shaykhoun is a lawyer at the Law Offices of Sonya Shaykhoun, Esq., according to her LinkedIn.

She describes herself as an 'award-winning NY-qualified attorney doing cross-border transactions; tech, media, telecoms, & satellites; aviation; big contracts; & compliance and author of upcoming book, "The Commercially Savvy Lawyer."'

DailyMail.com reached out to Shaykoun for comment but did not hear back.

New York    Twitter

**Share or comment on this article: Outrage erupts as NYC lawyer unleashes fury on vendors selling food without permit in local park**

**42**
shares



**Healthy legs never felt so good! Minimally invasive vein treatment. Covered by insurance.**

Metro Vein Centers | Sponsored

▶ track mass deportations

 

▶ Longtime Democrat Raul Grijalva, 77, suddenly dies

▶ Scottie Scheffler wrestles with 'punishing' Sawgrass as world No 1 chases historic Players three-peat

▶ Pictured: Michael B Jordan sparks dating rumours with Harry Styles' ex Taylor Russell as they're spotted on a day out in London

▶ Get a HUGE $115 discount on the 'super powerful' Dyson cordless and handheld vacuum combo: 'Best I have ever owned... amazing suction!' SHOPPING

▶ Mums hit back as woke Snow White star Rachel Zegler slams 'weird and sexist' Disney original and says her version is 'dreaming about becoming the leader'

▶ Taylor Swift earns whopping eight-figure sum from Spotify royalties as she becomes the streaming platform's highest earner over the last year

▶ George Clooney and wife Amal asking for nearly $250K from guests to attend their lavish Lake Como fundraiser

▶ Jourdan Dunn puts

**EXHIBIT 2 (EXHIBIT 4 OF THE INITIAL COMPLAINT (EMAIL FROM THE PLAINTIFF TO AJ MCDOUGALL, ¶ 2))**

Firefox

 Outlook

---

**Re: Media Query: Unlicensed Vendor in Riverside Park**

From Sonya Shaykhoun <sonya@shaykhounlaw.com>

Date Fri 5/19/2023 10:14 AM

To    Sonya Shaykhoun <shaykhoun@protonmail.com>; Amanda.McDougall@thedailybeast.com <Amanda.McDougall@thedailybeast.com>

Amanda,

I obviously meant that Twitter is an extreme hotbed of leftist radicalism (not "a hotbed of extreme right radicalism" – though it can be that, too).

Many thanks,
Sonya

---

## Sonya Shaykhoun
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

---

**From:** Sonya Shaykhoun <shaykhoun@protonmail.com>
**Sent:** Thursday, May 18, 2023 10:49 PM
**To:** Amanda.McDougall@thedailybeast.com <Amanda.McDougall@thedailybeast.com>
**Cc:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Subject:** Re: Media Query: Unlicensed Vendor in Riverside Park

Hi Amanda,

Sorry for not getting back to you until now. I was on a call and then I had dinner. It is very nice to meet you and I want to thank you for being so polite.

I'm reposting your questions here so I can stay on target in my answer. You wrote:

"*I hope this email finds you well. My name is Amanda, and I'm a reporter with The Daily Beast. I saw your tweet from yesterday regarding the ad hoc food seller in Riverside Park, and I'm very interested in learning more about what happened and how you feel about the reaction the post has spurred.*

*If you're interested and available, I'd love to chat as soon as possible. I'm also happy to answer any questions or concerns you might have. My number is 775-430-6200; please give me a call anytime."*

First of all, let me just say, I am flummoxed by the viral nature of the tweet. Last I checked, it got 5.2 million views. All because I described a brief exchange in Riverside Park with a girl (part of a duo) selling food and drinks in the Park. I live just up the street and I had never seen them - or any other such food vendors in Riverside Park ever. There is a food truck, further up on 101st St  but they get driven into the park as it's a proper enclosed wagon. One of the girls was very push and walked toward me to try to get me interested in her wares. I asked her very neutrally and politely if she had a food permit. I was not aggressive. I was not rude. And for the record, she sounded like she was from NYC, too. She pretended to go to her purse for her food permit and then she started to ask me why I needed to see it. And I told her it was because she has to have a permit to sell food as it's the law. And if she wanted me to buy from her, I needed to see the permit. Then I walked away and I turned back to take a picture to load to 311. That is when things got icky. She came running after me with her phone and started videoing me, demanding to know why I needed to see her permit. I said because it's against the law. And how do I know she's not preparing the food on a counter that her cat has walked all over and potentially pooped on. When she got aggressive, that is when I decided to call the police. The police called me as they were about to attend the matter and they did not admonish me for calling them for this matter. I explained that she was harassing me and her behavior was getting aggressive, filming me and not leaving me alone for asking a simple question. I grew up in this neighborhood and I feel particularly attached to the park. It breaks my heart to see so much abuse of the parks, the laws are destroyed by dogs off the leash defecating all over the place, and the total lack of respect for the space and for others. And perhaps that is why I

As to your question as to how I feel about the reaction the post has spurred, I feel a mix of emotions. In one way, I am not surprised because Twitter can still be a hotbed of extreme right radicalism and that manifests in a kind of Maoist hunting you down and trying to destroy you for "wrong think", or in this instance, "wrong Tweet." Many of the response from other Twitter users were just vitriolic and not commensurate with what I had said. There was a lot of name-calling (especially the "C U Next Tuesday" word" and a lot of "fuck you's"). There was quite a lot of shaming me as a Karen, which I am sure you read. And then a lot of the screen sharing of my various social media - from my website, Instagram, and other places. Talk about bringing the wrong weapons to a battle. I brought a pea shooter, they brought nuclear missiles. And I noted a lot of the people abusing me - including the actor who played Charlotte's husband in Sex and the City - the bald one who was her divorce lawyer - retweeted me and called my attitude archaic and steeped in the 1950s. See, although I was born and raised in NYC on the Upper West Side - although I went to Dalton and finally went to St. Andrews after high school - my adventures found in Bahrain and Qatar for 15 years from 2004 to 2019. During the 8 years I spent in Qatar, I got used to high levels of cleanliness and orderliness - when they built Doha, they fashioned it after Switzerland and one gets used to that kind of mechanical functionality. It's a real luxury to live in a place where the rule of law is observed so fastidiously in the day-to-day things. Of course, Qatar has its issues, but don't we also have our issues here in America and NYC? I also have three Master degrees, the last one of which is an LL.M. in Corruption, Law and Governance and I spent a few years working in compliance. As a lawyer, you get used to wanting to make things right and legal. That is how my brain operates after all of these years. I guess you would say I am very "correct."

So let me just bullet point my reactions:

- I found the raging backlash to be hugely hypocritical. I got calls and tweets all day long from all over the country. I didn't pick any of the calls up. Many of the abusive tweets

came from out of state and out of the City. They followed a template of either screaming "Karen" or accusing me of being a racist (I'm not) or being "a bitch" or a classist, etc. I reported an incident because it annoyed and aggrieved me to see the park being abused like this. I found this hypocritical – so it is OK for people to abuse me for my tweet, but not okay for me to describe an actual improper and prohibited activity happening in my local park.

- On a macro level, I think this signals the end of society frankly. When we can no longer discuss our different viewpoints without trying to destroy each other, we have gone past a point of received civility and gone toward that kind of social violence we read about happening during the Cultural Revolution. How can a society grow if we cannot discuss issues rationally. Yes, get heated, but call me a cunt? Really?

- On a micro level, it is surprising and very angry that people have targeted my law license. While doing the same thing they were accusing me of doing. But at a very extreme ratio. You don't like my tweet? Okay, tell me. But try to get me disbarred? Really? This is where we are now? We have to destroy each other for having a divergent opinion from others? When I was at Dalton from 86-90, I had many a heated debate about the contentious issues with people and still be cordial after the fact.

- It is also very disappointing. I have gotten a lot of shitty phone calls and threatening texts (I'll send them to you). It hardly seems commensurate with the tweet. And it has me wondering, what has happened in America that we are now so hateful, call each other names so easily, assume racism so readily, and try to destroy other people who happen to have a different opinion than we have? How is this "land of the free, home of the brave"? So someone who is doing something she is not supposed to be doing in the Park is martyred while I am an accomplished lawyer who asks a reasonable question and I get demonized? What is wrong with that picture?

If you want to talk about it, call me – but text or email me beforehand so I know it's not spam.

Many thanks,
Sonya

Tel: +1-929-408-4531

Sent with Proton Mail secure email.

------- Original Message -------
On Thursday, May 18th, 2023 at 4:45 PM, Amanda McDougall
<Amanda.McDougall@thedailybeast.com> wrote:

> Hi Sonya,
>
> I hope this email finds you well. My name is Amanda, and I'm a reporter with The Daily Beast. I saw your tweet from yesterday regarding the ad hoc food seller in Riverside Park, and I'm very interested in learning more about what happened and how you feel about the reaction the post has spurred.
>
> If you're interested and available, I'd love to chat as soon as possible. I'm also happy to answer any questions or concerns you might have. My number is 775-430-6200; please give me a call anytime.
>
> Thanks for your time, and hope to hear from you soon!
>
> Cheers,

**AJ McDougall**
**Breaking News Reporter**
THE DAILY BEAST
cell.    +1 775 430 6200
twitter.  @oldmcdougall
amanda.mcdougall@thedailybeast.com

**10:45**

p4034286400@gmail.com

Text Message
Today 10:42 PM

/ / / Your soul is forever lost, with no hope of finding its way back to the light

/ / / Your soul is forever lost, with no hope of finding its way back to the light

The sender is not in your contact list.

Report Junk

Text Message

**10:45**

 

p4032661234@gmail.com

Text Message
Today 10:44 PM

/ / / You are a burden to yourself and those around you, with no way out

/ / / You are a burden to yourself and those around you, with no way out

The sender is not in your contact list.

Report Junk

  Text Message

      

10:46

 862

+1 (603) 479-0543

9 Items



Sonyaaaaaaa

Where are youuuuuu

I miss youuuuu

Oh, you're a bitch








**10:45**

+1 (319) 350-5618

iMessage
Today 7:21 PM



BOO!

The sender is not in your contact list.

Report Junk





10:46





+1 (413) 437-4918

Text Message
Today 5:18 PM



The sender is not in your contact list.

Report Junk



10:45

 

+1 (801) 909-5151

You know this could have all been avoided if you had just treated people with kindness. Be respectful and a decent person. But you aren't. You're a vile bitch, with no real future, a failing law practice, and really no way to make this any better.

You really dug yourself in a hole. Now I'm going to create such an annoyance to you, you'll be pulling your hair out begging me to stop the digital assault.

But I can't. Once I start, there's no turning back.

This was your choice.

Today 10:30 PM

And it's just starting...

The sender is not in your contact list.

Report Junk

  

      

 **Proton Mail**
Notification                                    now



+1 (269) 442-1324

Text Message
Today 4:06 PM

Dumbest bitch on the planet.
Honestly. You are such a
goddamn cunt. Mind your own
fucking business you fucking
scab.

The sender is not in your contact list.

Report Junk



10:46

  

+1 (603) 479-0543

iMessage
Today 5:24 PM

Hey Sonya, it's Deez. Give me a call back when you can




     iMessage

      

**EXHIBIT 3 (EXHIBIT 5 OF THE INITIAL COMPLAINT (HATE MAIL, ¶ 3))**



← Tweet

**Andrew Fleischman** @ASFleischman · 3m
Sometimes, people who are very successful and who have been treated with a lot of grace find that grace withdrawn. And suddenly, people start enforcing rules you didn't even know you were breaking.

♡ 1          ⟲          ♡          ↥

**Sonya Shaykhoun, Esq.** ◉
@SonyaShaykhoun

How do you know about my life story and how much grace I have experienced? Are you threatening me, Andrew? Because if you are, we can take it up with the Bar.

9:56 AM · May 18, 2023

📊 View Tweet analytics

○          ⟲          ♡          ⊠          ↥

Tweet your reply!

**Sonya Shaykhoun, Esq.** ◉ @SonyaShaykhoun · 1s
I never once used a racial slur in my dealings with that vendor. It's Antifa and Antfia light who brought race into it, shamefully.

Threaten me again.

○          ⟲          ♡          ᴊ          ↥

### Left sidebar navigation

🏠 Home
# Explore
🔔 Notifications
✉ Messages
▤ Lists
🔖 Bookmarks
◈ Top Articles
◈ Verified Orgs
👤 Profile
⋯ More

Tweets

**Sonya Shaykho...** ◉
@SonyaShaykhoun ⋯

### Right sidebar

🔍 Search Twitter

**#nationalcitizensinquiry**

🟦 **Bybit** ◉ is hosting
**TURBOS Finance**    sygbir +17

⚖ ☪ **Haitham the third** ❀❀❀❀❀❀ is speaking
هيئة العلماء

## What's happening

NBA · Last night
**Heat at Celtics**

Trending
**#DumbPrinceAndHisStupidWife**
5,491 Tweets

Trending
**The Harkles**
Trending with Markles

Video games · Trending
**Kameo**

Trending
**Omid Scobie**
1,148 Tweets

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2023 X Corp.

Messages

← **Tweet**

**Sonya Shaykhoun, Esq.** ✪ @SonyaShaykhoun · 13m   ...
I stand by my story and my opinions. I am not a coward or a hypocrite. So thanks for the advice, but as a lawyer, you should have seen what was wrong with that scenario.

The rules set us free.

○ 7          ↺ 1          ♡          ⊪ 254          ↥

**Andrew Fleischman** @ASFleischman · 8m   ...
Ok. And maybe you're totally right and she had to have a permit and had to show you the permit. But I don't know what name you called her. And I don't know how you approached her. And I can't be 100% sure that you were following the law when you did.

### *Amy Cooper Faces Charges After Calling Police on Black Bird-Watcher*

Ms. Cooper was captured on video calling the police after Christian Cooper asked her to keep her dog on a leash in Central Park.

○ 1          ↺          ♡ 9          ⊪ 49          ↥

**Andrew Fleischman** @ASFleischman · 3m   ...
Sometimes, people who are very successful and who have been treated with a lot of grace find that grace withdrawn. And suddenly, people start enforcing rules you didn't even know you were breaking.

○ 1          ↺          ♡ 2          ⊪ 12          ↥

**Sonya Shaykhoun, Esq.** ✪
@SonyaShaykhoun

How do you know about my life story and how much grace I have experienced? Are you threatening me, Andrew? Because if you are, we can take it up with the Bar.

---

**Relevant people**

**Sonya Shaykhoun, Esq.** ✪
@SonyaShaykhoun
Transactional/TMT/satellite NY lawyer w/ 19 years' intn'l exp. Born & raised @NYC, educated @Britain, worked @Bahrain @Qatar. @Maven instructor. NO DATING DMs.

**Andrew Fleischman**                    [Follow]
@ASFleischman
I work on behalf of the wrongfully or unfairly convicted. I also try cases. Partner at Sessions & Fleischman.
SF-justice.com
post.news/asfleischman

**Listen live in Spaces**

🐎 OG Horses Kisses🦄 ⚡☂ 👸 is listening

**NCI OTTAWA ONT 🍁 DAY 2**       +36
#NCI
#nationalcitizensinquiry

🟪 Bybit ✪ is hosting
**TURBOS Finance**                BYBIT +17

🎙 🧍 Haitham the third ⚖⚖⚖⚖ is speaking    +8
خاصة للاصدقاء

**What's happening**

NBA · Last night       **Messages**
**Heat at Celtic**



**New message**

**David Kalinski**
Retail Consultant - Kitchen / Home. Creator - Chef Di Cucina /La Gourmet & Origin X Coffee

Cease & Desist

David,

I write to advise you to stay away from my LinkedIn profile and to stop commenting on posts that pertain to me in any way. Your constant attempts to call me names in Arabic, to smear me, and to discredit me are not only juvenile but unprofessional and damaging to me.

If you do not stop, I will write to your employer to advise them that, while representing them, you are behaving like a complete thug.

Do it again and see where we can take this. Because I take my reputation seriously and I do not need a troll like you harassing my professional contacts or me or damaging my reputation.

I hope that is clear.

Regards,
Sonya Shaykhoun, Esq.

PREMIUM          Use 1 of 14 InMail credits

---

**David Kalinski** ✓ · 2nd
Retail Consultant - Kitchen / Home. Creator - Chef Di Cucina /La Gourmet & Origin X Coffee

Brooklyn, New York, United States · Contact info

500+ connections

Kirsten Osolind, Duke MBA is a mutual connection

Connect    Message    More

## Highlights

**David has viewed your profile**
Reach out to David and turn shared interest into opportunities.

## About

I have over 20 years of experience in Sales, Management, Business Development & an emphasis on Retail.

## Activity

Firefox

 **Outlook**

## Sonya

**From** Helena Sloane <hellsloane89@yahoo.com>
**Date** Tue 5/23/2023 4:21 PM
**To** Sonya Shaykhoun <sonya@shaykhounlaw.com>

Fuck off and die, you evil cunt



**Sonya Shaykhoun, Esq., LL.M.**                                        16 seconds ago

Email: sonya@shaykhounlaw.com

loop_back: I have already downloaded a copy of my LinkedIn account data using the link above

Type of personal data you are requesting.: I need copies of all exchanges between me and another LinkedIn user named David Kalinski. These exchanges happened on discussions around Israel. David Kalinski (whom I blocked and who has since blocked me) called me "sharmuta" (it means "Bitch" in Arabic) and then he started hurling links at me from articles in The Independent UK and The Daily Beast and Daily Mail UK – I intend to sue these publications and to show the damage of the articles I need copies of the exchanges between David Kalinski and me.

He said stuff like, "You are universally disliked" and mocked me. He repeatedly tried to use this article to make me look bad.

As you know, there is no defamation case without proof of damage and I need the exchanges (which I reported immediately because he upset me before I realized how important they would be to my lawsuit).

Location of personal data you are requesting.: All messages directed at or about me by David Kalinski in the last 60 days.

He is "David Kalinski" and resides in Brooklyn.

This is what I could find on Google about his LI profile (as I said, I am blocked): "Creator - Chef Di Cucina /La Gourmet & Origin X Coffee. Brooklyn, New York, United States. 1K followers 500+ connections. Join now. Join to view profile. About. I have over 20 years of experience..."

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 92 of 223



Search

Home    My Network    Jobs    Messaging    Notifications    Me ▼    For Business ▼    Learning

**Manage your Notifications**

View Settings

New from **Ayele Hegena Anabo (Ph.D.)** in Climate Justice or Injustice : An Analytical Exploration of Inter-basin and Intra-basin Water Transfer: Examining the Risks and Opportunities      42m

New from **Sramana Mitra** in Best of Bootstrapping: Bootstrapped a Product Using Services First      42m

New from **Bloomberg News** in Your Guide to Life Well Spent: Your Guide to Getting Ahead of Your Debts      42m

**Dan Rosenthal** and 1 other commented on your post      1h

Absolutely do not work with this woman. She calls the police on people operating lemonade stands.

***The Commercially Savvy Lawyer©: Follow me on Instagram!*** Are you on Instagram...

5 Reactions · 2 Comments

**Anthony Basso** just reshared your post to their network.      1h

An elitist anti-poor coastal elite who grew up rich and worked for dictatorships, absolutely do not work...

***The Commercially Savvy Lawyer©: Follow me on Instagram!*** Are you on Instagram...

New from **Financial Times** in Editor's Digest : Brexit blow      1h

This is how to rebound from the edge of failure.      2h

Ad ···

Sonya, your goals are our goals.

Follow McDermott Will & Emery for valuable legal insights

Follow

About    Accessibility    Help Center
Privacy & Terms ▼    Ad Choices
Advertising    Business Services ▼
Get the LinkedIn app    More

Linked LinkedIn Corporation © 2023

Messaging



Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 93 of 223

## Notifications

All        Verified        Mentions

**PeterPaulMary and 3 others liked your Tweet**

This genius thinks that asking a vendor trying to sell you some food is against free speech.

No wonder we have problems in NYC.

It's full of dummies.

**Julie Unruly** @jdgejulieunruly · 31s
Replying to @SonyaShaykhoun
DO IT!

**Julie Unruly** @jdgejulieunruly · 1m
Replying to @jdgejulieunruly and @SonyaShaykhoun
moreover, the NY Bar does not like radical christian terrorists harassing street vendors. your actions reflect poorly on your standing as a member of the profession. if they can disbar rudy giukiani, who was the mayor and the US Atty for SDNY, they can disbar you. watch it.

**NYC Citizen** liked your Tweet

They love to hate me...I'm actively ignoring these people and they're obsessed with me.

Insisting on their treacherous Communism, they only have hate in their hearts

But they love me in a weird obsessive kind of way

Do I need an injunction?

**Sonya Shaykhoun**
@SonyaShaykhoun

### Home
### Explore
### Notifications
### Messages
### Lists
### Bookmarks
### Twitter Blue
### Profile
### More

Tweet

### Listen live in Spaces

**Ran Neuner** is listening
**Udi vs Foss LIVE DEBATE #Bitcoin**    +2.7K

**Dr. Brian P. Simon** is listening
**GOBLIN TOWN ALPHA ANNOUNCEMENT**    +544

**Steve Kirsch** is hosting
**Can you name an unvaccinated Amish person who died in US from COVID?**    +510

Show more

### What's happening

La Liga · Starts at 4:00 PM
**Real Valladolid vs FC Barcelona**

Sports · Trending
**#MSDhoni**
Trending with #CSKvsGT

Trending
**Beatrice**
12.9K Tweets

Trending
**Princess Anne**

Trending
**#HarryAndMe**
1,409 Tweets

**(EMMY)L E I G H**
@embarrassed_4u







The Commercially Savvy Lawyer @ 🔒 @SonyaShaykhoun · Jan 11
I learned the hard way what @BillAckman is learning now - that you cannot trust the press, no matter what they tell you to your face.

In 2019, a man in DC found me on LinkedIn and made great efforts to get to know me professionally. I had had a rough go of it in Qatar and it had
Show more

← Post

This Post was deleted by the Post author. Learn more

The Commercially Savvy Lawyer @ 🔒
@SonyaShaykhoun

The problem - as I found out in Unlicensed Vendor-Gate - and as Bill Ackman is finding out now - and as you seem to have found out yourself - is that journalism is now weaponized.

Journalists don't give a shit how they destroy your good name, your prospects, what your side of the story is - It's like weaponization has replaced ethics.

It's horrible.

6:52 PM · Jan 11, 2024 · **77** views

View post engagements

Post your reply                                    Reply

sandwiches @dead_ramen · Jan 12
i think you're actually just a gigantic asshole and people called you out on it

independent.co.uk
NYC lawyer roasted on Twitter for reporting illegal for
Sonya Shaykhoun told The Independent she stood by her viral tweet and would continue to raise

The Commercially Savvy Lawyer @ 🔒 @SonyaShaykhoun · Jan 12
Get thee behind me, Satan.

**EXHIBIT 4 (EXHIBIT 8–9 OF THE INITIAL COMPLAINT (EMAILS TO TRACY CONNOR, ¶ 62))**

Firefox                                                                        about:blank

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902



**SHAYKHOUN LAW**

825 West End Avenue,
New York, NY 10025
Email: sonya@shaykhounlaw.com
Tel: +1-929-408-4531

February 20th, 2024

**PRIVATE AND CONFIDENTIAL**
**WITHOUT PREJUDICE**
**VIA EMAIL**

Tracy Connor
Editor-In-Chief
The Daily Beast
555 W 18th Street
NY, NY 10011

Dear Tracy Connor:

**Re: Take Down Request**

*Introduction*

We have not been formally introduced yet; my name is Sonya Shaykhoun, Esq., I am
a NY-attorney who was born and raised in NYC and had the opportunity to live and
work in many European and Middle Eastern countries before returning to NYC in
March 2019. Unfortunately, I am also the subject of an article that your publication
published on May 18th, 2023, entitled *"Lawyer Roasted for Calling 911 on 'Unlicensed'*

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

*Food Vendor in NYC Park*"[1] (the "**Article**") as a result of a tweet I posted on May 17th, 2023, that became viral.

### Objective of this letter ("Letter")

The purpose of this Letter is to request that **The Daily Beast** take down the Article with immediate effect. The Article has damaged me, my name, and my professional prospects indelibly, as I explain herein.

### Background and Credentials

I wanted to take a moment to tell you a bit more about myself. I was born in Manhattan to an Irish mother and an Egyptian father who met in NYC (of course!) We lived in Brooklyn for the first five years of my life before my mother got sick of the 1.5-hour long commute to and from Manhattan and we moved to Manhattan on Christmas Eve, 1977. I went to the local public school (PS 75 on 96th Street and West End Avenue) and, after my 4-year-old sister came home and called my brother an "*asshole*" and threw a pen at him, nearly blinding him, to St. Hilda's & St. Hugh's with the nuns. After a brief stint in Southampton, I had the privilege of attending Dalton. Diversity has been a common thread throughout my education in NYC. My friends and classmates came from all over the world, whether from South America or South Africa. As children, my friends and I were curious about one another, but we never judged one another or castigated each other for being different.

After Dalton, I attended the University of St. Andrews in Scotland. It was a tough time in my family. My father had made a risky bet in his venture capital fund and lost US$120,000,000. We went from riches to rags overnight. It was traumatic. To make matters worse, my younger sister Laura was date-raped and suffered a psychotic break that ultimately took her life in 2008 (she jumped from the bathroom window of our 11th floor apartment while my mother and brother were in the house, and I was in my office in Bahrain and on the phone with my mother to hear my mother's blood-curdling scream as she realized what had happened before the phone went dead). As much as the bankruptcy and collateral damage were devastating, it was also character-building. I am no stranger to hard work or doing menial jobs. I have also faced my share of racial discrimination so I would never do that to someone else. One particularly painful example is where my high school college counsellor refused to send my papers to any colleges, including Harvard, because my father was Egyptian and she was a radical Zionist she was racist against my Egyptian Muslim father and me, his daughter.

---

[1] https://www.thedailybeast.com/nyc-lawyer-sonya-shaykhoun-roasted-for-calling-911-on-a-food-vendor

Firefox

about:blank

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

There was no money for me to go to university, much less law school, but I went, worked all the way through, and made it through somehow. I went to law school in London at a college that is literally called the "School of Oriental and African Studies (SOAS)" where my classmates were from all over the world. In 2004, I got an opportunity to work in Bahrain as a Senior Legal Counsel at Orbit, a pan Arab pay satellite TV company where I was a technology lawyer. Orbit was innovative and we worked on satellite projects more innovative than Elon Musk's current projects but on a regional, not a global, scale. Eventually, I moved into private practice in Bahrain and after a few years, I got a job at Al Jazeera Media Network in Doha (during the Arab Spring) where I realized I had a nose for corruption. I got fired because the licensed lawyer in me needed compliance with the laws and I uncovered a global conspiracy within Al Jazeera and the gang leader was my boss! Following my retaliatory termination from Al Jazeera and I got a job with a start-up. Sadly (and this was a critical part of my getting my "Ph.D. in Street Smarts" that I always say I got in the Arabian Gulf), the start-up turned out to be a front from a criminal gang who decided not to honor my employment contract and terminated me because I refused to accept half of the salary that they owed me under the contract. In mid-2015, I had to start a litigation against the gang in the Qatari Civil Courts for unpaid salary and during which time, I could not leave Qatar because of the sponsorship rules that governed who could come and go. I won my case and, in early 2017, I went to work in the Contracts Department at Qatar Airways in Doha with employees from the four corners of the world. It was not always easy to live and work in the Arabian Gulf (although I loved a lot of it). I developed grit, a tough skin, and, despite what the many trolls on Twitter/X would say, commercial savvy.

In every role I have had, I distinguished myself as a nimble problem-solver, a workhorse, and as someone who gets things done. Consequently, I was entrusted with many groundbreaking multi-million and multi-billion-dollar contracts for projects all over the world. I had hoped and still hope to leverage the unique and valuable life and professional experience I got in Europe and the Middle East. Indeed, I am proud of not only my accomplishments and my legal skills, but astonished that I didn't crumble under the weight of the tough tests that life in the Arab Gulf gave me.

In 2016, I got the opportunity to do a second LL.M. in Corruption, Law and Governance at the satellite campus of the University of Sussex and the Rule of Law and Anti-Corruption Center in Doha. Although I was still in the throes of fighting my legal case against the money launderers who scammed me into taking a job with them and for which they never intended paying me, some friends helped me to pay the tuition fees. During this time, many older, male professional friends commented on how brave I was to be able to handle and face all the issues I had faced in Qatar. In recent years, men in similar situations took their lives rather than face up to getting unstuck in Qatar. By this point, it should be clear that I, Sonya Shaykhoun, the lawyer and human being, put a heavy emphasis on compliance and the rule of law and that, given my training and my experiences in the Arabian Gulf, and that I carry

Page 3 of 9

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

this with me in every aspect of my life. It should also be clear that my insisting on compliance with the law got me in trouble with those less respectful of the rule of law (does that sound familiar?)

In March 2019, I left Doha for good. I was working on massive contracts and supporting the contracts and the compliance departments at Qatar Airways respectively. My uncanny ability to sniff out corruption and shenanigans meant I alarmed the corrupt and shenanigous in the airline. I became a target again and my new boss started harassing me and threatening to investigate me for nothing. Qatar spit me out eventually and I was happy to be back home, safe from people who wanted to hurt and smear me because of my incorruptibility. I took a wealth of life lessons with me.

Despite appearances, my prestigious education and work experience, I am a humble and fair person. The trauma I experienced after my sister Laura's suicide taught me compassion. Like I said, the Arabian Gulf was the university from which I earned my *"Ph.D. in Street Smarts"*.

Against all the odds, I have managed to have a phenomenal career and work in amazing companies advising on fascinating projects on a global scale. I attach my resume and pitch deck, so you see the justification for my assertion regarding my professionalism and professional credentials.

### *Justifications for unpublishing the Article*

The Article has both put my physical safety and my reputation and career at risk. For **The Daily Beast**, the Article is a *"flash in the pan"* for clicks, a response to an admittedly phenomenally controversial tweet that garnered almost seven million views and extreme reactions from one end of the political spectrum to another. I can understand the appeal of picking up the so-called *"news"*. That said, the Article has damaged me on several fronts:

1. **Ugly threats.** Please see the attached letter which is emblematic of the kind of abuse I received after **The Daily Beast** published the Article.

2. **Perpetual weaponization.** I am a technology, media and telecommunications lawyer who spent 15 years in Bahrain and Qatar where I deliberately did not use Twitter/X when it arrived on the scene and actively self-censored myself for my own protection in the more conservative Gulf States. When I arrived back in America in March 2019 after many years abroad, I had no concept of the extent to which social media has become weaponized in American society. Now, for example, whenever I disagree with anyone on social media, invariable a troll will throw the Article in my face as

Firefox

about:blank

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

a weapon. It is humiliating, embarrassing, extremely distressing and damaging on several fronts. It makes me feel hopeless about my future in NYC and my legal career.

3. **Excluded and besmirched.** Last Fall, I met a woman in my neighborhood who is an activist against Open Plans, which has taken over West 103rd Street despite objections from the local community. When she found out I am a lawyer, she eagerly welcomed me to her WhatsApp group of civic activists. Within a few hours, she kicked me out. I wrote to her to ask what had happened and she said that she understood I was anti-immigrant, and she did not want to work with me! I attach that email exchange. That is a direct result of the Article painting me as a racist. I explained to her that the girls in the park were Americans and were not immigrants, but she wouldn't listen, the damage was done. The Article painted me unfairly as a racist and a pariah in my admittedly leftist Upper West Side neighborhood. As I am sure you are aware now, many New Yorkers from the Mayor to the Everyman has expressed dismay at the situation with the migrants. Why should I be the whipping boy (or girl as the case may be)? NYC is a City of a diversity of views and politics. Why would you use my tweetstorm as an opportunity to eviscerate me?

4. **Contradicts The Daily Beast's Core Values.** The tweet I wrote was about a chronic problem in NYC, unlicensed vendors. After the storm that erupted around my tweet, Councilman Robert Holden took up the issue of unlicensed vendors as has Mayor Adams (most recently evicting the illegal vendors on the Brooklyn Bridge), which I felt vindicated my questions of the vendors. I did not do anything wrong. Because one of the two girls in Riverside Park started chasing after me when she saw me taking a picture and got in my face, I called the police when she refused to leave me alone. I felt physically aggressed and calling 911 was the only option I saw at that moment to prevent something bad from happening. Did I make the wrong choice? That was the best I could do in the moment.

The Article casts me as a villain, which is inaccurate. The interaction, which lasted not more than five minutes in real life, is emblematic of one of the many issues plaguing NYC – the lawlessness and the disrespect for the Law.

The Article implies that I lied about calling the police. This is inaccurate. The cops might be understaffed or did not bother to record the complaint but make the complaint I did. The police did call me on the phone to get my side of the story and they must have spoken to the girls because they disappeared and never appeared again.

Without saying it explicitly, the Article also paints me as a racist and a bigot, which is rich, given that I am half Irish and half Egyptian and have lived in

Page 5 of 9

Firefox

about:blank

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

several countries around the world and worked and been friends with people from many walks of life.

Rather than being a racist or bigot, I am a lawyer – that means that I see the world through the lens of "*compliance with the law*". So, when I walk around NYC and see laws being broken and how it impacts the City negatively, I always see things through the lens of corruption and rule of law – not racism and xenophobia, as the Article suggests in error.

The Article wrongly casts me as a bully, bigot and hypocrite. I am none of those things. In this regard, I feel the Article fails to meet the following **The Daily Beast** values:

"*We value an inclusive culture, committed to the public good. A core part of our mission is to confront bullies, bigots and hypocrites. We believe that skepticism is a virtue and cynicism is a vice. Above all, our goal is to tell the truth.*

*To that end, journalists must strive to hold themselves to high ethical standards: aiming for honesty, fairness and accuracy while avoiding conflicts of interest.*"

If I break that down, surely my views and experiences should be considered with "*skepticism*", "*honesty*", "*fairness*" and "*accuracy*". I would also add that the Article conflicts with my right to privacy and to be safe in NYC since, as I said, the Article precipitated scary threats and has regularly been weaponized against me on Twitter.

### *Legal Issues and Journalistic Ethics*

**The Daily Beast** published the Article was published on May 23rd, 2023. statute of limitations on defamation is one year from the initial publication. We are still within the statute of limitations.

The Article portrays me as racist bigot without including a larger context. Indeed, the impact on my reputation, life and career has been severe and noticeable even now after nearly nine months of publication. Additionally, there are several assertions and/or damaging insinuations that are incorrect. Specifically, the Article asserts that the NYPD did not call me back after I called 911 after the unlicensed vendor came running after me and getting aggressive. The police did indeed speak with me, and I am sure with a bit of elbow grease, I could provide confirmation of that. Secondly, the insinuation that I am an anti-immigrant bigot is completely wrong because, as stated, the unlicensed vendors in the park are Americans and AJ McDougall referenced another tweet that upset people about a dead-drunk immigrant on my doorstep

Page 6 of 9

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

(something I had never seen in front of my West End Avenue doorman building even in the worst days of NYC when I was a kid in the late 1970s and early 1980s).

Further, the Article breaches my privacy (when I choose to protect my tweets, which is the case right now – I gave up Twitter/X for Lent) and seeks to make a laughingstock out of me because of the false perception that I am an elitist bigot. While I have been extremely privileged, I am not an elitist and, as a child of immigrants who has lived and worked all over the world, I am not a bigot.

AJ McDougall wrote the Article clinically but without reference to the greater context. That context is the recent surge in illegal immigration to the sanctuary city that is NYC and the related and consequent social, civic, political and legal issues. It follows that the rare sighting of   unlicensed vendors in Riverside Park and the exchange between one of the vendors and me that would later that day become a viral tweet are emblematic of the dichotomy of the "breakdown in the rule of law"/"rule of law" that characterizes the schism in NYC and NYS politics currently.

Although AJ McDougall wrote to me for comment, she did not give me a chance to comment, and then pressed "*publish*" anyway. Having worked in media internationally, I understand the inability to wait. But I do wish that **The Daily Beast** had given me an opportunity to comment as it would have given me an opportunity to mitigate against the damage or even to take appropriate legal steps to stop publication of this very disparaging and damaging Article.

Surely, calling a seasoned international lawyer with my educational and professional credentials a "*Karen*" is well below the standard of journalistic ethics? I am not a public person and so why take me down like this? It is not just well below the standard of journalistic ethics; it is just nasty.

### *Personal Appeal*

The personas we present to the world on social media are often narrow and subject to misinterpretation. They get twisted and reframed according to the individual reader's personal bias.

In summation, behind @SonyaShaykhoun on Twitter/X is a lawyer who has had to fight tooth and nail for everything she got, from the age of 18 when my now deceased father's business missteps ended in bankruptcy and ensuing familial chaos that had long-lasting effects. It went from bad to worse when my younger sister Laura was date raped and had a nervous breakdown, ending her dreams of having a normal life, a life which ultimately ended in her suicide in 2008. I faced and overcame the incredible challenges as an American woman in the Middle East, where I often say I got my "*Ph.D. in Street Smarts*".

Page 7 of 9

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

I am the first person to admit that my Twitter/X takes make people angry. I have an uncanny ability of pissing people off. But should I be subjected to ugly and potentially dangerous threats, defamation, weaponization, and threats of excommunication and disbarment? You and your writers, even the trolls on X, might not agree with my takes. But does that mean you have to ruin my life? Isn't this unethical and abuse of power? Does that mean that your journalists get to drag my name – my family name – through the mud? That perhaps is the most heartbreaking – to make me, Sonya Shaykhoun, the child of immigrants, synonymous with a *"bigoted Karen"*. You might as well have just killed me.

Thanks to the Article, my herculean efforts to build my own law practice in NYC are under serious threat and stunted. Anyone who Googles me will see the Article and think that I am a racist Karen, despite the support I have gotten from other New Yorkers and Americans who reached out to support me after you published the devastating Article.

The impact of the Article and the Karen moniker has been to reduce me to a meme and to cancel out all those years of study, blood, sweat and tears – both to get my education against all odds and to survive the vicissitudes of life as a female lawyer in Bahrain and Qatar and now New York City. I never once dreamed that America, my home, would be so hostile to me. Perhaps my extended time in those conservative Gulf States, where compliance with the rule of law in day-to-day life is a given, shaped my views and my expectations, but I am passionate about NYC and passionate about the rule of law – how are those crimes punishable by the destruction of my safety, name, and professional prospects by your publication?

Importantly, I have the authority to protect my tweets on my Twitter/X account and determine who gets to read my thoughts, but I do not have the ability to delete this damaging Article without taking legal action. You can, however, delete the Article and save me a lot of pain and suffering. Again, I am not a public figure.

**The Daily Beast** espouses the following policy:

**"Deletion:** *Stories will not be deleted by any single employee or without express permission from The Daily Beast leadership. Deletion will occur only in very rare circumstances having to do with a serious and fundamental factual error, __significant violation of our values or concern about compromising personal safety__."*

I am not perfect, but I am certainly not the racist bigot portrayed by the Article. The Article describes five minutes in my life last summer and I am still paying for the resulting misfired tweet that upset so many people, rightly or wrongly.

Page 8 of 9

DocuSign Envelope ID: 0E0272F5-0868-4322-9BAB-6F4FCA9A4902

### *Resolution*

Please delete the Article and take this thorn out of my side.

My tweet and the Article are old news. Since May 2023, the social perception and understanding of the problem that unlicensed vendors pose has been championed by our politicians, including Mayor Adams. While the tweet and Article are old news, the impact is not. When I am public on Twitter/X, someone regularly throws the Article in my face to discredit me.

I recently watched a short on YouTube by @SimonSquibb. Simon interviewed a New Yorker (it looks like it's in the Oculus) about his "dream". The man said, he's just trying to put his life back together after the devastation that occurred during the Covid Pandemic.[2] I really resonated with this clip as I am sure many of us do – not only am I trying to build a life in NYC after long stints in the Middle East and Europe, but we are all trying to recover in the post-Pandemic era. Please have some compassion and decency; delete the Article.

I will also be writing to the other publications, including the UK newspapers, that picked up this story to ask them to do the same.

If you wish to discuss this on the phone or in person, I am happy to do so. I need **The Daily Beast** to unpublish the Article so I can put this fiasco behind me.

As a lawyer, I would remiss if I did not include that all rights are reserved. I would much prefer to resolve this issue amicably than to go to court and draw more attention to myself.

Many thanks,

DocuSigned by:

*Sonya Shaykhoun*

1DC0F583E8FC442...

Sonya Shaykhoun, Esq.

Attachments: 5

---

[2] See: https://youtube.com/shorts/wtCdpWpWdcQ?si=INa2bVB2GUGRSxFD

Page 9 of 9

5/19/23

Sonya,

You really are a cunt. You got yours, I'm sooo sure you earned it all. Did it all by yourself. Ya, right.

But now you got it, so fuck everyone else, right? I hope you get dis-barred and are forced to make hard choices about how you have to make ends meet.

You suck, fuck off

YT

People who work for a living

Firefox

https://outlook.office.com/mail/id/AAMkAGU4NDBkN2E2LTJ4NzktNGVhYS04NDM1LT...

But now you got it, so fuck everyone else, right?

you get dis-barred and are forced to

12 JUN 2023

SEATTLE

D. Beas

1141 S. 4th St

NY, NY, 10010



Sonya Shayhoun, ESQ
825 WEST End Ave.
New York, NY 10025

3/14/25, 4:57 AM

Re: Federal lawsuit

**Maxine DeSeta** <maxinelois.deseta@gmail.com>
Thu 10/19/2023 8:59 AM
To:Sonya Shaykhoun <sonya@shaykhounlaw.com>
Cc:Herb Alter <herbalter.consultant@gmail.com>

Dear Sonya,

This is not about the Israel/Gaza conflict. I noticed that a lawyer with your minus the k called the police on some unlicensed, obviously immigrant women. We do not support this kind of action. Pardon me, if this was a different person.

Thank you again for you concern.

Take care,
Maxine

> On Oct 17, 2023, at 2:59 PM, Sonya Shaykhoun <sonya@shaykhounlaw.com> wrote:
>
> Hi Maxine,
>
> I hope you are OK after yesterday's fiasco. I was deeply upset about what happened to you and how the DOT and Open Plans are just steamrolling you.
>
> Let me know if there is anything I can do to support you. Even if we are not aligned about Gaza/Israel, we are very much aligned on NYC matters.
>
> Best,
> Sonya
>
> <Outlook-horizontal.png>
>
> **Sonya Shaykhoun**
> Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney
> <Outlook-Law Office.png>
> +1-929-408-4531
> 825 West End Ave
> New York, NY 10025-5349
> https://shaykhounlaw.com
>
> **From:** Maxine DeSeta <maxinelois.deseta@gmail.com>
> **Sent:** Sunday, October 15, 2023 12:39 PM
> **To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
> **Cc:** Herb Alter <herbalter.consultant@gmail.com>
> **Subject:** Re: Federal lawsuit
>
> Sonja,
>
> Sorry I did not get back to you. Exhaustion caught up with me. Unfortunately we are not aligned with some of your actions and can not at this time given our fragile situation become involved with more controversy.
> Thank you for extending your help to us.
>
> Be Well,
> Maxine
>
>> On Oct 15, 2023, at 12:34 PM, Sonya Shaykhoun <sonya@shaykhounlaw.com> wrote:
>>
>> Hi Maxine,
>>
>> I hope you are well. I am a bit confused about something. Last night, I noticed you removed me from the WhatsApp group and didn't respond to my question privately about it. I can only assume that you do not align with my politics as per Twitter and will not take my offer of help.
>>
>> If this is a mistake, I stand corrected. Should you need my assistance in this regard, I am happy to help. But for now, given you ejected me from the WhatsApp group, I am assuming you do not need my help.
>>
>> Many thanks,
>> Sonya
>>
>> <Outlook-horizontal.png>
>>
>> **Sonya Shaykhoun**
>> Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney
>> <Outlook-Law Office.png>
>> +1-929-408-4531
>> 825 West End Ave
>> New York, NY 10025-5349
>> https://shaykhounlaw.com
>>
>> **From:** Maxine DeSeta <maxinelois.deseta@gmail.com>
>> **Sent:** Saturday, October 14, 2023 4:50 PM
>> **To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
>> **Subject:** Federal lawsuit
>>
>> Dear Sonya,
>>
>> W are also plaintiffs in a federal lawsuit against open streets under the American for Disabilities Act. nycaccessforall.org
>>
>> Thank you, again, for your time.

Maxine DeSeta



# SONYA SHAYKHOUN

sonya@shaykhounlaw.com  |  +1-929-408-4531  |  NY, NY 10025

## Summary

Dedicated and skilled Attorney specializing in complex and high-value cross-border transactions with twenty years' experience in legal counseling, contract negotiation, drafting, and management. Committed to pursuing the best outcomes for clients and legal firms alike. New York Attorney in good standing.

## Skills

- Global employment law experience
- Legal Writing
- Intellectual Property Law Expertise
- Legal Research
- Corporate Law
- Document Preparation
- Evaluating Documents
- Contract Negotiation

- Strategy Development
- Intellectual Property Law
- Negotiation
- Legal Compliance
- Settlement Negotiation
- Conflict Resolution
- Complex project management
- Time management

## Experience

**Lawclerk | Remote**
**Freelance Attorney**
*07/2022 - Current*

- Successfully completed several freelance projects, including: writing a blog post on due diligence best practices; writing an ebook on the uses of "Recitals" in contracts; Drafting a partnership agreement; reviewing a brand license agreement for a Cannabis company in NY; and, a six (6)-month maternity cover for a GDPR-compliance data privacy project.

**Epiq | New York City, NY**
**Contract Attorney**
*07/2019 - Current*

- Supported several document review projects (first level review and privilege review) in relation to a variety of matters, including litigation, arbitration, in-house investigations, labor disputes, FTC investigations, and regulatory reviews.

**Law Offices of Sonya Shaykhoun, Esq. |**
**New York City, NY**
**Founder/Attorney**
*05/2019 - Current*

- Advise on a wide variety of domestic, international, and complex cross-border legal matters and transactions, including TMT matters (including satellites), IT Outsourcing, cross-border litigation and dispute resolution, Middle East matters, and data privacy matters including data privacy agreements.
- Teach the "Commercially Savvy Lawyer Contract Negotiation and Drafting Boot Camp on the Maven educational platform (NYS CLE pending.)

**Qatar Airways | Doha, Qatar**
**Senior Legal Specialist**
*01/2017 - 04/2019*

- Drafted, reviewed and negotiated contracts including service agreements, software licenses, confidentiality agreements and other related documents related to the running of a multi-faceted 5-star global airline.
- Highlights include negotiating and drafting: (i) the cutting-edge inflight connectivity agreement between Qatar Airways and Inmarsat worth more than one billion Qatari Riyals (i.e., about US$750 million); (ii) the multi-million-dollar sponsorship agreement between Qatar Airways, Jet Blue and the Barclays Center in Brooklyn, NY; (iii) the 1.3 billion Qatari Riyals (i.e.,

US\$800 million) facility management contract with FMM (a Spanish facility management company); and, (iv) an inflight entertainment upgrade agreement worth US\$165 million with Thales; and, (v) supported the Chief Legal and Compliance Officer in developing Qatar Airways' award-winning Corporate Compliance Program.

- Provided legal advice and guidance to corporate clients on a variety of global corporate, commercial, employment and regulatory matters.

**My-HD Media | Dubai, UAE**
**Independent Legal Consultant**
*09/2015 - 06/2016*

- Drafted and/or negotiated rights and distribution contracts, termination letters, and, non-disclosure agreements as part of a contract renegotiation exercise between My-HD and their vendors.

**Syscontech Limited W.L.L. | Doha, Qatar**
**General Counsel**
*02/2015 - 07/2015*

- Advised a technology start-up on complex agreements, documentation for tender submissions, litigation strategy, Qatari law matters with the assistance of local counsel, IT Outsourcing agreements, and IP matters.

**Al Jazeera Media Network (AJMN) | Doha, Qatar**
**Senior Legal Counsel**
*02/2011 - 12/2014*

- Provided legal and operational support across the AJMN group in Qatar and on a global basis.
- Reviewed, drafted and negotiated a wide range of commercial contracts, including license agreements, services agreements, joint venture agreements and purchase and supply agreements.
- Managed AJMN's global corporate, commercial contract and compliance matters either alone or with outside counsel and/or consultants.
- Managed a global portfolio of and subsequent restructuring of more than 120 Al Jazeera bureaus (i.e., new companies and branches) and related regulatory, legal and tax compliance, governance, and employment law matters (including streamlining the global employment contract template).
- Reviewed articles, scripts, and films for compliance with OfCom (Al Jazeera English's regulator) prior to publication/broadcast.
- Negotiated non-contentious dispute resolution matters.
- Led internal investigations with HR and other AJMN executives.
- Advised on a wide range of global IP issues.

**Charles Russell Speechlys LLP | Manama, Bahrain**
**Attorney**
*04/2008 - 08/2010*

- Advised on a range of contract reviews for various media, IT Outsourcing (vendor and client side), technology, insurance, and facility management companies in Bahrain and other Arabian Gulf countries.
- Developed client relationships for Charles Russell's Bahrain office,
- Seconded to the Telecommunications Regulatory Authority (TRA) and Gulf Air in Bahrain respectively for six (6)-month engagements.
- Managed complex due diligence projects via digital war rooms.
- Managed the "Know Your Client" protocols for new clients.

**Orbit Communications Company WLL | Manama, Bahrain**
**Senior Legal Counsel**
*05/2004 - 02/2008*

- Managed a broad range of Orbit's corporate, commercial, and regulatory matters.
- Active member of Orbit's Anti-Piracy team combatting TV piracy globally.
- Managed the extensive global trademark portfolio with third party trademark agents.
- Provided Noorsat (Orbit's sister company) with support on legal, corporate, and regulatory matters.

## Education and Training

University of Sussex And The Rule of Law And Anti-Corruption Center | Doha, Qatar
**Master of Laws (LL.M.) in Corruption, Law and Governance**
*10/2018*

School of Oriental and African Studies (SOAS), University of London | London, England
**Master of Laws (LL.M.), Corporate and Commercial Law**
*10/2003*

BPP Law School | London, England
**Legal Practice Course**
*06/2002*

School of Oriental and African Studies (SOAS), University of London | London, England
**BA in Arabic and Law (equivalent to a Juris Doctor)**
*06/2000*

University of St. Andrews | St. Andrews, Scotland
**MA Honors in English Language and Literature**
*06/1995*

London Institute of Space Policy and Law | London, England
**Space Law Certificate Course**

## Websites, Portfolios, Profiles

- https://www.linkedin.com/in/sonya-shaykhoun-esq-ll-m-2468002/
- https://shaykhounlaw.com

## Committees

- March 2021 - June 2023 Member of the NYC Bar Association Committee on NYC Affairs
- March 2022 - present, Member of the NYC Bar Association Committee on Aeronautic Affairs

## Publications

Confidentiality agreements in the Middle East, Business in the Gulf (BIG), published November 2009; Presented a paper at "Satellite Law Workshop" at Capital Club, Dubai sponsored by Charles Russell, 2010; and Contributed extensively to specialist satellite industry magazines.

## Activities and Honors

- Avid tennis player in NYC public courts
- Accomplished equestrienne
- Enthusiastic pianist
- Filmmaking, screenplay writing, and Off-Off-Broadway playwright
- Writing and blogging

## Languages

**Arabic:**

Professional

**French:**

Professional

## Accomplishments

- Member of GC Powerlist's Middle East Teams 2018 - Transport and Infrastructure

## References

References available upon request.

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 115 of 223

# LAW OFFICES OF
# SONYA SHAYKHOUN, ESQ.

ATTORNEY ADVERTISING

©2019-2024 SONYA SHAYKHOUN, ESQ.



Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 116 of 223

# SONYA SHAYKHOUN, ESQ.



### 19 YEARS OF INTERNATIONAL EXPERIENCE

The Law Offices of Sonya Shaykhoun, Esq. is the boutique law firm of Sonya Shaykhoun, Esq. is a British-educated, native New Yorker & NY-qualified attorney with 18 years of international experience working for iconic companies in Europe & the Arabian Gulf (Bahrain and Qatar.)

### NOTABLE ACHIEVEMENTS

Sonya Shaykhoun, Esq. has worked on a wide range of multi-millions and multi-billion dollar agreements, including some cutting-edge technology agreements, facilities management agreements, and a wide range of global corporate and commercial matters.

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 117 of 223

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 118 of 223

WORK EXPERIENCE

2004 - 2008
Senior Legal Counsel for a pan-Arab pay satellite TV company. Handled technology, media, telecommunications (including satellites), corporate and commercial matters.

2008 - 2010
Attorney, handled telecommunications, aviation, and corporate & commercial work.

04

2011 - 2014
Senior Legal Counsel Handled corporate and commercial work on a global basis.



WORK EXPERIENCE

**2015-2016**
Represented individual
and corporate clients
in corporate, advisory,
and dispute resolution
matters in Dubai,
UAE, and Doha, Qatar.

**2017-2019**
Senior Legal Specialist.
Managed high value
contracts and
compliance matters.

**2019-present**
Handle a variety
of high-value
cross-border and
local contracts
and disputes.

05

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 119 of 223





Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 121 of 223

# PROJECTS - I

**Satellite Projects**
- Project-managed multi-million dollar semi-digital broadcast system in Bahrain between Orbit & SONY Middle East
- Drafted multi-million dollar space capacity deal between Noorsat & NileSat
- Managed the billion-dollar WiFi satellite connectivity contract for A350s and B777s between Qatar Airways & Inmarsat
- Drafted Noorsat's satellite space capacity templates
- Handled Orbit's 2-way SatNet contract

**Secondments**
- Seconded to & participated in the Telecommunications Regulatory Authority of Bahrain during the Third Mobile License auction
- Seconded to Gulf Air, Bahrain's national carrier's contracts department

**Complex Facilities Agreements**
- Managed the billion-dollar facilities management contract between Hamad International Airport and Ferrovial Airports

**Aviation & Travel and Tourism**
- Managed significant IATA contracts for Qatar Airways Cargo & Qatar Airways
- Handled a wide range of global travel and tourism-related contracts



**EMPIRE STATE BUILDING, NYC**
**(C) SONYA SHAYKHOUN, ESQ 2022**

**PRIOR RESULTS DO NOT GUARANTEE A SIMILAR RESULT**

Case 1:24-cv-09978-ALC   Document 29   Filed 03/17/25   Page 122 of 223

# PROJECTS - II



DOHA SKYLINE, QATAR (C) SONYA SHAYKHOUN, ESQ. 2022

PRIOR RESULTS DO NOT GUARANTEE A SIMILAR RESULT

Global Corporate & Commercial
- Managed Al Jazeera Media Network's global network of foreign bureaus and new channels, including local contracts (leases, fit-outs, and licenses)
- Oversaw internal HR and financial investigations at Al Jazeera Media Network
- Managed various corporate and commercial matters (including sponsorship agreements and JVs), and non-contentious disputes for Al Riyadiah (now BeIN Sports)
- Managed litigation and dispute resolution on a consultancy basis in Qatar for individual clients
- Managed contracts audit and contracts negotiation and drafting project for MyHD, a Dubai-based pay-satellite TV company
- Assisted an American company with its acquisition of a Bahraini tech company

Technology, Film & Media Licensing
- Drafted (often from scratch) a wide range of cross-border media and technology licensing agreements (including barter agreements, assignments, channel pass-thrus, content licenses and sub-licenses, film development agreements, film option agreements, technology escrow agreements, SaaS agreements)

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 123 of 223

# PROJECTS - III





**Compliance & Data Privacy**

- Founding member of Qatar Airways' first Compliance Department
- Drafted compliance policies (i.e., anti-bribery and corruption)
- Supported the roll-out of the GDPR and data privacy policies for Qatar Airways
- Supported AMD's data privacy compliance project 2022-2023

**Sponsorship Agreements**

- Managed the multi-million dollar Barclay Center sponsorship deal between Qatar Airways, Jet Air, and Barclay Center
- Handled sponsorship agreements around the world for Orbit, Al Jazeera Media Network (including BeIN Sports), and Qatar Airways

**Trademark registrations and IP Disputes**

- Oversaw Orbit's extensive trademark portfolio with outside counsel
- Managed IP disputes on Al Jazeera's behalf
- Conducted individual Trademark registrations for individual clients

**Fashion Law**

- Handle a series of contentious & non-contentious disputes between Immortal Model Management and models/modelling agencies in NYC globally
- Redrafted Immortal Model Management's contracts

EAST RIVER OVERLOOKING THE BROOKLYN BRIDGE, NYC.
(C) SONYA SHATKHOUR, ESQ. 2021

PRIOR RESULTS DO NOT GUARANTEE A SIMILAR RESULT

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 124 of 223

# EDUCATION

- MA Honours Degree in English Language & Literature, University of St. Andrews, Scotland (1990-1995)

- BA in Arabic and Law, School of Oriental and African Studies (SOAS), University of London (1996-2000)

- Legal Practice Course (LPC), BPP Law School, London (2000-2001)

- LL.M. Corporate and Commercial Law, SOAS, University of London (2002-2003)

- Certificate in Space Law and Policy, London Institute of Space Law & Policy, University of London (2014)

- LL.M. in Corruption, Law, and Governance, University of Sussex and Rule of Law and Anti-Corruption Center (ROLACC), Doha, Qatar (2016-2018)

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 125 of 223

# LET'S WORK TOGETHER

**EMAIL**
sonya@shaykhounlaw.com

**WEBSITE**
https://shaykhounlaw.com

**MOBILE**
+1-929-408-4531

**MAILING ADDRESS**
825 West End Avenue, NY, NY, 10025, USA

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 126 of 223

 Outlook

## Re: [CONTACT] Formal Complaint

**From** Sonya Shaykhoun <sonya@shaykhounlaw.com>

**Date** Tue 4/30/2024 3:30 PM

**To** Editorial Dailymailonline <editorial@mailonline.co.uk>; katrina.bell@dailymail.co.uk
<katrina.bell@dailymail.co.uk>

Dear Ms. Bell,

I trust you are well.

It has been over two months since I sent you my response fleshing out my complaint and
justification for the takedown notice - I imagine you are busy. That said, my complaint is serious
and merits attention, especially since the article your publication published about me eviscerated
my character and published my likeness and home address.

Please advise soonest as to what next steps you will take to accommodate my request to take down
the hit piece the Daily Mail published about me which has subsequently damaged my reputation.

Thank you.

Regards,
Sonya Shaykhoun, Esq.

---

## Sonya Shaykhoun
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

**From:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Sent:** Tuesday, February 27, 2024 10:52 PM
**To:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Subject:** Re: [CONTACT] Formal Complaint

Dear Ms. Bell:

As promised, please find my take-down notice and attachments.

Many thanks,

Firefox

Sonya Shaykhoun, Esq.

---

## Sonya Shaykhoun

Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



SHAYKHOUN LAW

+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

---

**From:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Sent:** Tuesday, February 27, 2024 7:36 AM
**To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Cc:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Subject:** RE: [CONTACT] Formal Complaint

Dear Ms Shaykhoun,

Thank you for your email.

Please set out what specific points in the article you think are inaccurate, along with what you believe is the corresponding correct position.

Kind regards,

Katrina

**Katrina Bell**
**Deputy Head of Compliance**

**From:** MailOnline <no-reply@mailonline.com>
**Sent:** Monday, February 26, 2024 9:51 PM
**To:** Corrections MOL <corrections@mailonline.co.uk>
**Subject:** [CONTACT] Formal Complaint

**External Sender~~**

Formal Complaint

User query:

**Your name:** Sonya Shaykhoun

**Your email:** sonya@shaykhounlaw.com

**Link to article:** https://www.dailymail.co.uk/news/article-12103463/Outrage-erupts-NYC-lawyer-unleashes-fury-vendors-selling-food-without-permit-local-park.html

**Details:** This article includes a lot of false information and is defamatory. I will sue Daily Mail via its NY office if you do not take it down immediately.

**Disclaimer**

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Associated Newspapers Ltd. Registered Office: Northcliffe House, 2 Derry St, Kensington, London, W8 5TT. Registered No 84121 England.

**EXHIBIT 5 (EXHIBIT 10–12 OF THE INITIAL COMPLAINT (EMAILS TO KATRINA BELL, ¶ 62))**

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E



**SHAYKHOUN LAW**

825 West End Avenue,
New York, NY 10025
Email: sonya@shaykhounlaw.com
Tel: +1-929-408-4531

February 28th, 2024

**PRIVATE AND CONFIDENTIAL**
**WITHOUT PREJUDICE**
**VIA EMAIL AND MAIL**

Ms. Katrina Bell,
Deputy Head of Compliance,
The MailOnline
dmg media
Northcliffe House
2 Derry Street
London
W8 5TT
England

Dear Ms. Bell:

**Re: Take Down Notice**

*Introduction*

I write further to our brief email exchange on February 27th, 2024 pursuant to my online complaint and take down request. My name is Sonya Shaykhoun, Esq., I am a NY-attorney who was born and raised in NYC and had the opportunity to live and work in many European and Middle Eastern countries since graduating high school

Firefox

about:blank

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

in 1990 before returning to NYC in March 2019. Unfortunately, I am also the subject of an extremely damaging article that your publication published on May 19th, 2023, entitled *"New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen'"*[1] (the "**Article**") as a result of a tweet I posted on May 17th, 2023, that became viral.

### *Objective of this letter ("Letter")*

The purpose of this Letter is to request that **The Daily Mail** take down the Article with immediate effect. The Article includes several incorrect statements and is unfair and unbalanced. The Article has damaged me, my name, my professional prospects everywhere indelibly, and potentially put me in physical harm's way. The Article has reduced me to a laughingstock and a meme and cast me as a bigot and a racist while smearing me with the inherently damaging moniker, *"Karen"*.

### *Background and Credentials*

Perhaps if I share about my background, you might see me as a human being and not as an example to be made of in the proverbial global town square. I am a human being and a consummate professional who cares a lot about the rule of law and NYC. I was born in Manhattan to an Irish mother and an Egyptian father who met in NYC (of course!) We lived in Brooklyn for the first five years of my life before my mother got sick of the 1.5-hour long commute to and from Manhattan and we moved to Manhattan on Christmas Eve, 1977. I went to the very diverse local public school and, after my 4-year-old sister came home and called my brother an *"asshole"* and threw a pen at him, nearly blinding him, I later moved to St. Hilda's & St. Hugh's, an Episcopalian school near Columbia University. After a brief stint in Southampton, Long Island, I had the privilege of attending Dalton (a very fancy private high school in Manhattan). Diversity has been a common thread throughout my education in NYC. My friends and classmates came from all over the world, e.g., Korea, China, South America, Europe, and South Africa. As children, my friends and I were curious about one another, but we learned to never judged one another or castigate each other for being different.

After Dalton, I attended the University of St. Andrews in Scotland. It was a tough time in my family. My father had made a risky bet in his venture capital fund and lost US$120,000,000. We went from riches to rags overnight. It was traumatic. To make matters worse, my younger sister Laura was date-raped and suffered a psychotic break that ultimately took her life in 2008 (she jumped from the bathroom window of our 11th floor Manhattan apartment while my mother and brother were in

---

[1] https://www.dailymail.co.uk/news/article-12103463/Outrage-erupts-NYC-lawyer-unleashes-fury-vendors-selling-food-without-permit-local-park.html

Page 2 of 11

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

the house, and I was in my office in Bahrain and on the phone with my mother to bear witness to my mother's blood-curdling scream as she realized from the resounding thud in the interior courtyard of our building what had happened before the phone went dead). As much as the bankruptcy and collateral damage were devastating, it was also character-building. I am no stranger to hard work or doing menial jobs. I have also faced my share of racial discrimination so I would never do that to someone else. One particularly painful example is where my high school college counsellor refused to send my papers to any colleges, including Harvard, because my father was Egyptian and she was a radical Zionist she was racist against my Egyptian Muslim father and me, his daughter.

There was no money for me to go to university, much less law school, but I went, worked all the way through, and made it through somehow. I went to law school in London at a college that is literally called the "School of Oriental and African Studies (SOAS)" where my classmates were, again, from all over the world. In 2004, I got an opportunity to work in Bahrain as a Senior Legal Counsel at Orbit, a pan Arab pay satellite TV company where I began my legal career as a technology lawyer. Orbit was innovative and we worked on satellite projects more innovative than Elon Musk's current projects but on a regional, not a global, scale. Eventually, I moved into private practice in Bahrain (Charles Russell LLP as it was known then). After a few years, I got a job at Al Jazeera Media Network in Doha (I started as the Arab Spring was kicking off) where I realized I had a keen nose for corruption.

Shockingly, I got fired from Al Jazeera because the licensed "rule of law" lawyer in me required compliance with the global laws with which we were working, and I uncovered a global conspiracy within Al Jazeera and the gang leader was my boss. Following the retaliatory termination from Al Jazeera and I got a job with a start-up that turned out to be a critical part of my getting my *"Ph.D. in Street Smarts"* in the Arabian Gulf. The start-up turned out to be a front from a criminal gang who decided not to honor the salary written in my employment contract and terminated me because I refused to accept half of the salary that they owed me under the contract. In mid-2015, I had to start a litigation in which I represented myself against the shady start-up in the Qatari Civil Courts for unpaid salary and during which time, I could not leave Qatar because of the sponsorship rules that governed who could come and go. I won my case and, in early 2017, I went to work in the Contracts Department at Qatar Airways in Doha with colleagues who would become friends from the four corners of the world. It was not always easy to live and work in the Arabian Gulf (although I loved a lot of it). I developed grit, a tough skin, adaptability, and, despite what the many trolls on Twitter/X would say, commercial savvy.

In every role I have had, I distinguished myself as a nimble problem-solver, a workhorse, and as someone who gets things done. Consequently, I was entrusted with many groundbreaking multi-million and multi-billion-dollar contracts for projects all over the world. At Qatar Airways, I worked in both the Contracts Department and

Page 3 of 11

Firefox                                                                                                    about:blank

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

the Compliance Department, which I helped to set up. I had hoped and still hope to leverage the unique and valuable life and professional experience I got in Europe and the Middle East. I am proud of both my accomplishments, experience and skillset, and I marvel that I did not crumble under the weight of the tough tests that life in the Arab Gulf gave me.

In 2016, I got the opportunity to do a second LL.M. in Corruption, Law and Governance at the satellite campus of the University of Sussex and the Rule of Law and Anti-Corruption Center in Doha. I was still in the throes of fighting my legal case against the money launderers who scammed me into taking a job with them and for which they never intended paying me, some friends helped me to pay the tuition fees since, because of the arcane sponsorship rules in Qatar, I was precluded from getting another job for the two years that this palaver was going on. I was completely alone. Several older, male professional friends commented on how brave I was to be able to handle and face all the issues I had faced in Qatar. In recent years, men in similar situations took their lives rather than face up to getting unstuck in Qatar. It should be clear that I, Sonya Shaykhoun, the lawyer and human being, put a heavy emphasis on compliance and the rule of law and that, given my training and my experiences in the Arabian Gulf, and that I carry this with me in every aspect of my life. The Code of Professional Conduct that governs NYS lawyers demands we comport ourselves correctly in all areas of our lives. It should also be clear that my insisting on compliance with the law got me in trouble with those less respectful of the rule of law (does that sound familiar?)

In March 2019, I left Doha for good. I was working on massive contracts and supporting the contracts and the compliance departments at Qatar Airways respectively. My uncanny ability to sniff out corruption and shenanigans meant I alarmed the corrupt and shenanigous in the airline. I became a target again and my new boss started harassing me and threatening to investigate me for nothing. Qatar spit me out eventually and I was happy to be back home, safe from people who wanted to hurt and smear me because of my incorruptibility. I took a wealth of life lessons with me.

Despite appearances, my prestigious education and work experience, I am a humble and fair person. The trauma I experienced after my father lost the money and after my sister Laura's suicide taught me compassion. The Arabian Gulf was the university from which I earned my *"Ph.D. in Street Smarts"*.

Against all the odds, I have managed to have a phenomenal career and work in amazing companies advising on fascinating projects on a global scale. I attach my resume and pitch deck, so you see the justification for my assertion regarding my professionalism and professional credentials.

Page 4 of 11

3/14/25, 5:00 AM

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

Did I go too far with the Tweet and bickering with everyone? Probably. Should I have turned the comments off? Possibly. But you must understand that at this point, I was chairing citizen meetings for a civic group called *"Save NYC Working Group"* that I set up with like-minded citizens to figure out how we could improve NYC.

### *Justifications for unpublishing the Article*

The Article has both put my physical safety and my reputation and career at risk. For **The Daily Mail**, the Article is a *"flash in the pan"* for clicks, a response to an admittedly phenomenally controversial tweet that garnered almost seven million views and extreme reactions from one end of the political spectrum to another. I can understand the appeal of picking up the so-called *"news"*. That said, the Article has damaged me on several fronts:

1. **The rule of law is at risk in NYC.** Since Mayor DeBlasio, NYC has fallen into a state of lawlessness and criminality. This is exacerbated by the onslaught of illegals who have decided to make NYC, a so-called *"Sanctuary City"*, their home. The current Manhattan District Attorney Bragg has outraged and endangered citizens by not prosecuting violent criminals. The Article fails to address the larger context, e.g., the lawlessness, in which this event I tweeted about occurred. The Article was extremely imbalanced and did not include the tweets that were for the rule of law but solely focused on the vitriolic comments. Suddenly, calling for the laws to be followed is a crime punishable by doxing and public shaming in an international platform like **The Daily Mail**.

2. **False reporting and defamation.** There are many false assertions in the Article and the tone of the Article is mocking and nasty, ironically reporting that my tweet triggered *"accusations of pettiness and entitlement among New York"* while the Article is an exercise in pettiness and the entitlement to destroy a person's good name and life with impunity. Specifically:

   a. **There was no "wrath".** I did not *"unleash [my] wrath"* on anyone. I was walking along the path when one of the girls bounded toward me and demanded I buy something from her. The lawyer in me asked her if she had a permit to sell food in the park. I just blurted it out. The set-up was a mess and so I was not about to buy from her and her friend. We had a very temperate exchange and she accused me of calling her an ugly name, but I do not recall doing that. When I walked away, I was about 50 feet away from her and I took a picture to report it to the community hotline (311), one of the girls came chasing after me and stuck her phone in my face. She refused to go away. I kept my calm, and she was getting increasingly aggressive. I told her, *"How do I know you*

Page 5 of 11

Firefox

about:blank

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

*didn't prepare that food with your cats pooping all over the counter?"* to which she retorted, *"I don't have cats"*, completely missing the point. I believe that these girls professed to be socialists (the party in NYC that is responsible for undoing the rule of law) and I hazard to guess that the bulk of my trolls that day were of a similar political ilk. The wrath came from the trolls, not from me.;

b. **"Esq".** I label myself as an *"Esq."* because that is what I am – I am a lawyer and as such, am entitled to use Esquire. Noa Halff wrote sardonically that as though I had committed a cardinal sin when that is in fact my professional title that I earned and am entitled to use;

c. **Lies.** The Article asserts that I called the police because I was *"petty and vindictive"* when the tweet that I wrote and which **The Daily Mail** reposted clearly stipulates that the girl was *"getting increasingly aggressive"*. I called the police to protect myself. Any normal person would respond that way rather than get into a physical altercation, which is where I feared that interaction was headed;

d. **Another lie.** The Article implies that I lied about calling the police when it states that, *"a spokesperson for the police department said there was no record of such complaint"*. If I had to go to court to prove this, I could find the proof of that call. Why would I lie about calling the police and the police calling me back?;

e. **Reproduction of my pictures without my permission.** While the pictures of me that **The Daily Mail** plastered all over the Article were very nice, even X/Twitter allows users to complain when their pictures are reproduced on the platform without their permission;

f. **My home address.** I had to register my law firm to my home address after the Covid Mandates were enforced and I preferred not to get vaccinated and was forced to quit my workspace. While my address is located on my website and the courts website, I prefer not to have my home address, work number and email published in an article whose whole purpose is to crucify me for wanting the rule of law to prevail in NYC and its parks. I have received hate mail and nasty calls and texts after the publication of the Article. What if I had been murdered or physically assaulted by some unhinged lunatic who was triggered by the unbalanced assertions in the Article? **This is also a clear breach of the GDPR and data privacy laws;**

g. **Another lie.** No one from **The Daily Mail** reached out to me for comment. If I had heard from this journalist, I would have taken the

Page 6 of 11

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

necessary action to stop the publication of this defamatory and devastating Article at the time.

h. **Defamation.** I assume you are a lawyer but in case you are not, the definition of defamation is a statement/s that injures a third party's reputation; it is a tort that includes libel (written statements) and slander (spoken statements). The elements of defamation are: "1) a false statement purporting to be fact; 2) publication or communication of that statement to a third party; 3) fault amounting to at least negligence; and 4) damages, or some harm caused to the reputation of the person or entity who is the subject of the statement".[2] Although this is the American definition, the English definition of the same is not too different. It would not be difficult to persuade a judge that all four elements had been met by the publication of this nasty take-down Article and to seek damages accordingly.

3. **Ugly threats and perpetual weaponization.** I am a technology, media and telecommunications lawyer who spent 15 years in Bahrain and Qatar where I deliberately did not use Twitter/X when it arrived on the scene and actively self-censored myself for my own protection in the more conservative Gulf States. When I returned to America in March 2019 after years abroad, I had no concept of the extent to which social media has become weaponized in American society. At the start of the BLM riots, I commented on the fact that we were undergoing our own Cultural Revolution, and that idea has become mainstream. Today, for example, whenever I disagree with anyone on social media (whether it be X/Twitter when I am active on it or LinkedIn), invariable a troll will throw the Article in my face as a weapon. It is humiliating, embarrassing, extremely distressing and damaging on several fronts. It makes me feel hopeless about my future in NYC and my legal career. I worry about my personal safety in NYC. After **The Daily Beast's** article about the same (which I suspect Noa Halff plagiarized given the many similarities), I received very ugly hate mail (see attached).

4. **Excluded and besmirched.** Last Fall, I met a woman in my neighborhood who is an activist against Open Plans (an anti-car charity), which has taken over West 103rd Street in my neighborhood despite objections from the local community. When she found out I am a lawyer, she eagerly welcomed me to her WhatsApp group of civic activists. Within a few hours, she kicked me out of the WhatsApp group. I wrote to her to ask what had happened and she said that she understood I was anti-immigrant, and she did not want to work with me! I attach that email exchange. That is a direct result of the Article painting me as a racist. I explained to her that the girls in the park were Americans and were not immigrants, but she wouldn't listen, the damage was done. The

---

[2] https://www.law.cornell.edu/wex/defamation

Firefox

about:blank

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

Article painted me unfairly as a racist and a pariah in my admittedly leftist Upper West Side neighborhood. As I am sure you are aware now, many New Yorkers from the Mayor to the Everyman has expressed dismay at the situation with the migrants. The Mayor and several Council people have taken up the issue of illegal food vendors, so my tweet was not anomalistic but rather captured the exasperation of many New Yorkers who remember how civilized NYC was just a decade ago under Mayor Bloomberg and before him, Mayor Giuliani. Why should I suffer being the whipping boy (or girl as the case may be)? NYC is a diverse city of filled with people with a wide range of views and politics. diversity of views and politics. Why would **The Daily Mail** use my tweetstorm as an opportunity to eviscerate me? This was not journalism, rather it was an exercise in international bullying.

5. **Breach of data privacy and privacy.** The Daily Mail breached the GDPR by publishing my private law firm data (which also is my home address) on its website but also used my photos without my permission. These two acts are injurious breaches of privacy.

6. **Journalistic ethics.** The tweet I wrote was an accurate depiction of a chronic problem in NYC, unlicensed vendors. The trolls and **The Daily Mail** blew the exchange, which lasted all of five minutes, way out of proportion. **The Daily Mail** did so at my huge expense. After the storm that erupted around my tweet, NYC Councilman Robert Holden took up the issue of unlicensed vendors as has Mayor Adams (most recently evicting the illegal vendors on the Brooklyn Bridge), which vindicated me. I did not do anything wrong. Again, because one of the two girls in Riverside Park started chasing after me when she saw me taking a picture and got in my face, I called the police when she refused to leave me alone. I felt physically aggressed and calling 911 was the only option I saw at that moment to prevent something bad from happening. Did I make the wrong choice? That was the best I could do in the moment.

The **Society of Professional Journalists** offers code of ethics which **The Daily Mail** has breached by publishing the Article.[3] Specifically, the code of ethics states, among other things:

*The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues. Conscientious journalists from all media and specialties strive to serve the public with thoroughness and honesty. Professional integrity is the cornerstone of a journalist's credibility.*

Importantly, the code of ethics demands that journalists should, "*minimize harm*". This needs no further explanation, and it is a fact that the Article was

---

[3] https://journalistsresource.org/home/code-of-ethics/

Page 8 of 11

8 of 11

3/14/25, 5:00 AM

DocuSign Envelope ID: A055868E-652C-4862-B8BE-B94E9A7E883E

crafted to **maximize harm** as the lack of balance and fairness demonstrates. It was a professional hit.

The Article casts me as a villain, which is inaccurate. The interaction, which lasted not more than five minutes in real life, is emblematic of one of the many issues plaguing NYC – the lawlessness and the disrespect for "the Law".

The Article implies that I lied about calling the police. This is inaccurate. The cops might be understaffed or did not bother to record the complaint but make the complaint I did. The police did call me on the phone to get my side of the story and they must have spoken to the girls because they disappeared and never appeared again.

Without saying it explicitly, the Article also paints me as a racist and a bigot, which is rich, given that I am half Irish and half Egyptian and have lived in several countries around the world and worked and been friends with people from many walks of life. I couldn't do that if I were really a *"Karen"* as the Article asserts.

Rather than being a racist or bigot, I am a lawyer – that means that I see the world through the lens of *"compliance with the law"*. So, when I walk around NYC and see laws being broken and how it impacts the City negatively, I always see things through the lens of corruption and rule of law – not racism and xenophobia, as the Article suggests in error.

The Article wrongly casts me as a bully, bigot and hypocrite. I am none of those things. Surely, calling a seasoned international lawyer with my educational and professional credentials a *"Karen"* is well below the standard of journalistic ethics? I am not a public person and so why take me down like this? It is not just well below the standard of journalistic ethics; it is just nasty.

### *Personal Appeal*

The personas we present to the world on social media are often narrow and subject to misinterpretation. They get twisted and reframed according to the individual reader's personal bias. But it is a misconception that the Internet is forever.

In summation, behind @SonyaShaykhoun on Twitter/X is a lawyer who has had to fight tooth and nail for everything she got, from the age of 18 when my now deceased father's business missteps ended in bankruptcy and ensuing familial chaos that had long-lasting effects. It went from bad to worse when my younger sister Laura was date raped and had a nervous breakdown, ending her dreams of having a normal life, a life which ultimately ended in her suicide in 2008. I faced and overcame the

DocuSign Envelope ID: A055866E-652C-4862-B8BE-B94E9A7E883E

incredible challenges as an American woman in the Middle East, where I often say I got my *"Ph.D. in Street Smarts"*.

I am the first person to admit that my Twitter/X takes make people angry. I have an uncanny ability to piss people off. But should I be subjected to ugly and potentially dangerous threats, defamation, constant attacks and online bullying by weaponizing the Article, and threats of excommunication from society and disbarment? You and your writers, even the trolls on X, might not agree with my takes. But does that mean you have to ruin my life for clicks??? Isn't this unethical and abuse of power? Does that mean that your journalists get to drag my name – my family name – through the mud? That perhaps is the most heartbreaking – to make me, Sonya Shaykhoun, the child of immigrants, synonymous with a *"bigoted Karen"*. You might as well have just killed me.

Thanks to the Article, my herculean efforts to build my own law practice in NYC are under serious threat and stunted. Anyone who Googles me will see the Article and think that I am a racist Karen, despite the support I have gotten from other New Yorkers, lawyers, and Americans who reached out to support me after **The Daily Mail** published the devastating Article.

The impact of the Article and the Karen moniker has been to reduce me to a meme and to cancel out all those years of study, blood, sweat and tears – both to get my education against all odds and to survive the vicissitudes of life as a female lawyer in Bahrain and Qatar and now New York City. I never once dreamed that America, my home, would be so hostile to me. Perhaps my extended time in those conservative Gulf States, where compliance with the rule of law in day-to-day life is a given, shaped my views and my expectations, but I am passionate about NYC and passionate about the rule of law – how are those crimes punishable by the destruction of my reputation, safety, name, and professional prospects by your publication?

Importantly, I have the authority to protect my tweets on my Twitter/X account and determine who gets to read my thoughts, but I do not have the ability to delete this damaging Article without taking legal action. **The Daily Mail** can, however, delete the Article and save me a lot of pain and suffering. Again, I am not a public figure.

I am not perfect, but I am certainly not the *"Karen"* portrayed by the Article. The Article describes five minutes in my life last summer and I am still paying for the resulting misfired tweet that upset so many people, rightly or wrongly, who continue to retaliate against me to shut me up. I don't have to read about living in the Cultural Revolution of Maoist China, I'm living it. And the Article is one of the weapons.

DocuSign Envelope ID: A055888E-652C-4862-B8BE-B94E9A7E883E

### *Resolution*

Please delete the Article **immediately** and take this thorn out of my side.

My tweet and the Article are old news. Since May 2023, the social perception and understanding of the problem that unlicensed vendors pose has been championed by our politicians, including Mayor Adams. While the tweet and Article are old news, the impact is not. When I am public on Twitter/X, someone regularly throws the Article in my face to discredit and taunt me.

I recently watched a short on YouTube by @SimonSquibb. Simon interviewed a New Yorker (it looks like it's in the Oculus) about his *"dream"*. The man said, he's just trying to put his life back together after the devastation that occurred during the Covid Pandemic.[4] I really resonated with this clip as I am sure many of us do – not only am I trying to build a life in NYC after long stints in the Middle East and Europe, but we are all trying to recover in the post-Pandemic era. Please have some compassion and decency; delete the Article.

I am writing to the other major publications who picked up the "story", to ask them to do the same. Obviously, if I am forced to litigate, I will join all parties in one law suit.

If you wish to discuss this on the phone or in person, I am happy to do so. **The Daily Mail** must unpublish the Article so I can put this fiasco behind me.

As a lawyer, I would remiss if I did not include that all rights are reserved. I would much prefer to resolve this issue amicably than to go to court and draw more attention to myself. If the Article is still online by COB March 31st, 2024, I will take legal action and sue for the maximum damages, a retraction and an apology.

Many thanks,

Sonya Shaykhoun

Sonya Shaykhoun, Esq.

Attachments: 5

---

[4] See: https://youtube.com/shorts/wtCdpWpWdcQ?si=lNa2bVB2GUGRSxFD

Page 11 of 11

 Outlook

---

## Re: [CONTACT] Formal Complaint

---

**From** Sonya Shaykhoun <sonya@shaykhounlaw.com>

**Date** Tue 4/30/2024 3:30 PM

**To**    Editorial Dailymailonline <editorial@mailonline.co.uk>; katrina.bell@dailymail.co.uk
<katrina.bell@dailymail.co.uk>

Dear Ms. Bell,

I trust you are well.

It has been over two months since I sent you my response fleshing out my complaint and
justification for the takedown notice - I imagine you are busy. That said, my complaint is serious
and merits attention, especially since the article your publication published about me eviscerated
my character and published my likeness and home address.

Please advise soonest as to what next steps you will take to accommodate my request to take down
the hit piece the Daily Mail published about me which has subsequently damaged my reputation.

Thank you.

Regards,
Sonya Shaykhoun, Esq.

---

## Sonya Shaykhoun
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

---

**From:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Sent:** Tuesday, February 27, 2024 10:52 PM
**To:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Subject:** Re: [CONTACT] Formal Complaint

Dear Ms. Bell:

As promised, please find my take-down notice and attachments.

Many thanks,

Firefox

Sonya Shaykhoun, Esq.

---

## Sonya Shaykhoun

Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

---

**From:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Sent:** Tuesday, February 27, 2024 7:36 AM
**To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Cc:** Editorial Dailymailonline <editorial@mailonline.co.uk>
**Subject:** RE: [CONTACT] Formal Complaint

Dear Ms Shaykhoun,

Thank you for your email.

Please set out what specific points in the article you think are inaccurate, along with what you believe is the corresponding correct position.

Kind regards,

Katrina

**Katrina Bell**
**Deputy Head of Compliance**

**From:** MailOnline <no-reply@mailonline.com>
**Sent:** Monday, February 26, 2024 9:51 PM
**To:** Corrections MOL <corrections@mailonline.co.uk>
**Subject:** [CONTACT] Formal Complaint

**External Sender~~**

Formal Complaint

User query:

**Your name:** Sonya Shaykhoun

**Your email:** sonya@shaykhounlaw.com

**Link to article:** https://www.dailymail.co.uk/news/article-12103463/Outrage-erupts-NYC-lawyer-unleashes-fury-vendors-selling-food-without-permit-local-park.html

**Details:** This article includes a lot of false information and is defamatory. I will sue Daily Mail via its NY office if you do not take it down immediately.

**Disclaimer**

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Associated Newspapers Ltd. Registered Office: Northcliffe House, 2 Derry St, Kensington, London, W8 5TT. Registered No 84121 England.

**EXHIBIT 6 (EXHIBIT 13 OF THE INITIAL COMPLAINT (RICHARD BEST'S RESPONSE, ¶ 62))**

 Outlook

---

**Request 202660: How would you rate the support you received?**

---

**From** The Independent Customer Services <customerservices@independent.co.uk>

**Date** Fri 11/1/2024 1:02 PM

**To** Sonya Shaykhoun <sonya@shaykhounlaw.com>

##- Please type your reply above this line -##



Dear Sonya,

We would love to hear what you think of our customer service. Please take a moment to answer one simple question by clicking either link below:

**How would you rate the support you received?**

Good, I'm satisfied

Bad, I'm unsatisfied

Here is a reminder of what your ticket was about:

---

**Richard Best** (The Independent)

Oct 31, 2024, 16:29 GMT

Dear Sonya

Thank you for you further message.

Having considered your complaint, I disagree that the article has damaged your good name and your ability to build a business. The article refers to events that took place in the public domain, both in Riverside Park and on social media. The article also contains commentary from you provided to us for this purpose. You willingly co-operated with us in the preparation of this article, and the article contains a fair and accurate report of events and your responses to them.

As far as the GDPR is concerned, this would be a matter for the ICO and not for the NY

Supreme Court. However, we do not normally amend or remove historic articles, as we believe it is in the public interest to maintain the integrity of our archive.

As I said, the article in question is an accurate report of events in which you were involved, and you voluntarily and deliberately contributed to the article by correspondence with the author for the explicit purpose of preparing an article for publication. The article also contains comments you (and others) made on social media. I do not believe you can have a reasonable expectation of privacy in relation to any of this material, and we consider this article to form a part of the public record.

In this case, we benefit from an exemption under the so-called 'right to be forgotten' and we are therefore not obliged to take down the article or amend it. For reference, the exemption is set out in Schedule 2 Part 5 of the Data Protection Act 2018.

I cannot, therefore, see any basis for removing the article from publication, and nor can I see any basis for litigation or a complaint to the Information Commissioner's Office.

I am sorry this will not be the response you were hoping for

Yours sincerely,

Richard

---

**Sonya**
Oct 30, 2024, 23:29 GMT

Dear Richard,

Thank you for getting back to me. I hope you agree to take down this article - it has had quite a negative impact on me, my life and my ability to make a life in NYC and build my business. I cannot imagine that the viral roasting of a lawyer in Manhattan has that much interest to readers in the UK.

Please note that I already have a lawsuit in progress against The Daily Beast and The Daily Mail. The lawsuit is not frivolous and there is more than one cause of action than mere defamation and defamation per se.

As a lawyer who spent four years advising Al Jazeera Media Network in Doha, Qatar, I can tell you that my arguments for taking this down are pretty robust. I do not usually lose my cases, by the way, including one law suit I fought in Doha against a corrupt employer. If this were me advising Al Jazeera, I would say, it is far cheaper to take it down than to hire lawyers in NYC to fight this case. Not to mention that I am going to file a complaint against the Independent for UK GDPR breaches (using all of my pictures without my consent).

In terms of timeline, my next visit to the Court is on Monday, November 4th. If I do not hear from you by then, I will assume you are happy to litigate and face the ICO.


Many thanks,
Sonya


---

**Sonya Shaykhoun**
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

---

**Richard Best** (The Independent)
Oct 29, 2024, 11:00 GMT

Dear Sonya

Thank you for contacting us in relation to this article, and apologies for a slight delay in getting back to you.

We will consider your request and respond substantively once we have done so.

Yours sincerely,
Richard Best

---

**Sonya**
Oct 19, 2024, 00:22 GMT+1

My name is Sonya Shaykhoun and I am the subject of an article that the Independent UK wrote about an incident that occurred to me in NYC on May 17. 2023. I "tweeted" about it and the story went viral. The Independent article is one of three articles which have damaged my good name and my ability to build my business. The article has been weaponized against me since it was published, both on LinkedIn and on Twitter. I need this article to come down ASAP.

If you do not take it down, I will file a motion to add you to my lawsuit in the NY Supreme Court against The Daily Beast and The Daily Mail.

Thank you.

Kind regards,
Sonya Shaykhoun, Esq.


Many thanks for your feedback.


[K2Z1GW-LZDWM]

**EXHIBIT 7 (EXHIBIT 14 OF THE INITIAL COMPLAINT (X TOS, ¶ 2))**

Page 50 of 52



Skip to main content

Terms of Service

- Terms of Service Archive (https://twitter.com/tos/previous)

Download PDF (https://cdn.cms-twdigitalassets.com/content/dam/legal-twitter/site-assets/2023-10-10/en/x-terms-of-service-23-09-29.pdf)

# Terms of Service

**We have made some updates to our Terms of Service. This version of the**

**Terms of Service will go into effect on November 15, 2024. Until then, the current Terms of Service continue to apply.**

# Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement – a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services without X's express written permission, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.

- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms. If you are a recipient of the X Service in the European Union, you may challenge certain decisions we make under the Digital Services Act (Regulation (EU) 2022/2065) via our internal process or via out-of-court dispute settlement as described here (https://help.x.com/ rules-and-policies/digital-services-act).

Please also note that these Terms incorporate our Privacy Policy (https://x.com/ privacy (https://x.com/privacy)) as well as other terms applicable to your use of the Services and your Content. Finally, these Terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service (https://x.com/tos), our Privacy Policy (https://x.com/privacy), our Rules and Policies (https://help.x.com/rules-and-policies), and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service (https://x.com/tos#intlTerms), our Privacy Policy (https://x.com/privacy), our Rules and Policies (https://help.x.com/rules-and-policies), and all incorporated policies.

# X Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your and other users' access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, with its registered office at 865 FM 1209, Building 2, Bastrop, TX 78602 U.S.A. The words "we," "us," and "our" mean X Corp.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person

accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) (https://x.com/privacy (https://www.x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations (https://help.x.com/rules-and-policies/x-report-violation#specific-violations) and https://help.x.com/managing-your-account/

suspended-x-accounts (https://help.x.com/managing-your-account/suspended-x-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)
Email: copyright@x.com

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to (i) analyze text and other information you provide and to otherwise provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post,

transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies (https://help.x.com/rules-and-policies), which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies (https://help.x.com/rules-and-policies) or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here (https://help.x.com/rules-and-policies/enforcement-options).

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy (https://x.com/privacy).

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html) (https://legal.x.com/purchaser-terms.html (https://legal.x.com/purchaser-terms.html)).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites) (https://developer.x.com/docs/x-for-websites (https://developer.x.com/docs/x-for-websites)), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards) (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards)), Public API (https://developer.x.com/docs) (https://developer.x.com/docs (https://developer.x.com/docs)), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter) (https://developer.x.com/docs/authentication/guides/log-in-with-twitter (https://developer.x.com/docs/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) (https://developer.x.com/developer-terms/agreement (https://developer.x.com/developer-terms/agreement)) and Developer Policy (https://developer.x.com/developer-terms/policy) (https://developer.x.com/developer-terms/policy (https://developer.x.com/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform,

transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms (https://developer.x.com/developer-terms). Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x) (https://hackerone.com/x (https://hackerone.com/x)). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms) (https://ads.x.com/terms (https://ads.x.com/terms)).

# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use

the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy (https://help.x.com/rules-and-policies/platform-manipulation) or any other Rules and Policies (https://help.x.com/rules-and-policies), including our Misuse of Reporting Features Policy (https://help.x.com/rules-and-policies/misuse-of-reporting-features); or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See <u>https://help.x.com/ managing-your-account/how-to-deactivate-x-account</u> (https://help.x.com/managing-your-account/how-to-deactivate-x-account)for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or <u>our Rules and Policies</u> (https://help.x.com/rules-and-policies), (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our <u>Help Center</u> (https://help.x.com/forms/account-access/appeals) (https://help.x.com/ forms/account-access/appeals (https://help.x.com/forms/account-access/appeals)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives,

partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

# Limitation of Liability

NOTWITHSTANDING ANY OTHER TERMS TO THE CONTRARY, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY USER OR THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

BY AGREEING TO THESE TERMS OR USING THE SERVICES, YOU AGREE, TO

THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THAT THE X ENTITIES ARE NOT RESPONSIBLE OR LIABLE TO YOU OR OTHERS FOR THE ACTIONS OR CONDUCT OF USERS AND THIRD PARTIES ON THE SERVICES, OR FOR ANY CONTENT USERS AND THIRD PARTIES SHARE ON THE SERVICES, INCLUDING OFFENSIVE, DEFAMATORY, ILLEGAL OR OTHER OBJECTIONABLE CONTENT.

# Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - $15,000 USD per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/ or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or other equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/ tos (https://x.com/tos), will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state

courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of Texas (excluding choice of law).

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us (https://help.x.com/forms).

**Effective:** November 15, 2024

Archive of Previous Terms (https://x.com/tos/previous)

# X Terms of Service

## If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your and other users' access to and use of the services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and Twitter International Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services, with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we," "us," and "our," mean Twitter International Unlimited Company.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The

words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) (https://x.com/privacy (https://www.x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. Content recommendations are made based on a combination of factors: how you engage with the Services, the topics you have indicated that you are interested in, and what other users who share your similar interests like. Adjustments can be made in your settings, and additional information can be found in our Help Center (https://help.x.com/resources/recommender-systems (https://help.x.com/resources/recommender-systems)). All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement,

including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation (https://help.x.com/rules-and-policies/x-report-violation) and https://help.x.com/managing-your-account/suspended-x-accounts (https://help.x.com/managing-your-account/suspended-x-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)
Email: copyright@x.com

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to (i) provide, promote, and improve the

Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies (https://help.x.com/rules-and-policies), which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies (https://help.x.com/rules-and-policies) or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here (https://help.x.com/rules-and-policies/enforcement-options).

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies (https://help.x.com/rules-and-policies) or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy (https://x.com/privacy).

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html) (https://legal.x.com/purchaser-terms.html (https://legal.x.com/purchaser-terms.html)).

If you use developer features of the Services, including but not limited to X for

Websites (https://developer.x.com/docs/x-for-websites) (https://developer.x.com/docs/x-for-websites (https://developer.x.com/docs/x-for-websites)), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards) (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-card (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-card)), Public API (https://developer.x.com/docs) (https://developer.x.com/docs (https://developer.x.com/docs)), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter) (https://developer.x.com/docs/authentication/guides/log-in-with-twitter (https://developer.x.com/docs/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement)(https://developer.x.com/developer-terms/agreement (https://developer.x.com/developer-terms/agreement)) and Developer Policy (https://developer.x.com/developer-terms/policy) (https://developer.x.com/developer-terms/policy (https://developer.x.com/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms (https://developer.x.com/developer-terms). Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x) (https://hackerone.com/x (https://hackerone.com/x)). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms) (https://ads.x.com/terms (https://ads.x.com/terms)).

# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or

deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header

or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy (https://help.x.com/rules-and-policies/platform-manipulation) or any other Rules and Policies (https://help.x.com/rules-and-policies), including our Misuse of Reporting Features Policy (https://help.x.com/rules-and-policies/misuse-of-reporting-features); or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account (https://help.x.com/managing-your-account/how-to-deactivate-x-account) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies (https://help.x.com/rules-and-policies); (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals) (https://help.x.com/forms/account-access/appeals (https://help.x.com/forms/account-access/appeals)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that Twitter International Unlimited Company, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - €15,000 EUR per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/ or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/ tos (https://x.com/tos), will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

To the extent permitted by law, all disputes related to these Terms or the Services, including without limitation disputes related to or arising from other

users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively before a competent court in Ireland without regard to conflict of law provisions and will be governed by Irish law, notwithstanding any other agreement between you and us to the contrary. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us (https://help.x.com/ forms).

**Effective:** November 15, 2024

Archive of Previous Terms (https://x.com/tos/previous)

# Terms of Service

## Effective until November 15, 2024

**We have made some updates to our Terms of Service. The updated Terms of Service will go into effect on November 15, 2024. The current Terms of Service are located below.**

# Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement– a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.

- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms.

Please also note that these Terms incorporate our Privacy Policy (https://x.com/ privacy (https://x.com/privacy)) as well as other terms applicable to your use of the Services and your Content. Finally, these terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service (https://x.com/tos), our Privacy Policy (https://x.com/privacy), our Rules and Policies (https://help.x.com/rules-and-policies), and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service (https://x.com/tos#intlTerms), our Privacy Policy (https://x.com/privacy), our Rules and Policies (https://help.x.com/rules-and-

policies), and all incorporated policies.

# X Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https:// help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. The words "we," "us," and "our" mean X Corp.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) (https://www.x.com/privacy (https://

www.x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations (https://help.x.com/rules-and-policies/x-report-violation#specific-violations) and https://help.x.com/managing-your-account/suspended-x-accounts (https://help.x.com/managing-your-account/suspended-x-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)) or contacting our designated copyright agent at:

X Corp.

Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)
Email: copyright@x.com

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses,

consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies (https://help.x.com/rules-and-policies), which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies (https://help.x.com/ rules-and-policies) or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here (https://help.x.com/ rules-and-policies/enforcement-options).

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy (https://x.com/privacy).

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html) (https://legal.x.com/purchaser-terms.html (https://legal.x.com/purchaser-terms.html)).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/twitter-for-websites) (https://developer.x.com/docs/twitter-for-websites (https://developer.x.com/docs/twitter-for-websites)), X Cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards) (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards)), Public API (https://developer.x.com/docs) (https://developer.x.com/docs (https://developer.x.com/docs)), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter) (https://developer.x.com/docs/authentication/guides/log-in-with-twitter (https://developer.x.com/docs/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) (https://developer.x.com/developer-terms/agreement (https://developer.x.com/developer-terms/agreement)) and Developer Policy (https://developer.x.com/developer-terms/policy) (https://developer.x.com/developer-terms/policy (https://developer.x.com/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms (https://developer.x.com/developer-terms). Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x) (https://hackerone.com/x (https://hackerone.com/x)). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms) (https://ads.x.com/terms (https://ads.x.com/terms)).

# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while

accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; (v) engage in any conduct that violates our Platform Manipulation and Spam Policy (https://help.x.com/rules-and-policies/platform-manipulation) or any other Rules and Policies (https://help.x.com/rules-and-policies); or (vi) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/ managing-your-account/how-to-deactivate-x-account (https://help.x.com/managing-your-account/how-to-deactivate-x-account)for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies (https://help.x.com/rules-and-policies), (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we

may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals) (https://help.x.com/forms/account-access/appeals (https://help.x.com/forms/account-access/appeals)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X

ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at x.com/tos (https://x.com/tos), will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum. To the extent permitted by law, you also waive the right to participate as a

plaintiff or class member in any purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us (https://help.x.com/forms).

**Effective:** September 29, 2023

Archive of Previous Terms (https://x.com/tos/previous)

# X Terms of Service

## If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your access to and use of the services,

including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https:// help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and Twitter International Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services, with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we," "us," and "our," mean Twitter International Unlimited Company.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) (https://www.x.com/privacy (https:// www.x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation (https://help.x.com/rules-and-policies/x-report-violation) and https://help.x.com/managing-your-account/suspended-x-accounts (https://help.x.com/managing-your-account/suspended-x-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.x.com/forms/dmca (https://help.x.com/forms/dmca)
Email: copyright@x.com

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to

copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies (https://help.x.com/rules-and-policies), which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies (https://help.x.com/rules-and-policies) or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here (https://help.x.com/rules-and-policies/enforcement-options).

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies (https://help.x.com/rules-and-policies) or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-

identifying information to third parties except in accordance with our Privacy Policy (https://x.com/privacy).

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html) (https://legal.x.com/purchaser-terms.html (https://legal.x.com/purchaser-terms.html)).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/twitter-for-websites) (https://developer.x.com/docs/twitter-for-websites (https://developer.x.com/docs/twitter-for-websites)), X Cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards) (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards)), Public API (https://developer.x.com/docs) (https://developer.x.com/docs (https://developer.x.com/docs)), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter) (https://developer.x.com/docs/authentication/guides/log-in-with-twitter (https://developer.x.com/docs/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement)(https://developer.x.com/developer-terms/agreement (https://developer.x.com/developer-terms/agreement)) and Developer Policy (https://developer.x.com/developer-terms/policy) (https://developer.x.com/developer-terms/policy (https://developer.x.com/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms (https://developer.x.com/developer-terms). Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x) (https://hackerone.com/x (https://hackerone.com/x)). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms) (https://ads.x.com/terms (https://ads.x.com/terms)).

# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations

in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; (v) engage in any conduct that violates our Platform Manipulation and Spam Policy (https://help.x.com/rules-and-policies/platform-manipulation) or any other Rules and Policies (https://help.x.com/rules-and-policies); or (vi) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account (https://help.x.com/managing-your-account/how-to-deactivate-x-account) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies (https://help.x.com/rules-and-policies); (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially

viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals) (https://help.x.com/forms/account-access/appeals (https://help.x.com/forms/account-access/appeals)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that X Corp., its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at x.com/tos (https://x.com/tos), will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

To the extent permitted by law, you waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as

possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us (https://help.x.com/forms).

**Effective:** September 29, 2023

Archive of Previous Terms (https://x.com/tos/previous)

© 2024 X Corp.
Cookies (https://help.x.com/rules-and-policies/twitter-cookies)
Privacy (https://x.com/privacy)
Terms and conditions (https://x.com/tos)

English

Terms of Service (https://x.com/en/tos)

- English (https://x.com/en/tos)
- Bahasa Indonesia (https://x.com/id/tos)
- Español (https://x.com/es/tos)
- Français (https://x.com/fr/tos)
- Deutsch (https://x.com/de/tos)
- Italiano (https://x.com/it/tos)
- 日本語 (https://x.com/ja/tos)
- 한국어 (https://x.com/ko/tos)
- Português (https://x.com/pt/tos)
- Русский (https://x.com/ru/tos)
- Slovenčina (https://x.com/sk/tos)
- Български (https://x.com/bg/tos)
- Čeština (https://x.com/cs/tos)
- Dansk (https://x.com/da/tos)
- Ελληνικά (https://x.com/el/tos)
- Eesti (https://x.com/et/tos)
- Suomi (https://x.com/fi/tos)
- Gaeilge (https://x.com/ga/tos)
- Hrvatski (https://x.com/hr/tos)
- Magyar (https://x.com/hu/tos)
- Lietuvių (https://x.com/lt/tos)
- Latviešu (https://x.com/lv/tos)
- Malti (https://x.com/mt/tos)
- Nederlands (https://x.com/nl/tos)
- Polski (https://x.com/pl/tos)
- Română (https://x.com/ro/tos)
- Slovenščina (https://x.com/sl/tos)
- Svenska (https://x.com/sv/tos)
- العربية (https://x.com/ar/tos)
- فارسی (https://x.com/fa/tos)
- Հայերեն (https://x.com/hy/tos)
- ខ្មែរ (https://x.com/km/tos)
- Tagalog (https://x.com/tl/tos)
- Tiếng Việt (https://x.com/vi/tos)
- 简体中文 (https://x.com/zh-cn/tos)
- 繁體中文 (https://x.com/zh-tw/tos)
- Lus Hmoob (https://x.com/hmn/tos)

10/18/24, 8:36 PM



# X Privacy Policy

## Before you scroll, read this

It's really hard to make everyone happy with a Privacy Policy. Most people who use X want something short and easy to understand. While we wish we could fit everything you need to know into a post, our regulators ask us to meet our legal obligations by describing them all in a lot of detail.

With that in mind, we've written our Privacy Policy as simply as possible to empower you to make informed decisions when you use X by making sure you understand and have control over the information we collect, how it's used, and when it's shared.

So if you skip reading every word of the Privacy Policy, at least know this:

**X is a public platform**

Learn what's viewable & searchable

**We collect some data about you**

Learn what we collect & how

**Affiliate services may have their own policies**

Learn about affiliates

**We use your data to make X better**

Learn how we make your info work

**You can control your experience**

Learn how to update your settings

**If you have questions about how we use data, just ask**

Learn how to contact us



# 1. Information We Collect

**The information we collect when you use X falls into three categories.**

## 1.1 Information you provide us.

To use some of our products and services you need to have an account, and to create an account, you need to provide us certain information. Likewise, if you use our paid products and services, we cannot provide them to you without getting payment information. Basically, certain information is necessary if you want to use many of our products and services.

- **Personal Accounts.** If you create an account, you must provide us with some information so that we can provide our services to you. This includes a display name (for example, "Creators"); a username (for example, @XCreators); a password; an email address or phone number; a date of birth; your display language; and third-party single sign-in information (if you choose this sign-in method). You can also choose to share your location in your profile and posts, and to upload your address book to X to help find people you may know. Your profile information, which includes your display name and username, is always public, but you can use either your real name or a pseudonym. And remember, you can create multiple X accounts, for example, to express different parts of your identity, professional or otherwise.

- **Professional Accounts.** If you create a professional account, you also need to provide us with a professional category, and may provide us with other information, including street address, contact email address, and contact phone number, all of which will always be public.

- **Payment Information.** In order to purchase ads or other offerings provided as part of our paid products and services you will need to provide us payment information, including your credit or debit card number, card expiration date, CVV code, and billing address.

- **Preferences.** When you set your preferences using your settings, we collect that information so that we can respect your preferences.

- **Biometric Information.** Based on your consent, we may collect and use your biometric information for safety, security, and identification purposes.

- **Job Applications / Recommendations.** We may collect and use your personal information (such as your biographical information, employment history, educational history, employment preferences, skills and abilities, and job search activity and engagement, in addition to the information we already collect as disclosed in the "Information we collect when you use X" section of our Privacy Policy below) to recommend potential jobs to you, to share with potential employers when you apply for a job, to enable connections for professional opportunities, and to show you more relevant advertising.

X

## 1.2 Information we collect when you use X.

When you use our services, we collect information about how you use our products and services. We use that information to provide you with products and services, to help keep X more secure and respectful for everyone, and more relevant to you.

**Usage Information.** We collect information about your activity on X, including:

- Posts and other content you post (including the date, application, and version of X) and information about your broadcast activity (e.g., Spaces), including broadcasts you've created and when you created them, your lists, bookmarks, and Communities you are a part of.

- Your interactions with other users' content, such as reposts, likes, bookmarks, shares, downloads, replies, if other users mention or tag you in content or if you mention or tag them, and broadcasts you've participated in (including your viewing history, listening, commenting, speaking, and reacting).

- How you interact with others on the platform, such as people you follow and people who follow you, metadata related to Encrypted Messages, and when you use Direct Messages, including the contents of the messages, the recipients, and date and time of messages.

- If you communicate with us, such as through email, we will collect information about the communication and its content.

- We collect information on links you interact with across our services (including in our emails sent to you).

**Purchase and payments.** To allow you to make a payment or send money using X features or services, including through an intermediary, we may receive information about your transaction such as when it was made, when a subscription is set to expire or auto-renew, and amounts paid or received.

**Device Information.** We collect information from and about the devices you use to access X, including:

- Information about your connection, such as your IP address, browser type, and related information.

- Information about your device and its settings, such as device and advertising ID, operating system, carrier, language, memory, apps installed, and battery level.

- Your device address book, if you've chosen to share it with us.

**Location Information.** When you use X, we collect some information about your approximate location to provide the service you expect, including showing you relevant ads. You can also

X

choose to share your current precise location or places where you've previously used X by enabling these settings in your account.

**Inferred Identity.** We may collect or receive information that we use to infer your identity as detailed below:

- When you sign into X on a browser or device, we will associate that browser or device with your account. Subject to your settings, we may also associate your account with browsers or devices other than those you use to sign into X (or associate your signed-out device or browser with other browsers or devices or X-generated identifiers).

- When you provide other information to X, including an email address or phone number, we associate that information with your X account. Subject to your settings, we may also use this information in order to infer other information about your identity, for example by associating your account with hashes of email addresses that share common components with the email address you have provided to X.

- When you access X and are not signed in, we may infer your identity based on the information we collect.

**Log Information.** We may receive information when you view content on or otherwise interact with our products and services, even if you have not created an account or are signed out, such as:

- IP address and related information; browser type and language; operating system; the referring webpage; access times; pages visited; location; your mobile carrier; device information (including device and application IDs); search terms and IDs (including those not submitted as queries); ads shown to you on X; X-generated identifiers; and identifiers associated with cookies. We also receive log information when you click on, view, or interact with links on our services, including when you install another application through X.

**Advertisements.** When you view or interact with ads we serve on or off X, we may collect information about those views or interactions (e.g., watching a video ad or preroll, clicking on an ad, interacting with reposts of or replies to an ad).

**Cookies and similar technologies.** Like many websites, we use cookies and similar technologies to collect additional website usage data and to operate our services. Cookies are not required for many parts of our products and services such as searching and looking at public profiles. You can learn more about how we use cookies and similar technologies here.

**Interactions with our content on third-party sites.** When you view our content on third-party websites that integrate X content, such as embedded timelines or post buttons, we may receive log information that includes the web page you visited.



## 1.3 Information we receive from third parties.

When you use other online products and services, they may share information about that usage with us.

**Ad Partners, Developers, Publishers.** Our ad and business partners share information with us such as browser cookie IDs, X-generated identifiers, mobile device IDs, hashed user information like email addresses, demographic or interest data, and content viewed or actions taken on a website or app. Some of our ad partners, particularly our advertisers, also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by X from the websites and apps of ad partners and affiliates may be combined with the other information you share with X and that X receives, generates, or infers about you described elsewhere in this Privacy Policy.

**Other Third Parties, Account Connections, and Integrations.** We may receive information about you from third parties who are not our ad partners, such as other X users, developers, and partners who help us evaluate the safety and quality of content on our platform, our corporate affiliates, and other services you link to your X account. You may choose to connect your X account to your account on another service, and that other service may send us information about your account on that service.

# 2. How We Use Information

Breaking down how we use the information we collect is not simple because of the way the systems that bring our services to you work. For example, the same piece of information may be used differently for different purposes to ultimately deliver a single service. We think it's most useful to describe the five main ways we use information and if you have questions that are not answered, you can always contact us. Here we go:

## 2.1 Operate, improve, and personalize our services.

We use the information we collect to provide and operate X products and services. We also use the information we collect to improve and personalize our products and services so that you have a better experience on X, including by showing you more relevant content and ads, suggesting people and topics to follow, enabling and helping you discover affiliates, third-party apps, and services. We may use the information we collect and publicly available information to help train our machine learning or artificial intelligence models for the purposes outlined in this policy.

We may use the information we collect from accounts of other services that you choose to connect to your X account to provide you features like cross-posting or cross-service authentication, and to operate our services.

We use your contact information to help others find your account if your settings permit, including through third-party services and client applications.

X

We use your information to provide our advertising and sponsored content services subject to your settings, which helps make ads on X more relevant to you. We also use this information to measure the effectiveness of ads and to help recognize your devices to serve you ads on and off of X. Some of our ad partners also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by X from the websites and apps of ad partners and affiliates may be combined with the other information you share with X and that X receives, generates, or infers about you, as described elsewhere in our Privacy Policy.

## 2.2  Foster safety and security.

We use information we collect to provide for the safety and security of our users, our products, services, and your account. This includes verifying your identity, authenticating your account, and defending against fraud, unauthorized use, and illegal activity. We also use the information to evaluate and affect the safety and quality of content on X - this includes investigating and enforcing our policies and and terms, as well as applicable law.

## 2.3 Measure, analyze and make our services better.

We use the information we collect to measure and analyze the effectiveness of our products and services and to better understand how you use them in order to make them better.

## 2.4 Communicate with you about our services.

We use the information we collect to communicate with you about our products and services, including about product updates and changes to our policies and terms. If you're open to hearing from us, we may also send you marketing messages from time to time.

## 2.5 Research.

We use information you share with us, or that we collect to conduct research, surveys, product testing, and troubleshooting to help us operate and improve our products and services.

# 3. Sharing Information

You should know the ways we share your information, why we share it, and how you can control it. There are five general ways we share your information.

## 3.1 When you post and share.

**With the general public.** You are directing us to disclose that information as broadly as possible. X content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public does not need to be signed in to view some content on X. They may also find X content off of X: for example, from search query results on

X

Internet search engines or videos downloaded and reshared elsewhere (depending on your settings).

**With other X users.** Depending on your settings, and based on the X products and services you use, we share:

- Your interactions with X content of other users, such as replies, and people you follow.

- Content you send to a specific X user, such as through Direct Messages. Please keep in mind that if you've shared information like Direct Messages or protected posts with someone else who accesses X through a third-party service, the information may be shared with the third-party service.

**With partners.** Depending on your settings, we also provide certain third parties with information to help us offer or operate our products and services. You can learn more about these partnerships in our Help Center. You can control whether X shares your personal information with these partners by using the "Data sharing with business partners" option in your Privacy & Safety settings. (This setting does not control sharing described elsewhere in this Privacy Policy, such as when we share information with our service providers, or through partnerships other than as described in this Help Center article.)

## 3.2 With third parties & third-party integrations.

**With service providers.** We may share your information with our service providers that perform functions and provide services on our behalf, including payment services providers who facilitate payments; service providers that host our various blogs and wikis; service providers that help us understand the use of our services; applicant tracking system providers to send and receive applicant and job data to potential employers; and those that provide fraud detection services.

**With advertisers.** Advertising revenue enables us to provide our products and services. Advertisers may learn information from your engagement with their ads on or off X. For example, if you click on an external link or ad on our services, that advertiser or website operator might figure out that you came from X, along with other information associated with the ad you clicked, such as characteristics of the audience it was intended to reach and other X-generated identifiers for that ad. They may also collect other personal information from you, such as cookie identifiers, or your IP address.

**Third-party content & integrations.** We share or disclose your information with your consent or at your direction, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. Similarly, to improve your experience, we work with third-party partners to display their video content on X or to allow cross-platform sharing. When you watch or otherwise interact with content from our video or cross-platform sharing partners, they may receive and process your personal information as described in their privacy policies. For video content, you can adjust your autoplay settings if you prefer that content not to play automatically.

X

**Third-party collaborators.** Depending on your settings, or if you decide to share your data, we may share or disclose your information with third parties. If you do not opt out, in some instances the recipients of the information may use it for their own independent purposes in addition to those stated in X's Privacy Policy, including, for example, to train their artificial intelligence models, whether generative or otherwise.

**Through our APIs.** We use technology like APIs and embeds to make public X information available to websites, apps, and others for their use, for example, displaying posts on a news website or analyzing what people say on X. We generally make this content available in limited quantities for free and charge licensing fees for large-scale access. We have standard terms that govern how this information can be used, and a compliance program to enforce these terms. But these individuals and companies are not affiliated with X, and their offerings may not reflect updates you make on X. For more information about how we make public data on X available to the world, visit https://developer.x.com.

## 3.3 When required by law, to prevent harm, or in the public interest.

We may preserve, use, share, or disclose your information if we believe that it is reasonably necessary to:

- comply with a law, regulation, legal process, or governmental request;

- protect the safety of any person, protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services;

- explain why we have removed content or accounts from our services (e.g., for a violation of our Rules);

- address fraud, security, or technical issues; or

- protect our rights or property, or the rights or property of those who use our services.

We may also use different signals and your data to infer, preserve, use, share, or disclose your age and identity information in order to comply with regulatory requirements as well as for safety, security, fraud, know-your-customer, know-your-business, and identity verification, as the case may be. We may also share or disclose your age and identity information with our partners, service providers, and others for these purposes.

## 3.4 With our Affiliates.

We may share information amongst our affiliates to provide our products and services.

X

## 3.5 As a result of a change in ownership.

We may share, sell, or transfer information about you in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy. This Privacy Policy will apply to your personal information that is shared with (before and after the close of any transaction) or transferred to the new entity.

# 4. How Long We Keep Information

We keep different types of information for different periods of time, depending on how long we need to retain it in order to provide you with our products and services, to comply with our legal requirements and for safety and security reasons. For example:

- We keep your profile information, such as your display name, user name, password and email address for the duration of your account. We cannot provide you with our products and services without retaining this information.

- We keep your usage information, such as the content you post, your interactions with other users' content and how you interact with others on the platform for the duration of your account or until such content is removed.

- We keep your payment information, including your credit or debit card number and billing address for the duration you use our paid products and services. Records of transactions will be kept for longer, in accordance with applicable law.

- If you communicate with us, such as through email, we will keep information about the communication and its content for up to 18 months, unless it is necessary for us to retain it for a longer period to comply with our legal obligations or to exercise or defend our legal rights.

- We generally collect device information, location information, inferred identity information and log information using cookies. We keep cookies and information collected using cookies for up to 13 months. You can learn more about how we use cookies and similar technologies here.

- We keep information about your views or interactions with ads on or off X, as well as how you interact with our content on third-party sites for up to 90 days.

- We keep information shared by ad and business partners for up to 90 days.

- Where you violate our Rules and your account is suspended, we may keep the identifiers you used to create the account (such as your email address or phone number) indefinitely to prevent repeat policy offenders from creating new accounts.

We may need to keep certain information longer than our policies specify in order to comply with legal requirements and for safety and security reasons. For example:

𝕏

- **To comply with a law, regulation, legal process or governmental request.** Including in order to adhere to a legally appropriate preservation request made by law enforcement. You can read more about law enforcement access here.

- **In connection with legal claims, litigation and regulatory matters.** Including where it is reasonably necessary to retain information relating to your account in order to defend X against legal claims.

- **To maintain the safety and security of our products and services.** Including where it is necessary to store your information longer in order to investigate and fight abuse on our products and services.

Remember public content can exist elsewhere even after it is removed from X. For example, search engines and other third parties may retain copies of your posts longer, based upon their own privacy policies, even after they are deleted or expire on X. You can read more about search visibility here.

# 5. Take Control

## 5.1 Access, Correction, Portability.

You can access, correct, or modify the information you provided to us by editing your profile and adjusting your account settings.

- You can learn more about the information we have collected or inferred about you in Your X Data and request access to additional information here.

- You can download a copy of your information, such as your posts, by following the instructions here.

To protect your privacy and maintain security, we take steps to verify your identity before granting you access to your personal information or complying with a deletion, portability, or other related request. We may, in certain situations, reject your request for access, correction, or portability, for example, we may reject access where you are unable to verify your identity.

## 5.2 Deleting your Information.

If you follow the instructions here, your account will be deactivated and your data will be queued for deletion. When deactivated, your X account, including your display name, username, and public profile, will no longer be viewable on X.com, X for iOS, and X for Android. For up to 30 days after deactivation it is still possible to restore your X account if it was accidentally or wrongfully deactivated.



## 5.3 Objecting to, Restricting, or Withdrawing your Consent.

You can manage your privacy settings and other account features here. If you change your settings it may take some time for your choices to be fully reflected throughout our systems. You may also notice changes in your X experience or limitations in your ability to access certain features depending on the settings you've adjusted. You may also manage additional settings when interacting with certain content and features on different parts of the platform, such as whether a Space is recorded, or whether videos you upload are downloadable by others.

## 5.4 Authorized Agent Requests.

To submit a request related to access, modification, or deletion of your information, or someone else's information if you are their authorized agent, you may also contact us as specified in the How To Contact X section of our Privacy Policy below. We may require you to provide additional information for verification.

# 6. Your Rights and Ours

We provide X to people all over the world and provide many of the same privacy tools and controls to all of our users regardless of where they live. However, your experience may be slightly different than users in other countries to ensure X respects local requirements.

## 6.1 We have specific legal bases to use your information.

X has carefully considered the legal reasons it is permitted to collect, use, share and otherwise process your information. If you want to dig in to learn more and better understand the nuances, we'd encourage you to check out this additional information about data processing. And no, we don't sell your personal information.

## 6.2 We move your data to make X work for you.

Just as you use X to seamlessly participate in global conversations with people in countries all over the world, X must move information across borders and to different countries around the world to support the safe and reliable service you depend on. For example, if you live in Europe and are having a conversation with someone in the United States, information has to move between those countries to provide that experience – it's what you expect from us.

We also use data centers and cloud providers, and engage our affiliates and third-party partners and service providers located in many parts of the world to help us provide our services. Before we move data between countries we look at the risks that may be presented to the data and rely on standard contractual clauses (SCCs), where applicable, to ensure your data rights are protected. To request a copy of the SCCs, please contact us here. If data will be shared with a third party, we require them to maintain the same protections over your data that we provide directly.



X is a participant in the EU-US Data Privacy Framework (DPF), the Swiss-US DPF and the UK Extension to the EU-US DPF. X complies with the DPF Principles for all its processing of personal data received from the European Union, Switzerland and the UK, in reliance on the EU-US DPF, Swiss-US DPF and UK Extension to the EU-US DPF, respectively. If you have an inquiry or complaint related to our participation in the DPF, please contact us here. As part of our participation in the DPF, if you have a dispute with us about our adherence to the DPF Principles, we will seek to resolve it through our internal complaint resolution process, alternatively through the US-based independent dispute resolution body JAMS, and under certain conditions, through the DPF Arbitration Process following the procedures and subject to the conditions described in Annex 1 to the DPF Principles. DPF participants are subject to the investigatory and enforcement powers of the US Federal Trade Commission and other authorized statutory bodies. Under certain circumstances, participants may be liable for the transfer of personal data from the EU, Switzerland and the UK to third parties outside the EU, Switzerland and the UK. Learn more about the EU-US DPF, the Swiss-US DPF and the UK Extension to the EU-US DPF here.

# 7. X's Audience

Our services are not directed to children, and you may not use our services if you are under the age of 13. You must also be old enough to consent to the processing of your personal data in your country (in some countries we may allow your parent or guardian to do so on your behalf). We do not knowingly collect personal information from children under 13. If you become aware that your child has provided us with personal information without your consent, please contact us here. If we become aware that a child under 13 has provided us with personal information, we take steps to remove such information and terminate the child's account. You can find additional resources for parents and teens here.

# 8. Changes To This Privacy Policy

The most current version of this Privacy Policy governs our processing of your personal data and we may revise this Privacy Policy from time to time as needed.

If we do revise this Privacy Policy and make changes that are determined by us to be material, we will provide you notice and an opportunity to review the revised Privacy Policy before you continue to use X.

# 9. General

The X Privacy Policy is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X Privacy Policy shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X Privacy Policy.



# 10. How To Contact X

We want to hear from you if you have thoughts or questions about this Privacy Policy. You can contact us via our Privacy Policy Inquiries page or by writing to us at the appropriate address below. Information about our handling of California Consumer Privacy Act (CCPA) requests is available here. Information about our handling of "Consumer Health Data" and associated requests as defined under Washington State's My Health My Data Act and other similar state laws is available here.

If you live in the United States or any other country outside of the European Union, EFTA States, or the United Kingdom, the data controller responsible for your personal data is X Corp., with an address of:

**X Corp.**
**Attn: Privacy Policy Inquiry**
**865 FM 1209, Building 2**
**Bastrop, TX 78602**

If you live in the European Union, EFTA States, or the United Kingdom, the data controller responsible for your personal data is Twitter International Unlimited Company, with an address of:

**Twitter International Unlimited Company**
**Attn: Data Protection Officer**
**One Cumberland Place, Fenian Street**
**Dublin 2, D02 AX07 IRELAND**

If you live in Switzerland, you can also contact our appointed representative at the following address:

**Twitter Switzerland GmbH**
**Attn: Data Protection Officer**
**c/o Wasag Treuhand AG**
**Bolligenstrasse 18**
**Bern, 3006, SWITZERLAND**

If you wish to raise a concern about our data processing practices, you have the right to do so with your local supervisory authority or Twitter International Unlimited Company's lead supervisory authority, the Irish Data Protection Commission, using the contact details listed on their website.

**Effective: November 15, 2024**

**EXHIBIT 8: PLAINTIFF'S ORDER OF VOLUNTARY WITHDRAWAL**

FILED: NEW YORK COUNTY CLERK 01/15/2025 04:40 PM    INDEX NO. 100558/2024
NYSCEF DOC. NEW YORK COUNTY CLERK 12/31/2024 01:39 PM    RECEIVED NYSCEF: 01/15/2025
NYSCEF DOC. NO. 26    RECEIVED NYSCEF: 12/31/2024

At I.A.S. Part 55 of the Supreme
Court of the State of New York, held
and for the County of New York, at the
Courthouse thereof, 71 Thomas Street,
New York, N.Y., on the 15 day of
___January___, 2025

PRESENT: Hon. James d'Auguste
     Justice of the Supreme Court

---------------------------------------------------------------x   **Index Number:**
                     **100558/2024**

SONYA SHAYKHOUN, ESQ.

Plaintiff

  **-against-**

THE DAILY MAIL, DAILYMAIL.Com,
DAILY MAIL AND GENERAL TRUST PLC ("DMGT"),
NOA HALFF, THE DAILY BEAST COMPANY LLC ("TDB"),
AJ MCDOUGALL, BEN SHERWOOD, JOANNA COLES,
IAC INC., BARRY DILLER

Defendants.

--------------------------------------------------------------x

<u>ORDER OF VOLUNTARY DISCONTINUANCE</u>

PLEASE TAKE NOTICE that Plaintiff *Pro Se*, Sonya Shaykhoun, Esq. duly sworn to on the 31st day of December 2024, hereby moves this Court for an Order permitting the voluntary discontinuance of the instant case per CPLR 3217(a).

In accordance with Hon. James d'Auguste, J.S.C.'s verbal instructions during the off-the-record pre-trial conference held on November 20th, 2024, wherein he advised Plaintiff to withdraw the current case before December 31st, 2024, or be held liable for the Defendants' costs should she proceed with the instant Supreme Court case, Plaintiff hereby voluntarily discontinues the instant case without prejudice and without liability.

FILED: NEW YORK COUNTY CLERK 01/15/2025 04:40 PM    INDEX NO. 100558/2024
NYSCEF DOC. NO. 26    RECEIVED NYSCEF: 01/15/2025
FILED: NEW YORK COUNTY CLERK 12/31/2024 01:39 PM
NYSCEF DOC. NO. 26    RECEIVED NYSCEF: 12/31/2024

Sufficient cause appearing therefore, let service by email of a copy of this Order, upon all other parties to this action or their attorneys, who have appeared in this action, on or before the 22 day of January , 2025 be deemed good and sufficient. An affidavit or other proof of service shall be presented to this Court on or before the return date indicated above.

ENTER

Hon. James d'Auguste, J.S.C.

Page 2 of 2

**EXHIBIT 9: MARCH 3 – 10, 2025 EMAIL EXCHANGE BETWEEN KATE BOLGER
AND THE PLAINTIFF**

 Outlook

## RE: Shaykhoun v. Daily Beast

From Bolger, Kate <KateBolger@dwt.com>

Date Mon 3/10/2025 7:03 PM

To     Sonya Shaykhoun <sonya@shaykhounlaw.com>

Cc     Cherner, Lindsey <LindseyCherner@dwt.com>

Ms Shaykhoun
I received this email. We will be filing our pre-motion letter with the Court on March 17 as required by the rules, which will set forth the grounds for dismissal and explain why the anti-SLAPP applies. It will answer the questions you pose below.
Regards,
Kate Bolger

Kate Bolger
Partner, Davis Wright Tremaine LLP

P 212.402.4068  E katebolger@dwt.com
A 1251 Avenue of the Americas, 21st Floor, New York, NY 10020-1104
DWT.COM

**From:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Sent:** Thursday, March 6, 2025 10:53 AM
**To:** Bolger, Kate <KateBolger@dwt.com>
**Cc:** Cherner, Lindsey <LindseyCherner@dwt.com>
**Subject:** Re: Shaykhoun v. Daily Beast

[EXTERNAL]

Dear Ms. Bolger,

Following my March 5, 2025 letter, I supplement my claims against **The Daily Beast** and two international newspapers with critical facts and New York State (NYS) legal grounds that affirm the merit of my SDNY complaint (filed December 27, 2024) and expose the frailty of your Anti-SLAPP defense. These points demand your substantive response by March 14, 2025.

## I. Copyright Infringement and Commercial Value

My May 17, 2023 tweet, viewed nearly 7 million times, generated approximately US$85 via X's monetization program, evidencing its commercial value and my exclusive rights under 17 U.S.C. § 106. The Daily Beast's unauthorized use in a monetized article—absent a licensing agreement—constitutes clear infringement. My 21-year career negotiating cross-border licenses for Orbit (now OSN) in Bahrain/Dubai and Al Jazeera Media Network in Qatar underscores the industry standard: third-party monetization requires consent. X's Terms of Service permit non-commercial use, not profit-driven exploitation, as affirmed in *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 308 (S.D.N.Y. 2011), and echoed in NYS precedent (*Capitol Records, LLC v. ReDigi Inc.*, 934 F.

Supp. 2d 640, 657 (S.D.N.Y. 2013)). Should this reach trial, I will seek a full accounting of all defendants' profits under 17 U.S.C. § 504(b) and NYS equitable relief.

## II. Tortious Harm Under NYS Law

**The Daily Beast's** article, potentially mirrored by international outlets, named my firm and likeness, triggering severe cyberbullying that forced me to privatize my @Sonyashaykhoun X account. This halted my monetization (e.g., $85+ revenue stream) and exposed me to ongoing hate mail and threats - direct results of your client's doxxing. Under NYS law, this violates Civil Rights Law §§ 50-51 (unauthorized trade use of name/likeness) and aligns with aggravated harassment (N.Y. Penal Law § 240.30), supporting my claims for invasion of privacy, intentional infliction of emotional distress (IIED), and injurious falsehood (*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 123 (1993)). These acts, far from protected speech, fall outside N.Y. Civ. Rights Law § 76-a's scope (*Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 29 (S.D.N.Y. 2020)), negating your § 76-a(2) burden.

## III. Ethics Concerns and Litigation Strategy

Your March 4-5 emails threatened me with fee motions to compel withdrawal, asserting NYS Anti-SLAPP applies to all claims without specifying which causes of action trigger § 70-a fees. This tactic raises serious ethical issues under the NYSBA Rules of Professional Conduct:

- **Rule 4.4(a)**: *"A lawyer shall not use means that have no substantial purpose other than to embarrass or harm a third person."* Your vague threats - absent a detailed Anti-SLAPP analysis - appear designed to intimidate rather than defend, especially given my complaint's basis in *Morel* and *Palin*.

- **Rule 8.4(d)**: *"A lawyer shall not engage in conduct that is prejudicial to the administration of justice."* Pressuring me, a pro se attorney, to abandon a meritorious case through unsubstantiated threats risks violating this rule.

Should you persist - or file a baseless fee motion post-Anti-SLAPP (which I anticipate and will oppose) - I will report this conduct to the NYS Supreme Court Appellate Division, First Department, and use any such motion to quantify **The Daily Beast's** damage to my livelihood. As I noted off-record at the November 20, 2024 state pre-trial conference, no one will hire me due to these articles - a loss compounded by all three defendants' actions in our global digital landscape.

I stand with nothing left to lose. **The Daily Beast**, in concert with its co-defendants, has shattered my reputation across New York City and globally, a devastation magnified in today's digital age. I am fully equipped to confront you in SDNY, armed with my 21 years of cross-border licensing expertise and irrefutable evidence - X revenue of $85 from my tweet, hate mail triggered by your client's doxxing, and documented financial losses - to demand justice. No judge, upon hearing the compounded toll of all three defendants' actions on my livelihood and earning capacity, could justly impose your clients' fees on me under N.Y. Civ. Rights Law § 70-a. Their articles - still online and actively harming me - inflict ongoing damage that far outweighs any frivolous fee claim.

## IV. Demand and Next Steps

My tweet's proven value and the tangible losses from your client's misconduct - escalated by international amplification - necessitate a serious settlement offer by March 14, 2025: article removal and compensation reflecting global harm. Provide a detailed response to my March 5 requests (Section 5) or I will proceed with litigation against all defendants.

Many thanks,

**Sonya Shaykhoun**
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

**From:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Sent:** Wednesday, March 5, 2025 5:29 PM
**To:** Bolger, Kate <KateBolger@dwt.com>
**Cc:** Cherner, Lindsey <LindseyCherner@dwt.com>
**Subject:** Re: Shaykhoun v. Daily Beast

Dear Ms. Bolger:

Please find attached my response to your earlier email.

I look forward to your response in due course.

Have a lovely evening.

Many thanks,
Sonya Shaykhoun, Esq.

**Sonya Shaykhoun**
Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

**From:** Bolger, Kate <KateBolger@dwt.com>
**Sent:** Wednesday, March 5, 2025 11:59 AM
**To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Cc:** Cherner, Lindsey <LindseyCherner@dwt.com>
**Subject:** RE: Shaykhoun v. Daily Beast

Case 1:24-cv-09978-ALC    Document 29    Filed 03/17/25    Page 217 of 223

Dear Ms. Shaykhoun:

If you do not withdraw the SDNY Complaint, we will file our attorneys' fees and costs applications for both the Supreme Court action and the SDNY action in due course.

For the avoidance of doubt, the Daily Beast Defendants will not be taking down the Article and reject the below offer.

Thanks,
Kate Bolger

Kate Bolger
Partner, Davis Wright Tremaine LLP

P 212.402.4068  E katebolger@dwt.com
A 1251 Avenue of the Americas, 21st Floor, New York, NY 10020-1104
DWT.COM

**From:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Sent:** Tuesday, March 4, 2025 1:03 PM
**To:** Bolger, Kate <KateBolger@dwt.com>
**Cc:** Cherner, Lindsey <LindseyCherner@dwt.com>
**Subject:** Re: Shaykhoun v. Daily Beast

[EXTERNAL]

# Redacted as sent Without Prejudice

## Sonya Shaykhoun

Law Offices of Sonya Shaykhoun, Esq., Founder/Attorney



+1-929-408-4531
825 West End Ave
New York, NY 10025-5349
https://shaykhounlaw.com

**From:** Bolger, Kate <KateBolger@dwt.com>
**Sent:** Monday, March 3, 2025 11:31 AM
**To:** Sonya Shaykhoun <sonya@shaykhounlaw.com>
**Cc:** Cherner, Lindsey <LindseyCherner@dwt.com>
**Subject:** Shaykhoun v. Daily Beast

Dear Ms. Shaykhoun:

We are in receipt of your new Complaint filed in the Southern District of New York. We write to reiterate that the New York anti-SLAPP law still governs this action and recovery of our attorneys' fees and costs is mandatory. If, however, you agree to withdraw your Complaint, the Daily Beast Defendants will not seek their fees and costs.

This correspondence is without waiver of all of the Daily Beast Defendant's defenses.

Respectfully,
Kate



Kate Bolger
Partner | Davis Wright Tremaine LLP

P 212.402.4068  E katebolger@dwt.com
A 1251 Avenue of the Americas, 21st Floor, New York, NY 10020-1104

DWT.COM        in



**SHAYKHOUN LAW**
NEW YORK PRACTICE

825 West End Avenue,
New York, NY 10025

Email: sonya@shaykhounlaw.com
Tel: 929-408-4531

March 5, 2025

Kate Bolger, Esq.
Partner,
Davis Wright Tremaine LLP
1251 Avenue of the Americas,
21st Floor,
New York, NY 10020-1104

**VIA EMAIL**

Dear Ms. Bolger:

**Re:    Shaykhoun v. Daily Beast (SDNY Case No. 24CV9978)**

Thank you for your emails dated March 4 and March 5, 2025, regarding the above-referenced matter. I write to address apparent misunderstandings in your correspondence, clarify the basis of my complaint filed in the Southern District of New York (Case No. 24CV9978) on December 27, 2024, and reiterate the significance of the Order of Voluntary Discontinuance filed in the New York Supreme Court on December 31, 2024, and signed by Hon. James d'Auguste, J.S.C., on January 15, 2025. **I again request your specific position on which claims in the SDNY complaint you contend are subject to New York's Anti-SLAPP**

**statute (N.Y. Civ. Rights Law §§ 70-a, 76-a) and how you reconcile your stance with the governing law and facts.**

## 1. Overview of SDNY Complaint (24CV9978)

The SDNY complaint asserts multiple causes of action, with the primary claim being copyright infringement arising from **The Daily Beast**'s unauthorized use of my original tweet posted on X on May 17, 2023 (the "**Tweet**"), which garnered nearly 7 million views. Under X's Terms of Service, third parties receive a worldwide, non-exclusive license to use user content, but this license does not extend to monetization without the copyright owner's express consent. Case law, including authorities cited in my prior Supreme Court filing (in addition to *Agence France Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011)), supports the proposition that commercial exploitation of copyrighted material exceeds the scope of such licenses absent permission. **The Daily Beast**'s publication of my Tweet in a monetized article, without my consent, constitutes infringement. Additionally, the complaint alleges breaches of X's Privacy Policy and Terms of Service by using my likeness and law firm name, resulting in doxing and severe reputational harm.

Other causes of action, detailed at pages 139–153 of the complaint, include:

i.   Copyright infringement (p. 139);

ii.  Breach of contract and quasi-contract (p. 140);

iii. Invasion of privacy (p. 142);

iv.  Intentional infliction of emotional distress (p. 153);

v.   Unjust enrichment (p. 152); and,

vi.  Additional torts such as injurious falsehood, fraudulent inducement, and negligent misrepresentation (pp. 141-150).

These claims arise not from protected speech under the First Amendment or Anti-SLAPP laws but from actionable misconduct exceeding journalistic privilege.

## 2.    New York Anti-SLAPP Laws and Their Limits

Your correspondence suggests that New York's Anti-SLAPP statute immunizes **The Daily Beast**'s conduct. I respectfully disagree. The statute (N.Y. Civ. Rights Law § 76-a) protects "*action[s] involving public petition and participation*," defined as claims based on communications in a public forum on matters of public interest. However, federal courts applying New York law have held that Anti-SLAPP protections do not shield copyright infringement or violations of contractual or privacy rights (see, e.g., *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21 (S.D.N.Y. 2020) (distinguishing tort claims from protected speech)). My complaint alleges commercial misuse of copyrighted material and breaches of X's Terms of Service, which are claims that fall outside the statute's ambit.

Moreover, **The Daily Beast**'s publication of my law firm name and likeness, foreseeably inciting hate mail and reputational damage, constitutes doxing, which violates X's policies and New York law (see N.Y. Penal Law § 240.30 (aggravated harassment)). Your assertion that Anti-SLAPP laws override these protections would, if accepted, undermine the contractual rights of X users and chill free expression on social platform. This result flies in the face of public policy.

## 3.    Order of Voluntary Discontinuance

The Order of Voluntary Discontinuance, signed by Justice d'Auguste on January 15, 2025, following a pre-trial conference on November 20, 2024, states that my withdrawal of the Supreme Court action is "*without prejudice and without liability*". This preserves my right to pursue these claims in federal court, as reflected in the SDNY filing. Your failure to attend the pre-trial conference or contest the order undermines any claim that imposes liability or precludes my current action. I invite you to explain how you intend to challenge this judicial determination.

## 4.    The Daily Beast's Conduct and Ethical Standards

**The Daily Beast**'s article, authored by AJ McDougall, was a targeted attack that omitted critical context. For example, AJ McDougall omitted that I called the police as a victim of assault by an unlicensed vendor in Riverside Park. Published without awaiting my response to McDougall's inquiry, the piece misrepresents the incident and amplifies harm by naming my law firm. This conduct contradicts **The Daily**

**Beast**'s own Standard of Ethics, which pledges fairness and accuracy. I question whether my ethnicity (half-Egyptian), gender, or professional history in Qatar motivated this hit piece, which is an issue I intend to explore in litigation.

## 5. Requests for Clarification

Considering the foregoing, I respectfully request:

i. A detailed statement identifying which specific claims in the SDNY complaint (24CV9978) you assert fall under New York's Anti-SLAPP statute, with legal authority supporting your position;

ii. Acknowledgment of the Order of Voluntary Discontinuance and an explanation of how you reconcile it with any demand for fees or dismissal;

iii. An explanation of how **The Daily Beast** justifies its actions under its Standard of Ethics, particularly regarding the treatment of private individuals; and

iv. Your position on the interplay between X's Terms of Service, Privacy Policy, and New York's Anti-SLAPP laws, with reference to relevant precedent.

## 6. Conclusion

I have carefully considered your request to withdraw my complaint in the Southern District of New York (Case No. 24CV9978). However, **The Daily Beast**'s actions - monetizing my copyrighted Tweet without consent, breaching X's Terms of Service and Privacy Policy, and causing irreparable harm to my reputation and livelihood - demand judicial resolution. The complaint, filed on December 27, 2024, asserts well-founded claims that extend beyond the scope of New York's Anti-SLAPP protections, as outlined above. Your insistence on withdrawal does not address the substantive issues raised or the Order of Voluntary Discontinuance, which preserves my rights to pursue this matter in federal court. This dispute implicates not only my personal and professional interests but also the broader accountability of media entities in their use of social media content. I urge you to provide a detailed response to the requests in Section 5 above and a serious settlement offer which includes taking down the article and a financial offer commensurate with the

Page 4 of 5

global damage that **The Daily Beast** did to me in baptizing me a *"Karen"* in its digital newspaper by March 14th, 2025, failing which I will proceed with the litigation to protect my rights.

Many thanks.

Sincerely,

Sonya Shaykhoun, Esq.

Enc.    Order of Voluntary Discontinuance