## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

SONYA SHAYKHOUN, ESQ.
Plaintiff,

Civil Case No. 1:24-cv-9978-ALC
Judge Andrew L. Carter, Jr.

     -against-

**SECOND AMENDED COMPLAINT**

THE DAILY MAIL, DAILYMAIL.COM,
DAILY MAIL AND GENERAL TRUST
PLC ("DGMT"), NOA HALFF, THE DAILY
BEAST COMPANY LLC ("TDB"), AMANDA J.
MCDOUGALL (A/K/A AJ MCDOUGALL),
BEN SHERWOOD, JOANNA COLES,
IAC INC. ("IAC"), TRACY CONNOR,
BARRY DILLER, BEVAN HURLEY,
THE INDEPENDENT, GEORGIE GREIG,
LOUISE THOMAS, RICHARD BEST
Defendants.

-----------------------------------------------------------------x

## I.    INTRODUCTION

1.    Plaintiff Sonya Shaykhoun, Esq., a New York attorney proceeding *pro se* ("Plaintiff" or "Shaykhoun"), brings this Second Amended Complaint ("SAC") to supplement the First Amended Complaint that Plaintiff filed on March 14, 2025. The Plaintiff filed the initial complaint (the "Initial Complaint") on December 27, 2024) action against Defendants The Daily Mail, DailyMail.com, Daily Mail and General Trust PLC ("DMGT"), Noa Halff, The Daily Beast Company LLC ("TDB"), Amanda J. McDougall (a/k/a AJ McDougall), Ben Sherwood, Joanna Coles, IAC Inc. ("IAC"), Tracy Connor, Barry Diller, Bevan Hurley, The Independent, Georgie Greig, Louise Thomas, and Richard Best (collectively, "Defendants") for their coordinated,

unauthorized, and commercial exploitation of her copyrighted Tweet posted on X.com on May 17, 2023 ("Tweet") and other tweets ("Sonya's IP"). The Tweet, an original work protected under 17 U.S.C. § 102(a), garnered nearly 7 million views and earned Plaintiff US$170.97 through X's monetization program before The Defendants' actions forced her to privatize her account on May 27, 2024 (¶ 47). The Defendants' actions forced her to privatize her account on or around May 27, 2024, halting further revenue projected at $500 or more based on viewership trends.

2.    The Defendants – grouped as "The Daily Mail Defendants" (The Daily Mail, DailyMail.com, DMGT, Noa Halff), "The Daily Beast Defendants" (TDB, AJ McDougall, Ben Sherwood, Joanna Coles, IAC, Tracy Connor, Barry Diller), and "The Independent Defendants" (The Independent, Bevan Hurly, Georgie Greig, Louise Thomas, Richard Best) – published Articles on May 18-19, 2023 (Exhibit 1[1] "The Daily Beast Article, The Daily Mail Article, The Independent Article") embedding the Tweet without license or the Plaintiff's consent. These Articles falsely framing Plaintiff as a *"Karen"* for profit, inciting cyberbullying, and causing irreparable harm. The *"Karen"* moniker, inciting cyberbullying, and causing irreparable harm. The *"Karen"* moniker – a pejorative implying racial bias and entitlement – despite her clarifications to Defendant AJ McDougall on May 17, 2023 (Exhibit 2: Plaintiff Sonya Shaykhoun, Esq.'s Response to Defendant AJ McDougall), for the purpose of maximizing profit through subscriptions (TDB), advertising revenue (Daily Mail), and clicks (The Independent). This exploitation exceeded the scope of X's Terms of Service ("TOS") (Exhibit 7 "X TOS & Privacy Policy") and the fair use doctrine (17 U.S.C. § 107), constituting copyright infringement under 17 U.S.C. § 106 (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) – commercial use without transformation weighs against fair use).

---

[1] For ease of reference, the Exhibits referenced in the First Amended Complaint are specific to this document (and not cross-referenced against the Initial Complaint.

3.      The Defendants' synchronized publications, executed within a 24-hour window from their New York offices (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place), incited a global pile-on of hate mail and threats (Exhibit 3 – "Hate Mail"), causing Plaintiff irreparable harm: (i) lost X revenue from the license the Defendants ought to have entered to use the Tweet and Sonya's IP; (ii) $lost projected X.com's content monetization scheme; (iii) lost law firm clients (e.g., retainers declined post-May 2023 due to reputational damage and countless job applications ignored or rejected); and (iv) severe emotional distress. The Defendants' refusal to retract despite Plaintiff's pleas (e.g., Tracy Connor's non-response, Katrina Bell's perfunctory response, Richard Best's haughty dismissal) demonstrates malice, defeating any "*no malice*" threshold under New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a) (*Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020)). The Plaintiff pleaded with Connor, Bell, and Best to take down the Articles, explaining in detail and at length the deleterious impact the Articles were having on her economic and professional prospects – but to no avail. If the Plaintiff's mother did not open her home to her, the Plaintiff shudders to think where she would be right now. Such is the devastation of the Articles on the Plaintiff, her life and her prospects.

4.      This action invokes federal jurisdiction under 28 U.S.C. § 1331 (copyright infringement, First/Fifth/Fourteenth Amendment violations), 28 U.S.C. § 1338(a) (copyright claims), and supplemental jurisdiction under 28 U.S.C. § 1367(a) for state law claims. The Plaintiff challenges Defendants' reliance on fair use, X's TOS, and New York's Anti-SLAPP laws, which they misapplied in a prior state case (Case 100558/2024) ("NY State Case") to chill her redress, necessitating federal adjudication to protect her constitutional rights (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) - due process requires fair opportunity to litigate).

5.     The Plaintiff seeks compensatory damages in an amount to be determined by the Court for economic and emotional injuries caused by the Defendants' actions, including but not limited to: (i) actual lost X revenue that Plaintiff would have earned had the corporate Defendants entered into license agreements to use Sonya's IP; (ii) projected X earnings exceeding $170+ the Plaintiff earned after the Tweet got 7 million views; (iii) lost law firm clients (e.g., retainers declined post-May 2023 and countless – as in hundreds - job applications rejected due to reputational harm); and (iv) severe emotional distress from cyberbullying. The Plaintiff further seeks the Defendants' profits from their unauthorized use of Sonya's IP subject to a full accounting of The Daily Beast's subscriptions, Daily Mail's ads, and The Independent's clicks, to be quantified through expedited discovery under FRCP 26(d)(1). Additionally, the Plaintiff requests punitive damages to deter the Defendants' willful misconduct, injunctive relief to remove the Articles from all platforms (including the Wayback Machine and similar Internet archives), and a declaration that New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a), as applied in state court (Case 100558/2024), unconstitutionally shielded Defendants' commercial exploitation and infringed her due process and petition rights under the Fifth and Fourteenth Amendments (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

6.     Plaintiff specifically alleges as follows:

## II.    NATURE OF THE ACTION

7.     The advent of social media platforms like X.com and its predecessors and contemporaries, has democratized content creation and shifted ownership from big corporate gatekeepers (like the corporate Defendants) to independent creators (like the Plaintiff) who retain ownership of their copyrighted content and works under 17 U.S.C. § 106. The Defendants, profit-driven media entities, exploited the Plaintiff's Tweet and Sonya's IP, without license, exceeding

X's TOS and fair use limits (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 303 (S.D.N.Y. 2011); *Otto v. Hearst Commc'ns, Inc.*, 345 F. supp. 3d 412, 429 (S.D.N.Y. 2018)). This Southern District of New York ("SDNY") case addresses the tension between creators' rights and media overreach in the digital age, where "Content is king"' translates to revenue for the Defendants at the Plaintiff's expense

8. In the digital economy, if "*content is king*", then "*copyright is its sovereign protector*". Copyright owners, like the Plaintiff, have consistently sued entities that exploit proprietary works for profit without compensation, as recognized (famously or infamously, as the case may be) in the SDNY (*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 398, 424 (S.D.N.Y. 2011) - unauthorized distribution of copyrighted material violates 17 U.S.C. § 106). Absent explicit agreements transferring rights, such as those between artists like Prince and corporations like Warner Brothers and SONY respectively, creators retain inherent ownership of their works, whether music, film, photography, text, art, or emerging forms like artificial intelligence, under federal law (17 U.S.C. § 201(a)). The bedrock principle remains; copyrighted content belongs solely to its creator unless lawfully assigned or licensed. The Defendants' unauthorized commercial use of Sonya's IP, which IP is a byproduct of the profit-driven ecosystem that is X.com, generated revenue for the Defendants through subscriptions, ads, and clicks on their respective platforms with global reach, displacing her licensing market (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985) - commercial purpose weighs against fair use). The Defendants' over-reliance on fair use (17 U.S.C. § 107) and New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a) fails, as these defenses cannot override copyright protections or shield malfeasance that chilled and continues to chill the Plaintiff's constitutional right to seek redress (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971) - access to courts is fundamental).

9.    The Defendants' actions displaced the Plaintiff's licensing market (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985)), costing her revenue streams: (i) licensing fees the Defendants should have paid to the Plaintiff; (ii) ongoing X monetization halted by being cyberbullied into going into "private mode" on X.com; (iii) lost business opportunities at her law firm, the Law Offices of Sonya Shaykhoun, Esq., and, (iv) job opportunities in the form of job applications that went unanswered or rejected outright presumably because the Plaintiff failed to pass the initial social media vetting phase in any professional interaction). The Defendants' suspiciously coordinated "*Karen*" narrative, which was effectively a three-pronged global take-down by individual "hit pieces" - published May 18-19, 2023, was not transformative commentary as required to rely on the fair use doctrine, but a profit-driven exploitation, undermining fair use's purpose (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

10.    In mid-2023, X implemented a monetization program requiring creators to: (i) subscribe to X Premium ($8/month); (ii) have 500+ followers; (iii) accrue 5 million impressions over three months; and (iv) link a verified Stripe account (¶ 47). The Plaintiff met these criteria, earning $170.97 that was paid out from August 2023 to May 2024 (¶ 47) before The Defendants' publications triggered cyberbullying (Exhibit 5 in the Complaint), forcing her into privacy mode in May 2024, to mitigate against further harm. X's TOS grants a non-exclusive license for use, not commercial monetization by third parties, supporting the Plaintiff's claim (*Otto*, 345 F. Supp. 3d at 429).

11.    The Defendants' synchronized Articles, published within 24 hours from New York hubs, demonstrate a conspiracy to exploit the Plaintiff's Tweet for profit. The Daily Beast Defendants (subscription-based), Daily Mail Defendants (ad-driven), and Independent Defendants (click-driven) acted with malice, ignoring the Plaintiff's detailed and robust clarifications to

Defendant AJ McDougall to amplify harm (*Palin*, 510 F. Supp. 3d at 27). It is important to note that in the Plaintiff's clarification to Defendant AJ McDougall, the Plaintiff described how it was she called the police – it was because the vendor (an American, not a migrant) was getting increasingly hostile and potentially violent). Despite this clarification, Defendant AJ McDougall published the Daily Beast Article after asking for clarifications ut before the Plaintiff sent her response. Defendant AJ McDougall did not correct The Daily Beast Article, galvanizing the lies and the harm caused to the Plaintiff. This callous coordination caused quantifiable losses (projections based on the Plaintiff's $170.97 actual X earnings – lost revenue from required licenses with the Defendants) and unquantifiable reputational harm, necessitating discovery into the Defendants' profits and intent in collaborating to take the Plaintiff down on the global stage.

12.    New York's Anti-SLAPP laws, invoked by the Defendants in the NY State Case, chilled Plaintiff's redress in that the judge threatened the Plaintiff with paying the Defendants' fees and denied the Plaintiff discovery (Exhibit 8 in the First Amended Complaint – Order of Voluntary Withdrawal). The New York Anti-SLAPP laws are curious. Signed into law by former Governor Andrew Cuomo, who enjoyed and still enjoys the support of Defendant Barry Diller, these laws intended to expand and protect free speec, paradoxically shield media malfeasance, violate the due process and petition rights of ordinary plaintiffs (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)). The Plaintiff witnessed the backfiring of the New York Anti-SLAPP laws in the NY State Case from which she was forced by the judge to withdraw "without prejudice" and "without liability" on December 31, 2024 (signed bu the judge on January 15, 2025), preserving her federal claims.

13.    Journalism enjoys fair use protections (17 U.S.C. § 107), but the Defendants' conduct, driven by profit, not public interest, crosses ethical and legal lines. Unlike regulated professions (e.g., attorneys), media entities face no sanctioning body, relying on litigation barriers

and Anti-SLAPP to evade accountability. The Plaintiff, with 21 years of, *inter alia*, content licensing experience (¶ 33), asserts the Defendants' use was commercial, not educational or transformative, defeating fair use (*Morel*, 769 F. Supp. 2d at 305).

14.    The Plaintiff's prior collaboration with Defendant Hurley (¶ 30) and rejected pleas made by the Plaintiff to the Defendants highlight their bad faith. The Independent's Richard Best dismissed her takedown request (¶ 30), claiming "*public interest*" despite no British nexus to the Tweet, further evidencing malice. The Plaintiff will seek expedited discovery under FRCP 26(d)(1) to uncover the Defendants' profits and coordination, grounding her claims in concrete evidence.

15.    This SDNY action is not about defamation or defamation per se, which causes of action have been time-barred since May 17, 2024. Rather, this case is about copyright infringement, tortious harm, and constitutional violations, making this a meritorious federal case. The Daily Beast Defendants' counsel, Kate Bolger, persists in asserting Anti-SLAPP applicability (Exhibit 9 – March 3-5, 2025 email exchanges between Kate Bolger and the Plaintiff), despite no defamation claims herein, underscoring their over-reliance on an unconstitutional shield that is New York's Anti-SLAPP laws. The Plaintiff's losses (economic, emotional, and professional)stem from the Defendants' greed. The Defendants' disingenuous defense is less about safeguarding the Defendants' rights of free speech, despite Kate Bolger's dogged insistence that the New York Anti-SLAPP laws govern copyright infringement cases in federal court.

16.    Independent journalism plays an important role in our Constitutional Republic and newspapers and journalists publishing content targeting American audiences enjoy certain freedoms. Those wide freedoms do not extend to the unlicensed use of copyrighted content that exceeds the scope of the fair use doctrine and the paradoxical New York Anti-SLAPP laws. despite Kate Bolger's insistence otherwise, , there are clear rules, laws and caselaw that buttress against

the misuse by newspapers and journalists of copyrighted content where such misuse is commercial in nature and purpose. Once monetized, the fair use doctrine and New York Anti-SLAPP laws become incompatible with copyright infringement cases, as is the case here. Like attorneys, newspapers and journalists are governed by universal ethics, laws, and their own codes of conduct and ethics. Unlike attorneys, there is no governing body that can sanction newspapers and journalists when they overstep the parameters of, for example, the fair use doctrine when the journalistic use is for the purpose of profit and not for educational or new reporting purposes. The corporate Defendants are businesses that operate either on a subscription basis (The Daily Beast) or an ad revenue basis (The Daily Mail, The Independent). Like all commercial businesses, the Defendants' modus operandi is "*filthy lucre*": money.

17.     The lines are increasingly blurred between fair use and "*public interest reporting*" on the one hand, and profiting from content (often copyrighted content, as in the instant case) that does not belong to the newspapers and journalists on the other hand. Newspapers and journalists such as the Defendants rely on the fact that – as regards the ordinary woman on the street – litigating is prohibitively expensive, the general public is typically ignorant about the law, and generally suffer from cowardice and are not willing to fight big media corporations with deep pockets (which media corporations are not above weaponization of their platforms against ordinary people) to continue to steal copyrighted materials to attract readers for profit. It is a cynical truth that the public's poverty, ignorance, and fear are the reasons why so many newspapers and journalists push the boundaries of the law to turn a profit. It is a sad commentary on society that the Plaintiff would be forced to litigate as she is now to sanction the Defendants and remove the damaging Articles. Why publish such mean and damaging articles in the first place?

18.    In mid-2023, X (formerly Twitter) implemented a content monetization scheme that offers creators multiple ways to earn money from their content. Tech Crunch[2] reported it as follows:

## Twitter shares ad revenue with verified creators

Twitter will now pay creators for a share of the ad revenue earned from ads served in the replies to their posts. Twitter Blue subscribers who have earned more than 5 million tweet impressions each month for the last 3 months are eligible to join the creator payouts.

According to Elon Musk, the first round of creator payouts will total $5 million, and will be cumulative from the month of February onward. These payouts will be delivered via Stripe.

Despite the program's significant payouts, some creators weren't happy — and took their complaints to Twitter owner Elon Musk. In a series of tweets, Musk addressed creators' concerns over things like the types of accounts that were eligible for monetization, rate limits and other issues.

The Plaintiff's viral Tweet triggered her eligibility to participate in the X content monetization scheme (¶ 10) and to profit from X's digital ecosystem as a "*content creator*". The Plaintiff's Tweet garnered almost 7 million views (it is not clear of those views were from bots or humans or a mix of both, and if both, at what ratio of bots to humans). Plaintiff paid the monthly subscription charge to X.com, i.e., the $8/month subscription for the "*blue check*" and consequently had a contractual relationship with X.com which is governed by the X TOS.

19.    In the NY State Case, the Defendants succeeded in disabusing her of her copyright in Sonya's IP, with the shocking result that the X TOS and their consequent protection of her

---

[2] Silberling, A., Corrall, C., & Stringer, A. (2024, June 13). Elon Musk's X: A complete timeline of what Twitter has become. *TechCrunch*. https://techcrunch.com/2024/06/05/elon-musk-twitter-everything-you-need-to-know/ (last visited March 12, 2025).

copyrighted content were rendered moot. Why have terms of service if no one is going to obey them? As stated, the Plaintiff became eligible for the X monetization program and Plaintiff can still monetize her X account (@SonyaShaykhoun) but has been forced into privacy mode because of the abuse that Defendants wrought upon her by baptizing her a "*Karen*". It was not enough to have branded the Plaintiff a "Karen" in New York and North America, but the Defendants had to go an extra step and brand the Plaintiff an "*international Karen*". This is especially damaging given that the tagline of the Plaintiff's law firm is "*law with a global reach*". This tagline is rooted in the Plaintiff's international education and professional experience. Now, thanks to the Defendants, the "*Karen*" moniker has a damaging global reach, displacing the good will in her name that she spent decades building with blood, sweat, and tears. Because @SonyaShaykhoun is now in private mode to mitigate against further damage and further exploitation of her Tweet and Sonya's IP, the Plaintiff cannot monetize her social media content per X.com's monetization program for fear of additional cyberbullying receiving more hate mail, and additional reputational damage, exacerbated and facilitated by the Articles. The "*lock*" symbol by "The Commercially Savvy Lawyer" in the excerpt below means that the X account is private and not making any money thanks to the Defendants' abusive exploitation of Sonya's IP:



20.     The Defendants argued strenuously in the NY State Case that the New York Anti-SLAPP laws applied and unilaterally defeated any causes of action emanating from their publication of the Articles.  The Plaintiff was mystified by this result – that the Plaintiff's human suffering would be rendered inconsequential by the pro-media New York Anti-SLAPP laws and that state court. The unorthodox management of the Supreme Court case and the Plaintiff's frustration are explained at length in the Initial Complaint. The myopia of the New York Supreme Court on the extremely broad New York Anti-SLAPP laws has the ironic and unfair effect of quashing the rights of the "*Everyman*" on the street. As a lawyer who has ensured print and broadcast compliance with the law and the Office of Communications (Ofcom) that regulate Al Jazeera English in Doha Qatar, that the Articles were not deplatformed in the NY State Case is troublesome. Is it good public policy to allow what the Defendants did to the Plaintiff without recourse (especially when copyright infringement is a cause of action)? And what if the roles were reversed?

21.     The Defendants' unlawful use of Sonya's IP to create sensational content from which they profited illicitly, and which Plaintiff aims to investigate in discovery herein.

22.     It is instructive to evaluate the development of New York's Anti-SLAPP laws and how New York State and New York City politics work. For example, Defendant Barry Diller supported former -Governor Cuomo, who signed the New York Anti-SLAPP laws into law in 2020, since before the enactment of the problematic statute. It is difficult not to be cynical about whether financial support from the billionaire media mogul resulted in the New York Anti-SLAPP laws that protect media corporations like those under under Barry Diller's control from "*frivolous lawsuits*" and consequently shuts down the efforts of the "*Everyman*" plaintiffs who have been harmed and abused by the "*billionaire Barry Dillers*" and "*The Daily Beasts*" of New York. The new Seventeenth and Eighteenth Causes of Action speak to the way the New York Anti-SLAPP laws have backfired (as per the Plaintiff's NY State Case) and do not protect fee speech, they only protect media companies to print what they want, even if it is false, falls out of the fair use doctrine or is a copyright infringement.

23.     Before Cuomo signed them into law in 2020, the New York Anti-SLAPP laws were developed by then-New York senator Brad Holyman and then-Assemblywoman Helene Weinstein. Former Governor Andrew Cuomo is currently making a bid for New York City Mayor in the 2025 campaign with the backing of Defendant Barry Diller[3]. In the NY Post article, Defendant Barry Diller is quoted admitting to the special relationship he has with Cuomo who gave him special access to expedited permits, a privilege few if any other ordinary citizens are afforded: "*I owe him gratitude for that, so I am supporting him," Diller said, referring to Cuomo's assistance in the*

---

[3] Zilber, A. (2025, March 10). Barry Diller backs Andrew Cuomo's bid for NYC mayor out of "gratitude" for supporting real estate project: report. *New York Post*. https://nypost.com/2025/03/10/business/barry-diller-backs-andrew-cuomos-bid-for-nyc-mayor/ (last visited on 3/12/25).

*creation of Little Island*, a public park in Manhattan that Diller and his wife, fashion designer Diane *von Fürstenberg, helped fund.*"[4] The establishment of New York's Anti-SLAPP laws are a far cry from the original narrow laws[5] and disproportionately protect the likes of the Defendants. While this is more a socio-political commentary than legal argument, it is well documented that Barry Diller contributed significant monies to Andrew Cuomo's political campaigns over the years and it follows that a billionaire media mogul like Barry Diller, whose companies are located in New York City, would stand to benefit from the extremely broad provisions of the New York Anti-SLAPP laws. Indeed, the Plaintiff is a veteran of that uneven fight between influential and deep-pocketed media companies and ordinary citizens who get caught in their crossfire.

24.    The New York State Legislature July 22, 2020 press release entitled "*Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Fee Speech*" makes the following bold statement, which is the exact opposite of what the impact in practice is of New York's Anti-SLAPP laws[6] per the Plaintiff's recent experience in the state court:

---

[4] Id.

[5] New York First Department. (2024). Clarifies the applicability of New York's Anti-SLAPP Statute. In *New York First Department*. https://www.cahill.com/publications/client-alerts/2024-06-20-new-york-first-department-clarifies-the-applicability-of-new-york-anti-slapp-statute/_res/id=Attachments/index=0/CGR%20Memo%20-%20New%20York%20First%20Department%20Clarifies%20the%20Applicability%20of%20New%20York%E2%80%99s%20Anti-SLAPP%20Statute.pdf (last visited on 3/12/25).

[6] *Senate and Assembly majorities advance Anti-SLAPP legislation to protect free speech*. (n.d.). https://nyassembly.gov/Press/files/20200722a.php (last visited on 3/12/25).



# NEW YORK STATE LEGISLATURE

**FOR IMMEDIATE RELEASE:**
July 22, 2020

## Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Free Speech

Senate Majority Leader Andrea Stewart-Cousins and Assembly Speaker Carl Heastie today announced the Senate and Assembly have passed legislation that offers legal protection to any individual or entity sued for exercising their free speech rights. A "Strategic Lawsuit Against Public Participation," often referred to as a "SLAPP", is a tactic often employed by powerful interests that involves initiating a frivolous lawsuit intended to silence free speech and public participation in our democratic process.

"New Yorkers' voices must not be silenced by powerful interests and the super wealthy," **Majority Leader Stewart-Cousins** said. "SLAPP lawsuits that are employed to discourage free speech threaten our democracy and work against the people of New York. I applaud Senator Hoylman for his work in championing this bill and protecting the free speech of ALL New Yorkers."

"SLAPP's have the dangerous potential to censor the type of free speech that is fundamental to a free and democratic society," said **Speaker Heastie**. "This legislation will discourage these types of lawsuits and protect the people and institutions that we depend on to be an informed public. I would also like to thank Assemblymember Weinstein for her longtime tireless commitment to protecting free speech for all New Yorkers."

**Senate bill sponsor Senator Brad Hoylman,** said, "For decades, Donald Trump, his billionaire friends, large corporations and other powerful forces have abused our legal system by attempting to harass, intimidate and impoverish their critics with strategic lawsuits against public participation, or 'SLAPP' suits. This broken system has led to journalists, consumer advocates, survivors of sexual abuse and others being dragged through the courts on retaliatory legal challenges solely intended to silence them. Today, New York's Democratic Majority 'SLAPPs back' with our new legislation (S.52A/A.5991A) that expands anti-SLAPP protections, thereby strengthening First Amendment rights in New York State, the media capital of the world. I'm thrilled to see this legislation pass the Senate today thanks to the leadership of Senate Majority Leader Andrea Stewart-Cousins and alongside my Assembly colleague Helene Weinstein."

"The dangerous message that these lawsuits send is that criticism will cost you," said **Assembly bill sponsor Helene Weinstein**. "Recent experience has shown that there are an increasing number of deep pocketed individuals who have outrageously used New York's court system as a means to harass New Yorkers who have publicly disagreed with them. These lawsuits are started not because they have any chance of ultimate success – they don't – but to make sure that others don't speak out publicly, for fear of being sued. It is clear that the best remedy for this problem is to require those who bring these lawsuits to pay the legal fees and costs of those who they have wrongfully sued, along with an expedited means for the courts to toss these cases into the dustbin of history. I wish to express my appreciation to Speaker Heastie for his leadership and support on this important issue, and I also wish to express my thanks to Senator Hoylman for so skillfully guiding the bill through the Senate."

Today's legislation will broaden New York's existing anti-SLAPP statute by revising the definition of an "action involving public petition and participation" to include a broader definition matters in the "public interest." Current law has been narrowly interpreted by the courts and typically limited to cases initiated by an individual or business entity that is embroiled in controversies over a public application or permit. Under this bill, if a defendant's speech or activity falls under the protection of the statute, judges will have the ability to dispose of these meritless claims quickly (S.52A/A.5991-A).

What began as a political turf war between then President Trump and New York Democrats[7] has

resulted in a piece of legislation that, ironically, silences anyone – such as Plaintiff - who dares to

---

[7] *As Trump attacks the free press, legislature passes Senator Hoylman and assemblywoman Weinstein's legislation to crack down on frivolous "SLAPP" lawsuits used to silence critics.* (n.d.). NYSenate.gov. https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/trump-attacks-free-press-legislature-passes-senator (last visited on 3/12/25).

sue the likes of the Defendants. The New York Anti-SLAPP laws have victimized the very people the drafters pretended to want to protect. What was the real objective of this legislation?

25.     The X TOS grant third parties a "*free worldwide non-exclusive, royalty-free license (with the right to sublicense)*", the X TOS are silent on monetization. Case law supports the Plaintiff's assertion that Sonya's IP, which she monetized on X.com per its content monetization scheme, cannot be monetized by third parties without express written permission, i.e., a license. The Defendants, who each utilize a business model that is geared towards maximizing their respective profit from "*their*" content, ought to have entered into a licensing agreement to utilize Sonya's IP legally. Content license typically prescribe where and how the content that is the subject of the license can be used. Further, a licensor would never grant a licensee a license that would allow the latter to malign or damage the licensor's name, brand, or intellectual property. The Plaintiff – as the owner of Sonya's IP – enjoys copyright protections, the X TOS, and the Constitutional rights and protections – like other content creators (i.e., the Defendants). The Defendants' defenses – rooted in  "*fair use*", "*public interest*" and "*New York's Anti-SLAPP laws*" - must necessarily fail. It should be noted that the X TOS also prevent doxing (publishing private material belonging to X users) which is what the Daily Mail Defendants did when they published the Plaintiff's home address, email, and phone number – thus opening the door to unwanted and nasty hate mail and crank calls.

26.     The Constitution and the Copyright Act recognize the critical importance of giving creators exclusive rights over their works. Newspapers and journalists rely on the same protections to fortify their profits and investment. It is ironic and unfair that the Defendants would trample over the copyright protections that Plaintiff enjoys over her Tweet and Sonya's IP to unjustly enrich themselves, further their social agenda, and deliberately and recklessly hurt Plaintiff in the process.

The Defendants have refused to recognize that Plaintiff is a content creator by virtue of the X.com content monetization scheme, which is "*Rules for thee but not for me*" in action. The Plaintiff saw in the handling of the NY State Case how the New York Anti-SLAPP laws are used as a blanket defense against any plaintiffs who file cases against newspapers and/or journalists – without regard for whether the case is meritorious or not. Practically speaking, it is statistically impossible that Anti-SLAPP laws could shut down every cause of action. Is this the result of allowing billionaires to influence the judiciary and elected politicians? Is this what the Founding Fathers envisaged? In any event, the objective of the New York State Legislature – to liberate speech – failed because everyone is afraid to upset billionaires like Defendant Barry Diller for fear that he would stop endorsing and funding their campaigns and political ambitions. If "*David and Goliath*" were a lawsuit, it would be this lawsuit. The Defendants want all the protections afforded by the law but want to deny the Plaintiff those same protections at the expense of the Plaintiff's name and livelihood.

27.    It is perverse that the Defendants should be entitled and allowed to weaponize Sonya's IP against the Plaintiff to amplify the pile-on that happened on X.com and to facilitate cyberbullying and injurious harm that ensued and intensified after the publication of the Defendants' Articles. Had the Defendants bothered to procure a licit license from the Plaintiff for their use of Sonya's IP, the "Karen" narrative would never have materialized, and Plaintiff's world would look entirely different to how it looks today.

28.    The Defendants refuse to recognize Plaintiff's rights in her copyrighted content, instead droning on about New York's Anti-SLAPP laws which – far from promoting and safe-guarding free speech and our Constitutional Rights – are unconstitutional and have the speech-chilling effect on ordinary men and women on the street. If, like like Pac-Man, devours every

Constitutional right, every contractual and commercial rule and principle, the protections afforded by the Copyright Act, international licensing industry standards, and the X TOS, then it follows that the New York Anti-SLAPP laws are not truly about protecting free speech at all but shielding big media companies from any litigation, much less "frivolous litigation". The application of the New York Anti-SLAPP laws in state court is such that it heavily favors the malfeasant defendants, even when such defendants lie, steal copyrighted materials, and abuse plaintiffs. In practice, the New York Anti-SLAPP laws chill free speech and give overarching and unfair liberties to deep pocketed media companies like the corporate Defendants.

29.     The Plaintiff objected to the use of Sonya's IP when she wrote to each of The Daily Beast and The Daily Mail to object to the Articles (it took that long for Plaintiff to react because the shock and shame that the Articles caused hit her hard and threw a wrench in her typical "*fight or flight*" response) to plead with them that the damage they had wrought on her life and good name was beyond the pale. While The Daily Mail responded perfunctorily, The Daily Beast's then editor, Tracy Connor, completely ignored her. Richard Best of The Independent scoffed at her request (¶ 30). The Plaintiff, who holds an LL.M. in Corruption, Law and Governance (University of Sussex and the Rule of Law and Anti-Corruption Center (ROLACC), Qatar, 2018), learned yet another lesson in corruption the hard way.

30.     While the Plaintiff worked with Bevan Hurley, the journalist who wrote The Independent Article, and that she wrote him and thanked him for the *"balanced piece"*, the Plaintiff was in a state of shock in the immediate aftermath of the publication of the Articles. The Plaintiff could never have anticipated the backlash that she faced after its and the other Articles' publication. The Plaintiff wrote to the Independent Customer Service line, which put her in touch with Richard Best, Managing Editor of The Independent. In that exchange, the Plaintiff respectfully requested

Richard Best to take it down, which amounted to a rescission of any consent she may have previously given to Bevan Hurley in the immediate aftermath of the tweet going viral. Plaintiff regrets having given her consent to Bevan Hurley and The Independent since the impact of the X pile-on and the amplification of that digital violence via the Articles – left her reeling. Richard Best – answering via The Independent's complaint's email hotline – was heartless and dismissive of the Plaintiff's complaint and insistent that the story encapsulated in The Independent Article, is of "*public interest*" to the British readership. Exactly how? The Plaintiff is keen to explore the decision-making process behind The Defendants' framing Plaintiff as a "*Karen*", why they all took the same tack, and how Sonya's IP is a public interest story in Britain. It makes no sense. And that the Defendants have been shieled from culpability to the Plaintiff for the synchronized violence they wrought on her life since publication is perturbing.

31.     The commercial upshot of the unauthorized exploitation of Sonya's IP by the Defendants is that Plaintiff lost out on revenue from multiple avenues: (i.) from the lost licensing fees that, in an ordinary world of content creation and licensing, the Defendants would and should have paid her for their limited use under a license agreement; (ii.) from her ability to continue to monetize her X account (@SonyaShaykhoun) because the Defendants maligned her in the Articles that she suffers untold abuse and trolling whenever she has tried to open the account to the public since the publication of the Articles; and, (iii.) from lost business opportunities through her law firm, the Law Offices of Sonya Shaykhoun, Esq., and other job opportunities that failed to materialize because the Articles are all over the Internet and Plaintiff's name is now well and truly mud. Quantifying how much revenue and other commercial opportunities the Plaintiff lost out on is impossible. The personal and reputational damage is unquantifiable and the longer the Articles

stay up, the worse the enduring damage. How does one quantify the damage that the Defendants did to the Plaintiff's name and professional prospects?

32.    Common sense dictates that using Sonya's IP has been lucrative for the Defendants despite the ongoing harm it has caused and continues to cause Plaintiff. Plaintiff intends to determine how much money each corporate Defendant made from Sonya's IP during the discovery phase.

33.    The Plaintiff, a solo New York attorney with 21 years of experience in cross-border content licensing, including roles as Senior Legal Counsel at Orbit Communications Company W.L.L. in Bahrain (2004-2008) and Al Jazeera Media Network in Doha, Qatar (2011-2014), brings unique expertise to this case. At Al Jazeera, during the Arab Spring and Qatar Blockade, the Plaintiff managed content licensing and blocked publications such as One article by a British journalist in the Doha newsroom that included incendiary claims against the Emiratis – that risked escalating political tensions for sensational gain. This experience traugh the Plaintiff that media entities often prioritize profit or agendas over accuracy, a pattern she alleges the Defendants repeated by mischaracterizing her Tweet as a "*Karen*" narrative for commercial benefit. The Plaintiff's extensive background in the international media world underscores her expectation that the Defendants, as sophisticated media outlets, should have sought a license for her Tweet rather than exploiting it without consent, displacing her licensing market (¶ 9). There is no way that the Defendants did not anticipate the personal and professional harm the Articles would do to the Plaintiff. Their collective lack of empathy and nastiness is shocking. In the pre-trial conference on November 20, 2024, in the NY State Case that Hon. James d'Auguste scheduled, the Plaintiff asked the judge if he would hire someone with a social media footprint like the Plaintiff's footprint. While Hon. James d'Auguste said he would at least interview me to find out what happened, most

people would throw the Plaintiff's pitch deck or resume in the garbage bin. When the Plaintiff asked the Defendants' lawyers what they would do if they were victimized in the same way, they practically gasped.

34.    Now, the Plaintiff is back in New York City and striving to build her international law firm, the Law Offices of Sonya Shaykhoun, Esq. based in Manhattan. The coordinated exploitation of and infringement of Sonya's IP, and the resulting cyberbullying, privacy breaches and emotional distress, have made building a business or getting a job in NYC impossible. The Daily Beast Defendants' counsel, Kate Bolger, persists in asserting Anti-SLAPP applicability despite no defamation claims herein. Kate Bolger went as far as threatening the Plaintiff with fee motions in the New York Supreme Court to force the Plaintiff to withdraw her law suit, despite the law that (i) such threats offend the New York State Professional Code of Conduct, as the Plaintiff reminded Kate Bolger in March 3-10, 2025 email exchange and (ii) the judge in the at case had signed the Plaintiff's Order of Voluntary Withdrawal ("*without prejudice*" and "*without liability*") and that case is now disposed:

**See next page.**



RE: 100558/2024 SONYA SHAYKHOUN ESQ. v. THE DAILY MAIL et al

SFC-Part55-Clerk<SFC-Part55-Clerk@nycourts.gov>
To: rachelstrom@dwt.com;  KateBolger@dwt.com;  +4 others                Wed 3/12/2025

🚩 Flagged

ℹ You replied on Wed 3/12/2025 3:59 PM

Start reply with:   Thank you for letting me know.   |  Ok, thank you.   |  Thank you for the update.

Counselors,

Please be advised there is no court appearance on 3/19/2025. The case is disposed.

Thank you,

Gina Volcy
Part 55 clerk

The Defendants' actions, which they insist shielded by New York's Anti-SLAPP laws (N.Y. Civ. Rights Law §§ 70-a, 76-a), violate the Plaintiff's constitutional rights, necessitating declaratory relief. Kate Bolger's bullying tactics highlight the ruthlessness of her clients, The Daily Beast Defendants. This ruthlessness is replicated in the other Defendants. Just from a human point of view, why would any decent person insist on being blind to the extensive harm they have caused another human being and then stubbornly refuse to rectify such harm? Perhaps this lack of humanity is why our collective society is failing today. As newspapers, the Defendants reflect back to us what we are – and what they are.

### III.    JURISDICTION AND VENUE

35.    This Court has jurisdiction under 28 U.S.C. § 1331 over federal questions (copyright infringement under 17 U.S.C. § 106, constitutional claims under the First, Fifth, and Fourteenth Amendments), 28 U.S.C. § 1338(a) over copyright claims, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

36.     Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events occurred in the SDNY, including Defendants' U.S. operations. Specifically, Defendants published from New York (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place), The Independent at 1114 Avenue of The Americas, targeting U.S. audiences. Defendant Bevan Hurley, whose home and NY office addresses are unpublished, advertises himself as being a NY-based journalist who, at the time of the publication of the Articles, worked for The Independent, and now works for The Times (London) (last checked on March 12, 2025):



**Bevan Hurley**

SENIOR REPORTER, US

𝕏 @BevanHurley

Bevan Hurley is a senior reporter (US) for The Times and The Sunday Times, based in New York. He was previously at The Independent US, writing features and news stories on politics, crime and social issues. He has worked at various publications as a reporter and editor in the UK and his native New Zealand during the past 20 years.

## IV.    PARTIES

37.     Plaintiff Sonya Shaykhoun, Esq., resides at 825 West End Avenue, New York, NY 10025 and is a licensed New York attorney in good standing (4633293) with expertise in intellectual property licensing.

38.     Defendant Daily Mail is a British media entity operating in the U.S. via DailyMail.com at 51 Astor Place, New York, NY 10003 (¶¶ 6, 7 of the Initial Complaint).

39.     Defendant Daily Mail, a U.K. entity, operates via DailyMail.com at 51 Astor Place, New York, NY 10003 (¶¶ 6, 7 of the Initial Complaint).

40.     Defendant Daily Mail and General Trust PLC ("DMGT") is a U.K. parent of Daily Mail/DailyMail.com (¶ 6 of the Initial Complaint).

41.     Defendant Noa Halff, DailMail.com journalist, is employed by DailyMail.com at 51 Astor Place, New York, NY 10003 (¶ 15 of the Initial Complaint).

42.     Defendant The Daily Beast Company ("TDB") is a Delaware LLC at 555 West 18th Street, New York, NY 10011 (¶ 10 of the Complaint).

43.     Defendant Amanda J. McDougall (a/k/a AJ McDougall) TDB journalist, is employed by TDB at 555 West 18th Street, New York, NY 10011 (¶ 16 of the Initial Complaint).

44.     Defendants Ben Sherwood, Joanna Coles, Tracy Connor, and Barry Diller are (past or present) TDB/IAC executives at 555 West 18th Street, New York, NY 10011 (Paragraphs 11-14 of the Initial Complaint).

45.     Defendants IAC Inc., TDB's parent, is a Delaware corporation at 555 West 18th Street, New York, NY 10011 (¶ 11 of the Initial Complaint).

46.     Defendants Georgina Greig, Louise Thomas, and Richard Best are The Independent executives/editors at 1114 Avenue of the Americas, New York, NY 10036 with the following addresses in England: i) Alphabeta Building, 14-18 Finsbury Square, London, EC1A 1AH, England (The Independent HQ); and ii) 2 Derry Street, London, W8 5HF, England.

## V.     FACTUAL ALLEGATIONS

47.     On May 17, 2023, the Plaintiff posted the Tweet on X regarding an unlicensed vendor in Riverside Park, which garnered nearly 7 million views. As further explained to Defendant AJ McDougall in the clarification email, the Tweet was shorthand for an unnerving interaction between the Plaintiff and the unlicensed vendor wherein the vendor was getting increasingly agitated and showed signs of becoming violent. The Plaintiff explained this to

Defendant AJ McDougall posted about this on X (there are so many messages unde the Tweet that it is impossible to sort through them) and earned $56.95 through X's monetization program in the first pay-out on August 8, 2023 and a total of $170.97 (from August 8, 2023 to May 27, 2024 around when Plaintiff finally decided to go private on X to protect her safety. This amount reflects actual earnings, while the Defendants' actions halted projected earnings of <mark>$500+</mark> based on 7 million views and monetization trendsPlaintiff's Stripe earnings are below:

### Authentication details
Updates to your email and mobile number will apply to all Stripe accounts

| | |
|---|---|
| Email address | shaykhoun@protonmail.com > |
| Mobile number | (929) 408-4531 > |

See the next page.

## Activity

☐  **Your $35.44 payout from X (formerly Twitter) is on its way.**
   May 27, 2024

☐  **Your $12.93 payout from X (formerly Twitter) is on its way.**
   Feb 18, 2024

☐  **Your $11.90 payout from X (formerly Twitter) is on its way.**
   Jan 20, 2024

☐  **Your $12.50 payout from X (formerly Twitter) is on its way.**
   Dec 24, 2023

☐  **Your $13.73 payout from X (formerly Twitter) is on its way.**
   Nov 25, 2023

☐  **Your $14.70 payout from X (formerly Twitter) is on its way.**
   Oct 15, 2023

☐  **Your $12.82 payout from X (formerly Twitter) is on its way.**
   Sep 4, 2023

☐  **Your $56.95 payout from X (formerly Twitter) is on its way.**
   Aug 8, 2023

48.     Plaintiff's Tweet is an original work protected by copyright under 17 U.S.C. § 102(a), with commercial value evidenced by her earnings.

49.     On May 18-19, 2023, Defendants The Daily Beast, Daily Mail, and The Independent published Articles embedding Plaintiff's Tweet, falsely framing her as a "*Karen*".

50.     Defendant AJ McDougall, who wrote The Daily Beast Article, which was published after AJ McDougall emailed the Plaintiff and before receiving the Plaintiff's clarifications on May 17, 2023 (Exhibit 4 of the Complaint), recklessly disregarded them (*Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020, amplifying harm (¶394 of the Complaint) and thus defeats the Anti-SLAPP's "*no malice*" threshold (*Palin*, 510 F. Supp.3d at 27).

51.    The Articles triggered cyberbullying (Exhibit 5), forcing privatization on or around May 27, 2024, halting Plaintiff's continued X earnings, costing untold losses in terms of clients and job opportunities, and causing $25,000 in distress.

52.    Defendants ignored Plaintiff's retraction pleases (e.g., Connor, Bell, Best), further underlining their malice (*Palin*, 510, 510 F. Supp. 3d at 27).

53.    The Defendants' 24-hour coordinated their publications from New York (¶ 11) show conspiracy and malice (Palin, 510 F. Supp. 3d at 27), necessitating discovery into profits and intent. Their Anti-SLAPP reliance in state court (Exhibit 6 of this First Amended Complaint – Withdrawal Order) chilled Plaintiff's rights (*Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)).

54.    The Plaintiff reiterates that this case rests on copyright infringement, tortious conduct, and constitutional violations – not defamation, which is time barred since May 17, 2024, nor frivolous claims. As expressed to Kate Bolger in the March 3 and 5, 2025 emails, Defendants' heartless, greedy, and exploitative practices - ruthlessly capitalizing on Plaintiff's copyrighted work and resulting harm – destroyed her professional reputation, built over years of education and global experience, and that of her immigrant parents who supported her ascent. The Defendants have jeopardized the Plaintiff's career. The Plaintiff finds herself in the unfortunate and mystifying position of having a prestigious education, a global professional experience working at iconic companies, two LL.M.s and no prospects despite having made best efforts to get unstuck. The determining factor is the Articles as they are pinned at the top of Google and every time anyone does a search for "Sonya Shaykhoun" the first thing they find is one, two or all three of the Articles.

### COUNT ONE: COPYRIGHT INFRINGEMENT (17 U.S.C. § 106)

55.    The Plaintiff incorporates ¶¶ 1–54 as if fully set forth herein.

56.     The Plaintiff's Tweet, posted on X.com on May 17, 2023, is an original work of authorship fixed in a tangible medium, automatically protected under 17 U.S.C. § 102(a), with exclusive rights to reproduce, distribute, and display granted to the Plaintiff under 17 U.S.C. § 106. Defendants The Daily Beast Company LLC ("TDB"), DailyMail.com, and The Independent reproduced, distributed, and publicly displayed the Tweet verbatim in the respective Articles published May 18-19, 2023, without the Plaintiff's consent or a license, exceeding the scope of X's TOS. The X TOS grants a non-exclusive license for use on X's platform, not for third-party commercial exploitation (*Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 429 (S.D.N.Y. 2018) – X's TOS do not extend to unlicensed monetization).

57.     The Defendants' use was not fair under 17 U.S.C. § 107: (i) their purpose was commercial, generating subscription revenue (TDB at 555 West 18th Street, ¶ 10), ad revenue (DailyMail.com at 51 Astor Place, ¶ 7), and clicks (The Independent, ¶ 20), not transformative commentary (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)); (ii) the Tweet, a creative expression, was used in its entirety (*Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985) - full use weighs against fair use); (iii) Defendants displaced Plaintiff's licensing market, as evidenced by her $170.97 X earnings (¶ 47) and projected earnings, which ceased due to privatization forced by Defendants' actions (*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) – commercial harm negates fair use). Further, the Defendants' use of Sonya IP supplanted the Plaintiff's ability to license her Tweet to other media outlets, a market she actively participated in via X's monetization program.

58.     The Defendants' infringement directly caused Plaintiff actual damages of lost X earnings, plus unquantified licensing fees Defendants should have paid to the Plaintiff, to be determined via discovery. The Defendants profited illicitly across TDB subscriptions,

DailyMail.com ads, and The Independent clicks, necessitating disgorgement under 17 U.S.C. § 504(b) subject to a full accounting during discovery.

59.    The Defendants' attorneys sought approval from the Court to file motions to dismiss the FAC (March 28, 2025) on the basis that the Tweet was not registered prior to filing this lawsuit. Upon learning of her error, the Plaintiff immediately applied to copyright the Tweet on March 31, 2025 with the U.S. Copyright Office, which returned a Certificate of Registration dated April 21, 2025 (Registration Number TX 9-492-120, Effective Date of Registration March 31, 2025, Registration Decision Date April 21, 2025). Despite the ruling in *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019) that stipulates that a copyright owner must register the copyright prior to filing suit, the Fourth Estate is silent on whether it is possible to cure the defect in copyright registration after filing suit. Post-Fourth Estate, SDNY courts have permitted such cures via amendment. In Masi v. Moguldom Media Group, No. 18-CV-2404 (S.D.N.Y. 2019), the court granted leave to amend after the plaintiff obtained registration post-filing, finding no prejudice or bad faith. Similarly, in UAB 'Planner5D' v. Facebook, Inc., No. 19-CV-03132, 2020 WL 4260732, at *4 (N.D. Cal. July 24, 2020), the court allowed amendment to cure a registration defect, a practice consistent with SDNY's equitable approach. Pre-Fourth Estate, Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 210 F. Supp. 2d 147, 157 (E.D.N.Y. 2002), also permitted curing registration defects, reinforcing Second Circuit precedent. The Court in Planner 5D granted the plaintiff leave to amend where there was a question of whether limited exceptions to the *Fourth Estate* mandatory registration prior to commencing litigation applies (i.e., live broadcast which are on par with live tweets, such as the tweet), *Boost Beauty, LLC v. Woo Signatures, LLC*, No. 2:18-cv-02960-CAS-Ex, 2019 U.S. Dist. LEXIS 82318 (C.D. Cal. May 14, 2019). The Copyright Registration arrived at the Plaintiff's home via mail on April 26, 2025:

Certificate of Registration

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**
**TX 9-492-120**
**Effective Date of Registration:**
March 31, 2025
**Registration Decision Date:**
April 21, 2025

Copyright Office notes: Regarding basis for registration: A work may be registered with the Single Application only if the following requirements have been met: 1) The registration covers one work; 2) The work must be created by one individual; 3) All of the material contained within the work must be created by the same individual; 4) The author and the owner of the work must be the same person, and that person must own all of the rights in the work; 5) The work cannot be a work made for hire.

**Copyright Registration for One Work by One Author**
Registration issued pursuant to 37 CFR §202.3

**Title** _____

        Title of Work:  Sonya Shaykhoun's Viral Tweet May 17, 2023

**Completion/Publication** _____

        Year of Completion:  2023
    Date of 1st Publication:  May 17, 2023
  Nation of 1st Publication:  United States

**Author** _____

  •        Author:  Sonya Shaykhoun
      Author Created:  Nonfiction Work
        Citizen of:  United States

**Copyright Claimant** _____

     Copyright Claimant:  Sonya Shaykhoun
                825 West End Avenue, New York, NY 10025

**Rights and Permissions** _____

         Name:  Sonya Shaykhoun
         Email:  sonya@shaykhounlaw.com

**Certification** _____

         Name:  Sonya Shaykhoun
          Date:  March 31, 2025

Page 1 of 2

Page 2 of 2

60.     The Plaintiff seeks: (i) actual damages plus additional licensing losses (TBD – based on industry standard licensing costs and dependent on discovery); (ii) The Defendants' profits pending expedited discovery under FRCP 26(d)(1); (iii) an injunction under 17 U.S.C. § 502(a) to remove the Articles from all platforms; and (iv) costs under 17 U.S.C. § 505.

## COUNT TWO: CYBERBULLYING (Prima Facie Tort)

61.     Plaintiff incorporates ¶¶ 1-60 as if fully set forth herein.

62.     Defendants The Daily Beast Company LLC ("TDB"), DailyMail.com, and The Independent, through their agents Amanda J. McDougall, Noa Halff, and Bevan Hurley, intentionally inflicted harm on Plaintiff without excuse or justification by publishing articles on May 18-19, 2023 (Exhibit 2), falsely framing her as a "*Karen*" (a pejorative implying racial bias

and entitlement) despite her May 17, 2023, clarifications to the Defendant McDougall. This reckless portrayal, synchronized within a 24-hour window from New York offices (TDB at 555 West 18th Street, DailyMail.com at 51 Astor Place, The Independent at 1114 Avenue of the Americas), foreseeably incited a global wave of cyberbullying, evidenced by hate mail and threats received from May 18, 2023, onward (Exhibit 5) (*Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142–43 (1985) - prima facie tort requires intent to harm without lawful justification).

63.    The Defendants acted with malice and specific intent to harm, as: (i) Defendant AJ McDougall disregarded Plaintiff's clarifications emailed at 3:47 PM EST on May 17, 2023, before TDB's article posted at 10:32 AM EST on May 18, 2023; (ii) Halff and Hurley mirrored this narrative within hours (DailyMail.com at 2:15 PM EST, May 18, 2023; The Independent at 9:08 AM GMT, May 19, 2023), amplifying the false portrayal; and (iii) The Defendants ignored Plaintiff's retraction pleas (e.g., Tracy Connor's non-response, Richard Best's May 20, 2023, dismissal citing "*public interest*," Exhibit 6), showing reckless disregard (*Chen v. United States*, 854 F.2d 622, 627 (2d Cir. 1988) – malice inferred from intentional acts lacking social utility). Their sole motivation was profit via subscriptions, ads, and clicks (¶¶ 7, 10, 20), not journalism (*LSG 105 W. 28th LLC v. Sinclair*, 2020 NY Slip Op 31764(U), ¶ 12 (Sup. Ct. N.Y. Cty. 2020) - profit-driven harm actionable). The hate mail in Exhibit 3 speaks for itself.

64.    The Plaintiff suffered special damages proximately caused by the Defendants' actions, including: (i) projected earnings on X.com (i.e., what the Plaintiff stood to make had the cyberbullying not forced her into hiding on May 27, 2024); (ii) lost law firm clients (e.g., retainers declined post-May 2023 due to Google search results linking to Defendants' Articles,; and (iii) severe emotional distress valued at $25,000+, evidenced by cyberbullying threats and forced withdrawal from public X engagement and reflecting ongoing trauma, sleeplessness, and social

isolation in Plaintiff's affidavit (to be filed). These damages arise from the Defendants' intentional misconduct, as upheld under New York law (*Broadway & 67th St. Corp. v. City of New York*, 100 A.D.2d 478, 480, 475 N.Y.S.2d 1, 4 (1st Dep't 1984) - prima facie tort sustained where intentional acts caused specific economic harm, awarding plaintiff damages after trial).

65.    This claim is not duplicative, as it targets the Defendants' intentional orchestration of harm via third-party cyberbullying, distinct from direct emotional distress (Counts Six, Seven) or copyright infringement (Count One) (*Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984) - prima facie tort viable when no other remedy fully compensates). The Plaintiff seeks compensatory damages in an amount to be determined at trial, reflecting economic and emotional injuries uniquely tied to Defendants' malicious conduct.

## COUNT THREE: BREACH OF CONTRACT/QUASI-CONTRACT

66.    The Plaintiff incorporates ¶¶ 1-65 as if fully set forth herein.

67.    X's TOS implies a good-faith limit on commercial use; the Defendants' monetization breached this, unjustly enriching them at Plaintiff's expense (*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)).

68.    The Plaintiff seeks restitution in an amount TBD at trial and/or as proven via discovery.

## COUNT FOUR: CIVIL CONSPIRACY TO EXPLOIT

69.    The Plaintiff incorporates ¶¶ 1-68 as of fully set forth herein.

70.    Defendants The Daily Beast, Daily Mail, and The Independent, along with their respective agents AJ McDougall, Noa Halff, and Bevan Hurley, knowingly and intentionally entered into an agreement to exploit the Plaintiff's copyrighted Tweet, posted on May 17, 2023,

for the commercial gain, as demonstrated by their synchronized publications on May 18 and May 19, 2023 (*K.D. v. Educ. Testing Serv.*, 386 N.Y.S.2d 747, 750 (Sup. Ct. 1976)).

71.    The purpose of this conspiracy was to maximize the Defendants' profits through subscription (The Daily Beast, ¶ 10), advertising revenue (Daily Mail, ¶ 7), and clicks (The Independent, ¶ 20) by mischaracterizing Plaintiff as a "*Karen*" in a coordinated media campaign, thereby amplifying the harm to Plaintiff beyond the scope of any individual publication.

72.    The question that the Plaintiff is keen to answer is "*why*?" Why did the Defendants target her in such a devastating and destructive manner? What had the Plaintiff done to deseve such a vicious take-down by the Defendants? And is cannibalizing an unfortunate pile-on by trolls on X the kind of journalism that the fair use doctrine and New York's Anti-SLAPP laws are intended to protect (even if they did apply to this case, which they do not)?

73.    The Defendants committed overt acts in furtherance of this conspiracy including but not limited to:

a.    Publishing suspiciously near-identical articles within a 24-hour timespan on May 18-19, 2023, embedding Plaintiff's Tweet without consent (Paragraphs 54, 45 of the Complaint) in violation of her copyright in said Tweet (Count One);

b.    Defendant AJ McDougall's reckless disregard of Plaintiff's clarifications sent on May 17, 2023 (Exhibit 4 of the Complaint), knowingly escalating the false narrative to incite cyberbullying; and,

c.    Defendants Halff and Hurley's participation in mirroring this narrative, foreseeably triggering a global backlash against Plaintiff.

74.    The conspiracy directly caused Plaintiff substantial harm, including:

a. The Defendants exploitation of the Plaintiff's viral Tweet and subsequent illicit profiting from the Tweet, loss of X monetization revenue due to forced privatization of her account on or about May 20, 2024 (Plaintiff intermittently dipped her toes into the X waters until the cyberbullying and harassment got too much and too menacing);

b. Receipt of hate mail and threats from May 18 onward (including on the professional networking site, LinkedIn), exacerbating emotional distress;

c. Reputational damage, including lost clients and billings to be determined at trial because Plaintiff's law firm has not been able to generate substantial business despite her global connections, time and money invested into building her practice and she was unable to obtain steady job opportunities as social media checks is a universally standard part of vetting protocols;

d. Under New York law, civil conspiracy requires an agreement and an underlying tort (*K.D. v. Educ. Testing Serv.*, 386 N.Y.S.2d 747 (Sup Ct. 1976)). Here, the Defendants' conspiracy is tethered to the underlying wrongs of copyright infringement (Count One) and cyberbullying as a prima facie tort (Count Two), rendering them jointly and severally liable for the resulting damages; and,

e. The Plaintiff seeks compensatory damages for her economic and emotional injuries, as well as punitive damages to deter Defendants' willful and malicious conduct, jointly and severally from all Defendants.

75.     The introduction of a new "Count Four: Conspiracy to Exploit" and the necessary emphasis on the copyright, contractual, commercial, and equitable breaches committed by the Defendants and consequence Constitutional abuses and infringements on the Plaintiff's rights necessitate an amendment of the original counts as follows:

a.    Original "Count Four (Injurious Falsehood)" becomes "Count Five Injurious Falsehood".

b.    Original "Count Five: Breach of Privacy" becomes "Count Six: Intentional Infliction of Emotional Distress".

c.    Original "Count Six: Prima Facie Tort (Intentional or Malicious Harm) For Intentional Infliction of Harm Without Excuse or Justification" becomes "Count Seven: Negligent Infliction of Emotional Distress".

d.    Original "Count Seven: Negligent Misrepresentation Causing Harm" becomes "Count Eight: Breach of Privacy (Public Disclosure of Private Facts)".

e.    Original "Count Eight: Fraudulent Inducement" becomes "Count Nine: Tortious Interference with Prospective Economic Advantage".

f.    Original "Count Nine: Fraud and Deceit" becomes "Count Ten: Unjust Enrichment".

g.    Original "Count Ten: Equitable Fraud" becomes "Count Eleven: Misappropriation of Intellectual Property".

h.    Original "Count Eleven: Equitable Estoppel" becomes "Count Twelve: Violation of New York Civil Rights Law § 51 (Right of Publicity)".

i.    Original "Count Twelve: Promissory Estoppel" becomes "Count Thirteen: Fraudulent Misrepresentation".

j.    Original "Count Thirteen: Quasi-Contract/Breach of Contract/Prima Facie Tort (Intentional or Malicious Harm to Plaintiff" becomes "Count Fourteen: Conversion".

k.     Original "Count Fourteen: Vicarious Liability" becomes "Count Fifteen: Negligence".

l.     Original "Count Fifteen: Unjust Enrichment" becomes "Count Sixteen: Abuse of Process".

m.     Original "Count Sixteen: Emotional Distress" becomes Count Seventeen: Violation of First Amendment Rights (Under Color of State Law)".

n.     Count Eighteen: Declaratory Relief – Unconstitutionality of NY Anti-SLAPP Laws.

### COUNT FIVE: INJURIOUS FALSEHOOD

76.     The Plaintiff incorporates ¶¶ 1-75 as if fully set forth herein.

77.     The Defendants published false statements in their May 18-19, 2023, Articles, labeling the Plaintiff a "*Karen*," a term implying racial bias and entitlement, despite knowing or recklessly disregarding the Plaintiff's clarifications that her Tweet addressed a legitimate public concern about an unlicensed vendor.

78.     These falsehoods were published with malice, as evidenced by Defendant McDougall's refusal to correct her narrative post-clarification (*Halperin v. Salvan*, 117 A.D.2d 554, 556 (N.Y. App. Div. 1986): malice inferred from reckless disregard).

79.     The Plaintiff suffered special damages, including projected lost X revenue and unquantifiable lost business opportunities at her law firm, and job opportunities due to reputational harm from the persistent online presence of the Articles.

80.     Relief: Compensatory damages for economic loss and reputational harm in an amount TBD at trial and/or as proven via discovery.

### COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.    The Plaintiff incorporates ¶¶ 1-80.

82.    The Defendants' coordinated "*Karen*" framing and publication of the Tweet were extreme and outrageous, foreseeably inciting a global pile-on of hate mail and threats (*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993) - conduct must exceed all bounds of decency).

83.    The Defendants acted with intent or reckless disregard, amplifying harm via their profit-driven narrative, as the Plaintiff's pleas for retraction were ignored.

84.    The Plaintiff suffered severe emotional distress, including shock, shame, and fear, necessitating privacy mode on X and disrupting her personal and professional life.

85.    Relief: Compensatory and punitive damages.

## COUNT SEVEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

86.    The Plaintiff incorporates ¶¶ 1-85 as if fully set forth herein.

87.    The Defendants owed the Plaintiff a duty to report accurately and avoid foreseeable harm, given their journalistic influence and access to her clarifications (*Sheila C. v. Povich*, 11 A.D.3d 120, 130 (N.Y. App. Div. 2004) - duty arises from special relationship or foreseeable risk).

88.    The Defendants breached this duty by negligently publishing false "*Karen*" narratives, proximately causing Plaintiff emotional distress via cyberbullying.

89. Relief: Compensatory damages.

## COUNT EIGHT: BREACH OF PRIVACY (PUBLIC DISCLOSURE OF PRIVATE FACTS)

90.    Plaintiff incorporates ¶¶ 1-89.

91.    The Defendants disclosed private facts by embedding the Plaintiff's Tweet and identifying her in a manner that exposed her to public scorn, despite her status as a private individual (*Finger v. Omni Publ'ns Int'l, Ltd.*, 77 N.Y.2d 138, 142 (1990) - privacy actionable when disclosure is not newsworthy).

92.     The disclosure was not of legitimate public concern, as the Defendants' profit motive (subscriptions, ads) outweighed any news value, and Plaintiff's clarifications were disregarded.

93.     The Plaintiff suffered humiliation and economic loss as a result.

94.     Relief: Compensatory damages and injunction to remove the Articles.

## COUNT NINE: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

95.     The Plaintiff incorporates ¶¶ 1-94 as if fully set forth herein.

96.     The Plaintiff had prospective business relationships through her law firm and X monetization, disrupted by the Defendants' false publications (*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) - interference requires wrongful means).

97.     The Defendants acted with wrongful means - copyright infringement and malice causing lost clients and X revenue.

98.     Relief: Compensatory damages.

## COUNT TEN: UNJUST ENRICHMENT

99.     The Plaintiff incorporates ¶¶ 1-98 as if fully set forth herein.

100.    The Defendants were enriched by profiting from the Tweet without licensing it, at the Plaintiff's expense, as her revenue stream was curtailed (*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) - enrichment unjust where benefit retained without payment).

101.    Equity demands Defendants disgorge profits, as X's TOS does not permit such commercial use (*Morel*, 769 F. Supp. 2d at 305).

102.    Relief: Restitution of the Defendants' profits from the Tweet, to be quantified via discovery under FRCP 26(d)(1) (estimated at $30,000 per Prayer for Relief, subsection c).

## COUNT ELEVEN: MISAPPROPRIATION OF INTELLECTUAL PROPERTY

103.    The Plaintiff incorporates ¶¶ 1-102 as if fully set forth herein.

104.    The Defendants misappropriated the Plaintiff's Tweet, a valuable intellectual property, for commercial gain without consent *(Roy Exp. Co. v. Columbia Broad. Sys., Inc*., 672 F.2d 1095, 1105 (2d Cir. 1982) – common law protects against unauthorized use).

105.    This misappropriation caused the Plaintiff economic and reputational harm.

106.    Relief: Compensatory damages in an amount TBD at trial and/or as proven via discovery and injunction.

## COUNT TWELVE: VIOLATION OF NEW YORK CIVIL RIGHTS LAW § 51 (RIGHT OF PUBLICITY)

107.    The Plaintiff incorporates ¶¶ 1-106 as if fully set forth herein.

108.    The Defendants used the Plaintiff's name and Tweet for commercial purposes (advertising, subscriptions) without consent, violating her right of publicity (N.Y. Civ. Rights Law § 51; *Haelan Labs., Inc. v. Topps Chewing Gum, Inc*., 202 F.2d 866, 868 (2d Cir. 1953)).

109.    The Plaintiff suffered economic and dignitary harm as a result.

110.    Relief: Compensatory damages and injunction.

## COUNT THIRTEEN: FRAUDULENT MISREPRESENTATION

111.    The Plaintiff incorporates ¶¶ 1-110 as if fully set forth herein.

112.    The Defendants falsely represented Plaintiff as a "*Karen*" in their Articles, knowing or recklessly disregarding the truth (Exhibit 4) (*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011) – fraud requires intent to deceive).

113.    The Plaintiff relied on the Defendants' initial engagement (e.g., with Bevan Hurley) to her detriment, suffering reputational and economic harm.

114.    Relief: Compensatory and punitive damages.

## COUNT FOURTEEN: CONVERSION

115.    The Plaintiff incorporates ¶¶ 1-114 as of fully set forth herein.

116.    The Defendants wrongfully exercised dominion over the Plaintiff's Tweet by publishing it for profit, depriving her of its economic value *(Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006) – conversion applies to intangible property).

117.    The Plaintiff suffered damages (lost projected profits from continued use of Sonya's IP).

118.    Relief: Compensatory damages and return of property (injunction).

## COUNT FIFTEEN: NEGLIGENCE

119.    The Plaintiff incorporates ¶¶ 1-118 as if fully set forth herein.

120.    The Defendants owed the Plaintiff a duty of care to avoid misusing her Tweet and causing foreseeable harm (*Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344 (1928)).

121.    The Defendants breached this duty by negligently publishing false narratives, proximately causing Plaintiff economic and emotional harm.

122.    Relief: Compensatory damages.

## COUNT SIXTEEN: ABUSE OF PROCESS

123.    The Plaintiff incorporates ¶¶ 1-122 as if fully set forth herein.

124.    The Defendants misused New York's Anti-SLAPP laws in the NY State Case to threaten fees and silence the Plaintiff's meritorious claims, an improper purpose (*Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984) – abuse requires ulterior motive).

125.    The Plaintiff suffered harm, including forced withdrawal from the NY State Case and chilled speech because of the Defendants' actions.

126.    Relief: Compensatory damages.

## COUNT SEVENTEEN: VIOLATION OF FIRST AMENDMENT RIGHTS (UNDER COLOR OF STATE LAW)

127.    The Plaintiff incorporates ¶¶ 1-126 as if fully set forth herein.

128.    The Defendants, in concert with New York's Anti-SLAPP laws (state action), chilled Plaintiff's First Amendment right to petition by leveraging an unconstitutional statute (*West v. Atkins*, 487 U.S. 42, 49 (1988) – private actors liable when entwined with state). The Defendants' invocation of Anti-SLAPP in the New York State Case, enforced by forced Order of Voluntary Withdrawal, constitutes state action entwined with private conduct.

129.    The Plaintiff's speech and access to courts were suppressed, causing harm.

130.    Relief: Compensatory damages and declaratory relief.

## COUNT EIGHTEEN: DECLARATORY RELIEF - UNCONSTITUTIONALITY OF N.Y. ANTI-SLAPP LAWS

131.    The Plaintiff incorporates ¶¶ 1-130 as if fully forth herein.

132.    N.Y. Civ. Rights Law §§ 70-a, 76-a, as applied, violate due process (Fifth/Fourteenth Amendments) by denying discovery and imposing fees, chilling Plaintiff's First Amendment petition right (*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)). The statute's fee provision (N.Y. Civ. Rights Law § 70-a) deterred the Plaintiff from pursuing meritorious claims, as evidenced by her forced withdrawal (Exhibit 8).

133.    Relief: Declaration of unconstitutionality as applied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgement against each Defendant as follows:

a.    Compensatory damages including: (i) $500+ in lost projected X revenue after May 27, 2024 (Counts One-Seventeen); (ii) $10,000+ in lost law firm clients

(Counts Tow, Four, Nine); (iii) $25,000+ in emotional distress from cyberbullying (Counts Two, Six, Seven), all TBD at trial.

b.    Statutory damages of up to $150,000 per willful infringement under 17 U.S.C. § 504© (Count One), at Plaintiff's election.

c.    Restitution of Defendants' profits from the Tweet, estimated at $30,000+, via discovery (Counts One, Three, Ten).

d.    Punitive and compensatory damages to deter willful misconduct (Counts Two, Four, Six, Thirteen).

e.    Injunctions under 17 U.S.C. § 502(a) removing the Articles from all platforms, including archives (Counts One, Five, Nine, Eleven, Twelve, Fourteen).

f.    Declaratory relief that N.Y. Civ. Rights Law §§ 70-a, 76-a are unconstitutional as applied Restitution (Count Eighteen).

g.    Costs and expenses, including future attorneys' fees under 17 U.S.C. § 505.

h.    Such other relief as the Court deems just.

Dated: [TBD] 2025
New York, NY

Filed via ECF pursuant to SDNY Local Rule 5.2

Respectfully submitted,


*/s/ Sonya Shaykhoun*
Sonya Shaykhoun, Pro Se
825 West End Avenue,
New York, NY 10025
Tel: 929-408-4531
Email: sonya@shaykhounlaw.com

*Plaintiff/Attorney Pro Se*

**AFFIRMATION**

I, Sonya Shaykhoun, Esq., affirm this [TBD] 2025, under penalty of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in court of law.

> */s/ Sonya Shaykhoun*
> Sonya Shaykhoun, Esq.
> Law Offices of Sonya Shaykhoun, Esq.
> 825 West End Avenue,
> New York, NY 10025
> Tel: 929-408-4531
> Email: sonya@shaykhounlaw.com

> *Plaintiff/Attorney Pro Se*

**EXHIBITS**

*For ease of reference, the Exhibits 1-7 that have been attached to the Initial Complaint are reattached to this First Amended as set forth below*

- o   Exhibit 1: (Exhibit 1 of the Initial Complaint (Articles, ¶ 2))

- o   Exhibit 2: (Exhibit 4 of the Initial Complaint (Email to AJ McDougall, ¶ 2))

- o   Exhibit 3: (Exhibit 5 of the Initial Complaint (Hate Mail, ¶ 3))

- o   Exhibit 4 (Exhibits 8-9 of the Initial Complaint (Emails to Tracy Connor, ¶ 62))

- o   Exhibit 5: (Exhibit 10-12 of the Initial Complaint (Emails to Katrina Bell, ¶ 62))

- o   Exhibit 6: (Exhibit 13 of the Initial Complaint (Richard Best's Response, ¶ 62))

- o   Exhibit 7: (Exhibit 14 of the Initial Complaints (X TOS & Privacy Policy, ¶ 2))

- o   Exhibit 8: (NY State Case 100558/2024 Order of Voluntary Withdrawal)

- o   Exhibit 9: (Email Exchange between Kate Bolger and the Plaintiff)

**EXHIBIT 1 (EXHIBIT 1 OF THE INITIAL COMPLAINT (ARTICLES, ¶ 2))**

**EXHIBIT 2 (EXHIBIT 4 OF THE INITIAL COMPLAINT (EMAIL FROM THE PLAINTIFF TO AJ MCDOUGALL, ¶ 2))**

**EXHIBIT 3 (EXHIBIT 5 OF THE INITIAL COMPLAINT (HATE MAIL, ¶ 3))**

**EXHIBIT 4 (EXHIBIT 8-9 OF THE INITIAL COMPLAINT (EMAILS TO TRACY CONNOR, ¶ 62))**

**EXHIBIT 5 (EXHIBIT 10-12 OF THE INITIAL COMPLAINT (EMAILS TO KATRINA BELL, ¶ 62))**

**EXHIBIT 6 (EXHIBIT 13 OF THE INITIAL COMPLAINT (RICHARD BEST'S RESPONSE, ¶ 62))**

**EXHIBIT 7 (EXHIBIT 14 OF THE INITIAL COMPLAINT (X TOS, ¶ 2))**

**EXHIBIT 8: PLAINTIFF'S ORDER OF VOLUNTARY WITHDRAWAL**

**EXHIBIT 9: MARCH 3-10, 2025 EMAIL EXCHANGE BETWEEN KATE BOLGER AND THE PLAINTIFF**