Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

# SITRICK AND COMPANY

a unit of Sitrick Group, LLC

June 20, 2018

Osama Abu-Dehays, Esq.
Partner
Pillsbury Winthrop Shaw Pittman LLP
Tower 42, Level 21
25 Old Broad Street
London EC2N 1HQ

Re: State of Qatar

Dear Osama:

This letter, when accepted by Pillsbury Winthorp Shaw Pittman LLP ("Attorney"), as counsel for and on behalf of the Embassy of the State of Qatar ("Client"), will constitute the agreement with respect to the engagement of Sitrick And Company, a unit of Sitrick Group, LLC ("Sitrick") as corporate communications advisor, specialist and consultant on the following terms and conditions ("Agreement"):

1. Client and Attorney, as counsel for Client, effective as of June 20, 2018, have retained Sitrick to provide consulting advice and public relations services relating to the Client's legal interests. For purposes of this Agreement, Attorney represents that Attorney is the authorized agent of Client with authority to bind Client to the terms and obligations of this Agreement.

2. Client shall pay Sitrick a fee of $150,000 per month for professional services for as long as services are provided; Client shall pay this monthly fee to Sitrick for no less than a minimum of three months. This monthly $150,000 fee for professional services does not include time incurred for travel outside of the executive's home city office (e.g., for Michael Sitrick and Sallie Hofmeister Los Angeles), which will be billed additionally, and the additional fees for such travel time will be charged at Sitrick's hourly rate range of $195 to $1,100, depending on the person performing the services; paraprofessional time will be billed at $65.00 per hour. Time charges are computed on a portal-to-portal basis for any travel time for meetings held outside of the home city of Sitrick's office(s) where the Sitrick executive(s) are based. For clarity, "portal to portal basis" means the time spent in traveling from the initial point of departure (e.g., from the executive's office or from the executive's home, etc.) until arrival at the destination (e.g., whether that be arrival at a hotel, arrival at an office for a meeting, etc.) In the event that Client requests Sitrick executive(s) to travel outside of the United States, then in addition to the $150,000 monthly fee, Client shall pay Sitrick's travel time for each executive plus time charges for time expended by Sitrick executives performing services for Client while the executive(s) are outside of the United States, at Sitrick's then current hourly billing rates. In

1

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

relation to services provided by Sitrick executives while outside of the United States, if one of our professionals performs multiple tasks for Client during the course of the day, our statement will describe those tasks in a continuous narrative form accompanied by single time entry for all tasks. Time is charged by Sitrick in increments of one-quarter of an hour. Billing rates are adjusted at the end of each calendar year. Reimbursable costs will be billed separately on the invoice.

3.  Client's obligation to pay Sitrick for professional fees charged and, for costs and expenses is not contingent upon obtaining any particular result(s) or on the outcome of any litigation Attorney is handling for Client. Although Sitrick's invoices in the ordinary course will be transmitted to Attorney as agent for Client rather than directly to Client, Sitrick acknowledges that its services being provided pursuant to this letter agreement are for the benefit of Client and that Attorney, as Client's counsel, shall not be responsible for any fees, costs or expenses incurred in connection with Sitrick's services.

4.  Sitrick will submit an invoice with respect to (i) the monthly $150,000 fee, and (ii) other fees and expenses payable hereunder that are in addition to the monthly $150,000 fee. Attorney shall pay the $150,000 monthly fee and all other fees and expenses agreed hereunder on behalf of Client based on monthly invoices rendered by Sitrick, but only after Attorney has first received the funds to do so from Client. Going forward, Sitrick shall invoice Client for the monthly $150,000 fee at the beginning of each monthly period (on the 20th of each month), and Client shall pay such invoice for the monthly fee within 30 days of date of invoice. Client commits to transfer the $150,000 monthly fee and other fees and expenses payable to Sitrick hereunder to Attorney not more than 30 days after the invoice date. Attorney will transfer such funds to Sitrick promptly upon receipt from Client, but Attorney is not required to, and will not, advance any funds in order to pay such invoices. Client and Attorney acknowledge that the first invoice is attached hereto and is currently payable.

5.  Please review our invoices upon receipt. If Attorney or Client has any questions, please feel free to contact us. However, unless we receive written notification to the contrary within thirty days of the date of the invoice, we will assume that there is no objection to the invoice as submitted, and in the absence of such written objection, Attorney and Client agree to the reasonableness of the fees and costs charged and the necessity of the services rendered under this engagement.

6.  Costs and expenses are not included in the $150,000 monthly fee. Such costs and expenses include, without limitation, travel costs, production costs, long distance and photocopy charges, advertisements and other out-of-pocket costs and expenses. With respect to travel costs, Client will reimburse Sitrick for actual costs incurred, unless non-commercial transportation is used, in which case Client will reimburse Sitrick for transportation costs (and time) that Sitrick would have incurred by using commercial transportation. Sitrick will obtain approval in advance from Attorney for any travel expenses over $1000. However, travel to London which has occurred prior to July 13, 2018 has already been approved and travel to Cannes, France on July 15,

2

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

2018 has likewise already been approved. Client agrees that Sitrick shall have the right, at the conclusion or termination of the engagement, to apply any unused expense advance against unpaid fees.

7.  Client guarantees and agrees to be liable for all financial and legal responsibilities to Sitrick under this Agreement. Client agrees that any and all sums payable to or for the benefit of Sitrick under this Agreement (including but not limited to amounts for fees, costs, expenses, reimbursement and indemnity) shall be promptly paid by Client if not timely paid by Attorney. Client agrees to transmit funds to Attorney in such a manner as to ensure that Attorney has the funds necessary to timely pay each monthly $150,000 fee invoice and any separate invoices for separately reimbursed fees and expenses covered under this agreement to Sitrick. Attorney agrees to transmit such funds to Sitrick so they are received in a timely manner.

8.  Sitrick's engagement hereunder may be terminated by any of the parties by written notice. All provisions of this Agreement relating to the payment of fees, time charges, costs and expenses (including the minimum fee obligation in paragraph 2 hereof, and in the case of each of the foregoing fees, costs and expenses, as and to the extent earned or incurred prior to the date of such termination) and indemnification will survive conclusion of the engagement or any termination of the engagement by any of the parties

9.  In the event any employee of Sitrick, at any time, is required or requested to participate or provide testimony, documents or other evidence in any action, arbitration or other proceeding relating, directly or indirectly, to our engagement, whether or not our engagement has been terminated or concluded, Client shall pay Sitrick for the time spent in preparing for and providing such participation or testimony, at Sitrick's then standard billing rates, and for any costs and expenses, including attorneys' fees, incurred in connection therewith.

10. Sitrick hereby represents and warrants that it is familiar with and at all times during the Terms of this Agreement will remain in full compliance with all applicable laws, rules, and regulations governing Sitrick's activity in any country, state, or locality in which Sitrick conducts or will conduct business pursuant to this Agreement, including, but not limited to the Foreign Agents Registration Act ("FARA"). Sitrick further agrees to provide the Client's outside counsel, Covington & Burling LLP ("Covington") and Attorney in advance, with copies of any reports that Sitrick must file under FARA in connection with services rendered to the Client, including registration statements and semi-annual disclosure reports. Sitrick shall provide Covington and Attorney with these reports sufficiently in advance of the date they are due to be filed so as to provide Covington and Attorney with a reasonable time to review them and communicate any comments or suggestions to Sitrick prior to such filing deadline. Sitrick acknowledges Covington and Attorney's role for Client is limited to providing comments and

3

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

suggestions and Sitrick remains responsible for the accuracy and completeness of all reporting to the government.

11. Client agrees to indemnify and hold harmless Sitrick, its members, shareholders, parent company, affiliates, officers, directors, employees and agents (each such entity or person being referred to as an "Indemnified Person") from and against any and all losses, claims, damages, liabilities, costs and expenses (including for Indemnified Person's own negligence, and including, but not limited to, reasonable attorney's fees) which any Indemnified Person may be subject to or incur in connection with the services rendered by Sitrick to or for Client. This paragraph shall not apply to any such losses, claims, damages, liabilities, costs or expenses of any Indemnified Person that are judicially and finally determined to have resulted from Sitrick's or such other Indemnified Person's material breach of this agreement, gross negligence or willful misconduct. For the avoidance of doubt, Attorney has no obligations under this clause and is not providing any indemnity to Sitrick.

12. Each of the parties hereto agrees to keep this Agreement, and the terms and conditions hereof, including invoices, billing statements and time sheets, strictly confidential, except only as may be necessary to enforce this Agreement or as required to be disclosed by law or judicial process; provided, however, that Client and Attorney acknowledge and consent to Sitrick disclosing to the media or others that Sitrick is engaged and acting in its capacity as a public relations firm for the benefit of Client.

13. In the performance of this Agreement, Sitrick may receive, or otherwise have access to, confidential, proprietary and/or other nonpublic information belonging to Client ("Confidential Information"). Client and/or Attorney may from time to time specifically identify information provided to Sitrick which may be disclosed because it is not Confidential Information (an "Authorized Disclosure"), but the parties agree that the default assumption shall be that all information and materials provided to Sitrick is Confidential Information unless otherwise designated or identified by Client or Attorney for release. Sitrick agrees to maintain in strictest confidence all Confidential Information and to take reasonable measures to maintain the confidentiality of such information. Sitrick agrees, with respect to such Confidential Information, to use the same methods and degree of care to prevent disclosure of such Confidential Information as it uses to prevent disclosure of its own proprietary and Confidential Information. Sitrick further agrees not to use, or disclose to any third party, any Confidential Information for any purpose without the prior consent of Client or unless compelled by court order or other legal or governmental process requiring such disclosure. Notwithstanding the foregoing, confidentiality obligations shall not apply to any information which (i) enters (or has entered) the public domain through no fault of Sitrick; (ii) which was known to Sitrick prior to receipt from Client; (iii) is or becomes available to Sitrick on a non-confidential basis from a source other than Client (unless Sitrick is aware of a duty of confidentiality on the part of the source owed to Client); (iv) which is independently developed or acquired by Sitrick without reliance on Confidential Information; or (v) which is permitted to be disseminated or otherwise disclosed pursuant to the next paragraph of this Agreement. It is expressly understood between the parties that a key function Sitrick will be providing in connection with its

4

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

public relations services will be the dissemination of information and materials as a public relations firm, including the disclosure and dissemination of certain information and materials received from Client or its affiliated representatives, agents, and/or entities or as to which Client has consented to its dissemination and disclosure.

14.    It is expressly understood between the parties that a key function Sitrick will be providing in connection with its public relations services will be the dissemination of information and materials as a public relations firm, including the disclosure and dissemination of certain information and materials received from Client or its affiliated representatives, agents, and/or entities or as to which Client has consented to its dissemination and disclosure. Notwithstanding the foregoing or anything in this Agreement that could be construed to the contrary, it shall be the responsibility of Client (or Attorney on behalf of Client) to specifically identify and designate to Sitrick the information provided to Sitrick which is not to be disclosed because it is Confidential Information (and such identification and designation of Confidential Information must be in writing and sent by Client or Attorney to Sitrick—whether by email text or other electronic transmission).

15.    In the event that Sitrick is requested or required to produce: (i) any Confidential Information or (ii) any documents generated by Sitrick in connection with this engagement by subpoena, request for information or documents, production of records consistent with its retention as Client's expert, or other similar legal process ("Request"), Sitrick will provide Client prompt written notice of the Request so that the Client may seek a protective order or otherwise seek to limit or protect such Confidential Information and/or documents from disclosure.

16.    We wish to point out that as a firm with a diversified practice we are often called upon to represent clients in many fields and with different interests. It is expressly understood between the parties that Sitrick will not represent another client on the particular subject matter of substantive work performed under this engagement where such other client is adverse to Client on that subject matter. However, nothing contained herein in any way prohibits or restricts Sitrick from representing a client now or in the future whose interests conflict with or are adverse to Client on matters other than the particular subject matter of substantive work performed under this engagement. In such event, Sitrick would of course maintain the confidentiality of information provided by Client.

17.    Each of the parties agrees not to solicit for employment, or employ any employee of the other during the pendency of Sitrick's engagement and for a period of two years thereafter. If either party hires an employee of the other during the engagement or within the two year period following the conclusion or termination of the engagement, the hiring party agrees to pay the employer of the employee(s) so hired, as liquidated damages, a fee equal to one hundred percent of the annualized total gross billings generated by each such hired employee for the twelve-month period prior to such employee's departure, or the annual gross salary of the employee at the time of departure, whichever is higher in dollar amount. All terms contained in this paragraph

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

will survive for a period of two years following the date of any termination or conclusion of this engagement.

18. By signing this Agreement, we agree that, in the event of any dispute or claim arising out of or relating to this Agreement, our relationship, our charges, or our services, SUCH DISPUTE OR CLAIM SHALL BE RESOLVED BY SUBMISSION TO FINAL AND BINDING ARBITRATION BEFORE A SINGLE NEUTRAL ARBITRATOR IN LOS ANGELES COUNTY, UNDER THE AUSPICES AND RULES OF JUDICIAL ARBITRATION AND MEDIATION SERVICES ("JAMS") USING JAMS STREAMLINED PROCEDURES. BY AGREEING TO ARBITRATE CLIENT WAIVES ANY RIGHT IT MAY HAVE TO A COURT OR JURY TRIAL.

19. Judgment upon such arbitration may be entered in the Superior Court for Los Angeles County, California, which the parties agree has, and hereby consent to, jurisdiction over all such matters. This Agreement shall be interpreted and enforced in accordance with the substantive laws of the State of California applicable to contracts made and to be performed therein. In the event that a dispute arises hereunder, the prevailing party in any litigation or arbitration shall be entitled to attorneys' fees and all costs and expenses of any sort.

20. If any term or provision of this Agreement shall be declared invalid by order, decree or judgment of a court of competent jurisdiction, this Agreement shall be construed as if such portion had not been inserted herein (except when such construction would constitute a substantial deviation from the general intent and purpose of the parties as reflected in this Agreement) and shall not affect the validity or enforceability of the remaining terms and provisions hereof.

21. The parties acknowledge and agree that all understandings, representations and agreements heretofore made or reached by them are merged into this Agreement which alone fully and completely expresses the Agreement between the parties. This Agreement may be amended or modified only by a writing signed by all of the parties hereto.

22. Sitrick acknowledges that its services being provided pursuant to this Agreement are for the benefit of Client and that Attorney, as Client's counsel, shall not be responsible for any fees, costs or expenses incurred in connection with Sitrick's services. For the avoidance of doubt, the parties agree that under no circumstance is Attorney liable for any payments to Strick for work performed by Sitrick pursuant to this Agreement. Should any claims or disputes arise with respect to such payments that have not yet been made to Attorney, Sitrick agrees to pursue such claims only against Client, and not against Attorney.

23. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, shall be deemed to constitute a single instrument. The parties agree that a facsimile or e-mailed PDF of an

6

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of a duplicate original that may be used for all the same purposes as an original.

Very truly yours,

Sitrick Group LLC

By

Michael Sitrick
Chairman and Chief Executive Officer

(Signatures follow on next page.)

7

Received by NSD/FARA Registration Unit  07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Agreed to and accepted this

20th day of June, 2018

Pillsbury Winthrop Shaw Pittman LLP

By _____
Osama Abu-Dehays
Counsel for and Authorized Agent of the Client

Agreed to and accepted this

20th day of June 2018

CLIENT (Embassy of the State of Qatar)

By _____
Name:
Title:

8

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Osama Abu-Dehays, Esq.
Partner
Pillsbury Winthrop Shaw LLP
Tower 42, Level 21
25 Old Broad Street
London EC2N 1HQ

Re: State of Qatar

## INVOICE

Past Due Initial Monthly Fee for the period beginning

June 20, 2018.................................................................... $150,000.00

Refundable Expense Advance................................................. $15,000.00

TOTAL DUE ...........................................................................$165,000.00

Please wire transfer funds to:

City National Bank
Credit Account of: Sitrick Group, LLC
~~████████████████████████~~
~~██████████████ 868806~~
Attn: Diane Wilson

or

Please make check payable to:

Sitrick Group, LLC
11999 San Vicente Blvd., Penthouse
Los Angeles, CA 90049
(310) 788-2850
Fed ID No. 33-0832424

9

Received by NSD/FARA Registration Unit   07/30/2018 11:09:55 AM

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT D:

*Plaintiff's March 8, 2020, Email & Letter to Debra Erni about Osama Abu Dehays' Licensure Deficit*

*Nota Bene: See Exhibit L (Letter to Sh. Ahmed) which is an attachment to the Debra Erni email and too voluminous to duplicate.*

**From:** **Sonya Shaykhoun** shaykhoun@protonmail.com
**Subject:** Private & Confidential - Osama Abu Dehays
**Date:** March 8, 2020 at 9:04 PM
**To:** debra.erni@pillsburylaw.com
**Cc:** edward.flanders@pillsburylaw.com

Dear Ms. Erni,

I sent the attached letter and related attachments on Friday 6 March 2020. Upon reflection, I should have included you in this correspondence. I am bound professional duty as a Member of the New York Bar (2008) to apprise you of this egregious matter. I believe you, as an English solicitor, you also have a professional duty to investigate Osama further and report your findings as necessary.

You should also know that I have heard from extremely credible sources that Osama is a flight risk and may abscond to a non-extradition country, which would leave Pillsbury and its clients to clean up his holy mess. If I didn't live part of this story personally, I would never believe it myself.

I have already sent this to the SRA and the Law Society of England and Wales.

Good luck.

Kind regards,
Sonya

Tel: +1-929-408-4531

Sent with ProtonMail Secure Email.

Osama_Abu_Dehays_Letter_to_D
_Erni_London_March_8_2020.d...
466 KB

SHS Memo Feb 12 2012 (1).pdf
2.1 MB

Letter to Dr. Soaeg-1 (2).docx
28 KB

DocuSign Envelope ID: 2DDB085A-2B05-4F91-BEDB-52F81CDD6B58

**The Law Offices of Sonya Shaykhoun, Esq.**
110 E. 25th Street,
New York, NY 10010

8 March 2020

**Private & Confidential**
Via email: debra.erni@pillsburylaw.com

Ms. Debra Erni
Partner
Pillsbury Winthrop Shaw Pittman LLP
Tower 42, Level 41,
25 Old Broad Street,
London, EC2N 1HQ,
United Kingdom

Dear Ms. Erni,

**Re:  Osama Abu Dehays, Partner, Pillsbury – London**

My name is Sonya Shaykhoun. I am writing to you about Osama Abu Dehays, a partner in Pillsbury's London office. My writing to you about Osama's credentials is not a personal vendetta and I have not had a personal relationship with Osama (i.e., no failed love affair or any other such shenanigans) and the only relationship I have had with Osama Abu Dehays was of a professional nature. I am duty-bound by a profound sense of personal and professional ethics to write to you about this sensitive subject: Osama Abu Dehays is not a licensed Jordanian lawyer as I explain below.

Before I get into Osama, let me introduce myself. I am a New York-qualified lawyer in good standing (I passed in 2007, swore in in 2008). I grew up in Manhattan, where I attended Dalton and then spent my final semester of high school at St. Stephen's School in Rome, Italy. I then attended the University of St. Andrews, Scotland where I read for an MA Honours Degree in English Language and Literature before going down to London. I read for a BA in Arabic and Law and an LL.M. in Corporate and Commercial Law at the School of Oriental and African Studies (SOAS), University of London. I embarked on my international legal career in May, 2004, when I travelled to Bahrain to take up my first-ever legal role as Senior Legal Counsel, working primarily as a technology, media and telecommunications lawyer. Ultimately, I spent 15 years in the Arabian Gulf, working as a lawyer for reputable multinationals like Orbit (now OSN) and Charles Russell LLP in Bahrain (2004-2011) and Al Jazeera Media Network ("AJMN") and Qatar Airways in Qatar (2011-2019). Based on all of the corruption that I witnessed and experienced in Qatar, I pursued my second LL.M in Corruption, Law and

DocuSign Envelope ID: 2DDB085A-2B05-4F91-BEDB-52F81CDD6B58

Governance offered by the University of Sussex and the Rule of Law and Anti-Corruption Center (ROLACC) in Doha, Qatar (2016-2018). I pride myself on my personal and professional integrity and it is that level of integrity that repeatedly got me into a lot of trouble in the Arabian Gulf, especially in the maelstrom of corruption and fraud that is Qatar.

I first encountered Osama when I interviewed for a job as Legal Counsel in the Contracts Department of AJMN in June 2010 and where I worked from February 2011 to March 2012. Knowing what I know, I was beyond flummoxed when I learned that Osama is now a partner at Pillsbury in London. It is an open secret in Qatar that Osama does not have a Jordanian law license. I first learned that Osama does not have a Jordanian law license from my former AJMN colleague, Yousef Al Jaber, a Qatari lawyer who had previously sued AJMN, its Chairman and Osama personally, asserting the claim that, because of "*Qatarization*", Osama's job should have gone to a Qatari lawyer and not a relatively inexperienced and young Palestinian/Jordanian. Yousef told me that he had travelled to Jordan to check Osama's credentials at the Jordanian Bar Association and discovered that the only Osama Abu Dehays listed on the roster of licensed lawyers in the Jordanian Bar Association ("JBA") was born in the 1940s. Osama Abu Dehays, the Pillsbury partner in London, is a 1970s baby. I recently called the JBA and learned that the JBA is not very transparent; one is unable to look up lawyers to confirm law licenses. An opaque institution like the JBA facilitates the perpetration of a fraud such as that of Osama. Despite the shroud of secrecy engulfing the JBA, Yousef Al Jaber, being Qatari and a native Arabic speaker, probably bribed someone (a normal practice in the Middle East) to obtain the information that he shared with me during the course of our working together at AJMN.

Nothing – not my education, not my privileged NYC upbringing - could have prepared me for the very ugly dealings I had with Osama when he sabotaged my onboarding at AJMN. The details of this saga are in the attached memos I addressed to Sheikh Ahmed Al Thani, the then-Director General ("DG") of AJMN, and Mostafa Soueg, the current DG. Suffice it to say, when I finally got to Doha in February 2011, Osama called me a serial troublemaker, refused to take responsibility for the loss of six months' salary and told me to "let it go" (would Osama "let it go"?) AJMN never compensated me for that lost six months. Sheikh Ahmed told me that Osama had pulled the same "*quit/don't quit trick*" detailed in the memos on another lawyer who had been offered a job at AJMN at the same time as I was. It was the start of a very arduous eight years detailed in The Daily Caller article about me.[1]

The Daily Caller was supposed to write a second piece about my time in the AJMN Contracts Department and the extent to which Osama's Contracts Department and AJMN were a mess. In February 2011, there were no corporate records of any of the bureaus, no contract copies, no paper trails of emails or anything, and we faced very serious and dubious issues like "*how do we send money abroad to the foreign*

---

[1] https://dailycaller.com/2019/08/03/qatar-travel-ban-billionaires-slaves-trapped-middle-east/

DocuSign Envelope ID: 2DDB085A-2B05-4F91-BEDB-52F81CDD6B58

*bureaus?*" (the practice had been to send cash abroad in bags). Osama's Contract Department was undisciplined, characterized by chaos, hacking, sabotage, and ineptitude. Osama was largely absent. I was one of the few lawyers with an actual law license. My job was to set up foreign bureaus but every time I opened a new bureau, I would get into serious trouble and my immediate supervisor, Dr. Mahdi Zahraa, would call me up yelling and screaming. Dr. Mahdi even went so far as to threaten assassination on multiple occasions. Nobody, including Osama, did anything to correct this behavior. This was in my first nine months at AJMN and I could not leave because I was now burdened with a loan in Qatar to clean up the financial mess that Osama caused me (and getting an exit permit from Qatar to leave for good requires that one has zero debt).

The Daily Caller's second article never happened. It seems to me that money may have passed hands to quash the story. Before that happened, The Daily Caller's "*fixer*" and hacker, John Hawley, met me in NYC in August 2019. John confirmed to me that he had Osama's Jordanian law license evaluated by an expert who advised that Osama's Jordanian law license was "*a very good forgery.*" Luke Roziak of The Daily Caller wrote to Matt Hyams of Pillsbury in New York in July 2019. Matt's correspondence with Luke about Osama's credentials confirms Osama's fraud:

> *As requested, I can confirm Osama Abu-Dehays was admitted to the Jordanian Bar Association in 2002 and that his Bar number is 11840. He is also registered with the UK's Solicitors Regulation Authority as a registered foreign lawyer and is a member of the Law Society of England and Wales.*

Osama's date of admission proves that Osama could not possibly be a licensed Jordanian lawyer. It seems that nobody – neither at Bird & Bird nor at Pillsbury – ever asked any questions to see if Osama's "*legal pedigree*" held water. Questions like the following would have stopped this fraudster in his tracks: "*How do you become a lawyer in Jordan?*"; or, "*How could Osama be a Jordanian licensed lawyer without fulfilling any of the conditions – like graduating from a Napoleonic Code university or doing a training contract?*"; "*When did Osama do his legal training in Jordan?*"; "*How could Osama be in Kent and in Jordan at the same time?*" To be fair, his working in Dubai without a license is par for the course, however he could not have the Jordanian law license. LinkedIn (see attached) states Osama worked at MBC in Dubai in 2002 but there is no mention of a training contract in Jordan.

Becoming a licensed lawyer in Jordan is intensive and is pre-conditioned on studying law in a Napoleonic Code jurisdiction, as Arab legal systems are based on Napoleonic Code. One cannot obtain a legal degree in a non-Napoleonic Code and/or non-Arab country and then become a licensed lawyer in an Arab country like Jordan. The English "*conversion course*" is not available in the Arab world. Osama did his LL.B. at the University of Kent at Canterbury in England (i.e., a common law country) and not in an Arab country. Therefore, Osama could not even have started the process of training to become a lawyer in Jordan. After graduation, the trainee lawyer must train in a law office IN JORDAN under the supervision of a JORDANIAN LAWYER. Training lasts for

DocuSign Envelope ID: 2DDB085A-2B05-4F91-BEDB-52F81CDD6B58

AT LEAST TWO YEARS (and sometimes longer) and CULMINATES with a written thesis, written under the supervision of an actual JORDANIAN LAWYER. (Someone should ask Osama what HE WROTE HIS THESIS ON TO BECOME A LICENSED JORDANIAN LAWYER.) The Jordanian legal training cannot be undertaken outside of Jordan. The Group General Counsel at MBC was and still is an English solicitor named John Whitehead. According to LinkedIn, Osama has not worked in Jordan at any time since 2002. Osama's jobs are well documented on LinkedIn and in press releases online. Since Osama cannot be a licensed Jordanian lawyer, it follows that his registrations with the SRA and his membership with the Law Society of England and Wales as a Foreign Lawyer are fraudulent. Obviously, Osama's dealings with Pillsbury's clients are not only a massive liability risk, but fraudulent, making Osama a criminal.

Luke asked Matt to explain why Osama had two additional inaccuracies on his Pillsbury profile:

> *I have a question about whether Osama Abu-Dehays, a partner in Pillsbury's London office, may be misrepresenting his credentials. He is from the nation of Jordan.*
>
> *1) Under Clerkships, his Pillsbury profile lists only "Clerk for Judge Cynthia Holcomb Hall, U.S. Tax Court."*
>
> *Judge Holcomb was on the tax court from 1972-1981, departing when Osama was only two years old (I believe he was born in 1979). She was on the US District court from 1981-1984, and on the Circuit Court of Appeals from 1984-1997. She retired in 1997, when Osama was only 18 years old. (He was in college 1997-2001.)*
>
> *2) Under Courts, his Pillsbury profile lists (only) "All California District Courts."*
>
> *The California state bar lists no record of him. Additionally, I am not sure California District Courts refers to anything. From what I know, there are US District Courts (federal) and California superior, supreme, and appeals courts. There is no record of him ever having tried a federal case in the US in PACER.*

Matt Hyams's implausible excuse to Luke was that the above misrepresentations were "leftovers" from another lawyer's profile because of the use of a boilerplate form. International firms like Pillsbury check, double-check and triple-check what their lawyers put on their official profiles. Osama is a partner and not a mere associate. It is so sloppy one wonders if a third party at Bird & Bird or Pillsbury were not complicit in Osama's fraud.

I wrote to the SRA in July 2019 about my concerns about Osama and followed up on several occasions. The SRA has not responded, which leaves me wondering if someone there has been paid off. Though my own dealings with Osama had disastrous consequences, the main reason I believe Osama is not a licensed Jordanian lawyer is

DocuSign Envelope ID: 2DDB085A-2B05-4F91-BEDB-52F81CDD6B58

based on facts and common sense: **Osama cannot be a licensed Jordanian lawyer because he did do his law degree in a Napoleonic Code Arab country and he did not do his training contract in Jordan**. Credentials fraud happens all the time in the Middle East; but we are in the West where the Rule of Law should mean something. Fraudsters should be brought to justice. Osama's insolence is so morally corrupt and offensive that it has to be cured. Osama has managed to bullshit his way into a partnership in a leading international firm. It looks like a case of "*The Emperor's New Clothes*" and the "*Emperor*" in this case is, unfortunately, Pillsbury.

I would be happy to discuss this grievous matter further with you. If you would like to discuss with me, although I am in NYC and I would be available to speak with you on the telephone. My email is shaykhoun@protonmail.com and my phone number is +1-929-408-4531.

Sincerely yours,

DocuSigned by:

*Sonya Shaykhoun*

7FB368C017824FD...

Sonya Shaykhoun, Esq.

cc.    Solicitors Regulatory Authority
       The Law Society of England and Wales
       Edward Flanders, Partner, Pillsbury – New York

Encs. Letter to Sheikh Ahmed Al Thani
      Letter to Dr. Mostafa Souag, Director
      Screenshot of Osama Abu Dehays' LinkedIn profile

Case 1:24-cv-09978-ALC    Document 78-1    Filed 04/10/26    Page 17 of 73



Osama Abu-Dehays | LinkedIn    ✕    (18624) Inbox | shaykhoun@    ✕    +

linkedin.com/in/osama-a-1251252/

Q Search    Home    My Network    Jobs    Messaging    Notifications    Me ▾    Work ▾    Reactivate Premium: 50% Off

**Osama Abu-Dehays**
Partner at Pillsbury Winthrop Shaw Pittman LLP

More...

UAE

Pillsbury bulks up in
Abu Dhabi with Bird ...

What is your greatest
weakness?

**Partner**
Bird & Bird
Jun 2012 – Nov 2014 · 2 yrs 6 mos
Qatar - UAE

Promoted                    ...

**Get Financed Today!**
Get your business financed in as
little as 24 hours with Lendio.

**Chief Legal Counsel**
Al Jazeera Media Network
Aug 2009 – Jun 2012 · 2 yrs 11 mos

**Jack Welch HR MBA**
Get ahead with a top-ranked Jack
Welch online MBA in Human
Resources.

**Head of Legal & Business Affairs**
Arab Media Group
2005 – 2009 · 4 yrs

**The Future of FinTech**
6-week online short course

**Associate Lawyer**
MBC (Middle East Broadcasting Centre)
2002 – 2005 · 3 yrs

Education

**University of Kent**
2000 – 2002

**Concordia University**
Bcomm, Bachelor of Commerce - International Business

20 October 2013

Dr. Mostefa Souag,

**Re: Sonya Shaykhoun's delayed start date 29 August 2010 – 5 February 2011**

Thank you for taking the time to speak with me, albeit briefly, earlier this month about my attempts to claim the salary I lost as a direct result of the mishandling by Al Jazeera HR and legal departments after I was hired as Legal Counsel for Al Jazeera in mid-2010. As requested, I have prepared a brief letter outlining the chronology, the losses I suffered and the reasons why I firmly believe Al Jazeera should compensate me for my loss of salary consequent to the bungled communications between Al Jazeera's HR and Legal departments, Maria Coombe (the recruiter of Footprint Legal engaged by Al Jazeera) and me.

**Chronology:**

- **June 22nd – June 24, 2010.** I was invited by Al Jazeera, via Maria Coombe, for an interview at Al Jazeera in Doha. For the duration of the hiring process, I dealt directly with Maria Coombe, who liaised directly with Osama Abu Dehays, the then-General Legal Counsel;

- **July 12th, 2010.** I received a written job offer for the role of Legal Counsel from Al Jazeera. The offer was conditional among other things, on: (i) "a contract of employment is signed by you and all employment procedures have been completed" (my employment contract was not signed until February 2012 when I took this matter up with Sheikh Ahmed, the former DG meaning I was working and paid but I was not working under a valid contract for an entire year); and, (ii) "the signed copy [of the offer] with a valid copy of your passport and the university degree (notarized by the embassy of the State of Qatar) within one week of the date above." Maria Coombe told me to refrain from quitting my stable job in Bahrain (which paid me more than Al Jazeera) until she received the "green light" from Osama Abu Dehays;

- **July 18th, 2010.** I accepted Al Jazeera's over via email to Maria Coombe (the protocol established by Maria Coombe and Al Jazeera);

- **July 19th, 2010.** Maria Coombe called and texted me (on my Bahraini mobile) to tell me that Osama Abu Dehays confirmed that I could quit my job. Maria Coombe wrote to me and to the concerned parties at Al Jazeera confirming my start date as August 29th, 2010;

- **July 20th, 2010.** Maria Coombe called me in a panic to ask me if I had tendered my resignation yet because Al Jazeera's HR Department were of the opinion that my Qatari work visa could take between a month and two months to process. Osama Abu Dehays wrote to me directly trying to "whitewash" the bungled communication regarding my start date. There was no offer to compensate me or to apologize for the error;

- **January 30th, 2011.** My Qatari work permit was finally issued, nearly six months after my original target start date; and

- **February 6ᵗʰ, 2011.** I finally took up my post as Legal Counsel in Al Jazeera.

I cannot tell you how excited and honored I was to be invited to work at Al Jazeera, the "Harvard" of media companies. I cannot tell you how disappointed I was when all my efforts to mitigate the delayed Qatari work permit fell on deaf ears. Osama Abu Dehays would not even dignify my countless pleading emails with a response. I am a dual citizen of the United States and Ireland and I could easily have worked in Washington or London or even in Bahrain as a freelancer. Osama refused to assist me in any way even though I wrote to him on many occasions to tell him how serious my worsening financial situation was. To make matters worse, in February 2011, when I was about to take up my job at Al Jazeera, Maria Coombe wrote to me warning me not to raise the issue of my lost salary with him. When I did in fact raise it with him a few months into my job, Osama simply told me to "let it go". Before that, Maria Coombe had written to me in the fifth month of my wait to tell me to start looking for another job.

In January 2012, I went to see Sheikh Ahmed about this problem that had been swept under the carpet for a year. Sheikh Ahmed asked me to prepare a memo, which I did (see attached for reference purposes). After Amin Abdalla became Executive Director - General Legal Counsel in April 2012, I took up the issue with him and he assured me it would be resolved and that things would get better for me. I left the issue with Amin and Sheikh Ahmed because while I was working hard to manage the corporate restricting and compliance exercise and to do my other work, I attended several Town Hall Meetings in which I heard about Al Jazeera's commitment to its people. In the invitation to a Town Hall Meeting dated October 4ᵗʰ, 2012, Sheikh Ahmed wrote:

> *"We want to reward, retain and develop our Al Jazeera Family to exceed that of all of our competitors. We want Al Jazeera to be the best place to work in television anywhere in the world."* Many such messages espousing the importance of employees have since been disseminated by the DG (*"Organizations that partner with their employees and recognize employees as the main assets will retain those employees, strengthen them and grow with them"* excerpted from DG Circular entitled "'Annual Performance Appraisal' the First Step in Improvement" dated October 4ᵗʰ, 2012.)

After a year of hearing these hopeful messages, after working long and hard hours, including over my holidays, weekends, evenings and often into the night, I feel very disappointed that an institution that has a stellar global reputation and that for the last year and a half has been striving to implement international best practices has failed both: (i) to accept that it made an error causing me serious financial losses and emotional distress; and, (ii) to rectify the damage and compensate me for the loss of earnings while I was waiting for my Qatari work permit to arrive.

In the English and American legal systems, a concept exists called **"promissory estoppel,"** defined as *"a 'consideration substitute' in contract law that renders certain promises otherwise lacking in consideration binding and enforceable...the promisee's reliance is treated as an independent and sufficient basis for enforcing the promise. Promissory estoppel can be viewed as a legal device that prohibits the promissor from denying the existence of a contract for lack of consideration."* What this means as it applies to my case is: (i) Al Jazeera and its agent (Maria Coombe) made an offer on which I relied in good faith; (ii) I acted on that offer to my detriment; (iii) because I acted on reliance of that offer to my detriment and lost nearly six months' salary, I assert that Al Jazeera has an obligation to compensate me for the salary I lost even though there was no signed contract by virtue of the fact that I relied on the communications from Maria et al.

When I received my letter from Amin Abdalla in September 2013 confirming my position Senior Legal Counsel and my ten percent increase in salary, I took the opportunity to ask Amin about the status of my request to resolve this issue. Amin told me that my losses were "inconsequential" and that I do not have a contractual right to the salary. He invited me to get a second opinion. I asserted the concept of "promissory estoppel" and he refused to hear about it because there was no "contract" (again, even though technically there was no contract until February of 2012). Amin brushed off what happened to me as "HR's inefficiency", which confirms that he acknowledges it was Al Jazeera's fault. Why should I pay for HR's inefficiency? How is this an example of treating employees as assets?

There are precedents that can be applied to my case to support my request for a resolution in my favor. During my nearly three years tenure at Al Jazeera, I have striven to protect the interests of Al Jazeera with integrity and fairness. Since February 2011, I have seen cases similar mine resolved fairly and consistently:

- **Caroline Guetteneau**. When Al Jazeera Sports France (now BeIN Sport) hired Caroline Guetteneau, Al Jazeera agreed to pay her six months' salary while she stayed at home (not working yet) so that she would not breach the six month non-complete clause in her employment contract with her former employer, Canal+;

- **Berlin Taxes & AJE Employees' Backtaxes**. As a result of the tax compliance exercise that I managed with International Operations (Jonathan Powell, specifically) from early 2012 onwards, the tax situation in Berlin was so tricky that it was decided by the EDs to pay the back-taxes of the AJE employees in Berlin who were not registered with the tax authorities because of bureaucratic hurdles within Al Jazeera. I specifically remember Amin agreeing to Al Jazeera paying their back taxes until May 31st, 2012 to avert the risk that one of the AJE employees would go to the German tax authorities to report the non-payment of taxes before Al Jazeera submitted its "Leniency Declaration." Had the AJE employees gone to the German tax authorities before Al Jazeera submitted its Leniency Declaration, Al Jazeera and its senior management (worldwide) would have lost immunity to criminal liability for tax evasion, which would have been disastrous for Al Jazeera and its senior management for countless reasons; and

- **Husam Chadet**. One of the outcomes of the Berlin tax compliance exercise was the realization that Al Jazeera had overpaid taxes and social security payments in respect of Husam Chadet. However, recently there was some misunderstanding about whether Husam Chadet owned Al Jazeera money in respect of back taxes. and in one staff meeting last September, Amin protested that an employee should not be penalized to the tune of €100,000. I questioned him about Al Jazeera's "moral and ethical duty to waive the taxes" and he agreed that this was the case in the meeting. As it happens, Husam paid all of his taxes and the amount in question represents Al Jazeera's overpayment of taxes in respect of his previous employment with Al Jazeera from 2005-10 and Husam's assignment of future tax rebates to Al Jazeera.

I am quite frankly flummoxed and very demoralized. I have dedicated three years of my career to helping to raise Al Jazeera up to the international standards to which it aspires by managing the restructuring and the tax compliance projects. I have heard countless beautiful speeches about how Al Jazeera puts its employees first and foremost. And yet, when I try to highlight the fact that I lost six months' salary (which cost me a year's salary to clean up the mess of cannibalized credit cards, late car payments, late rent, late student loan payments not to mention having to go through the embarrassment of borrowing money from friends and risked facing a travel ban in Bahrain because I couldn't pay my debts) to anyone with

authority to fix it, I am brushed off and told my loss is "inconsequential" and that I do not have a right to it. I love my job. I love the Al Jazeera brand and I believe it in. Notwithstanding, I firmly believe I have a right to be compensated for the loss of salary I suffered consequent to "HR's inefficiency", as Amin put it, because I relied on the job offer to my detriment and because, if Al Jazeera really puts its people first, then I believe it really has to remedy this issue on moral and ethical grounds, if the legal argument I have asserted is not accepted. I do not understand why my case is being deemed to be different to other similar cases. I am a stellar employee of high caliber, dedicated to my work and the company. It simply does not make sense to me to insist that I was not damaged by this mistake when I was and I am still paying for it and will continue to pay for it for several years to come.

I trust that Al Jazeera will do the right thing, even if it will have taken three years to do so.

Thank you.


Kind regards,


Sonya H. Shaykhoun, Esq.
NY Bar, LL.M (London)

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT E:

## *Plaintiff's March 8, 2020, Email & Letter to Edward Flanders (Partner, New York) about Osama Abu Dehays' Licensure Deficit*

*Nota Bene: See Exhibit L (Letter to Sh. Ahmed which is one of the voluminous attachments to this email.*

**From:** **Sonya Shaykhoun** shaykhoun@protonmail.com
**Subject:** Private & Confidential - Osama Abu Dehays
**Date:** March 6, 2020 at 5:56 PM
**To:** edward.flanders@pillsburylaw.com

Dear Mr. Flanders,

Please see attached letter and related documents for your perusal and action.  I am available in NYC to meet to discuss at your convenience.

Sincerely yours,
Sonya Shaykhoun, Esq.

Tel: +1-929-408-4531

Sent with ProtonMail Secure Email.



**Signed Letter to E Flanders March 6 2020 SHS.pdf**        **SHS Memo Feb 12 2012 (1).pdf**

**Letter to Dr. Soaeg-1.docx**

**The Law Offices of Sonya Shaykhoun, Esq.**
110 E. 25th Street,
New York, NY 10010

March 6, 2020

**Private & Confidential**

Mr. Edward Flanders
Partner
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019

Dear Mr. Flanders,

**Re: Osama Abu Dehays, Partner, Pillsbury – London**

My name is Sonya Shaykhoun. I am writing to you about Osama Abu Dehays, a partner in Pillsbury's London office. My writing to you about Osama's credentials is not a personal vendetta and I have not had a personal relationship with Osama (i.e., no failed love affair or any other such shenanigans) and the only relationship I have had with Osama Abu Dehays was of a professional nature. I am duty-bound by a profound sense of personal and professional ethics to write to you about this sensitive subject: Osama Abu Dehays is not a licensed Jordanian lawyer as I explain below.

Before I get into Osama, let me introduce myself. I am a New York-qualified lawyer in good standing (I passed in 2007, swore in in 2008). I grew up in Manhattan, where I attended Dalton and then spent my final semester of high school at St. Stephen's School in Rome, Italy. I then attended the University of St. Andrews, Scotland where I read for an MA Honours Degree in English Language and Literature before going down to London. I read for a BA in Arabic and Law and an LL.M. in Corporate and Commercial Law. I embarked on my international legal career in Mary 2004, when I travelled to Bahrain to take up my first-ever legal role as Senior Legal Counsel, working primarily as a technology, media and telecommunications lawyer. Ultimately, I spent 15 years in the Arabian Gulf, working as a lawyer for reputable multinationals like Orbit (now OSN) and Charles Russell LLP in Bahrain (2004-2011) and Al Jazeera Media Network ("AJMN") and Qatar Airways in Qatar (2011-2019). Based on all of the corruption that I witnessed and experienced in Qatar, I pursued my second LL.M in Corruption, Law and Governance offered by the University of Sussex and the Rule of Law and Anti-Corruption Center (ROLACC) in Doha, Qatar (2016-2018). I pride myself on my personal and professional integrity and it is that level of integrity that repeatedly

got me into a lot of trouble in the Arabian Gulf, especially in the maelstrom of corruption and fraud that is Qatar.

I first encountered Osama when I interviewed for a job as Legal Counsel in the Contracts Department of AJMN in June 2010 and where I worked from February 2011 to March 2012. Knowing what I know, I was beyond flummoxed when I learned that Osama is now a partner at Pillsbury in London. It is an open secret in Qatar that Osama does not have a Jordanian law license. I first learned that Osama does not have a Jordanian law license from my former AJMN colleague, Yousef Al Jaber, a Qatari lawyer who had previously sued AJMN, its Chairman and Osama personally, asserting the claim that, because of "*Qatarization*", Osama's job should have gone to a Qatari lawyer and not a relatively inexperienced and young Palestinian/Jordanian. Yousef told me that he had travelled to Jordan to check Osama's credentials at the Jordanian Bar Association and discovered that the only Osama Abu Dehays listed on the roster of licensed lawyers in the Jordanian Bar Association ("JBA") was born in the 1940s. Osama Abu Dehays, the Pillsbury partner in London, is a 1970s baby. I recently called the JBA and learned that the JBA is not very transparent; one is unable to look up lawyers to confirm law licenses. An opaque institution like the JBA facilitates the perpetration of a fraud such as that of Osama. Despite the shroud of secrecy engulfing the JBA, Yousef Al Jaber, being Qatari and a native Arabic speaker, probably bribed someone (a normal practice in the Middle East) to obtain the information that he shared with me during the course of our working together at AJMN.

Nothing – not my education, not my privileged NYC upbringing - could have prepared me for the very ugly dealings I had with Osama when he sabotaged my onboarding at AJMN. The details of this saga are in the attached memos I addressed to Sheikh Ahmed Al Thani, the then-Director General ("DG") of AJMN, and Mostafa Soueg, the current DG. Suffice it to say, when I finally got to Doha in February 2011, Osama called me a serial troublemaker, refused to take responsibility for the loss of six months' salary and told me to "let it go" (would Osama "let it go"?) AJMN never compensated me for that lost six months. Sheikh Ahmed told me that Osama had pulled the same "*quit/don't quit trick*" detailed in the memos on another lawyer who had been offered a job at AJMN at the same time as I was. It was the start of a very arduous eight years detailed in **The Daily Caller** article about me.[1]

**The Daily Caller** was supposed to write a second piece about my time in the AJMN Contracts Department and the extent to which Osama's Contracts Department and AJMN were a mess. In February 2011, there were no corporate records of any of the bureaus, no contract copies, no paper trails of emails or anything, and we faced very serious and dubious issues like "*how do we send money abroad to the foreign bureaus?*" (the practice had been to send cash abroad in bags). Osama's Contract Department was undisciplined, characterized by chaos, hacking, sabotage, and ineptitude. Osama was largely absent. I was one of the few lawyers with an actual law

---

[1] https://dailycaller.com/2019/08/03/qatar-travel-ban-billionaires-slaves-trapped-middle-east/

license. My job was to set up foreign bureaus but every time I opened a new bureau, I would get into serious trouble and my immediate supervisor, Dr. Mahdi Zahraa, would call me up yelling and screaming. Dr. Mahdi even went so far as to threaten assassination on multiple occasions. Nobody, including Osama, did anything to correct this behavior. This was in my first nine months at AJMN and I could not leave because I was now burdened with a loan in Qatar to clean up the financial mess that Osama caused me (and getting an exit permit from Qatar to leave for good requires that one has zero debt).

**The Daily Caller**'s second article never happened. It seems to me that money may have passed hands to quash the story. Before that happened, **The Daily Caller**'s "*fixer*" and hacker, John Hawley, met me in NYC in August 2019. John confirmed to me that he had Osama's Jordanian law license evaluated by an expert who advised that Osama's Jordanian law license was "*a very good forgery.*" Luke Roziak of **The Daily Caller** journalist wrote to Matt Hyams of Pillsbury in New York in July 2019. Matt's correspondence with Luke about Osama's credentials confirms Osama's fraud:

> As requested, I can confirm Osama Abu-Dehays was admitted to the Jordanian Bar Association in 2002 and that his Bar number is 11840. He is also registered with the UK's Solicitors Regulation Authority as a registered foreign lawyer and is a member of the Law Society of England and Wales.

Osama's date of admission proves that Osama could not possibly be a licensed Jordanian lawyer. It seems that nobody – neither at Bird & Bird nor at Pillsbury – ever asked any questions to see if Osama's "*legal pedigree*" held water. Questions like the following would have stopped this fraudster in his tracks: "*How do you become a lawyer in Jordan?*"; or, "*How could Osama be a Jordanian licensed lawyer without fulfilling any of the conditions – like graduating from a Napoleonic Code university or doing a training contract?*"; "*When did Osama do his legal training in Jordan?*"; "*How could Osama be in Kent and in Jordan at the same time?*" To be fair, his working in Dubai without a license is par for the course, however he could not have the Jordanian law license. LinkedIn (see attached) states Osama worked at MBC in Dubai in 2002 but there is no mention of a training contract in Jordan.

Becoming a licensed lawyer in Jordan is intensive and is pre-conditioned on studying law in a Napoleonic Code jurisdiction, as Arab legal systems are based on Napoleonic Code. One cannot obtain a legal degree in a non-Napoleonic Code and/or non-Arab country and then become a licensed lawyer in an Arab country like Jordan. The English "*conversion course*" is not available in the Arab world. Osama did his LL.B. at the University of Kent at Canterbury in England (i.e., a common law country) and not in an Arab country. Therefore, Osama could not even have started the process of training to become a lawyer in Jordan. After graduation, the trainee lawyer must train in a law office IN JORDAN under the supervision of a JORDANIAN LAWYER. Training lasts for AT LEAST TWO YEARS (and sometimes longer) and CULMINATES with a written thesis, written under the supervision of an actual JORDANIAN LAWYER. (Someone should ask Osama what HE WROTE HIS THESIS ON TO BECOME A LICENSED

JORDANIAN LAWYER.) The Jordanian legal training cannot be undertaken outside of Jordan. The Group General Counsel at MBC was and still is an English solicitor named John Whitehead. According to LinkedIn, Osama has not worked in Jordan at any time since 2002. Osama's jobs are well documented on LinkedIn and in press releases online. Since Osama cannot be a licensed Jordanian lawyer, it follows that his registrations with the SRA and his membership with the Law Society of England and Wales as a Foreign Lawyer are fraudulent. Obviously, Osama's dealings with Pillsbury's clients are not only a massive liability risk, but fraudulent, making Osama a criminal.

Luke asked Matt to explain why Osama had two additional inaccuracies on his Pillsbury profile:

> I have a question about whether Osama Abu-Dehays, a partner in Pillsbury's London office, may be misrepresenting his credentials. He is from the nation of Jordan.
>
> 1) Under Clerkships, his Pillsbury profile lists only "Clerk for Judge Cynthia Holcomb Hall, U.S. Tax Court."
>
> Judge Holcomb was on the tax court from 1972-1981, departing when Osama was only two years old (I believe he was born in 1979). She was on the US District court from 1981-1984, and on the Circuit Court of Appeals from 1984-1997. She retired in 1997, when Osama was only 18 years old. (He was in college 1997-2001.)
>
> 2) Under Courts, his Pillsbury profile lists (only) "All California District Courts."
>
> The California state bar lists no record of him. Additionally, I am not sure California District Courts refers to anything. From what I know, there are US District Courts (federal) and California superior, supreme, and appeals courts. There is no record of him ever having tried a federal case in the US in PACER.

Matt Hyams's implausible excuse to Luke was that the above misrepresentations were "leftovers" from another lawyer's profile because of the use of a boilerplate form. International firms like Pillsbury check, double-check and triple-check what their lawyers put on their Pillsbury profiles. Osama is a partner and not a mere associate. It is so sloppy one wonders if a third party at Bird & Bird or Pillsbury were not complicit in Osama's fraud.

I wrote to the SRA in July 2019 about my concerns about Osama and followed up on several occasions. The SRA has not responded, which leaves me wondering if someone there has been paid off. Though my own dealings with Osama had disastrous consequences, the main reason I believe Osama is not a licensed Jordanian lawyer is based on facts and common sense: **Osama cannot be a licensed Jordanian lawyer because he did do his law degree in a Napoleonic Code Arab country and he did not do his training contract in Jordan.** Credentials fraud happens all the time in the

Middle East; but we are in the West where the Rule of Law should mean something. Fraudsters should be brought to justice. Osama's insolence is so morally corrupt and offensive that it has to be cured. Osama has managed to bullshit his way into a partnership in a leading international firm. It looks like a case of "*The Emperor's New Clothes*" and the "*Emperor*" in this case is, unfortunately, Pillsbury.

I would be happy to discuss this grievous matter further with you. If you would like to meet me to discuss in person, I am in NYC and I would be available to meet you. My email is shaykhoun@protonmail.com and my phone number is 929-408-4531.

Sincerely yours,

Sonya Shaykhoun, Esq.

cc.     Solicitors Regulatory Authority
        The Law Society of England and Wales

Encs.   Letter to Sheikh Ahmed Al Thani
        Screenshot of Osama Abu Dehays' LinkedIn profile



20 October 2013

Dr. Mostefa Souag,

**Re:  Sonya Shaykhoun's delayed start date 29 August 2010 – 5 February 2011**

Thank you for taking the time to speak with me, albeit briefly, earlier this month about my attempts to claim the salary I lost as a direct result of the mishandling by Al Jazeera HR and legal departments after I was hired as Legal Counsel for Al Jazeera in mid-2010.  As requested, I have prepared a brief letter outlining the chronology, the losses I suffered and the reasons why I firmly believe Al Jazeera should compensate me for my loss of salary consequent to the bungled communications between Al Jazeera's HR and Legal departments, Maria Coombe (the recruiter of Footprint Legal engaged by Al Jazeera) and me.

**Chronology:**

- **June 22ⁿᵈ – June 24, 2010**.  I was invited by Al Jazeera, via Maria Coombe, for an interview at Al Jazeera in Doha.  For the duration of the hiring process, I dealt directly with Maria Coombe, who liaised directly with Osama Abu Dehays, the then-General Legal Counsel;

- **July 12ᵗʰ, 2010.**  I received a written job offer for the role of Legal Counsel from Al Jazeera.  The offer was conditional among other things, on: (i) "a contract of employment is signed by you and all employment procedures have been completed" (my employment contract was not signed until February 2012 when I took this matter up with Sheikh Ahmed, the former DG meaning I was working and paid but I was not working under a valid contract for an entire year); and, (ii) "the signed copy [of the offer] with a valid copy of your passport and the university degree (notarized by the embassy of the State of Qatar) within one week of the date above."  Maria Coombe told me to refrain from quitting my stable job in Bahrain (which paid me more than Al Jazeera) until she received the "green light" from Osama Abu Dehays;

- **July 18ᵗʰ, 2010.**  I accepted Al Jazeera's over via email to Maria Coombe (the protocol established by Maria Coombe and Al Jazeera);

- **July 19ᵗʰ, 2010.**  Maria Coombe called and texted me (on my Bahraini mobile) to tell me that Osama Abu Dehays confirmed that I could quit my job.  Maria Coombe wrote to me and to the concerned parties at Al Jazeera confirming my start date as August 29ᵗʰ, 2010;

- **July 20ᵗʰ, 2010.**  Maria Coombe called me in a panic to ask me if I had tendered my resignation yet because Al Jazeera's HR Department were of the opinion that my Qatari work visa could take between a month and two months to process.  Osama Abu Dehays wrote to me directly trying to "whitewash" the bungled communication regarding my start date.  There was no offer to compensate me or to apologize for the error;

- **January 30ᵗʰ, 2011.**  My Qatari work permit was finally issued, nearly six months after my original target start date; and

- **February 6ᵗʰ, 2011.** I finally took up my post as Legal Counsel in Al Jazeera.

I cannot tell you how excited and honored I was to be invited to work at Al Jazeera, the "Harvard" of media companies. I cannot tell you how disappointed I was when all my efforts to mitigate the delayed Qatari work permit fell on deaf ears. Osama Abu Dehays would not even dignify my countless pleading emails with a response. I am a dual citizen of the United States and Ireland and I could easily have worked in Washington or London or even in Bahrain as a freelancer. Osama refused to assist me in any way even though I wrote to him on many occasions to tell him how serious my worsening financial situation was. To make matters worse, in February 2011, when I was about to take up my job at Al Jazeera, Maria Coombe wrote to me warning me not to raise the issue of my lost salary with him. When I did in fact raise it with him a few months into my job, Osama simply told me to "let it go". Before that, Maria Coombe had written to me in the fifth month of my wait to tell me to start looking for another job.

In January 2012, I went to see Sheikh Ahmed about this problem that had been swept under the carpet for a year. Sheikh Ahmed asked me to prepare a memo, which I did (see attached for reference purposes). After Amin Abdalla became Executive Director - General Legal Counsel in April 2012, I took up the issue with him and he assured me it would be resolved and that things would get better for me. I left the issue with Amin and Sheikh Ahmed because while I was working hard to manage the corporate restricting and compliance exercise and to do my other work, I attended several Town Hall Meetings in which I heard about Al Jazeera's commitment to its people. In the invitation to a Town Hall Meeting dated October 4ᵗʰ, 2012, Sheikh Ahmed wrote:

> "We want to reward, retain and develop our Al Jazeera Family to exceed that of all of our competitors. We want Al Jazeera to be the best place to work in television anywhere in the world." Many such messages espousing the importance of employees have since been disseminated by the DG ("Organizations that partner with their employees and recognize employees as the main assets will retain those employees, strengthen them and grow with them" excerpted from DG Circular entitled "'Annual Performance Appraisal' the First Step in Improvement" dated October 4ᵗʰ, 2012.)

After a year of hearing these hopeful messages, after working long and hard hours, including over my holidays, weekends, evenings and often into the night, I feel very disappointed that an institution that has a stellar global reputation and that for the last year and a half has been striving to implement international best practices has failed both: (i) to accept that it made an error causing me serious financial losses and emotional distress; and, (ii) to rectify the damage and compensate me for the loss of earnings while I was waiting for my Qatari work permit to arrive.

In the English and American legal systems, a concept exists called **"promissory estoppel,"** defined as "*a 'consideration substitute' in contract law that renders certain promises otherwise lacking in consideration binding and enforceable...the promisee's reliance is treated as an independent and sufficient basis for enforcing the promise. Promissory estoppel can be viewed as a legal device that prohibits the promissor from denying the existence of a contract for lack of consideration.*" What this means as it applies to my case is: (i) Al Jazeera and its agent (Maria Coombe) made an offer on which I relied in good faith; (ii) I acted on that offer to my detriment; (iii) because I acted on reliance of that offer to my detriment and lost nearly six months' salary, I assert that Al Jazeera has an obligation to compensate me for the salary I lost even though there was no signed contract by virtue of the fact that I relied on the communications from Maria et al.

When I received my letter from Amin Abdalla in September 2013 confirming my position Senior Legal Counsel and my ten percent increase in salary, I took the opportunity to ask Amin about the status of my request to resolve this issue. Amin told me that my losses were "inconsequential" and that I do not have a contractual right to the salary. He invited me to get a second opinion. I asserted the concept of "promissory estoppel" and he refused to hear about it because there was no "contract" (again, even though technically there was no contract until February of 2012). Amin brushed off what happened to me as "HR's inefficiency", which confirms that he acknowledges it was Al Jazeera's fault. Why should I pay for HR's inefficiency? How is this an example of treating employees as assets?

There are precedents that can be applied to my case to support my request for a resolution in my favor. During my nearly three years tenure at Al Jazeera, I have striven to protect the interests of Al Jazeera with integrity and fairness. Since February 2011, I have seen cases similar mine resolved fairly and consistently:

- **Caroline Guetteneau.** When Al Jazeera Sports France (now BeIN Sport) hired Caroline Guetteneau, Al Jazeera agreed to pay her six months' salary while she stayed at home (not working yet) so that she would not breach the six month non-complete clause in her employment contract with her former employer, Canal+;

- **Berlin Taxes & AJE Employees' Backtaxes.** As a result of the tax compliance exercise that I managed with International Operations (Jonathan Powell, specifically) from early 2012 onwards, the tax situation in Berlin was so tricky that it was decided by the EDs to pay the back-taxes of the AJE employees in Berlin who were not registered with the tax authorities because of bureaucratic hurdles within Al Jazeera. I specifically remember Amin agreeing to Al Jazeera paying their back taxes until May 31st, 2012 to avert the risk that one of the AJE employees would go to the German tax authorities to report the non-payment of taxes before Al Jazeera submitted its "Leniency Declaration." Had the AJE employees gone to the German tax authorities before Al Jazeera submitted its Leniency Declaration, Al Jazeera and its senior management (worldwide) would have lost immunity to criminal liability for tax evasion, which would have been disastrous for Al Jazeera and its senior management for countless reasons; and

- **Husam Chadet.** One of the outcomes of the Berlin tax compliance exercise was the realization that Al Jazeera had overpaid taxes and social security payments in respect of Husam Chadet. However, recently there was some misunderstanding about whether Husam Chadet owned Al Jazeera money in respect of back taxes. and in one staff meeting last September, Amin protested that an employee should not be penalized to the tune of €100,000. I questioned him about Al Jazeera's "moral and ethical duty to waive the taxes" and he agreed that this was the case in the meeting. As it happens, Husam paid all of his taxes and the amount in question represents Al Jazeera's overpayment of taxes in respect of his previous employment with Al Jazeera from 2005-10 and Husam's assignment of future tax rebates to Al Jazeera.

I am quite frankly flummoxed and very demoralized. I have dedicated three years of my career to helping to raise Al Jazeera up to the international standards to which it aspires by managing the restructuring and the tax compliance projects. I have heard countless beautiful speeches about how Al Jazeera puts its employees first and foremost. And yet, when I try to highlight the fact that I lost six months' salary (which cost me a year's salary to clean up the mess of cannibalized credit cards, late car payments, late rent, late student loan payments not to mention having to go through the embarrassment of borrowing money from friends and risked facing a travel ban in Bahrain because I couldn't pay my debts) to anyone with

authority to fix it, I am brushed off and told my loss is "inconsequential" and that I do not have a right to it. I love my job. I love the Al Jazeera brand and I believe it in. Notwithstanding, I firmly believe I have a right to be compensated for the loss of salary I suffered consequent to "HR's inefficiency", as Amin put it, because I relied on the job offer to my detriment and because, if Al Jazeera really puts its people first, then I believe it really has to remedy this issue on moral and ethical grounds, if the legal argument I have asserted is not accepted. I do not understand why my case is being deemed to be different to other similar cases. I am a stellar employee of high caliber, dedicated to my work and the company. It simply does not make sense to me to insist that I was not damaged by this mistake when I was and I am still paying for it and will continue to pay for it for several years to come.

I trust that Al Jazeera will do the right thing, even if it will have taken three years to do so.

Thank you.


Kind regards,


Sonya H. Shaykhoun, Esq.
NY Bar, LL.M (London)

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT F:

## *Plaintiff's March 10, 2020, Forward of Ed Flanders email to David Dekker, Esq. (currently Firm Chair, Washington, D.C.) about Osama Abu Dehays' Licensure Deficit.*

## *Nota Bene: To avoid duplication, only the cover email is in this Exhibit F.*

# Fw: Private & Confidential - Osama Abu Dehays

From    shaykhoun@protonmail.com <shaykhoun@protonmail.com>

To      david.dekker@pillsburylaw.com, edward.perron@pillsburylaw.com

Date    Tuesday, March 10th, 2020 at 11:34 AM

FYI

Tel: +1-929-408-4531

Sent with ProtonMail Secure Email.

------- Original Message -------
On Friday, March 6, 2020 5:56 PM, Sonya Shaykhoun <shaykhoun@protonmail.com> wrote:

> Dear Mr. Flanders,
>
> Please see attached letter and related documents for your perusal and action.  I am available in NYC to
> meet to discuss at your convenience.
>
> Sincerely yours,
> Sonya Shaykhoun, Esq.
>
> Tel: +1-929-408-4531
>
> Sent with ProtonMail Secure Email.

**3.28 MB**   4 files attached

Letter to Dr. Soaeg-1.docx 27.14 KB      Osama's LinkedIn Profile.png 1014.28 KB

Signed Letter to E Flanders March 6 2020 SHS.pdf 312.35 KB      SHS Memo Feb 12 2012 (1).pdf 1.96 MB

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT G:

*Plaintiff's March 10, 2020, Email &
Letter to Edward Perron (Retired
Partner, Los Angeles) about Osama
Abu Dehays' Licensure Deficit*

*Nota Bene – This Exhibit G only
includes the cover email – please refer
to Exhibit D for the exhibits attached
to this cover email.*

# Fw: Private & Confidential - Osama Abu Dehays

From    shaykhoun@protonmail.com <shaykhoun@protonmail.com>

To      david.dekker@pillsburylaw.com, edward.perron@pillsburylaw.com

Date    Tuesday, March 10th, 2020 at 11:34 AM

FYI

Tel: +1-929-408-4531

Sent with ProtonMail Secure Email.

------- Original Message -------
On Friday, March 6, 2020 5:56 PM, Sonya Shaykhoun <shaykhoun@protonmail.com> wrote:

> Dear Mr. Flanders,
>
> Please see attached letter and related documents for your perusal and action.  I am available in NYC to meet to discuss at your convenience.
>
> Sincerely yours,
> Sonya Shaykhoun, Esq.
>
> Tel: +1-929-408-4531
>
> Sent with ProtonMail Secure Email.

**3.28 MB**   4 files attached

Letter to Dr. Soaeg-1.docx 27.14 KB     Osama's LinkedIn Profile.png 1014.28 KB

Signed Letter to E Flanders March 6 2020 SHS.pdf 312.35 KB     SHS Memo Feb 12 2012 (1).pdf 1.96 MB

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT H:
## *The Volokh Conspiracy,*
## *"Reproducing Controversial Tweet in News Story = Fair Use," Eugene Volokh, March 2, 2026, 8:48 am*

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy

FREE SPEECH

## Reproducing Controversial Tweet in News Story = Fair Use

**EUGENE VOLOKH** | 3.2.2026 8:48 AM

An excerpt from Judge Andrew Carter's opinion Friday in _Shaykhoun v. Daily Mail_ (S.D.N.Y.):

> Sonya Shaykhoun ("Plaintiff") is a licensed New York attorney with 21 years of experience, including expertise in intellectual property licensing, proceeding pro se in this action.... On May 17, 2023, Plaintiff posted a "Tweet" on X.com regarding an unlicensed vendor in Riverside Park ....

Here's the Tweet, from the Complaint:

4/10/26, 5:02 AM



Back to the opinion:

The Tweet garnered nearly 7 million views and sparked significant engagement, both negative and positive. Plaintiff made $170.97 from the Tweet through X.com's monetization program from August 9, 2023 to May 27, 2024. Plaintiff thereafter decided to change her X account from public to private "to protect her safety," thereby halting any future earnings....

On May 18, 2023, The Daily Beast published an article written by news reporter AJ McDougall, entitled "Lawyer Roasted for Calling 911 on 'Unlicensed' Food Vendor in NYC Park" .... The Daily Beast Article partially embedded the Tweet but included a hyperlink to the full, original tweet and did not include the two photographs Plaintiff included in the original Tweet.

On May 19, 2023, the Independent published an article written by Bevan Hurley titled 'NYC lawyer roasted on Twitter for reporting illegal food stand rails against city's 'rapid deterioration." The Independent Article embedded the Tweet in the article, with only part of the Tweet's full text visible, and did not include the two photographs included in the original Tweet.

On May 29, 2023, the Daily Mail also published an article written by Noa Halff titled "New York City lawyer is roasted for calling 911 on two female vendors selling food in Upper West Side park without a permit: 'Get a life, Karen.'" The Daily Mail article embedded the entire Tweet, including the two photos Plaintiff took and included in the original post.

The Daily Beast Article, The Daily Mail Article and the Independent Article ... all generally discuss the controversy generated by the Tweet. The Articles include a reproduction of the Tweet itself, other users' comments and critiques of the Tweet, Plaintiff's responses and defense of the Tweet. Plaintiff asked Defendants to retract the articles, but her requests were denied. Plaintiff states the Articles caused cyberbullying, causing her to privatize her X.com account May 24, 2024, halting any continued earnings through X.com's monetization program and causing loss of clients and job opportunities....

Plaintiff sued, claiming, among other things, that defendants infringed her copyright in the tweets. No, said the court, among other reasons because of fair use. The use was transformative, largely because "'[u]se of a copyrighted work for a news report, where the copyrighted work is itself the subject of the story, such as a news article about a viral video which displays a clip of that video to illustrate what all the fuss is about usually constitutes fair use'" (quoting *Richardson v. Townsquare Media, Inc.* (S.D.N.Y. 2025) and "'When an individual's decision to disseminate an Instagram post is the very thing the article is reporting on, the use of the ... post and its copyrighted material in the reporting has been deemed sufficiently transformative to support a fair use defense'") (quoting *Whiddon v. Buzzfeed, Inc.* (S.D.N.Y. 2022)). And though the defendants copied most or all of the plaintiff's work, "In the context of news reporting and analogous activities, moreover, the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Grp. Mgmt. Servs. Ltd. V. Bloomberg L.P.* (2d Cir. 2014):

> The necessity of the inclusion of the whole work is often based on the transformative use and "altered purpose or context of the work, as evidenced by surrounding commentary or criticism." Such is the case here. The Daily Beast Defendants and the Independent Defendants did not embed the entirety of the Tweet in their Articles. While the Daily Mail Defendants did include the entirety of the Tweet, such inclusion is appropriate to "provide the full context of the controversy." *Whiddon.* Indeed, "[r]educing the amount of the original work would have provided an incomplete description of the controversy, or even misrepresented the Post." ...

The opinion seems quite correct to me, and it makes me question the Twitter account title, "The Commercially Savvy Lawyer."

Thomas Byrne Sullivan and Saumya Kelkar Vaishampayan (Ballard Spahr LLP) represent defendants.

Start your day with *Reason.* Get a daily brief of the most important stories and trends every weekday morning when you subscribe to *Reason Roundup.*

Email Address            Subscribe

## *NEXT:* Looking for a Research Assistant for a Year (Good for a College-to-Law-School Gap Year)

**EUGENE VOLOKH** is the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford, and the Gary T. Schwartz Distinguished Professor of Law Emeritus and Distinguished Research Professor at UCLA School of Law. Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any institution. He is also the co-host of the *Free Speech Unmuted* podcast.

FREE SPEECH    COPYRIGHT

    G Add Reason to Google    MEDIA CONTACT & REPRINT REQUESTS

Show Comments (2)

    

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

# EXHIBIT I:
## *Osama Abu Dehays' LinkedIn Page and Pillsbury Bio Page*





# Osama Abu-Dehays

Partner, Doha & London

osama.dehays@pillsburylaw.com

T: +974.4020.8255

T: +44.20.7447.9588

# AREAS OF FOCUS

## Practices

| | |
|---|---|
| Corporate | Communications |
| Retail, Ecommerce & Consumer Brands | Copyright Counseling & Litigation |
| Employment Law | Regulatory |
| Intellectual Property | Intellectual Property Litigation |
| Internet & Interactive Entertainment | IP Audits & Strategic Planning |
| Media & Entertainment | Mergers & Acquisitions |
| Middle East | Restaurant, Food & Beverage |
| Technology | Trademark Counseling, Prosecution & Litigation |
| Travel, Leisure & Hospitality | Sports |

"Working closely with a bilingual team of lawyers, I bring more than 13 years' experience in the Middle East market, powerfully advocating for clients in the region's telecom, technology, media and sports sectors."

—Osama Abu-Dehays

**Pillsbury Corporate partner Osama Abu-Dehays is managing partner of the Doha office. He is known throughout the Middle East and North Africa for his commercial, technology, media and telecommunications law experience.**

Osama represents broadcasters, football leagues and telecom/technology providers. He crafts licensing deals, litigates intellectual property disputes, and advises on regulatory and corporate matters. Osama has drafted media and sports regulations, and has advised on numerous high-profile, politically sensitive civil and criminal cases. Before joining Pillsbury, he was a partner with a large UK law firm and worked as chief legal officer at Al Jazeera network and other major media groups.

# REPRESENTATIVE EXPERIENCE

- Advised the UAE's main professional soccer league in licensing its television rights, including the preparation and tender of all sponsorship and licensing rights associated with the league's matches and images.

- Represented Mohammed Zaidan, a top-tier professional soccer player, in his successful $4 million lawsuit against his club.

- Advised on one of the largest technology acquisitions in the Middle East and counseled various funds on Middle Eastern acquisitions in the hospitality, food and beverage, and technology sectors.

- Working on a Broadcasting and Telecommunication law draft for the State of Qatar.

- Reviewing the regulations governing broadcasting and online media in two different jurisdictions.

- Working with a number of telecom providers for the obtaining of mobile content from various sports content providers.

- Advising a number of online media providers on their privacy policy in the Kingdom of Saudi Arabia and the United Arab Emirates.

- Advising a major technology provider on its setup and on regulatory limitations in the Kingdom of Saudi Arabia.

- Carrying out a full due diligence of the current copyright and content policy for more than three Channels in the MENA region.

- Advised on the setting up of Al Jazeera Mobile platform, and preparation of all documentation and policies around this platform in more than 50 jurisdictions in North America, Asia, Africa and Europe.

- Preparing the corporate and holding structure of MBC Group, and later of Al Jazeera Media Network, resulting in a holding structure of over 89 news bureaus, and 20-plus subsidiaries.

- Working on one of the region's largest broadcasting acquisitions, including advising on all corporate matters and management of share structure, financial matrix, and taxation, employment and tender policies.

---

## PROFESSIONAL HIGHLIGHTS

- Frequently speaks at conferences and events, including the Symposium on Media Law in India and IBC Legal Leaders Middle East, on media and sports law topics.

- Worked on drafting numerous legislation instruments in the State of Qatar, including the newly enacted "Sports Club Regulation Law," the "Law Regulating Media Activities" and the "Flag and Emblem" regulation.

- Authored "Social Media & the Lawyer – Where to Draw the Line?" an article published in *The Oath* magazine in December 2014.

+ **Associations**

- International Bar Association, 2007

- Young International Arbitration Group

- International Media Committee

- Jordanian Bar Association

## EDUCATION

Postgraduate Degree, Intellectual Property Law, World Intellectual Property Organization (WIPO)

Postgraduate Degree, International Intellectual Property, University of Oxford, 2003

LL.B., University of Kent, 2002

B. Comm., Concordia International University, 2000

## ADMISSIONS

England and Wales (Registered Foreign Lawyer)

Jordan

## LANGUAGES

French

English

Arabic

Home > Lawyers > Osama Abu-Dehays

Legal Notices & Policies
Attorney Advertising
Secure Remote Access
Slavery and Human Trafficking Statement

© 2001–2026 Pillsbury Winthrop Shaw Pittman LLP

Shaykhoun v Daily Mail et al
1:2024cv09978

# EXHIBIT J:
# *Chronology of Events*

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

## CHRONOLOGY OF EVENTS

| Date | Event | Forensic Significance |
|---|---|---|
| June - July 2019 | Plaintiff interviews for and gets job as Legal Counsel at AJMN, Doha | The pre-inception of the 15-year-long Enterprise – Osama tells Plaintiff to quit and then not to quit via the recruiter. |
| Feb 2011 | Plaintiff arrives at **AJMN Doha**; finds Contracts Department in "shambles". | **Original Sin**: Discovery of lack of governance and paper trails. |
| 2011 | Verification of Osama Abu-Dehays' **Licensure Deficit** in Jordan. | **Achilles' Heel**: The forensic trigger for the $Trillion extraction. |
| Aug 2019 | **TDC Strike**: Ethan Barton/Luke Rosiak publish the "hit piece" using fraudulent licensure data. | **Wire Fraud (18 U.S.C. § 1343)**: Use of interstate wires to suppress the audit. |
| May 2023 | **The Daily Mail Strike**: Publication of Plaintiff's residential data by Noa Halff/Daily Mail. | **Digital Target Beacon**: Intentional publication to signal for physical liquidation. |
| May 2023 | **The Daily Beast Strike**: Publication of the "Karen" script by AJ McDougall/The Daily Beast. | **Market Erasure Phase 2**: Coordinated effort to devalue Plaintiff's senior-level credentials. |
| May 2023 | **The Independent Strike**: Bevan Hurley/The Independent reinforce the retaliatory script. | **Coordinated Narrative**: Forensic proof of a repeatable script across multiple outlets. |
| May 2024 | **Plaintiff files defamation case in NYSC: 100558/2024** | The source of Plaintiff's Section 1983 claim. |
| Nov 2024 | **Hon. Judge d'Auguste** rejects Plaintiff's Claims on Anti-SLAPP basis and tells Plaintiff to withdraw by 12/31/24 or pay Defendants' fees. | The source of Plaintiff's Section 1983 claims. |
| Dec 31, 2024 | Plaintiff formally withdraws from NYSC case. | Ibid. |
| June 2025 | **The Fee Ambush**: DWT/Katherine Bolger resurrect a dormant fee motion. | **Procedural Blockade**: Joint participation with the state to execute a "Squeeze Play". |
| March 2, 2026 | **The Post-Order Insult**: Reason.com publishes "coordinated script" within 96 hours of Order. | **Witness Tampering (18 U.S.C. § 1512)**: Retaliatory strike intended to force legal surrender. |

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

| Date | Event | Forensic Significance |
|------|-------|----------------------|
| April 8, 2026 | **The April 8 Machine**: Filing of the Verified Third Amended Complaint (TAC). | **Sovereign Audit**: Conclusion of the 15-year Forensic Continuum. |

# EXHIBIT K:
## *Professional Conduct Rules –*
## *California, England, New York, and*
## *Washington, D.C.*

Shaykhoun v Daily Mail et al
1:2024cv09978

Third Amended Complaint
Filed April 8, 2026

## THE MULTI-JURISDICTIONAL DUTY TO INVESTIGATE

In every jurisdiction where the Enterprise maintains an "Institutional Membrane," the failure to investigate the **"Oxford Fabrication"** and the **"Mathematical Impossibility"** of Osama's Jordanian law license constitutes a formal breach of professional duty.

*1. New York: The "Strict Supervision" Rule (22 NYCRR 1200.5.1)*

Under **NY Rule 5.1**, a law firm and its partners must make "reasonable efforts" to ensure all lawyers conform to the Rules of Professional Conduct. Specifically, **Rule 5.1(d)** holds a partner responsible for another's violation if they **"know of such conduct at a time when its consequences could be avoided or mitigated but fail to take reasonable remedial action"**.

- **Forensic Nexus:** Pillsbury's NY partners (Flanders, Dekker) were on notice in 2019; their silence while Osama billed (NY-based) clients is a direct violation of this mandate.

*2. Washington, DC: The "Managerial Assurance" Rule (DC Rule 5.1)*

**DC Bar Rule 5.1(a)** requires partners to possess "measures giving reasonable assurance" that all lawyers comply with the rules. **Comment [6]** explicitly states that a supervisor is required to **"intervene to prevent avoidable consequences of misconduct if the supervisor knows that the misconduct occurred"**.

- **Forensic Nexus:** As the firm's largest office and a hub for FARA (No. 5198) activity, the DC partners had a heightened duty to investigate the $Trillion extraction once Osama's Jordanian legal credentials were questioned.

*3. Los Angeles: The "State Bar Act" Mandate (CA Rule 5.1)*

California's **Rule 5.1** mirrors the ABA model but adds a specific link to the **State Bar Act**. A lawyer with managerial authority must take "corrective steps" if they know or **"reasonably should know"** of a violation.

- **Forensic Nexus:** The LA partners' failure to vet the "Oxford Fabrication" - which they used to market the firm's IP practice - constitutes a failure of "reasonable diligence" under **Rule 1.3**.

*4. London: The "SRA Code of Conduct" (Section 1.1 & 1.2)*

The **Solicitors Regulation Authority (SRA)** Standards require firms to have "controls in place to identify and assess" potential misconduct. Solicitors must act with integrity and uphold the rule of law.

- **Forensic Nexus:** By "hosting" the **Ghost Lawyer** in a London-integrated partnership without verifying the **"Institutional Impossibility"** of an Oxford LLM, the London partners participated in a **"Relay of Fraud"** that misled the UK Bar.

# EXHIBIT L:
## *Plaintiff lobbies Sh. Ahmed at AJMN for the salary she lost because of Osama Abu Dehays' sabotage of her onboarding*

Private & Confidential

MEMORANDUM

Date:           February 12, 2012

To:             Sheikh Ahmed Bin Jassim Al-Thani, Osama Abu Dehays

From:           Sonya Shaykhoun, Esq.

Subject:        Financial loss related to delayed visa

On July 12th, 2010, Maria Coombe (the recruitment agent hired by Al Jazeera) emailed me the job offer to join Al Jazeera as Legal Counsel ("Offer")(attached). On July 19th, 2010, Maria Coombe advised me that I could resign my job, which I did on the same day, and she confirmed this in an email to Osama et. al (see attached). On July 20th, 2010, having received contrary instructions from Al Jazeera, Maria wrote to me to renege her earlier instructions because of anticipated delays in getting the Qatari work permit. I would never have given up the financial security of my old job had I not got the confirmation from Maria to resign. My Qatari work permit ultimately came through on January 3oth, 2011, more than five months after the anticipated start date of August 29th, 2010. This Memorandum describes the sequence of events that cost me more than five months' salary and resulting in my being in serious financial debt due to waiting for my Qatari work visa.

Although I did not have a contractual relationship with Maria, I worked with her in good faith as a representative and agent of Al Jazeera. I was delighted to be joining Al Jazeera, the "Harvard" of global media companies. The Offer, which did not include caveats about the Qatari work visa, was conditioned only on my signed acceptance within seven days of the date of the Offer and on my providing my passport copy and my legalized university certificates, which I duly provided. I had been working in the GCC as a lawyer since 2004 and I had never heard of anyone being refused a work visa in any GCC country, including in Bahrain, where my work permit had been processed in three weeks back in 2004. I had no reason to worry about the work visa issue, Maria had not warned me and, as stated, the Offer was silent on this point. Consequently, I lost five months' salary and am now in serious financial debt as a result.

The sequence of events is set out below:

Page 1 of 3

Private & Confidential

- July 12th, 2010:              Maria Coombe emailed me the Offer letter as Legal Counsel with Al Jazeera;

- July 18th, 2010:              I accepted the Offer via email to Maria Coombe (attached);

- July 19th, 2010:              Maria called to tell me she had received the "go ahead for me to resign" from Osama and confirmed my start date of August 29th, 2010;

- July 19th, 2010:              I resigned my job (see attached);

- July 19th, 2010:              Maria confirmed our conversation about the resignation and the start date with an email to Osama et. al. (see attached, as above);

- July 20th, 2010:              Maria called me in a panic to tell me not to resign as Osama had called her to tell her that the Al Jazeera HR Department had notified Osama that my Qatari work permit would take time to process. It was not possible for me to withdraw my resignation;

- July 20th, 2010:              Osama emailed me about the new advice (see attached), which was contrary to Maria's advice the day before;

- January 30th, 2011:       My Qatari work permit was issued.

- February 6th, 2011:       My actual start date with Al Jazeera.

On February 2nd, 2011, Maria emailed me to ask me not mention my financial situation with Osama (see attached). My financial situation, directly related to the delayed visa and the bungled instructions I got in July 2010 to resign, had reached a critical point and I was forced to broach the subject with Osama. When I spoke to Osama, he told me to "let it go". At the time, I felt I had to let it go, I could not afford to make trouble, to not to pass my probation period and

Page 2 of 3

Private & Confidential

to be out of a job and to be without means to pay my debts. Now, my financial situation is as acute as it was a year ago; I cannot let it go because the losses I suffered will impact my financial health for the next three years and I feel I am paying for a mistake I did not make.

When I accepted the job with Al Jazeera, I was earning BD3,700 per month, all my credit cards were paid off, I had money in the bank and I was current with my car loan payments and my rent. By the time I joined Al Jazeera, I had lost five months' salary, I had spent my savings, I had maxed out all my credit cards (approximately BD11,000), I was four months behind on my rent (BD2200), I was late with my car loan payments and I had to borrow money from friends and family. I received letters and calls from the banks and my landlord about my debts and I was in danger of being sued and being placed under a travel ban, preventing me from leaving Bahrain.

Once in Doha, I had to take a loan amounting to QAR350,000 and a credit card with a limit of QAR50,000 to try to mitigate the damage I suffered. I am now sinking under the debt that I have because I acted on Maria's instructions to resign from my job. It is a huge financial and emotional strain. Maria was Al Jazeera's representative and agent, I had no reason to believe that, in following her instructions in good faith, I would end up bankrupt six months later. I did nothing wrong. I was proactive in following up on my visa during this period. I wrote to both Osama and Maria on countless occasions to tell them of my financial embarrassment and to try to find alternative solutions (see attached emails). In the fifth month of my wait, Maria advised me to look for another job. It was a harrowing experience.

Although I did not make the mistake, I am paying dearly for the mistake made by Maria et al. I need Al Jazeera's assistance to rectify this mistake by putting me back in the position I would have been in had Maria not bungled the instructions.

 **Gmail**
by Google

**Sonya Shaykhoun <shaykhoun@gmail.com>**

# Logistics

3 messages

**Maria Coombe <Maria@footprintlegal.com>**

Wed, Feb 2, 2011 at
10:44 AM

To: Sonya Shaykhoun <shaykhoun@gmail.com>

Dear Sonya,

Sorry to have disturbed! I was just checking in to see that the logistics are all underway? I know that Nancy is on the case and hopefully flights etc. are being booked so that you can organise yourself accordingly. I just tried her direct dial but she didn't pick up, so I will send a quick email to see that everything is going smoothly her end.

In relation to financial assistance from Al Jazeera, my strong recommendation is for you to physically get to Doha and then for everything else to fall into place. I know that Osama and the rest of the team are going to do their utmost for the best arrival and transition for you and I know that interest free loans and advances etc. etc. have been and are being discussed. I think it best that we don't contact Osama or mention it until your arrival as the key is getting you working again.

I will let you know anything I hear this end. Has the visa arrival and finality of the move sunk in yet? It must be a great feeling after your patience...

Best wishes,

Maria

Maria Coombe

Director

Footprintlegal

www.footprintlegal.com

maria@footprintlegal.com

Direct          +971 4 448 7146

Mobile          +971 55 881 8435

This email is for the attention of the addressee only. If you are not the intended recipient, please return it to grazia@footprintlegal.com. The views expressed in this message are those of the individual and not necessarily those of Footprintlegal.

If you would like more information about Footprintlegal, please visit our website at www.footprintlegal.com. Footprint Consultancy Services JLT (licence no.JLT-65355) trading as Footprintlegal is registered and licensed as a freezone company under the rules and regulations of DMCCA. Level 29, Reef Tower, JLT Dubai, PO Box 115738, Dubai, UAE

**Sonya Shaykhoun <shaykhoun@gmail.com>**                  Wed, Feb 2, 2011 at 10:50 AM

To: Mary Shakun <mary.shakun@gmail.com>

Hi Mom,
Do you think that Osama complained to her that I was being a pain about the SOS money?
Love,
Sonya
[Quoted text hidden]

**Sonya Shaykhoun <shaykhoun@gmail.com>**                  Wed, Feb 2, 2011 at 11:29 AM

To: Maria Coombe <Maria@footprintlegal.com>

Dear Maria,

No worries about this morning. I ought to have been up - I'm going to have to get used to getting up early now that the visa has finally come through.

I did speak with Nancy on Sunday morning and she was excited. Nancy also told me that it will take about 10 days for HR to sort out logistics.

About financial assistance - noted.

Kind regards,

Sonya
[Quoted text hidden]

 Sonya Shaykhoun <shaykhoun@gmail.com>

# SOS money

1 message

**Sonya Shaykhoun <shaykhoun@gmail.com>**　　　　Tue, Feb 1, 2011 at
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　12:58 PM

To: Osama Abu Dehays <Dehayso@aljazeera.net>

Hi Osama,

I hope you are well and thriving.  I'm great now that the visa came through
(and as I mentioned to Nancy, I'm sure they know what I've had for
breakfast every day since August!).  I'm hugely relieved and very excited
about joining Al Jazeera at long last.

The thing is, and I hate to be pushy but I am in dire straights so necessity
forces me to be like this, I am on my last pennies (I think I have 200BD left)
and it's getting pretty serious with my credit card companies, etc. who are
giving me deadlines like 5 Feb.  Would it be possible to organize the SOS
money that Maria mentioned to me sooner rather than later?

Let me know what you can do in this regard.

Thank you.

Best regards,
Sonya

 **Gmail**
by Google

Sonya Shaykhoun <shaykhoun@gmail.com>

# Nancy
1 message

**Sonya Shaykhoun <shaykhoun@gmail.com>**

Tue, Jan 25, 2011 at
2:03 PM

To: Maria Coombe <Maria.Coombe@footprintlegal.com>

Dear Maria,

Thanks for your email updating me about what Nancy and Osama said re my visa.  I wonder if there's a chance that it could have gotten lost?

The sooner I get emergency money, the better - if I get into trouble with my creditors here, there's a chance I could get a travel ban and not be able to leave the island.

Speak soon.

Regards,
Sonya

    Sonya Shaykhoun <shaykhoun@gmail.com>

# update

1 message

**Sonya Shaykhoun <shaykhoun@gmail.com>**    Sun, Jan 23, 2011 at
6:03 PM

To: Osama Abu Dehays <Dehayso@aljazeera.net>

Hello Osama,

I hope you are well.

I really hate to be a pest and I am normally much more low profile and patient. I called Maria on Thursday afternoon after I had been summoned to the bank to discuss my outstanding balance and where the relevant bank manager threatened to start litigation against me (which would mean a travel ban preventing me from leaving Bahrain as well as opening up a whole can of messy worms for me). This is the last thing I need. I hope I understood Maria correctly - she told me that you are personally chasing my visa and that Al Jazeera is planning to give me some financial assistance, both of which are really awesome on your / Al Jazeera'a part. Vis-a-vis the financial assistance, I need it now because I'm "between the wall and the sword" and it could get very ugly and messy for me (although my mother has been teasing me saying that at least if I go to "debtor's prison" it will be with a smile on my face as I have a job in the offing!)

On that note, I trust you to help me - I know this is all out of your control and I hope you in Doha sooner rather than later.

Thank you.

All the very best,
Sonya

 **Gmail**    Sonya Shaykhoun <shaykhoun@gmail.com>

# Osama

3 messages

---

**Sonya <shaykhoun@gmail.com>**    Sun, Jan 16, 2011 at 5:08 PM

To: Maria Coombe <Maria.Coombe@footprintlegal.com>

Maria can you please let me know if you spoke to Osama and if so if you told him that I am in a major financial dilemma? I called you twice and emailed you last week. I only have bd500 left and no trust fund on top of being very late with all my payments.

Do I have to write to Osama myself to tell him my situation?

Please can you update me one way or another?

Thank you.
Sent from my iPhone

---

**maria.coombe@footprintlegal.com
<maria.coombe@footprintlegal.com>**    Sun, Jan 16, 2011 at 5:36 PM

Reply-To: maria.coombe@footprintlegal.com
To: Sonya Shaykhoun <shaykhoun@gmail.com>

Hi Sonya,

I will try him again tomorrow - have been off sick. I'll drop him an email now and follow up with a call. He is aware that things are difficult financially. Nancy was due to get back to me last week but didn't, so I will chase her as well.

Maria
[Quoted text hidden]
Sent from my BlackBerryŽ smartphone from du

---

**Sonya Shaykhoun
<shaykhoun@gmail.com>**    Sun, Jan 16, 2011 at 5:51 PM

To: maria.coombe@footprintlegal.com

Hi Maria,

Thanks for your email - I am sorry you are unwell and I hope you feel better soon.

Would you mind blind copying me on the email? I am really in a bad state and I have no one to depend on for financial help. I was trying to avoid getting into this situation by flagging that I only had enough to see me through December.

Who knew the Qatari visa would take 5 months?!

Thanks & best,
Sonya
[Quoted text hidden]



Sonya Shaykhoun <shaykhoun@gmail.com>

# My visa

8 messages

**Sonya <shaykhoun@gmail.com>**

Sun, Jan 9, 2011 at 2:20 PM

To: Maria Coombe <Maria.Coombe@footprintlegal.com>

Hi Maria,

Happy new year! I hope you had a fabulous time at home.

I am fine although reaching the limits of my finances. I wrote to Osama two weeks ago about my situation and he promised to sort something out by the end of the first week of January. I followed up with him on Thursday to no avail. I don't want to hassle the poor guy so I am asking you to do it for me. :)

Thanks, I wouldn't bother you but I am in a seriously tricky situation now although I have learnt a very valuable lesson truth be told.

Best,
Sonya

Sent from my iPhone

**Maria Coombe <Maria@footprintlegal.com>**

Sun, Jan 9, 2011 at 3:43 PM

To: Sonya <shaykhoun@gmail.com>

Hi Sonya,

A very Happy New Year to you as well! I will chase Osama on your behalf -- leave it with me... I am so, so sorry that it has dragged out so. I'll be in touch...

Best wishes,

Maria


Maria Coombe
Director

Footprintlegal
www.footprintlegal.com

maria@footprintlegal.com
Direct        +971 4 448 7146
Mobile       +971 55 881 8435

This email is for the attention of the addressee only. If you are not the intended recipient, please return it to grazia@footprintlegal.com. The views expressed in this message are those of the individual and not necessarily those of Footprintlegal.
If you would like more information about Footprintlegal, please visit our website at www.footprintlegal.com. Footprint Consultancy Services JLT (licence no.JLT-65355) trading as Footprintlegal is registered and licensed as a freezone company under the rules and regulations of DMCCA. Level 29, Reef Tower, JLT Dubai, PO Box 115738, Dubai, UAE

[Quoted text hidden]

---

**Sonya <shaykhoun@gmail.com>**                    **Sun, Jan 9, 2011 at 5:18 PM**
To: Maria Coombe <Maria@footprintlegal.com>

Thank you Maria...I am not upset just having a cash glitch now.  I am happy for the rest and not having to wake up at the crack of dawn! ;)

Sent from my iPhone
[Quoted text hidden]

---

**Sonya Shaykhoun**                               **Tue, Jan 11, 2011 at 11:08**
**<shaykhoun@gmail.com>**                                            **AM**
To: Maria Coombe <Maria@footprintlegal.com>

Hi Maria,

I hate to be a pest.  I just wanted to tell you the level of seriousness of my cash flow glitch - I'm two months behind on my rent at my flat and I'm concerned that I will be evicted before I have a visa to go to Doha.  My credit card payments and car loan payment are now going to be one month late and I am in an extremely vulnerable position cash-wise.  I have never been in this situation in Bahrain and I am really concerned that I'll end up like one of those poor people we read about who got stuck in Dubai a few years ago because of their credit cards, etc.  I've gone through my savings and now I'm maxed out in debt - this was not my position five months ago when most of my credit cards were paid off and I had money in the bank and I was

current in all my financial obligations. I am not only financially embarrassed now but I am mortified because I am in such a bad situation now.

I really hope that this does not drag on for much longer because I'll be homeless and bankrupt. I needed to tell you this so you understand the seriousness of my situation. Again, I was happy to have had the time off and the much-needed break, but had I known it could drag on for 5 months, I would have handled my money very differently and asked for a sign-on bonus or that they pay me from the proposed start date of August 29th 2010.

Do you think that Al Jazeera would pay a sign-on bonus given I was told I could resign back in August and now it's January and still now news about the start date? Moreover, once I start, I won't have any money - or barely any or credit availability.

I hope we can resolve this soon. I am not trying to be difficult - I think I have been very patient, but now I am in a serious danger zone that I hope you can help me to get out of.

Let me know what you can do.

Thank you and kind regards,
Sonya
[Quoted text hidden]

---

**Maria Coombe <Maria@footprintlegal.com>**                    Tue, Jan 11, 2011 at
                                                                        6:05 PM
To: Sonya Shaykhoun <shaykhoun@gmail.com>

Hi Sonya,

Thank you for setting out the below... I have been in Abu Dhabi today, but between meetings sent an email to Osama and I will follow up with him by telephone tomorrow. I understand...

There is an opportunity with Injazat in Abu Dhabi - shall we have a chat about it tomorrow?

Kind regards,

Maria

Maria Coombe
Director

Footprintlegal
www.footprintlegal.com

maria@footprintlegal.com
Direct          +971 4 448 7146
Mobile          +971 55 881 8435

This email is for the attention of the addressee only. If you are not the intended recipient, please return it to grazia@footprintlegal.com. The views expressed in this message are those of the individual and not necessarily those of Footprintlegal.
If you would like more information about Footprintlegal, please visit our website at www.footprintlegal.com. Footprint Consultancy Services JLT (licence no.JLT-65355) trading as Footprintlegal is registered and licensed as a freezone company under the rules and regulations of DMCCA. Level 29, Reef Tower, JLT Dubai, PO Box 115738, Dubai, UAE

------Original Message------
From: Sonya Shaykhoun [mailto:shaykhoun@gmail.com]
Sent: Tuesday, January 11, 2011 12:09 PM
To: Maria Coombe
[Quoted text hidden]

**Sonya Shaykhoun <shaykhoun@gmail.com>Tue, Jan 11, 2011 at 6:12 PM**
To: Maria Coombe <Maria@footprintlegal.com>

Hi Maria,

Thanks for your email.  I really appreciate it.

Osama told me a few weeks ago that if my visa was not sorted by the end of the first week of January, then they would find an alternative for me - whether I could be hired out of the Bahrain office or work from home.  In all honestly, I'd prefer to work at Al Jazeera and I'm still excited about it and I don't want to lose the opportunity to work at Al Jazeera, which has been a dream of mine since I was at Orbit.

However, because I've lost now 5 months (the equivalent of about 20,000BD in salary), I'm stuck in a ever-widening hole.  So, my first choice is still AJSN.  If they could they could something (i.e. a sign-on bonus to help me hang in while I wait for the visa) it would make my life and the wait easier to handle.  I would even work from home.  Let's chat tomorrow in any event.

Thanks and have a wonderful evening.

Best,
Sonya
[Quoted text hidden]

---

**maria.coombe@footprintlegal.com**                              Tue, Jan 11,
**<maria.coombe@footprintlegal.com>**                           2011 at 6:36 PM
Reply-To: maria.coombe@footprintlegal.com
To: Sonya Shaykhoun <shaykhoun@gmail.com>

Hi there,

Let's definitely speak tomorrow.  11am your time, midday mine ok with you?

Best wishes,

Maria


Sent from my BlackBerry® smartphone from du
[Quoted text hidden]

---

**Sonya Shaykhoun <shaykhoun@gmail.com>**Tue, Jan 11, 2011 at 6:27 PM
To: maria.coombe@footprintlegal.com

Perfect, I'll talk to you tomorrow.

Best,
Sonya
[Quoted text hidden]

---

        Sonya Shaykhoun <shaykhoun@gmail.com>

# Hello from Bahrain

5 messages

**Sonya Shaykhoun <shaykhoun@gmail.com>**                    Sun, Dec 19, 2010 at
                                                                    7:44 PM
To: Osama Abu Dehays <Dehayso@aljazeera.net>

Hi Osama,

I hope this email finds you well and thriving.  I am fine and have been
enjoying my gardening leave.  I am feeling very rested very much looking
forward to starting work at Al Jazeera.

I am aware that Maria Coombe has been in touch with you about my two
proposals (i.e. working on a tourist visa in Doha or working from the
Bahrain office/home in Bahrain) regarding getting around the delay in the
visa issue.   I am touching base with you now so that we can discuss this
directly.   I do not want to make a nuisance of myself, however I did not
anticipate the visa taking quite this long and my funds will be dangerously
low very soon.  It would be a great relief if I could start working (even
remotely) by the beginning of January 2011 (or sooner) so that I can avoid
any financial discomfort/embarrassment.

I would appreciate anything you can do to assist me.  I look forward to
hearing from you.

Thank you.

Best regards,
Sonya

**Osama Abu Dehays <Dehayso@aljazeera.net>**                  Tue, Dec 21, 2010 at
                                                                    3:03 PM
To: Sonya Shaykhoun <shaykhoun@gmail.com>

Dear Sonya,

Just to let you know, we are now trying to get this expedited through unconventional matters. The
decision was made that we will give this until the end of the first week of January, at which if the visa is
still not available, we will then think of an alternative arrangement for you.