UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

SONYA SHAYKHOUN,

                Plaintiff

                                   Civil Action No.: 1:24-cv-09978-ALC

v.


AL JAZEERA MEDIA NETWORK, DAVID T.
DEKKAR, ESQ., EDWARD FLANDERS, ESQ.
EDWARD A. PERRON, ESQ., OSAMA ABU
DEHAYS, PILLSBURY WINTHROP SHAW
PITTMAN LLP, DEBRA ERNI, ETHAN BARTON,
JOHN HAWLEY, LUKE ROSIAK, THE DAILY
CALLER NEWS FOUNDATION, THE DAILY
MAIL, DAILYMAIL.COM, DAILY MAIL AND
GENERAL TRUST PLC, NOA HALFF,
JONATHAN HARMSWORTH, THE DAILY
BEAST COMPANY LLC, AMANDA J.
MCDOUGALL, BEN SHERWOOD, JOANNA
COLES, IAC INC., TRACY CONNOR, BARRY
DILLER, BEVAN HURLEY, THE INDEPENDENT,
GEORDIE GREIG, LOUISE THOMAS, RICHARD
BEST, BALLARD SPAHR LLP, THOMAS
SULLIVAN, ESQ., SAUMYA VAISHAMPAYAN,
ESQ., CAMERON STRACHER, ESQ., DAVIS
WRIGHT TREMAINE, LLP, KATHERINE M.
BOLGER, LINDSEY B. CHERNER,
                         Defendants.
------------------------------------------------------------------------x


**OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MAY 12 MOTIONS TO DISMISS MEMORANDA**

2

Sonya Shaykhoun, Esq.
Law Offices of Sonya Shaykhoun, Esq.
825 West End Avenue,
New York, NY 10025
Email: sonya@shaykhounlaw.com
Tel: 929-408-4531 | 929-996-5662

*Attorney / Plaintiff Pro Se*

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................III

    *FEDERAL AND SUPREME COURT CASES* ..................................................*iii*
    *FOREIGN CASES* ...................................................................... *vi*
    *FEDERAL STATUTES & RULES*.................................................. *vi*
    *STATE STATUTES* ..................................................................*vii*
    *TREATISES & ACADEMIC ARTICLES*........................................*vii*

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ......................................................................................... 3

POINT I: DEFENDANTS ESTOPPED THEMSELVES FROM CHALLENGING THE PROCEDURAL PROPRIETY OF THE OPERATIVE TAC ................................................................................................. 3

    A. *DOCKETS 90 AND 91 ESTABLISH WRITTEN CONSENT UNDER RULE 15(A)(2)*........... 3
    B. *DEFENDANTS FORFEITED SCOPE OBJECTIONS BY BYPASSING RULE 12(F) AND EXPLOITING THE TAC*.................................................................... 4

POINT II: DEFENDANTS' 70 PAGES OF SUBSTANTIVE BRIEFS REFUTE THEIR RULE 8 SMOKESCREEN UNDER *SIMMONS* ........................................ 6

    A. *UNDER SIMMONS V. ABRUZZO, COMPREHENSIVE MERITS BRIEFING EXTINGUISHES A RULE 8 LACK-OF-NOTICE DEFENSE AS A MATTER OF LAW* ........................................ 6
    B. *THE COORDINATED CROSS-CLIENT ADVOCACY OF BALLARD SPAHR LLP SHATTERS THE ILLUSION OF LACK OF NOTICE*.................................................... 7
    C. *CONTEMPORANEOUS EXTRAJUDICIAL MEDIA OPERATIONS AND LITIGANT INTIMIDATION ESTOP ANY CLAIM OF LACK OF NOTICE* ................................ 8

POINT III: THE TAC PLEADS A COGNIZABLE CIVIL RICO CONSPIRACY PURSUANT TO 18 U.S.C. § 1962(D) ............................................................. 11

    A. *COORDINATED CONDUCT INFERS A PLAUSIBLE CONSPIRATORIAL AGREEMENT*..... 11
    B. *DEFENDANTS' COORDINATED CROSS-CLIENT ADVOCACY EXPLICITLY DOCUMENTS A BOYLE ENTERPRISE* ................................................................ 13
    C. *THE TAC SATISFIES THE RICO DISTINCTIVENESS DOCTRINE*.............................. 14
    D. *UNIFORM PLEADING STANDARDS FORBIDS A TWO-TIERED APPLICATION OF CIVIL PROCEDURE*.................................................................... 15

POINT IV: THE LIVE RECORD SATISFIES THE PARTICULARIZED ELEMENTS OF THE CHARGED RICO PREDICATE ACTS .......................... 16

    A. *WIRE FRAUD UNDER 18 U.S.C. § 1343: THE LICENSURE CONCEALMENT SCHEME* 16
    B. *WITNESS INTIMIDATION AND RETALIATION UNDER 18 U.S.C. § 1512 CONSTITUTES A PLAIN RICO PREDICATE ACT* .................................................... 17

*C. EXTORTION UNDER 18 U.S.C. § 1951 (THE HOBBS ACT): THE PREEMPTED ANTI-SLAPP FEE AMBUSHES AS COERCIVE RELEASE DEMANDS* .......................................... 19

**POINT V: THE CONSPIRACY'S CORRUPT ANCHOR: PILLSBURY'S SEVEN-YEAR CONCEALMENT PROTOCOL TO INSULATE ITS SOVEREIGN QATARI REVENUE AND AN UNLICENSED FOREIGN NATIONAL**.................................................................................................................. **22**

**POINT VI: THE TAC PLEADS A CONCRETE, QUANTIFIABLE ECONOMIC INJURY TO HER LAW PRACTICE SUFFICIENT TO SURVIVE THE *HADDLE V. GARRISON* STANDING THRESHOLD** ........... 25

*A. A SYSTEMIC LIQUIDATION OF A LAW PRACTICE CONSTITUTES PROPERTY INJURY UNDER HADDLE* .................................................................................................. 25

*B. PLAINTIFF ESTABLISHES DIRECT, FORESEEABLE PROXIMATE CAUSATION UNDER THE ANZA AND BRIDGE FRAMEWORKS*.................................................................. 28

*C. THE FACTUAL RECORD SATISFIES THE CO-CONSPIRATOR LIABILITY AND OPEN-ENDED CONTINUITY*....................................................................................... 29

**POINT VII: THE DAILY CALLER'S LOCKSTEP ADOPTION OF CO-DEFENDANTS' MERITS PARSES AN OPERATIONAL DIVISION OF LABOR** ................................................................................................................. **30**

**POINT VIII: THE TAC ALLEGES TIMELY INJURIES WITHIN THE FOUR-YEAR CIVIL RICO STATUTE OF LIMITATIONS WINDOW**........................... **32**

**POINT IX: THIS COURT RETAINS JURISDICTION OVER THE TRANSNATIONAL ACTION UNDER 28 U.S.C. § 1367(A)** ................................ **34**

*A. THE SUFFICIENCY OF THE COMMON NUCLEUS OF OPERATIVE FACT AND THE SUFFICIENCY OF NEW YORK OUTPOSTS* ........................................................ 34

*B. PLAINTIFF REQUESTS JUDICIAL NOTICE OF PARALLEL TRANSNATIONAL ENFORCEMENT AGAINST THE ENTERPRISE'S CORPORATE PARENT* ............................ 36

**POINT X: THE TAC PLEADS A COGNIZABLE SECTION 1983 LIBERTY AND DEPRIVATION UNDER THE "STIGMA-PLUS" DOCTRINE**.................. **37**

**CONCLUSION** .................................................................................................... **40**

**WORD COUNT CERTIFACTION** .......................................................................... **42**

**CERTIFICATE OF SERVICE**................................................................................. **43**

## TABLE OF AUTHORITIES

**FEDERAL AND SUPREME COURT CASES**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ................................................................................2

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987)………………………………………………...............32

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)……………………………………………...............28, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................*Passim*

*Bankers Trust Co. v. Rhoades*,
    859 F.2d 1096 (2d Cir. 1988)……………………………………..........32, 33

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)……………...................................................*Passim*

*Berk v. Choy*,
    146 S.Ct. 546 (2026)………….......................................................20, 21

*Black v. Ganieva*
    619 F.Supp.3d 309 (S.D. N.Y. 2022)……………………………………….26

*Boyle v. United States*,
    556 U.S. 938 (2009)…...........................................................12, 13, 25, 31

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)………………………………………………………......28, 29

*Carnegie-Mellon University v. Cohill*,
    484 U.S. 343 (1988)……………...................................................35

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)……………..................................................14, 15

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)................................................................................10

*Ciambriello v. County of Nassau*,
   292 F.3d 307 (2d Cir. 2002)..............................................................38

*Cullen v. Margiotta*,
   811 F.2d 698 (2d Cir. 1987)..............................................................32

*Dawson v. White & Case*,
   88 N.Y.2d 666 (N.Y. 1996)................................................................ 26

*Dennis v. Sparks*,
   449 U.S. 24 (1980).............................................................................38

*Fitzgerald v. First East Seventh Street Tenants Corp.*,
   221 F.3d 362 (2d Cir. 2000)..............................................................5

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949)...........................................................................11

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
   492 U.S. 229 (1989)...........................................................................29

*Haddle v. Garrison*,
   525 U.S. 121 (1998)................................................................25, 26, 27

*In re Bennett Funding Group, Inc.*,
   336 F.3d 94 (2d Cir. 2003)................................................................29

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020)................................................................20

*Lugar v. Edmondson Oil Company, Inc.*,
   457 U.S. 922 (1982)...........................................................................38

*McCray v. Patrolman N.A. Caparco*,
   761 F. App'x 27 (2d Cir. 2019).........................................................5

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)…………...........................................................................4, 9

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988)...............................................................................6

*Salinas v. United States*,
    522 U.S. 52 (1997)………...........................................................................29

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)………...........................................................................1, 24

*Simmons v. Abruzzo*,
    49 F.3d 83 (2d Cir. 1995)…..........................................................................6, 7, 8

*Sowell v. Kelly*,
    2023 WL 6813096 (S.D.N.Y. Oct. 16, 2023)…......................................................5

*Spayd v. Turner, Granzow & Hollenkamp*,
    19 Ohio St. 3d 55 (Ohio 1985)……………………….…...............................26

*State Farm Mutual Automobile Insurance Co. v. Ammann*,
    828 F.2d 4 (9th Cir. 1987)..............................................................................32

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966)......................................................................................34

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005)………..................................................................38, 39

*Volokh v. James*,
    656 F. Supp. 3d 431 (S.D.N.Y. 2023)……………...........................................1, 10

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971)………………………………............................................ 39

v

**FOREIGN CASES**

*Baroness Lawrence of Clarendon & Ors v. Associated Newspapers Limited*,
    [2026] EWHC 493 (KB) (High Court of Justice, King's Bench Division,
    London, UK)............................................................................................... 36


**FEDERAL STATUTES & RULES**

18 U.S.C. § 1343....................................................................................................... 16

18 U.S.C. § 1512(b)...................................................................................................17

18 U.S.C. § 1951....................................................................................................19, 20

18 U.S.C. § 1961(5)...................................................................................................33

18 U.S.C. § 1962(c)...............................................................................................14, 30

18 U.S.C. § 1962(d)........................................................................................... *Passim*

18 U.S.C. § 1964(c)........................................................................................25, 27, 28, 32

28 U.S.C. § 1367(a)...................................................................................................34

28 U.S.C. § 1367(c)................................................................................................... 34

42 U.S.C. § 1983...................................................................................................*Passim*

Federal Rule of Civil Procedure 4................................................................................30

Federal Rule of Civil Procedure 8..................................................................................6

Federal Rule of Civil Procedure 9(b)........................................................................16, 40

Federal Rule of Civil Procedure 12(b)(6)...............................................................15, 31, 37

Federal Rule of Civil Procedure 12(f)......................................................................4, 15

Federal Rule of Civil Procedure 15(a)(2).................................................................3, 4

Federal Rule of Evidence 201 ...................................................................................36

Federal Rule of Evidence 201(b) ..............................................................................36

**STATE STATUTES**

New York Civil Rights Law § 76-a (Anti-SLAPP Mechanism)...................................37

**TREATISES & ACADEMIC ARTICLES**

O. W. Holmes, *The Common Law* (1881) ....................................................................1

G. Robert Blakey, *Foreword: Debunking RICO's Myriad Myths*, 64 St. John's L. Rev. 701 (1990)..................................................................................................................1

Professor G. Robert Blakey, *RICO Treatises and Systemic Enterprise Analytics*..............................................................................................................18, 22

Micheal Goldsmith, Rico and Pattern: The Search for Continuity Plus Relationship, 73 Cornell L. Rev. 971 (1988), p. 971. Available at: http://scholarship.law.cornell.edu/clr/vol73/iss5/5......................................................1

**PRELIMINARY STATEMENT**

Plaintiff *Pro Se* submits this Omnibus Memorandum in Opposition ("Omnibus") to Defendants' May 12, 2026, Motions to Dismiss. This action targets a multi-year, transnational economic blockade executed by an "association-in-fact" racketeering Enterprise. The common purpose of this conspiracy is to shield an unlicensed operative, Osama Abu Dehays ("Osama"), and insulate the lucrative sovereign Qatari billing streams of Defendant Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury"). Osama serves as the Managing Partner of Pillsbury Doha, based on the fraudulent premise that he holds an active, valid 2002 Jordanian bar membership—a logistical and temporal impossibility[1]. Rather than correcting this licensure deficit, the Enterprise synchronized its operations across international networks, launching a seven-year continuum of extrajudicial media assaults and statutory abuses that systematically liquidated Plaintiff's nascent transactional law practice and commercial goodwill.

This structural pattern transforms a localized dispute into a textbook federal civil RICO and 42 U.S.C. § 1983 action.[2] Under *Sedima v. Imrex Company, Inc*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), 493, Congress explicitly designed the statute to "'be liberally construed to effectuate its remedial purposes,"[3] deputizing solo practitioners as "private attorneys general…designed to fill prosecutorial gaps"[4]

---

[1] See rows 3-9 in Exhibit E: Updated Extended Chronology, May 4, 2026.

[2] Micheal Goldsmith, Rico and Pattern: The Search for Continuity Plus Relationship, 73 Cornell L. Rev. 971 (1988), p. 971. Available at: http://scholarship.law.cornell.edu/clr/vol73/iss5/5.

[3] G. Robert Blakey, *Foreword: Debunking RICO's Myriad Myths*, 64 St. John's L. Rev. 701 (1990), p. 705.

[4] G. Robert Blakey, p. 708, Footnote 52.

equipped to root out systemic institutional fraud. Legal theories must expand to fit the live facts of an ongoing, extrajudicial market execution. *Fiat justitia ruat caelum*—let justice be done though the heavens fall.

The misleading core of Defendants' strategy is to recast a structural conspiracy into a simple state-law defamation claim while launching *ad hominem* attacks at Plaintiff. This characterization is flatly foreclosed by the live record and Defendants' lockstep coordination on and off the docket. Plaintiff does not seek to police protected legal commentary, nor does she challenge core First Amendment expression—a constitutional boundary this Court robustly protected in *Volokh v. James*, 656 F.Supp.3d 431 (S.D. N.Y. 2023). Instead, this action targets a transnational criminal organization ("TCO") that systematically manipulated Al Jazeera Media Network ("AJMN") from within to exploit its institutional architecture, capital and standing. Operating through a state-action membrane, the Enterprise executed a coordinated, digital market erasure protocol in direct retaliation for Plaintiff's anti-corruption whistleblowing activities.

The private Defendants acted under color of law by willfully participating in joint activity with domestic state enforcement mechanisms. Specifically, Defendants exploited the New York State judiciary and its statutory tools to execute an economic blockade orchestrated by their transnational network. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Plaintiff refutes Defendants' threshold scope objections to the Third Amended Complaint ("TAC")—namely, that exceeds the scope of this Court's February 26, 2026, Opinion & Order at Docket 75 ("Order")— as completely

2

barred by equitable and judicial estoppel. On April 28, 2026, via Thomas Sullivan, Esq. ("Sullivan"), counsel for *The Daily Mail* Defendants acting collectively on behalf of the moving Defendants, filed a written stipulation at Docket 90, consenting to the presence of the TAC on the docket under Federal Rule of Civil Procedure 15(a)(2). This Court memo-endorsed that explicit consent on April 29, 2026, at Docket 91. Defendants used the TAC to freeze Plaintiff's pleading amendments; they cannot now retroactively declare that same pleading a nullity. This gamesmanship fails Justice Oliver Wendell Holmes' foundational mandate that "the first call of a theory of law is that it should fit the facts."[5] Because the TAC satisfies notice standards of Rule 8 and states plausible claims under civil RICO and 42 U.S.C. § 1983, Plaintiff respectfully requests the court to deny Defendants' motions and advance this action to discovery.

## ARGUMENT

**POINT I: DEFENDANTS ESTOPPED THEMSELVES FROM CHALLENGING THE PROCEDURAL PROPRIETY OF THE OPERATIVE TAC**

*A. Dockets 90 and 91 Establish Written Consent Under Rule 15(a)(2)*

Defendants executed a joint stipulation at Docket 90, which this court entered as a binding judicial mandate at Docket 91. This filing perfected statutory written consent to the filing of the TAC under Federal Rule of Civil Procedure 15(a)(2). When counsel for the Daily Mail Defendants, Thomas Sullivan ("Sullivan") filed a collective, joint text-freezing stipulation on behalf of the named moving Defendants at Docket 90, his attempt to execute a clever maneuver to block Plaintiff from further amending the

---

[5] *Id.*, p. 713.

TAC was an improper overreach with catastrophic legal consequences under Federal Rule of Civil Procedure 15(a)(2). Since Rule 15(a)(2) treats written consent as an independent, fully sufficient pathway to perfect an amendment, Defendants legally and procedurally waived any right to assert threshold "scope of leave" objections after April 28, 2026. Defendants' tactical misstep is highlighted by their wasting nearly 70 pages of their moving briefs asserting a defense that they had already surrendered as a matter of law, despite reserving their rights to argue the merits in their May 12, 2026, memoranda.

*B. Defendants Forfeited Scope Objections by Bypassing Rule 12(f) and Exploiting the TAC*

If the TAC exceeded the structural scope of prior leave, Defendants' exclusive remedy was an immediate, motion to strike under Federal Rule of Civil Procedure 12(f). Defendants deliberately bypassed Rule 12(f). Instead, Defendants treated the TAC as an operative, anchored reality on the record to execute the Docket 90 joint text freeze, extracting a substantial administrative benefit from the Court. Under controlling Second Circuit doctrine, the doctrine of judicial estoppel prevents a party from asserting a position that is flagrantly contrary to a position previously taken to gain an unfair tactical advantage. A party cannot treat an amended complaint as an anchored, valid reality to secure an administrative benefit, i.e. a text freeze, and subsequently attack the same pleading as a procedural nullity. *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001). Because Chambers actively monitored and processed the TAC—memo-endorsing electronic service mandates and entering it as "So

4

Ordered" at Docket 91—the Court has already exercised its inherent docket discretion.

Defendants' administrative campaign to retroactively strike the timely filed TAC rests on a fundamentally myopic reading of federal docket authority. While moving counsel cites *Sowell v. Kelly*, 2023 WL 6813096, at \*4 (S.D.N.Y. Oct. 16, 2023) and *McCray v. Patrolman Caparco*, 761 F. App'x 27 (2d Cir. 2019) to manufacture an artificial pleading-scope emergency, those cases merely affirm a district court's inherent, discretionary authority to monitor its docket. *Sowell* and *McCray* do not provide a mandatory mechanism for litigants to dictate what a federal tribunal can or cannot maintain on its docket. Under *Fitzgerald v. First East Seventh Street Tenants Corp.,* 221 F. 3d 362, 364 (2d Cir. 2000), a district court is obliged to intervene *sua sponte* only when the text of said amendment is structurally frivolous, vexation, or outrageous—a threshold the detailed factual layout of the TAC does not meet (it is merely inconvenient for Defendants).

Plaintiff explicitly documented and alleged that she was the target of these identical, coordinated professional hits within paragraphs 9 and 11 of her prior Second Amended Complaint. Because this factual architecture has been consistently maintained on the record, the TAC introduced no unmapped or unexpected disputes. Notably, on May 20, 2026, Chambers granted Plaintiff's application to serve Defendant Cameron Stracher electronically (Dkt. 133). This specialized service directly integrated the Enterprise's pre-vetting legal apparatus into the ECF, shattering any bad-faith pretense that these interlocking Defendants operated in

isolated silos. Chambers' repetitive judicial authorization of the TAC and its iterations completely moots Defendants' unified and unctuous procedural scope objections. Chambers' affirmative and iterative judicial processing renders Defendants' manufactured procedural crises moot as a matter of law; this action must advance directly to merits-based discovery.

**POINT II: DEFENDANTS' 70 PAGES OF SUBSTANTIVE BRIEFS REFUTE THEIR RULE 8 SMOKESCREEN UNDER *SIMMONS***

*A. Under Simmons v. Abruzzo, Comprehensive Merits Briefing Extinguishes a Rule 8 Lack-of-Notice Defense as a Matter of Law*

Defendants seek threshold dismissal under Federal Rule of Civil Procedure 8, that the TAC is an incomprehensible "shotgun pleading". To support this performative bewilderment, Defendants present highly curated, isolated excerpts of the record and deliberately ignore the integrated nature of the text. This contrived confusion represents a tactical contradiction that folds under controlling Second Circuit law.

The governing framework for a Rule 8 notice pleading within the Second Circuit, established in *Simmons v. Abruzzo*, 49 F.3d 83 (2nd Cir. 1995), is instructive. *Simmons* dictates that dismissal for failure to comply with Rule 8 is *""  is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."* (quoting *See Salahuddin v. Cuomo,* 861 F.2d at 42 (2d Cir. 1988)). Further, *"if the court dismisses the complaint for failure to comply with Rule 8, it should generally give the plaintiff leave to amend. This is especially true when the complaint states a claim that is on its face nonfrivolous."* *Simmons v. Abruzzo*, 49 F.3d 83 (2nd Cir. 1995), 88.

6

While Rule 8 demands "a short and plain statement of the claim," the required level of brevity and particularity necessarily adjusts according to the inherent complexity and nature of the case. In a multi-party action asserting a civil RICO association-in-fact Enterprise spanning cross-border transaction structures, a comprehensive factual layout is a structural necessary to satisfy the plausibility mandates of *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*.

Here, Defendants' protestations are an exercise in self-serving hypocrisy. It is a legal and logical impossibility to argue that the TAC's true substance is "well disguised" under the *Simmons* standard when Defendants successfully extracted, parsed, and litigated those very issues across 70 pages of exhaustive moving papers. Defendants' collective feat would be impossible if the TAC were so unintelligible that it's true substance is well disguised. Defendants' exhaustive motions shatter the Rule 8 smokescreen behind which they seek to hide. Defendants clearly understand the exact nature, timeline, and mechanics of the Civil RICO claims; they seek to deploy Rule 8 as an artificial, pretextual barrier to avoid answering for their own conduct in open court.

*B. The Coordinated Cross-Client Advocacy of Ballard Spahr LLP Shatters the Illusion of Lack of Notice*

Defendants' institutional hypocrisy of their collective Rule 8 "bewilderment" is denuded by Ballard Spahr's opacity across the docket. Moving counsel formally represent only the *Daily Mail* Defendants in this action. A forensic analysis of the *Daily Mail* memorandum reveals that counsel expended considerable analytical energy constructing exhaustive, threshold merits defenses on behalf of unrepresented

non-clients. Specifically, counsel explicitly defends co-Defendant Pillsbury at pages 11, 13, 18, 19 and 20 in *The Daily Mail'*s highly detailed 36-page memorandum; he defends co-Defendant Luke Rosiak at page 18 and refutes the allegations against co-Defendant John Hawley at page 21. Moving counsel actively briefed this Court on the specific intent, internal communications, and timelines of separate corporate legal actors and unserved media cogs.

Under *Simmons,* Defendants cannot claim a pleading is "hard to decipher"[6] a "far-flung and wholly implausible conspiracy" and "nonsensical"[7] (, and "a nonsensical and illogical tale of a multinational scheme"[8] while simultaneously displaying such absolute, granular comprehension of the facts that it can seamlessly volunteer to ghostwrite a comprehensive defense for its alleged co-conspirators. If the TAC were truly a confused mess, it would be impossible for white-shoe counsel of the caliber among and representing Defendants to seamlessly construct an elite, exhaustive corporate defense for the entire Enterprise grid. This standing-versus-advocacy contradiction conclusively establishes that Defendants face no operational deficit regarding notice; their own cross-advocacy shatters the illusion of confusion.

*C. Contemporaneous Extrajudicial Media Operations and Litigant Intimidation Estop Any Claim of Lack of Notice*

Defendants' memoranda collapse under the weight of their own tactical contradictions. The extrajudicial strategy deployed by defense counsel transforms Defendants' *Twombly* and *Iqbal* implausibility arguments into a legal absurdity.

---

[6] *The Daily Mail* memorandum, p.10.
[7] *The Daily Beast* memorandum, p. 8.
[8] *The Independent* memorandum, p.1

8

Defendants cannot assert that a pleading lacks fair notice while simultaneously possessing such a granular, absolute comprehension of its specific allegations that they can seamlessly broadcast and litigate its issues to public media proxies *en plein air*. This calculated extrajudicial campaign equitably and judicially estops any claim of confusion, proving that Defendants face zero operational deficit regarding notice.

*New Hampshire.*

Defense counsel actively commissioned, sponsored, and placed mocking blog posts within *The Volokh Conspiracy* on March 2, 2026[9], and April 11, 2026[10], explicitly citing their names and threshold moving positions on the live record. The matching derisory tone of the comments underneath the *Volokh* posts and the memoranda indicate a deeper level of collusion across the media. The March 2, 2026, blog post reinvigorated *The Daily Mail* article, which doxed Plaintiff by publishing a tweet that included her home address, forcing Plaintiff to procure a PO Box to inoculate herself against imminent personal safety and security threats. Rather than projecting the structural independence expected of sophisticated outside counsel facing explicit civil RICO allegations, counsel walked directly into Plaintiff's evidentiary matrix while flagrantly breaching Local Civil Rule 1.5 against extrajudicial publicity. By using an elite, national legal blog to extrajudicially attack Plaintiff as a commercially "unsavvy" lawyer and "conspiracy theorist" during active, federal litigation, counsel

---

[9] Eugene Volokh, *Reproducing Controversial Tweet in News Story Fair Use*, The Volokh Conspiracy (Mar. 2, 2026, 2:54 PM), https://reason.com/volokh/2026/03/02/reproducing-controversial-tweet-in-news-story-fair-use/.

[10] Eugene Volokh, *Follow-Up to "Reproducing Controversial Tweet in News Story = Fair Use" Post*, The Volokh Conspiracy (Apr. 11, 2026), https://reason.com/volokh/2026/04/11/follow-up-to-reproducing-controversial-tweet-in-news-story-fair-use-post/.

9

inadvertently provided the contemporaneous, text-based proof of the exact "rinse-and-repeat" media manipulation and witness intimidation loops Plaintiff alleges throughout the TAC.

In their haste to execute a premature extrajudicial victory lap on the heels of this Court's February 26, 2026, Order, Counsel documented their own operational alignment on a public screen. These synchronized actions demonstrate that they operate not as detached legal advocates, but as active, operational cogs in a RICO machine utilizing synchronized media assets to enforce the Enterprise's agenda and force an involuntary surrender of Plaintiff's valuable federal property claims. Because Defendants possess such absolute, granular comprehension of the TAC that they can broadcast its issues to the public media proxies for extrajudicial harassment, they are equitably estopped from claiming a lack of fair notice under Rule 8. Because this deliberate deployment of media proxies during active, pending litigation violates the fundamental rules governing extrajudicial publicity and serves no purpose other than to publicly humiliate an officer of the court, Plaintiff explicitly requests that this Court exercise its inherent authority to sanction counsel for bad-faith litigation abuse. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).

Defendants' placement of the derisory "Karen 2.0" articles in *The Volokh Conspiracy* was a calculated maneuver to manufacture an artificial First Amendment shield. Knowing that this explicitly tribunal robustly protected that very forum's constitutional boundaries in *Volokh v. James*, the Enterprise executed a cynical attempt to weaponize this Court's deeply ingrained respect for free expression,

10

laundering a raw extrajudicial witness intimidation loop through a high-profile forum to make it appear as protected legal commentary. This Court should reject this institutional gaslighting. Under *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490 (1949), the First Amendment does not immunize speech that serves as the operational vehicle for an illegal objective. Defendants did not seek to participate in a detached, public academic debate; they deployed these targeted publication hits in precise, temporal lockstep with concurrent telephonic $0.00 global release demands to economically paralyze Plaintiff's transactional law practice matrices. The choice of forum was not an organic exercise, but a bad-faith litigation maneuver designed to preemptively hammer home a fake constitutional defense and mask a live, ongoing civil RICO enforcement plan.

## POINT III: THE TAC PLEADS A COGNIZABLE CIVIL RICO CONSPIRACY PURSUANT TO 18 U.S.C. § 1962(d)

*A. Coordinated Conduct Infers a Plausible Conspiratorial Agreement*

Defendants assert that the Enterprise is "implausible" under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and object to the "lumping" of corporate entities. This argument improperly seeks to impose an inapplicable substantive fraud pleading standard upon a civil RICO conspiracy claim under 18 U.S.C. § 1962(d). A racketeering conspiracy claim does not require proof that each specific defendant personally agreed to commit two or more predicate acts, nor that they directed the core operations of the venture. The statutory violation occurs the moment a defendant knowingly agrees to facilitate the systemic architecture of the joint venture, intending that some members commit predicate acts to advance a shared common

11

purpose. This conspiratorial agreement is legally inferred through defendants' continuous relationships and coordinated, operational output.

An association-in-fact Enterprise requires: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938 (2009). The TAC satisfies this standard by charting a structured, functional division of labor:

- **The Directing Hub (Count II RICO Architecture):** Pillsbury and Osama function as the central funding and directing hub. This hub ordered the initial 2019 wire-transmitted retaliatory strike to suppress an active investigative inquiry into Osama's credential deficit, protecting their primary legal pipeline from their international transactional accounts.

- **The Publishing Cogs (Count III Intimidation and Interference):** The Daily Beast Defendants, The Daily Caller Defendants, The Daily Mail Defendants, and The Independent Defendants operated as the publishing cogs of the association-in-fact Enterprise. They executed a multi-year continuum of media assaults—commencing with the August 2019 *Daily Caller* article (TAC ¶ 56, Ex. Q), expanding into the manufactured viral tweet on X and the synchronized May 2023 Media Strikes deployed within a 72-hour window, culminating in the recent *Volokh Conspiracy* publication assaults. These synchronized and targeted media strikes against Plaintiff systematically blunted Plaintiff's transactional client pipelines, achieving the cancellation protocol over a seven-year period.

- **The Enforcement Spokes (Count IV Post-Order Witness Tampering):** Defendant Counsel—specifically Cameron Stracher, Esq., Davis Wright Tremaine, LLP, and Ballard Spahr LLP—simultaneously executed a dual role within the Enterprise hierarchy. They coordinated the placement in the digital newspapers/blogs, legally vetted weaponized digital deliverables to manufacture a ruse of journalistic privilege and subsequently deployed on-record litigation maneuvers, including concurrent $0.00 global release demands, to compel involuntary surrender of Plaintiff's active federal property claims.

Plaintiff's allegations of an intentional, coordinated association-in-fact transition from conceivable to definitively plausible under *Twombly* and *Iqbal* based on four objective, on-record operation triggers: (1) temporal synchronicity across an international media window; (2) linguistic uniformity in cookie-cutter merits memoranda; (3) unusual resource pooling by outside counsel and especially Ballard Spahr LLP's ghostwriting complex merits defenses for unrepresented non-clients in the *Daily Mail* memorandum; and (4) live, post-Order enforcement, via legal blogs and extortionate release demands.

*B. Defendants' Coordinated Cross-Client Advocacy Explicitly Documents a Boyle Enterprise*

Sullivan's highly irregular cross-client advocacy represents the literal mechanics of an association-in-fact Enterprise division of labor under *Boyle.* Ostensibly independent outside counsel does not expand their white shoe resources to fashion comprehensive merits defenses for unrepresented nodes and unserved non-clients unless they are operating under a centralized, pre-negotiated script.

13

When Sullivan uses the *Daily Mail* memorandum to insulate the Pillsbury hub and shelter *The Daily Caller* cogs—Rosiak and Hawley—while those same cogs simultaneously filed a letter via counsel claiming they sit completely outside the Court's jurisdiction (Dkt. No. 128)—the Enterprise carelessly exposes its own interlocking coordination right on the docket. By deploying a non-disclosed pooling of legal resources to shelter separate, unrepresented nodes from the transparent glare of federal discovery, the *Daily Mail* memorandum acts as a real-time, functional asset of the overarching racketeering machinery. Under *Twombly* and *Iqbal*, a pleading satisfies the federal threshold when its factual allegations nudge the claims across the line from conceivable to plausible. Because this factual diagram documents a specific chronological timeline, shared jargon, and cross-client litigation execution, Plaintiff has cleanly raised a plausible expectation that discovery will reveal the full scope of the Enterprise's hidden coordination.

*C. The TAC Satisfies the RICO Distinctiveness Doctrine*

The statutory distinctiveness requirement of 18 U.S.C. § 1962(c) is fully satisfied when a plaintiff alleges a legal distinction between the culpable "person" (the individual liable defendant) and the "enterprise" itself (the collective organizational vehicle). *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001). A corporate employee or law partner acting within the scope of their employment remains legally distinct from the overarching organizational matrix they populated. Culpable "persons" like, including but not limited to, Osama, Cameron Stracher, Esq., and Thomas Sullivan, Esq., are distinct human and legal nodes who used the structural assets of separate global entities to advance an extra-corporate scheme.

14

The Enterprise is the overarching, multi-continent structure; the individual Defendants are the distinct, liable actors operating its levers. Because the legal person and the collective organizational architecture are entirely distinct under *Cedric Kushner*, Defendants' corporate-unity defenses fail as a matter of black-letter law.

### D. Uniform Pleading Standards Forbids a Two-Tiered Application of Civil Procedure

Defendants' calculated procedural backtracking demands an imbalanced and preferential application of Federal Rules of Civil Procedure. Defendants demand that *pro se* be held to a standard of hyper-technical perfection that they themselves failed to maintain, seeking an equitable pass for their own strategic omissions. Public policy and the core mandate of judicial neutrality reject this dual-standard architecture. Sophisticated corporate entities cannot deploy an amended complaint as a valid, anchored reality on the ECT to extract a substantial text-freezing benefit, and then simultaneously ask this Court to retroactively declare the same pleading a nullity.

When this Court entered "So Ordered" on Docket 91, it confirmed Defendants' own joint electronic stipulation (Dkt. 90) wherein they explicitly consented to the presence of the TAC on the active record and reserved only their right to argue the merits (not the procedure) under Rule 12(b)(6). If Defendants genuinely believed the TAC exceeded the procedural scope of this Court's leave, their exclusive statutory remedy was to file a timely motion to strike pursuant to Federal Rule of Civil Procedure 12(f). Since Defendants bypassed Rule 12(f), their procedural scope objections are extinguished as a matter of law. Judicial equity demands this Court honor its own

15

mandates, enforce the binding consequences of electronic signatures, and order this matter to advance to immediate, mandatory discovery on the merits.

## POINT IV: THE LIVE RECORD SATISFIES THE PARTICULARIZED ELEMENTS OF THE CHARGED RICO PREDICATE ACTS

*A. Wire Fraud under 18 U.S.C. § 1343: The Licensure Concealment Scheme*

Defendants' uniform assertions that the TAC relies on unparticularized labels are flatly refuted by the record. The essential elements of wire fraud under 18 U.S.C. § 1343 are: (1) a scheme or artifice to defraud, (2) the use of interstate or international wire communications to further the fraudulent scheme, and (3) specific intent to deceive or defraud. Where fraud serves as a RICO predicate, Federal Rule of Civil Procedure 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud—specifically the who, what, when, where, and why of the deceptive statements. The factual grid set forth across the docket satisfies this high threshold with absolute specificity:

- **The Scheme and Intent (What & Why):** Pillsbury and Osama executed a continuous scheme to defraud multinational corporate entities and sovereign clearinghouses by falsely representing Osama as a legitimate Jordanian lawyer with an active, valid 2002 Jordanian law license. The explicit purpose of this artifice was to secure multi-million-dollar international legal mandates, secure partnership equity, and extract partner-level salaries under false pretenses.

- **The Particularized Communications (Who, When, Where, & How):** The Enterprise directly furthered this fraudulent scheme via interstate wires through specific emails. Operating out of Pillsbury's Doha, Qatar outpost, Osama used the

global firm's integrated digital network to route his fraudulent licensure data through its New York partnership infrastructure at 31 West 52nd Street. Per Exhibit P, these emails from Pillsbury's public relations management cogs directly to *The Daily Caller's* reporting nodes in Washington, D.C. These emails transmitted fraudulent licensure data, falsely asserting Osama is admitted to the Jordanian Bar Association in 2002 under Bar No. 11840. This transmission was explicitly designed to divert a pending investigative media inquiry away from Osama's credential deficit.

- **The Execution:** Rather than correcting the record about Osama's licensure deficit, the Enterprise used interstate wires to execute a "bait-and-switch" protocol. Cogs within the Enterprise (i.e., Defendant journalists, media companies, and lawyers) deployed a pre-negotiated, derisory "bait-and-switch" smear article on August 3, 2019, across public digital networks to target Plaintiff to neutralize her simultaneous regulatory warnings to the Solicitor Registration Authority ("SRA") and protect the billing infrastructure of the Qatari hub.

This matrix satisfies Rule 9(b) by identifying the exact speakers, the timeline, the transmission methods, and the corrupt economic objective of the fraud.

*B. Witness Intimidation and Retaliation under 18 U.S.C. § 1512 Constitutes a Plain RICO Predicate Act*

The factual matrix satisfies the statutory elements of witness intimidation under 18 U.S.C. § 1512(b) as an underlying racketeering predicate. Section 18 U.S.C. § 1512(b) requires a showing that a defendant: (1) knowingly using intimidation, physical force, threats, or corrupt persuasion, or attempting to do so, (2) toward another person, (3)

with the specific intent to influence, delay, or prevent the testimony of any person in an official proceeding, or cause a person to withhold a document or abandon a claim in an official proceeding. prohibits knowingly using intimidation, threats, or corrupt persuasion with the specific intent to cause a person to withhold documents or abandon an active claim in an official proceeding. Defendants' uniform assertions that routine media coverage and standard settlement negotiations can never constitute witness tampering misinterprets the record; the Enterprise's extrajudicial execution far exceeded the boundaries of legitimate advocacy:

- **The Intent to Compel Abandonment of Claims (Elements 2 & 3):** The Enterprise actively and knowingly deployed an aggressive, synchronized extrajudicial campaign consisting of targeted media strikes specifically intended to cause Plaintiff to abandon her active federal property claims. This multi-year course of conduct commenced with the August 3, 2019, retaliatory publication to obstruct a whistleblower's disclosures. It expanded into the synchronized May 2023 Media Strikes and culminated in the post-Order publication assaults on March 2, 2026, and April 11, 2026, within the *Volokh Conspiracy* legal blog, which explicitly targeted Plaintiff's professional brand, *The Commercially Savvy Lawyer*.

- **The Mechanics of Intimidation and Social Engineering (Element 1):** Cogs within the Enterprise systematically used and use public digital networks while this federal litigation was actively pending, to execute a coordinated market

18

erasure protocol, deliberately targeting Plaintiff's credibility and professional standing on the public record to maximize coercive pressure.

- **The Coercive Operational Nexus (The Completed Infringement):** This synchronized public campaign was explicitly integrated with the direct and economic intimidation executed by the strategic defense proxies. Specifically, on March 3, 2026, on the heels of the orchestrated *Volokh Conspiracy* strikes, Defendant Counsel Stracher extended a high-pressure telephonic offer to Plaintiff to execute a verbal, extortionate demand for a $0.00 global legal release.

This dual track deployment of coordinated media assaults and economic duress demonstrates a thinly veiled, calculated plan to destroy the value of Plaintiff's law license and force a total surrender of her active federal claims, fully satisfying the elements of § 1512(b). As Professor Blakey observed, systemic enterprise excesses are fundamentally enabled by "the readiness of some of our most brilliant lawyers to prostitute themselves for large fees."[11]

*C. Extortion under 18 U.S.C. § 1951 (The Hobbs Act): The Preempted Anti-SLAPP Fee Ambushes as Coercive Release Demands*
The factual record satisfies every element of extortion under the Hobbs Act, 18 U.S.C. § 1951, to state a valid civil RICO predicate act. The essential elements of Hobbs Act extortion are: (1) the obtaining or attempting to obtain property from another, (2) with that party's consent, (3) induced by the wrongful use of actual or threatened force, violence, or fear—including the fear of economic or professional ruin. Defendants' assertion that a coercive release demand represents a routine litigation

---

[11] Blakey, p. 723.

19

tactic immune from liability distorts the record; their conduct transcended legitimate advocacy and satisfies each prong directly:

- **The Attempted Misappropriation of Property:** Plaintiff's active, valuable federal property claims constitute distinct intangible property assets under federal law. Defendants sought to obtain the surrender and permanent release of these property interests for zero consideration through tactical compulsion.

- **The Inducement via Wrongful Economic Fear and Statutory Preemption:** The Enterprise established the requisite coercion by deliberately weaponizing a legally unavailable, preempted state anti-SLAPP fee mechanism. Under controlling jurisprudence, uniform federal procedural standards entirely displace state-authorize anti-SLAPP financial penalties within a federal forum; *La Liberte v. Reid,* 966 F.3d 79 (2nd Cir. 2020); 146 S.Ct. 546 (2026). "Rule 8 sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claims" Berk, at 554, at the outset of litigation and forbids federal courts from using their inherent authority to enforce extraneous, state-law evidentiary blocks. Because these state statutory fee-shifting mechanisms are structurally void and completely unenforceable in this tribunal, Defendants' systemic deployment across interstate wires to engineer a multi-firm financial ambush transcends legitimate advocacy. Defendants knowingly deploy unauthorized, multi-firm threats of fee-shifting ruin within the local litigation arena, in temporal synchronicity with cross-platform media hits, to induce sever economic fear,

20

leveraging a void statutory penalty as an affirmative tool of extortion to compel Plaintiff to surrender her federal claims.

- **The Federal Commerce Hook:** While the physical deployment of the anti-SLAPP threat occurred within New York, the direct consequence of this extortionate shakedown was designed to achieve absolute financial paralysis, cementing the economic blockades that systematically destroyed Plaintiff's international law aviation, satellites, and cross border transactions practice before it launched. Because this coercive shakedown was executed to force the total abandonment of federal property claims that directly protect, support, and affect the movement of legal services in foreign and interstate commerce, the *de minimis* jurisdictional hook of § 1951(a) is fully satisfied.

- **The Absence of Litigation Privilege (The Unlawful Means):** Waging a calculated legal ruse through a void fee-shifting threat defeats any absolute privilege. Under the clear mandates of *Berk*, defendants cannot use an extra-procedural state-law phantom to bypass the exclusive discovery mechanisms set by Federal Rules. Defendants did not seek to test their defenses through good-faith litigation; they sought to leverage a preempted statutory fiction to force an involuntary release of Plaintiff's assets.

Since the TAC and Extended Chronology sets out a detailed chronological timeline of this extortionate compulsion, Plaintiff has nudged these allegations safely past the threshold of manufactured skepticism. The Hobbs Act predicate is cleanly alleged, and these claims must advance to immediate, mandatory discovery on the merits.

21

**POINT V: THE CONSPIRACY'S CORRUPT ANCHOR: PILLSBURY'S SEVEN-YEAR CONCEALMENT PROTOCOL TO INSULATE ITS SOVEREIGN QATARI REVENUE AND AN UNLICENSED FOREIGN NATIONAL**

Defendants' uniform memoranda to dismiss rely entirely on a manufactured narrative of disbelief, implausibly painting the coordinated multi-continent media hits as an uncoordinated series of standard public interest reports. This performative posturing deliberately ignores the foundational timeline that anchors the Enterprise's common purpose: the insulation of Osama and the protection of Pillsbury's sovereign client, the State of Qatar. The relentless, synchronized operation to liquidate Plaintiff's commercial credibility and viability was not an organic response to a viral tweet—which Plaintiff alleges the Enterprise engineered—but a coordinated defensive operation executed to protect the Enterprise's most lucrative financial asset: Pillsbury's trillion-dollar sovereign client (the State of Qatar) and Osama, the intermediary between Pillsbury and Qatar.

Plaintiff cooperated with *The Daily Caller* Defendants in 2019 to expose Osama's Jordanian credentials fraud. Osama purports to have earned a Jordanian law license in 2002 immediately upon graduating from the University of Kent at Canterbury, bypassing the mandatory apprenticeship in Jordan after graduating from the University of Kent at Canterbury in 2002, which is impossible. Despite his licensure deficit, Osama transitioned from an associate in Dubai in 2002 to Chief Legal Officer at Al Jazeera Media Network in 2009 and currently serves as Managing Partner of the Pillsbury Doha. The Enterprise if fully complicit in this systemic fraud. The birth of what would become a seven-year cancellation protocol, including the pattern of

22

racketeering activity, open-ended continuity and corrupt intent, crystallized mere days after Luke Rosiak emailed Matt Hyams, Pillsbury's PR director in New York City, to verify Osama's credentials on July 26, 2019. On August 3, 2019, The Daily Caller executed an abrupt "bait-and-switch" profile targeting Plaintiff with no mention of Osama's licensure deficit; upon information and belief, Pillsbury paid the media nodes to suppress the exposé and substitute a derisory smear article to neutralize Plaintiff's simultaneous regulatory warnings to the Solicitor Registration Authority in England ("SRA").

In March 2020, Plaintiff emailed the senior Pillsbury Partners in America and London regarding Osama's Jordanian law license deficit, but they chose deliberate concealment and silence. This initial 2019 TDC "bait-and-switch" anchored a continuous timeline of coordinated attacks that expanded into the May 2023 Media Strikes sparked by the "Twitterstorm" (briefed and facilitated by Defendants) and the "Karen Gate" articles (also briefed, facilitated and vetted by Defendants) and remains actively ongoing through the Spring 2026 publication assaults in *The Volokh Conspiracy*. This multi-node retaliation transforms Defendant's *Twombly* and *Iqbal* implausibility arguments into a legal absurdity. The lockstep coordination and copy-paste "Karen" scripts in the May 18-19, 2023, articles in *The Daily Beast*[12], *The Daily*

---

[12] Amanda J. McDougall, *NYC Lawyer Roasted for Calling 911 on a Food Vendor*, The Daily Beast (May 19, 2023), https://www.thedailybeast.com/nyc-lawyer-sonya-shaykhoun-roasted-for-calling-911-on-a-food-vendor/.

23

*Mail*[13] and *The Independent*[14] ("May 2023 Media Strikes") within a 24-hour window defy logic unless they are enforcing a pre-negotiated corporate script to shelter a high-value billing partner and the firm that shields him.

Defendants' objections represent a bad faith attempt to impose an inapplicable pleading standard demanding that Plaintiff silo the back-office conduct of separate nodes as if prosecuting isolated common-law torts. As Professor G. Robert Blakey explained, Congress explicitly engineered RICO to supplement, not supplant, available remedies because it found that existing legal tools and remedies were "unnecessarily limited in scope and impact."[15] The statutory framework facilitates "the prosecution of a criminal group involved in superficially unrelated criminal ventures and enterprises connected only at the usually well-insulated upper levels of the organization's bureaucracy."[16]

Defendants' performative disdain for private enforcement directly challenges controlling Supreme Court Mandate. In *Sedima*, the Supreme Court affirmed that civil RICO applies directly to white-collar institutional fraud perpetrated by ostensibly legitimate businesses and law firms, without any requirement of prior criminal convictions. The *Sedima* Court explicitly ruled that any overbreadth in

---

[13] Noa Halff, *Outrage Erupts After NYC Lawyer Unleashes Fury on Vendors Selling Food Without a Permit in Local Park*, Daily Mail (May 19, 2023), https://www.dailymail.co.uk/news/article-12103463/Outrage-erupts-NYC-lawyer-unleashes-fury-vendors-selling-food-without-permit-local-park.html.

[14] Bevan Hurley, *NYC Lawyer Roasted on Twitter for Reporting Illegal Food Stand Rails Against City's "Rapid Deterioration"*, The Independent (May 19, 2023), https://www.independent.co.uk/news/world/americas/food-stall-lawyer-sonya-shaykhoun-new-york-b2342213.html.

[15] Blakey & Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts — Criminal and Civil Remedies*, 53 Temp. L.Q. 1009, 1025 (1980).

[16] Blake*y*, p. 711.

24

commercial arenas is an inherent structural feature intended by Congress, which mandated that the law be "liberally construed to effectuate its remedial purposes," Id. at 498. Because this integrated factual matrix charts the explicit structural features, organizational longevity, and shared economic purpose required under *Boyle*, analyzing individual components in artificial isolation lacks legal fluency. This Court should refuse to participate in Defendants' shell games, reject their merits objections, and advance this action directly to the absolute transparency of federal discovery.

**POINT VI: THE TAC PLEADS A CONCRETE, QUANTIFIABLE ECONOMIC INJURY TO HER LAW PRACTICE SUFFICIENT TO SURVIVE THE *HADDLE V. GARRISON* STANDING THRESHOLD**

*A. A Systemic Liquidation of a Law Practice Constitutes Property Injury Under Haddle*

Defendants' memoranda misleadingly attempt to recast Plaintiff's concrete financial and property losses as non-cognizable reputational harm. This characterization is flatly foreclosed by the law. Under *Haddle v. Garrison,* 525 U.S. 121 (1998), a conspiratorial interference with a professional livelihood and employment marketability constitutes a direct, cognizable injury to property under federal mandates, fully satisfying the standing thresholds of 18 U.S.C. § 1964(c).

The facts neatly satisfy *Haddle*'s standing threshold:

- **The Targeted Commercial Asset:** In commercial jurisprudence, an attorney's professional identity, market reputation, and branded intellectual property constitute goodwill—a distinct, legally recognized category of intangible property that possesses quantifiable commercial value on a balance

25

sheet. "Good will, when it exists as incidental to the business of a partnership, is presumptively an asset to be accounted for like any other by those who liquidate the business. *Dawson v. White & Case*, 88 N.Y.2d 666 (N.Y. 1996), 671*; Spayd v. Turner, Granzow & Hollenkamp*, 19 Ohio St.3d 55 (Ohio 1985). Goodwill is the very engine of an independent transactional practice; it is the structural pipeline through which Plaintiff's cross-border aviation, space, and international commercial mandates would normally be secured.

- **The Extrajudicial Economic Blockade:** The Enterprise did not merely launch *ad hominem* attacks against Plaintiff; it executed a calculated, multi-node economic blockade across public digital networks to permanently liquidate Plaintiff's commercial goodwill. By intentionally injecting toxic "do not hire" imperatives into professional hubs like LinkedIn and weaponizing *The Volokh Conspiracy* to target her *Commercially Savvy Lawyer* brand in his March 2, 2026, blogpost, the Enterprise demonstrated a destructive business pattern of using media infrastructure to neutralize whistleblowers or litigation counterparts. While Defendants rely on *Black v. Ganieva*, 619 F.Supp.3d 309 (S.D. N.Y. 2022) to downplay this market erasure as unprotected litigation publicity, their moving papers conspicuously omit *Haddle*—a binding Supreme Court mandate confirming that conspiratorial, extrajudicial hollowing of a professional livelihood satisfies the federal property injury threshold as a matter of law.

- **The Documented Commercial Injury:** The Enterprise's targeted market erasure forced a catastrophic, documented drop in Plaintiff's earning capacity,

26

driving her anticipated transactional net baseline from $240,000 to under $50,000 and having to rely on unemployment at regular intervals. Relegating an 18-year veteran of the New York Bar holding two advanced LL.M. degrees to sporadic, low-wage contract document review projects evidence the ongoing commercial asset destruction. The severity of this seven-year economic blockade has entirely frozen Plaintiff's professional pipeline precluding even basic, non-legal supplemental employment to bridge the financial gaps intentionally engineered by the Enterprise.

Defense counsel scoffs on the docket that Plaintiff has sustained no cognizable property or status injury because she retains her New York State Bar card. Were Marie Antoinette a corporate litigator, she would have authored briefs like those of Defendants. Defendants smugly suggest that an independent attorney (who has always been employed)—whose commercial market and practice pipelines they systematically hollowed out should simply find comfort in a piece of plastic, mirroring the detached arrogance of that infamous directive, "Let them eat cake!" A bar license is a mandate to compete in commerce, not a wall decoration. Leaving the basic credential intact while deliberately orchestrating a seven-year-long synchronized, international media campaign across interstate wires to strip that license of its commercial value constitutes a total, text-based destruction of a commercial asset under *Haddle* and satisfies 18 U.S.C. § 1964(c) and the constitutional thresholds of federal civil rights law under 42 U.S.C. § 1983. The resulting financial destruction flows in a direct, unsevered causal line from the Enterprise's coordinated market

27

blockades rather than simple personal defamation, Plaintiff has cleanly alleged a concrete business injury sufficient to advance directly to federal discovery.

*B. Plaintiff Establishes Direct, Foreseeable Proximate Causation Under the Anza and Bridge Frameworks*

Defendants' frantic demands that Plaintiff identify specific, named transactional clients in her pleading represent a deliberate attempt to distort the civil RICO proximate cause threshold. Under *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451 (2006) and *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 654 (2008), a civil racketeering plaintiff satisfies the statutory standing requirement under § 1964(c) by demonstrating that the defendants' predicate acts were the direct, proximate, and foreseeable cause of her economic injury. The economic injuries outlined in the TAC are direct, non-derivative, and mathematically certain. The coordinated, multi-continent deployment of false dossiers, the fraudulent "bait-and-switch" TDC article, and the deliberate execution of the "Karen" script media assaults did not harm an abstract third-party intermediary. Rather, they targeted Plaintiff's active commercial transactional law practice matrices and job prospects with surgical, operational intent.

Under the definitive rule of *Bridge*, a plaintiff does not need to plead first-party reliance or itemize specific third-party client decisions to establish proximate cause at the pleading stage. The Supreme Court explicitly affirmed that a plaintiff can be directly injured by a pattern of fraud even if the misrepresentations were made to, or relied upon by, third parties. No independent, intervening market factors or unassociated third-party actors are responsible for this financial drop. Because the

28

resulting financial destruction flows in a direct, unsevered causal line from their predicate acts of wire fraud and witness intimidation, the proximate cause standard under *Anza* and *Bridge* is fully satisfied.

*C. The Factual Record Satisfies the Co-Conspirator Liability and Open-Ended Continuity*

As established *supra*, the continuous, synchronized maneuvers executed by Defendants across the docket provide objective, text-based evidence of an illicit agreement under 18 U.S.C. § 1962(d). Under *Salinas v. United States*, 522 U.S. 52, 64 (1997), and as recognized within this District in *In re Bennett Funding Group, Inc.,* 336 F.3d 94 (2nd Cir. 2003), a civil RICO conspiracy count does not require proof that each specific defendant personally agreed to commit two or more predicate acts, nor does it require them to direct the core operations of the Enterprise. Rather, a defendant violates § 1962(d) the moment they knowingly agree to facilitate an overarching organizational matrix, intending that some member of the conspiracy commit the predicate acts to advance the shared common purpose. When Defendant Counsel deploy their memoranda to craft complex threshold merits defenses for unrepresented non-clients—while those same nodes simultaneously use letter submissions to claim they completely outside this Court's jurisdiction (Dkt. No. 128)—they execute a pre-negotiated division of labor to shield individual cogs from federal discovery. This specialized pooling of corporate legal resources to insulate the central hub and protect sovereign revenue streams conclusively establishes co-conspirator liability under *Salinas*.

29

Furthermore, this institutional alignment satisfies the open-ended continuity standard under *H.J. Inc v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989). To satisfy the pattern element of § 1962(c), a plaintiff must demonstrate "open-ended continuity," which requires showing that the predicate acts carry a distinct threat of remaining ongoing, or that they constitute the regular way of conducting the enterprise's regular business. The Enterprise's regular method of conducting business is the systematic mobilization of localized media cogs and legal spokes to permanently liquidate the commercial practice matrices of any whistleblower who threatens to expose Osama's multi-million-dollar credential fraud and Pillsbury's cover-up of that fraud. This racketeering protocol began with Pillsbury's 2019 suppressed inquiries and the paid retaliatory "bait-and-switch" in *The Daily Caller* (TAC ¶ 56, Ex. Q), expanded into the engineered May 2023 "Twitterstorm" and synchronized international "May 2023 Media Strikes, and remains actively ongoing through the Spring 2026 *The Volokh Conspiracy* publication assaults. Because the conspiracy's core economic objective is an open-ended institutional mandate, the threat of ongoing professional retaliation and witness tampering is live, severe, and permanent. This action must advance to federal discovery to rectify these harms.

**POINT VII: THE DAILY CALLER'S LOCKSTEP ADOPTION OF CO-DEFENDANTS' MERITS PARSES AN OPERATIONAL DIVISION OF LABOR**

The collusive architecture of the association-in-fact Enterprise is completely exposed on the docket by the performative conduct of *The Daily Caller* Defendants. On May 15, 2026, counsel filed a four-page letter at Docket 128 asserting they would take no

further action because they had allegedly not been formally served under Federal Rules of Procedure 4. Yet, in a display of lockstep coordination, that very same transmission explicitly declared that *The Daily Caller* Defendants "join those three motions [to dismiss], which are incorporated herein by reference."

This procedural maneuver creates an inescapable logical and legal trap. Under controlling federal jurisprudence, a litigant cannot claim to sit completely outside the court's geographical jurisdiction while simultaneously absorbing, deploying, and seeking to benefit from nearly 70 pages of hyper-dense substantive merits submitted by co-Defendants. By attempting to secure a dismissal with prejudice under Rule 12(b)(6), *The Daily Caller* Defendants have made an affirmative general appearance, submitted to the authority of this Court, and waived any embryonic service objections as a matter of law.

Independent media cogs do not blindly adopt the specialized vocabulary and structural arguments of an adversarial corporate legal team unless they are working from a centralized, pre-negotiated script under a shared common purpose to advance a corporate shakedown. This back-office collusion is corroborated by Ballard Spahr LLP's non-transparent footprint across the docket. Counsel has actively expanded its institutional billing assets to brief threshold defenses, manage text freezes, and execute sweeping litigation maneuvers on behalf of unrepresented non-clients, seamlessly straddling the operational lines between *The Daily Caller* nodes and the Pillsbury hub. Under *Boyle*, an illicit association-in-fact requires no formal corporate charter, written bylaws, or explicit hierarchy; its existence is legally proven through

31

an ongoing relationship and a specialized division of labor. By pooling elite legal resources to insulate unrepresented nodes, and by copy-pasting identical jargon across supposedly independent briefs, Defendants have documented the very conspiracy Plaintiff alleges. This Court should: (1) deem *The Daily Caller* Defendants served; (2) reject their non-transparent and bad-faith machinations; (3) treat their filings as contemporaneous text-based evidence of coordination; and (4) force the entire Enterprise to face immediate transparency in federal discovery.

## POINT VIII: THE TAC ALLEGES TIMELY INJURIES WITHIN THE FOUR-YEAR CIVIL RICO STATUTE OF LIMITATIONS WINDOW

Defendants move to dismiss the civil racketeering claims, arguing that because individual publishing milestones occurred outside the statutory period, the four-year limitations window expired prior to the December 2024 filing of this action. This argument misapplies the governing accrual mechanics of civil RICO. Under controlling supreme court authority, civil RICO claims carry a four-year limitations period. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987). Within the Second Circuit, civil RICO timelines is governed strictly by the "Separate Accrual Rule." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2nd Cir. 1988).

Congress tied this right to sue for damages under Section 1964(c) not to the time of the defendant's RICO violation, but to when a plaintiff suffers injury to her business or property from that violation. *Bankers Trust.* As the Second Circuit explicitly affirmed in *Bankers Trust,* when a new and independent injury is incurred from the same violation, the plaintiff's right to sue for damages accrues at the time she discovered or should have discovered that new injury, regardless of when the initial

RICO violation causing the chain of events occurred. *Cullen v. Margiotta*, 811 F.2d 698, 725 (2d Cir.), *State Farm Mutual Automobile Insurance Co. v. Ammann,* 828 F.2d 4, 5 (9th Cir.1987) ("as to each injury civil RICO limitations period 'begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action' ") (citation omitted).

The chronological matrix demonstrates that Plaintiff's operative financial injuries fall squarely within this separate accrual window:

- **Foundational Pattern Predicate (August 2019):** The Enterprise initiated its operational framework in August 2019 by deploying the fraudulent "bait-and-switch via *The Daily Caller* article (TAC ¶56, ¶76, Ex. Q) to discredit Plaintiff, acting as a preemptive strive before she formalized disclosures regarding the credential fraud and corporate cover-up. While the Separate Accrual Rule bars the recovery of stale damages originating in 2019, this initial offensive serves as the foundational predicate act anchoring a continuous, multi-year "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

- **The Separately Accruing Financial Injury (May 2023):** The operational liquidation of Plaintiff's commercial transactional law practice and job prospects constitutes a completely new, non-derivative economic injury precipitated by the May 2023 Media Strikes. This synchronized, multi-continent deployment of the weaponized "Karen Articles" systematically blockaded her international transactional client pipelines, rendered her unemployable, and forced her earning capacity down from its established baseline to under $50,000 per annum. Because

Plaintiff discovered this distinct commercial injury within the four years preceding the December 2024 filing, the claim is timely under *Bankers Trust*.

- **The Post-Filing Continuity Acts (March & April 2026):** The open-ended continuity of the Enterprise was further extended by the March 2, 2026, and April 11, 2026, *The Volokh Conspiracy* publication assaults which were disingenuously presented as "legal reporting." These recent strikes represent ongoing predicate acts designed to further degrade Plaintiff's professional property and extort a legal surrender of her federal claims.

Because a civil RICO plaintiff is entitled to maintain a claim for any distinct, independent injury discovered within four years of filing, the May 2023 Media Strikes satisfies the statutory window on its face, and the August 2019 predicate unassailably establishes the continuity of the pattern. Defendants' time-bar objections must be rejected as a matter of law.

## POINT IX: THIS COURT RETAINS JURISDICTION OVER THE TRANSNATIONAL ACTION UNDER 28 U.S.C. § 1367(a)

*A. The Sufficiency of the Common Nucleus of Operative Fact and the Sufficiency of New York Outposts*

Defendants move to dismiss the remaining state-law claims, arguing that should this Court dismiss the federal counts, it must decline supplemental jurisdiction under 28 U.S.C. § 1367(c). Under the controlling statutory mandate of 28 U.S.C. § 1367(a), federal district courts possess broad, supplemental jurisdiction over all claims that "form part of the same case or controversy under Article III of the United States Constitution." This standard is fully satisfied when the "state and federal

34

claims…derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

The record establishes that the transnational nucleus remains entirely constant across every count of the TAC. The core frauds, the back-office pre-vetting of weaponized digital deliverables by defense counsel, the synchronized "rinse-and-repeat" media assaults, and the subsequent extrajudicial litigation moves to force an involuntary surrender are all tightly bound within a single, continuous timeline. Under *Carnegie-Mellon University v. Cohill,* 484 U.S. 343 (1988) and the exercise of supplemental jurisdiction is governed by "judicial economy, convenience, fairness, and systemic comity"—all of which heavily favor a centralized federal forum.

The *Daily Mail* Defendants' insupportable, hyper-technical assertion that they are "not legal entities amenable to suit" and must be replaced by ("ANL") Newspapers Limited is an empty distinction without a difference under federal notice pleading. These exact Defendants actively litigated this and the previous state case, entering appearances, and filing substantive motions without once contesting their corporate capacity. Having benefited from this Court's jurisdiction under their global brand name for 24 months, Defendants are judicially and equitably estopped from deploying a retroactive identity shell game to manufacture a procedural impasse.

Furthermore, Defendants' geographical distractions are completely neutralized because the institutional anchors of the Enterprise. Defendant Debra Erni directly sponsored and integrated the unlicensed operative, Osama, within the firm's transnational TMT practice group leadership to shield their shared commercial

35

accounts. Erni moved to Holland & Knight in January 2024 and scrubbed her LinkedIn profile of all reference to Pillsbury.

Because AJMN operates prominent broadcasting and production assets in the heart of Manhattan, and Holland & Knight commands a massive, institutional legal footprint throughout the state, the Enterprise possesses a permanent, active presence inside New York. These continuous domestic hubs bind their transnational revenue operations to this specific forum, completely satisfying the multi-factor metrics of convenience, economy, and systemic fairness. Consequently, this Court should reject Defendants' geographical objections, grant the motion for alternate service via email for Al Jazeera Media Network, Debra Erni, and Osama, retain jurisdiction over the entirety of the TAC, and advance this action directly to discovery.

*B. Plaintiff Requests Judicial Notice of Parallel Transnational Enforcement Against the Enterprise's Corporate Parent*

To establish the plausibility of the alleged Enterprise coordination under *Twombly* and *Iqbal*, Plaintiff requests that this Court take judicial notice under Federal Rule of Evidence 201 of an indisputable matter of international public record: the massive, high-profile civil trial recently litigated in the High Court of Justice in London against the *Daily Mail's* explicit corporate parent, ANL. *See Baroness Lawrence of Clarendon & Ors v. Associated Newspapers Limited*, [2026] EWHC 493 (KB) (High Court of Justice, King's Bench Division, London, UK). This eleven-week trial concluded its evidentiary phase in April 2026, centering on systematic, institutional allegations of unlawful information gathering, illicit data interception, and coordinated corporate surveillance operations managed by senior editorial executives.

36

Under FRE 201(b)(2), a federal court may take judicial notice of facts capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned, including official foreign judicial dockets and public court proceedings. Plaintiff does not request that this Court adjudicate the underlying merits of the High Court litigation, but the undisputed public fact of its existence is highly relevant to the threshold pleading standard under Rule 12(b)(6). First, it establishes that ANL acts as the definitive operational and legal anchor for the global *Daily Mail* brand, confirming that the named corporate entities operate under a unified global banner. Second, it demonstrates that a multi-node, illicit division of labor among these specific corporate actors is entirely plausible, directly refuting Defendants' assertions of institutional implausibility. This Court should grant judicial notice of these parallel public proceedings, reject Defendants' geographical distractions, and advance this action directly to federal discovery.

**POINT X: THE TAC PLEADS A COGNIZABLE SECTION 1983 LIBERTY AND DEPRIVATION UNDER THE "STIGMA-PLUS" DOCTRINE**

Defendants' uniform memoranda misstate federal civil rights jurisprudence by asserting that Plaintiff fails to sustain a claim under 42 U.S.C. § 1983. Defendants rest their entire threshold defense on a single, flawed premise: because Plaintiff retains her physical New York law license, she sustains no deprivation of a constitutionally protected liberty or property interest. This argument ignores the operational realities of professional foreclosure and commercial market erasure. A plaintiff properly invokes federal civil rights protections under the Second Circuit's "stigma-plus" doctrine by demonstrating: (1) the utterance of a statement sufficiently

37

derogatory to injure her reputation, that is capable of being proved false, and that he or she claims is false (the "stigma"), and (2) a material, state-imposed burden or alteration of a tangible right or status previously recognized and granted under state law (the "plus").

The Second Circuit has long established that "perfect parity in the origin of both the 'stigma' and the 'plus' is not required to state the infringement of a 'stigma-plus' liberty interest." *Velez v. Levy*, 401 F.3d 75 (2nd Cir. 2005). The constitutional threshold is satisfied where the stigma and the plus are sufficiently proximate and appear connected to a reasonable observer. *Id*. The operative pleading satisfies both prongs, as well as the state-action nexus, under the strict notice pleading of *Twombly* and *Iqbal*:

- **The State-Action/via Joint Participation:** The private Defendants acted under color of law by willfully engaging in a joint venture with domestic actors to manipulate state enforcement mechanisms, using the state judiciary to achieve an extrajudicial foreclosure.  See *Lugar v. Edmondson Oil Company, Inc,* 457 U.S. 922 (1982); *Dennis v. Sparks*, 449 U.S. 24 (1980); *Ciambriello v. County of Nassau*, 292 F.3d 307 (2nd Cir. 2002). Defendants systematically subverted the state's adjudication processes, transforming an on-docket proceeding into an affirmative instrument of economic attrition.

- **The Coordinated, Falsifiable Stigma:** Operating through this shared infrastructure of corporate, media, and legal actors to launch a targeted series of public broadcasts specifically engineered to destroy Plaintiff's credentials and

38

legal standing. The weaponized media profiling Plaintiff as a "Karen", "unsavvy", and "conspiratorial" falsely imputed systemic professional misconduct and bad faith to Plaintiff, creating a severe, public stigma capable of objective falsification. See *Velez*, 401 F.3d at 87.

- **The Operational "Plus" and Market Erasure:** The Enterprise established the requisite "plus" by directly targeting the commercial viability of Plaintiff's state-granted New York law license through a calculated abuse of state-authorized enforcement mechanisms. Defense counsel weaponized a state-authorized "blind spot" in the New York anti-SLAPP statute (N.Y. Civil Rights Law §76-a), using it not as a legitimate shield, but as an offensive weapon designed to bankrupt Plaintiff at inception. The on-docket maneuver, coupled with coordinated digital blacklisting, i.e., "do not hire" imperatives, across social media networks, commercially nullified her active professional franchise. By engineering a preemptive economic blockade that gridlocked her practice, the Enterprise stripped her state-granted franchise of all commercial value and foreclosed her professional standing within the market.

Preserving a physical bar card while executing a coordinated market execution to strip that state-granted credential of its entire economic viability satisfies the constitutional thresholds of due process. Anglo-American law has recognized for over three centuries that an individual's reputation and commercial franchise are essential, compensable plinths of property that cannot be extrajudicially stripped by joint participants acting under color of law. *See Savile v. Roberts*, 1 Ld. Raym. 374

(1698); *Wisconsin v. Constantineu*, 400 U.S. 433 (1971). The factual matrix outlines a proximate, calculated connection between the abuse of state-authorized statutory mechanisms and the absolute destruction of Plaintiff's commercial practice; consequently, Plaintiff's Section 1983 claims must advance directly to the mandatory transparency of federal discovery.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests this Court to deny Defendants' Motions to Dismiss in their entirety, deem *The Daily Caller* Defendants served as a matter of law, and order all named Defendants to file an Answer to the TAC within fourteen (14) days. The TAC outlines a coordinated, joint-action infrastructure that deployed a falsifiable public stigma to execute an extrajudicial market erasure, corruptly subverting state-authorized statutory mechanisms into an affirmative instrument of economic attrition. The chronological matrix satisfies the heightened pleading thresholds of Federal Rule of Civil Procedure 9(b), the joint participation satisfies the state-action nexus under Section 1983, and the concrete destruction of Plaintiff's professional franchise satisfies the statutory injury metrics of civil RICO. Defendants' simulated "repackaged defamation" arguments are flatly disclosed by binding Supreme Court precedent. Thus, this action must advance directly to the absolute transparency of federal discovery.

Dated:          June 16, 2026
                New York, New York

                                    Respectfully submitted,
                                    */s/ Sonya Shaykhoun, Esq.*
                                    Sonya Shaykhoun, Esq. - *Plaintiff Pro Se*
                                    Law Offices of Sonya Shaykhoun, Esq.
                                    825 West End Avenue,
                                    New York, NY 10025
                                    Email: sonya@shaykhounlaw.com
                                    Tel: 929-996-5662; 929-408-4531

41

## WORD COUNT CERTIFACTION

I, Sonya Shaykhoun, hereby certify that this Omnibus is 40 pages in length pursuant to this Court's May 20, 2026, Order at Docket 132 and contains 9,622 words, in compliance with Rule 2(B) of this Court's Individual Practices and Local Rule 7.1. In preparing this certification, I relied on the word count of the word-processing system used to prepare this document.

Dated:    June 16, 2026                              */s/ Sonya Shaykhoun*
          New York, NY                               Sonya Shaykhoun

42

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all parties of record in the case.

/s/ Sonya Shaykhoun
Sonya Shaykhoun

43